No. 21-56056

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## *JAMES HUNTSMAN*

*Plaintiff and Appellant,*

*v.*

## *CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS*

*Defendants and Appellees.*

APPEAL FROM U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES
D.C. NO. 2:21-CV-02504-SVW-SK
HON. STEPHEN V. WILSON

## APPELLANT'S OPENING BRIEF

LAVELY & SINGER PROFESSIONAL CORPORATION
DAVID B. JONELIS (BAR NO. 265235)
JAKE A. CAMARA (BAR NO. 305780)
2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
Telephone: (310) 556-3501
Facsimile: (310) 556-3615
djonelis@lavelysinger.com; jcamara@lavelysinger.com
*Attorneys for Plaintiff / Appellant*
*James Huntsman*

# <u>TABLE OF CONTENTS</u>

**Page(s)**

I. INTRODUCTION AND SUMMARY OF ARGUMENT .................. 1

II. JURISDICTIONAL STATEMENT .................................................. 5

III. STATEMENT OF ISSUES PRESENTED FOR REVIEW ............. 6

IV. STATEMENT OF THE CASE ....................................................... 7

    A. Relevant Facts.......................................................................... 7

        1. Mr. Huntsman Gave Millions Of Dollars To The Church In Reliance On Repeated Assurances That His Money Would Only Be Used For Non-Commercial Purposes. .................................................. 8

        2. The Church Repeatedly Represented To Mr. Huntsman That Tithing Funds Would Not Be Used To Develop The City Creek Mall. ....................... 10

        3. Contrary To The Church's Representations And Assurances, And As Witnessed And Attested To By Church Whistleblower David Nielsen, Tithing Funds Were In Fact Used To Develop The City Creek Mall And Bail Out Beneficial Life Insurance...................................................................... 13

        4. As Witnessed And Attested To By Mr. Nielsen, The Church Was Well-Aware That It Was Deceiving Its Members (And The Public At Large) About The Use Of Tithing Funds. ............................... 16

        5. In 2019, After Years Of Donating Money To The Church Under False Pretenses, Mr. Huntsman Finally Learned Of The Church's Fraud Through Mr. Nielsen's Whistleblower Complaint...................... 18

i

| | | | |
|---|---|---|---|
| | B. | Procedural History | 19 |
| | | 1. Mr. Huntsman's Complaint For Fraud | 19 |
| | | 2. The Church's Summary Judgment Motion | 20 |
| | | 3. Mr. Huntsman's Opposition To The Church's Motion | 26 |
| | | 4. The Church's Reply Papers | 28 |
| | | 5. The District Court's Order Granting Summary Judgment | 29 |
| V. | | STANDARD OF REVIEW | 33 |
| VI. | | ARGUMENT | 34 |
| | A. | There Is Undeniably A Triable Issue Of Fact Here As To Whether The Church Mispresented Its Use Of Tithing Funds, And Thus Summary Judgment Was Improper | 34 |
| | B. | In Any Event, The Church's "Truth" Defense Is Unsupported By The Evidence | 37 |
| | C. | In The Absence Of A Proper Disclosure To Mr. Huntsman, The Church's Use Of "Earnings" On Invested Tithing Funds To Develop The City Creek Mall Would Still Be Fraudulent | 43 |
| | D. | The Lack Of A Specific Affirmative Misrepresentation Is Not Fatal To Mr. Huntsman's Claim Concerning Beneficial Life Insurance | 45 |
| VII. | | CONCLUSION | 49 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)......................................................................33, 34

*Balint v. Carson City, Nev.,*
180 F.3d 1047 (9th Cir. 1999).............................................................33

*In re Beckman,*
14 A.2d 581 (1940) .............................................................................44

*Lazar v. Superior Ct.,*
12 Cal. 4th 631 (1996).........................................................................47

*Mull for Mull v. Motion Picture Indus. Health Plan,*
865 F.3d 1207 (9th Cir. 2017).............................................................33

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,*
210 F.3d 1099 (9th Cir. 2000).......................................................38, 39

*Phillips v. Washington Legal Found.,*
524 U.S. 156 (1998).............................................................................44

*Roddenberry v. Roddenberry,*
44 Cal. App. 4th 634 (1996) ...............................................................47

*Small v. Fritz Companies, Inc.,*
30 Cal. 4th 167 (2003).........................................................................47

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.,*
330 F.3d 1110 (9th Cir. 2003).............................................................33

**Statutes**

28 U.S.C. § 1291 ....................................................................................6

28 U.S.C. § 1332(a)................................................................................5

**Other Authorities**

Ninth Circuit Rule 28-2.2.................................................................5

FRAP 4(a)(1)(A) .....................................................................6, 9

FRCP 56(a) ...............................................................................6

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

The core issue presented in this appeal is simple and straightforward, and effectively boils down to one question: <u>Is there a triable issue of fact as to whether Appellee The Church of Jesus Christ of Latter-Day Saints (the "Church")[1] falsely told Appellant James Huntsman that his annual donations to the Church would not be used to fund any commercial endeavors, including the development of a shopping mall?</u>  As set forth herein, the answer is undoubtedly "yes," and thus there was no basis for the District Court to grant summary judgment to the Church.  Nor was the District Court entitled to weigh the parties' competing evidence – which it necessarily did in reaching its ruling.  Rather, Mr. Huntsman is entitled to have his fraud claim be heard and determined by a <u>jury</u>, and thus the District Court's ruling must be <u>reversed</u>.

---

[1] Although Mr. Huntsman technically filed his Complaint against the Corporation of the President of the Church of Jesus Christ of Latter-day Saints (the entity he gave his fraudulently-obtained money to), that entity has since been renamed to the Church of Jesus Christ of Latter-day Saints.  4-ER-669.

Simply stated, this case presents a clear "the light was red / the light was green" scenario, wherein each side has a **_diametrically-opposed_** view of what transpired.

Mr. Huntsman, on the one hand, adamantly contends (and, critically, has proffered admissible evidence) that (1) the Church repeatedly told him that no "tithing" funds (*i.e.*, the money donated by Church members on an annual basis) would in any way, shape, or form be used for a commercial purpose, including specifically to develop a shopping mall in Salt Lake City, and (2) the Church nonetheless fraudulently used tithing funds to develop the shopping mall and to bail out a commercial life insurance company. In support of this contention, Mr. Huntsman has pointed to five specific statements in which the Church denied using tithing funds for the mall or any other "for-profit endeavor," and has further offered up the declaration of a Church whistleblower who swears (based on **_personal knowledge_**) that the Church did in fact use principal tithing funds to develop the mall and to bail out a private life insurance company (in stark contradiction of its representations to Mr. Huntsman).

The Church, on the other hand, zealously claims that (1) it only used the "earnings" realized from the investment of tithing funds (as opposed to the principal tithing funds themselves) to develop the shopping mall, and (2) it plainly disclosed this use to Mr. Huntsman. And in support of this claim, the Church has offered up its own declarant who (although he was not as intimately involved in the Church's financial affairs as Mr. Huntsman's declarant) contends that only "earnings" on invested tithing funds were used to develop the mall, and that certain statements made three decades ago (concerning the creation of a Church "reserve" fund) somehow put Mr. Huntsman on notice of this use (despite the fact that development of the mall did not even commence until over a decade later).

Of course, since Mr. Huntsman's evidence and the Church's evidence are at direct odds with each other, the resolution of this case necessarily depends on a subjective determination of which side is telling the truth.  In other words, who is more believable? Mr. Huntsman's declarant or the Church's declarant?

Such a determination is within the strict province of the trier of fact (in this case, the jury), and <u>cannot</u> be made by a court on summary

judgment. And yet, that is precisely what the District Court here did when it granted summary judgment to the Church. More specifically, the District Court **weighed the evidence** and made its own **subjective factual finding** that the testimony of Mr. Huntsman's whistleblower declarant should somehow be disregarded (supposedly on the basis that he was only employed by the Church's investment firm since 2010), while the testimony of the Church's declarant should be given credence (even though he was never even employed by the Church's investment firm at all). In doing so, the District Court failed to properly take into account the sworn testimony of Mr. Huntsman's declarant that principal tithing funds were in fact used for a commercial purpose at odds with the Church's representations to Mr. Huntsman. Had that critical testimony (which was in direct conflict with the Church's testimony) been taken into account, there would have been no basis to grant summary judgment.

As set forth herein, and as should become evident to this Court upon its *de novo* review of the record, there is an undeniable triable issue of fact concerning Mr. Huntsman's fraud claim, and thus this case cannot be resolved on summary judgment and must proceed forward to trial. Further, even if there was not a triable issue (and there is), the Church

has still failed to meet its burden of production as the moving party on summary judgment (since the Church's purported "evidence" does not actually support its position). And finally, because the District Court misapplied the requisite elements of fraud in granting summary judgment to the Church (by conflating the requirement of fraudulent misrepresentation with that of fraudulent concealment), its order cannot stand as a matter of law.

Accordingly, Mr. Huntsman respectfully submits that the District Court's order should be reversed, and he should be allowed to try his case before a jury.

## II. <u>JURISDICTIONAL STATEMENT</u>

Pursuant to Federal Rules of Appellate Procedure ("FRAP") 28 and Ninth Circuit Rule 28-2.2, Mr. Huntsman submits the following Jurisdictional Statement.

**District Court Jurisdiction**. This action for fraud against the Church was filed on March 22, 2021 in the United States District Court for the Central District of California. 2-ER-252—64. The District Court had diversity jurisdiction over this action under 28 U.S.C. § 1332(a) because, at the time of filing, Mr. Huntsman's claim was between citizens

of different states and the amount in controversy exceeded the sum of $75,000. 2-ER-256.

**Appellate Jurisdiction**.   On September 10, 2021, the District Court entered an order granting the Church's Motion for Summary Judgment pursuant to FRCP 56(a). 1-ER-2—13.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291 to review the District Court's order granting the Church's Motion for Summary Judgment.   The District Court's order is a final order disposing of Mr. Huntsman's claim in its entirety. 1-ER-2—13.

**Timeliness of Appeal**.  On September 24, 2021, Mr. Huntsman timely filed his Notice of Appeal pursuant to FRAP 4(a)(1)(A). 2-ER-265—67.

**Finality of Order.**  This Appeal is from a final order or judgment of the District Court that disposes of all of Mr. Huntsman's claims. 1-ER-2—13.

## III.   <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

The questions presented to this Court are as follows:

1.   May summary judgment properly be granted where the parties staunchly disagree on the material facts and

6

circumstances giving rise to the case, where the parties' evidence is in direct conflict, and where the resolution of that conflict depends on a credibility determination by the trier of fact?

2.   May summary judgment properly be granted in favor of a party in the absence of evidence unambiguously supporting that party's position?

3.   Is the lack of a specific affirmative misrepresentation by a party fatal to a fraud claim where that party has nonetheless knowingly concealed material facts to the detriment of the complaining party?

As set forth herein (and as a matter of well-settled law), the answer to all three of these questions is a resounding "no."

## IV.   <u>STATEMENT OF THE CASE</u>

### A.   <u>Relevant Facts</u>

In an attempt to confuse the issues here and obfuscate the truth about how it improperly used billions of dollars donated by its congregation to develop a mall and bail out an insurance company, the Church set forth a long-winded and hard to follow factual narrative in

the District Court. Indeed, this narrative was rendered all the more confusing due to the plethora of substantial redactions made by the Church to its purported financial "evidence" – which redactions were ironically premised on the notion that the Church's own members and the public at large should be kept in the dark as to how the Church has used its tax-exempt funds (despite the fact that such secrecy is what gave rise to the fraud here in the first place).

However, as set forth below, the facts that actually matter here are quite simple and straightforward, and do not depend in the least on redacted financial information or confusing narratives. Those facts are as follows:

1.  ***Mr. Huntsman Gave Millions Of Dollars To The Church In Reliance On Repeated Assurances That His Money Would Only Be Used For Non-Commercial Purposes.***

Mr. Huntsman was born into a family of devout members of the Church, and likewise spent much of his childhood and adult life as a devout member, donating his time, energy, money, and resources in support of the Church's ostensibly-charitable pursuits throughout the world. 2-ER-256.

8

Beginning in 1993 (when Mr. Huntsman was 22 years old) and continuing until 2015 (when he became disillusioned with the Church's doctrines, including its support of polygamy and its open disdain for members of the LGBTQ community), Mr. Huntsman made annual tithing payments to the Church, which ultimately added up to ***millions*** of dollars. 2-ER-45, 2-ER-256, 4-ER-674. Until he discovered otherwise in 2019, Mr. Huntsman reasonably believed that these annual tithing payments had been and were being used by the Church for purely ***non-commercial*** purposes. 2-ER-44—46. In fact, Mr. Huntsman was repeatedly assured – including through the Church's Sunday School manuals, teachings, and conference addresses – that the Church's use of tithing funds was restricted to ***charitable*** purposes consistent with the Church's stated priorities. *Id*. More specifically, Mr. Huntsman was assured that his tithing monies would be used to fund missionary work, member indoctrination, temple work, and other educational and charitable activities – and <u>nothing else</u>. *Id*.

However, as Mr. Huntsman discovered in 2019, the Church had concealed its true use of tithing funds (both from him and the Church's congregation at large). 2-ER-45. Specifically, at issue in this case are the

Church's improper use of tithing funds for two purely ***commercial***, ***non-charitable*** purposes: (1) to pay for the commercial development of the City Creek Mall in Salt Lake City, and (2) to bail out a commercial, for-profit company called Beneficial Life Insurance. 2-ER-81—82. Such uses were not only <u>concealed</u> by the Church (until they were publicly divulged by Church whistleblower David Nielsen in 2019), but obviously ran counter to the Church's own representations concerning the use of tithing funds (which Mr. Huntsman relied upon in making his tithing payments). 2-ER-44—45, 2-ER-81—82.

> ### 2. *The Church Repeatedly Represented To Mr. Huntsman That Tithing Funds Would Not Be Used To Develop The City Creek Mall.*

On at least five separate occasions beginning in 2003, the Church specifically represented to Mr. Huntsman (through publicly made statements) that tithing funds would <u>not</u> be used to develop the City Creek Mall project.

<u>*First*</u>, in April 2003, the president of the Church, Gordon B. Hinckley – apparently in response to growing public concern about where the Church was getting its money to develop the commercial City Creek Mall – made the following statement concerning that project.

10

"I call attention to that which has received much notice in the local press. This is our decision to purchase the shopping mall property immediately to the south of Temple Square.

We feel we have a compelling responsibility to protect the environment of the Salt Lake Temple. The Church owns most of the ground on which this mall stands. The owners of the buildings have expressed a desire to sell. The property needs very extensive and expensive renovation. We have felt it imperative to do something to revitalize this area. ***But I wish to give the entire Church the assurance that tithing funds <u>have not</u> and <u>will not</u> be used to acquire this property. Nor will they be used in developing it for commercial purposes.***

Funds for this have come and will come from those commercial entities owned by the Church. These resources, together with the earnings of invested reserve funds, will accommodate this program."

2-ER-250 (emphasis added); 2-ER-257.

<u>Second</u>, at an October 2003 press conference concerning the development of the City Creek Mall, Presiding Bishop H. David Burton emphatically reiterated the Church's promise that tithing funds were not being used in connection therewith.  He stated:

"***None of this money comes from the tithing of our faithful members***… That is <u>not</u> how we use tithing funds."

2-ER-257, 3-ER-369—70 (emphasis added).

11

*Third*, in December 2006, the Church's official magazine, *Ensign*, printed the following statement once again claiming that no tithing funds would be used in connection with the City Creek Mall:

> "The Church first announced three years ago it was planning to redevelop the downtown area to energize the economy of the city that houses its headquarters and to bolster the area near Temple Square. ***No tithing funds will be used in the redevelopment***."

2-ER-258, 3-ER-373 (emphasis added).

*Fourth*, a March 2007 article published in the Church-owned newspaper, *The Deseret News*, yet again reiterated that no tithing funds were used for the City Creek Mall development project. The article stated:

> "***Money for the project is not coming from LDS Church members' tithing donations***. City Creek Center is being developed by Property Reserve Inc., the church's real-estate development arm, ***and its money comes from other real-estate ventures***.

2-ER-258, 3-ER-523 (emphasis added).

*Fifth*, in 2012, Keith B. McMullin (the head of a Church-affiliated commercial entity known as Deseret Management Corporation) unequivocally represented (via a quote in *The Salt Lake Tribune*) that

12

tithing funds had not been and would not be used for commercial purposes. The *Tribune* reported:

> "McMullin said ***not one penny of tithing*** goes to the church's for-profit endeavors. Specifically, the church has said ***no tithing went toward City Creek Center***."

2-ER-258, 3-ER-378.

As Mr. Huntsman attested in the District Court, he was aware of all of the above-described representations at or around the time they were made, and he relied upon them in continuing to make his annual tithing payments. 2-ER-44, 2-ER-139.

> **3.** ***Contrary To The Church's Representations And Assurances, And As Witnessed And Attested To By Church Whistleblower David Nielsen, Tithing Funds Were In Fact Used To Develop The City Creek Mall And Bail Out Beneficial Life Insurance.***

From 2010 until 2019, an individual named David Nielsen worked for a company called Ensign Peak Advisors, Inc. ("EPA"). 2-ER-80. EPA is an entity that was established by the Church in 1997 to invest money on its behalf, and was seeded with tithing money from the Church. *Id*.

Mr. Nielsen's position at EPA was as its Senior Portfolio Manager. *Id*. As such, he had scores of meetings, both formal and informal, with EPA's top brass – including Roger Clarke (EPA's President and

13

Managing Director), Robert Nydegger (EPA's former Head of Fixed Income and later its Chief Investment Officer), Richard Willes (EPA's Head of Fixed Income), and Michael Connors (EPA's Head of Fixed Income). *Id*.

On account of his job responsibilities and his meetings and communications with EPA's senior leadership, Mr. Nielsen obtained a detailed and first-hand understanding of how EPA operated its business, and consequently, how the Church managed its finances. *Id*.

Most notably, as Mr. Nielsen attested in the District Court, the principal tithing money donated by the Church's members was ***commingled*** with the earnings that EPA had realized thereon, and no distinction was drawn between those two sources of funds. *Id*. Consistent with this commingling, EPA's senior leadership and other EPA employees also referred to and revered **all** EPA funds as "tithing" money, regardless of whether they were referring to the principal tithing itself or the earnings on that principal. *Id*.

While working at EPA, Mr. Nielsen also learned that EPA's tithing funds were administered by a committee known as the Council on the Disposition of the Tithes (the "Tithing Council"). *Id*. The Tithing Council,

as evidenced by its very nomenclature, was responsible for approving any distributions and/or withdrawals of tithing funds. *Id.*

Critically, as Mr. Nielsen attested in the lower court, over a five-year period, the Tithing Council approved EPA's withdrawal of approximately $1.4 billion in tithing funds to pay for the commercial development of the City Creek Mall – notwithstanding that the Church was simultaneously assuring its members (including Mr. Huntsman) that tithing funds were not being used for such a purpose. 2-ER-81.

As Mr. Nielsen further attested below, in 2009, the Council likewise approved EPA's withdrawal of $600 million in tithing funds to bail out Beneficial Life Insurance – notwithstanding that the Church was assuring its members (including Mr. Huntsman) that tithing funds were being used solely for non-commercial purposes. *Id.*[2]

---

[2] Curiously, while the Church's District Court declarant, Paul Rytting, purported to dispute that tithing funds were used to develop the City Creek Mall, the Church offered no testimony or evidence disputing that tithing funds were used to bail out Beneficial Life. 3-ER-532—41. Thus, Mr. Nielsen's testimony on this critical point is **<u>undisputed.</u>**

> **4.** ***As Witnessed And Attested To By Mr. Nielsen, The Church Was Well-Aware That It Was Deceiving Its Members (And The Public At Large) About The Use Of Tithing Funds.***

As he attested below, Mr. Nielsen attended a meeting in March 2013 led by EPA senior leadership. At that meeting, EPA's President Roger Clarke, along with its Chief Investment Officer Robert Nydegger, gave a presentation in which they described the various ways that EPA had been distributing its tithing funds – including in connection with the development of the City Creek Mall and to bail out Beneficial Life Insurance. *Id.* In fact, one of the slides from that presentation (which Mr. Nielsen saved) specifically referenced how <u>principal</u> "investment reserves" (*i.e.*, <u>not</u> the "earnings" thereon) were withdrawn to pay for the City Creek Mall and Beneficial Life Insurance. 2-ER-81, 2-ER-85.

Prior to the March 2013 meeting, Mr. Nielsen and other EPA employees were well-aware of the Church's public statements (including as set forth above) that no tithing funds would be used to develop City Creek Mall or other for-profit businesses. 2-ER-81—82. Consequently, after being presented with the truth at the March 2013 meeting – *i.e.*, that tithing funds were in fact being used for purely commercial purposes – Mr. Nielsen pointed out to Mr. Clarke the direct contradiction

between (1) what the Church was telling the public about its use of tithing funds, and (2) how the Church was actually using those funds. *Id.* Mr. Clarke responded that because the EPA funds distributed for the benefit of the City Creek Mall and Beneficial Life Insurance were first funneled through two other Church-affiliated entities (Property Reserve, Inc. and Deseret Management Corporation), people would not know that EPA was the source of this funding. *Id.* **Mr. Clarke also stated to Mr. Nielsen that it was important people <u>should not know</u> EPA's role as the source of the funds.** 2-ER-82.

Ultimately, based on the Church's intentional deception concerning EPA's use of tithing funds for City Creek Mall and Beneficial Life, Mr. Nielsen filed a whistleblower complaint with the Internal Revenue Service (the "IRS"). While Mr. Nielsen's complaint is still pending with the IRS, *The Washington Post* ran a highly-publicized story about the complaint in December 2019.[3]

---

[3] https://www.washingtonpost.com/investigations/mormon-church-has-misled-members-on-100-billion-tax-exempt-investment-fund-whistleblower-alleges/2019/12/16/e3619bd2-2004-11ea-86f3-3b5019d451db_story.html

     **5.**     *In 2019, After Years Of Donating Money To The Church Under False Pretenses, Mr. Huntsman Finally Learned Of The Church's Fraud Through Mr. Nielsen's Whistleblower Complaint.*

In December 2019, Mr. Huntsman learned of the facts contained in David Nielsen's IRS Whistleblower Complaint, and realized for the first time in his life that the Church had deceived him about where his tithing donations had gone. 2-ER-45. Up until then, he had understandably believed – based on the Church's longstanding repeated representations and teachings – that his tithing donations had been used for purely non-commercial purposes. 2-ER-45—46.

Had Mr. Huntsman known the truth, as he ultimately discovered in 2019 – *i.e.*, that the Church was using his tithings to, among other things, build a mall and bail out a private, for-profit insurance company – he never would have made any tithing donations in the first place. 2-ER-44—45.

Notably, however, rather than file a public lawsuit, Mr. Huntsman repeatedly reached out to the Church to attempt to request the return of his fraudulently-obtained donations and resolve his grievance <u>privately</u>. 2-ER-46—47. These efforts included letters sent to the Church's attorneys in December 2020 and February 2021, as well as a conversation

with Elder Ronald A. Rasband (of the Church's Quorum of the Twelve Apostles) on February 28, 2021. 2-ER-46—47, 2-ER-50—78. It was only after the Church staunchly rebuffed these efforts that Mr. Huntsman was forced to seek recourse in the court system. 2-ER-47, 2-ER-76—78.

### B. __Procedural History__

#### 1. *Mr. Huntsman's Complaint For Fraud*

On March 22, 2021, Mr. Huntsman initiated the present lawsuit in the Central District of California, filing a Complaint for fraud against the Church. 2-ER-252—64. In short, the Complaint alleges that Mr. Huntsman was deceived by the Church as to the intended use of his tithing donations, and that he relied on the Church's misrepresentations by paying millions of dollars to the Church that he otherwise would not have paid but for the Church's deception. *Id.*, 2-ER-44—45.

More specifically, Mr. Huntsman contends that (1) the Church affirmatively misrepresented that tithing funds would not be used to fund the City Creek Mall or any other "for-profit endeavors", and (2) the Church concealed the material fact that tithing funds were used to bail out Beneficial Life Insurance (in stark derogation of its longtime assurances to Mr. Huntsman that tithing funds would only be used for non-commercial purposes). 2-ER-44—45, 2-ER-260—62.

As damages, Mr. Huntsman's Complaint simply seeks the return of his tithing money which was given to the Church under false pretenses. 2-ER-255, 2-ER-263. The Complaint makes clear that, upon receiving back that money, Mr. Huntsman will use it to benefit organizations and communities whose members have been marginalized by the Church's teachings and doctrines – including charities supporting LGBTQ, African-American, and women's rights. 2-ER-255.

### 2. *The Church's Summary Judgment Motion*

On June 28, 2021, only three months after Mr. Huntsman's Complaint was filed, and before any discovery was conducted, the District Court ordered the Church to file an expedited summary judgment motion for the stated purpose of "testing the waters." 2-ER-27. The Court's order afforded Mr. Huntsman only a single week to oppose what was certain to be a fact-intensive motion by the Church – thus effectively depriving Mr. Huntsman of the opportunity to test the facts and evidence proffered by the Church despite having not yet taken any discovery. 2-ER-30.[4]

---

[4] At the Church's request, however, the Court ordered Mr. Huntsman to sit for an expedited deposition. 2-ER-29. That deposition took place on July 16, 2021. 2-ER-110.

On August 9, 2021, the Church filed its summary judgment motion. 4-ER-663—92. Of relevance here, the Church's motion was premised primarily on the purported notion that the Church's alleged statements were all true (and thus there could not have been any fraud).[5] 4-ER-682— 85. More specifically, in what will be referred to herein as the Church's "truth" defense, the Church asserted that (1) it had plainly disclosed to Mr. Huntsman that it was only using the "earnings" on invested tithing funds (as opposed to the principal tithing funds themselves) to fund the City Creek Mall, and (2) it had in fact only used those "earnings" to fund the mall. 4-ER-682—85. Hence, by the Church's purported logic, when Mr. Huntsman was repeatedly told that no tithing funds were used to pay for City Creek Mall, the Church was telling him the truth (since the Church was supposedly using only the "earnings" realized on the principal tithings). *Id.*

---

[5] The Church also raised two additional grounds for summary judgment: (1) that the First Amendment bars Mr. Huntsman's claim; and (2) that no reasonable juror could find that Mr. Huntsman justifiably relied on the Church's misrepresentations. 4-ER-670—71. However, since the District Court ruled in Mr. Huntsman's favor on both of these grounds, Mr. Huntsman agrees with the rulings and does not seek to disturb them on appeal.

In support of its "truth" defense, the Church set forth a complex and confusingly-worded narrative which spanned the time period of 1830 (when the Church was founded) to the present day and which purported to describe the internal financial workings of numerous Church-affiliated entities. Of relevance here, the Church claimed as follows:

- That in 1991, President Hinckley announced that a fixed percentage of the Church's "income" would be "set aside" to "build reserves" for a possible "rainy day" (2-ER-237), (3-ER-346), (3-ER-410), (3-ER-535);

- That Hinckley's 1991 announcement somehow put Mr. Huntsman on notice that the Church was setting up a reserve fund comprised solely of tithing monies – even though the announcement did not specify that the referenced "income" was tithing money (to the contrary, Hinckley referred to the existence of a "***few income-producing business properties***"), and even though there is no evidence that Mr. Huntsman was aware of the announcement (he was only 20 years old at the time and had not yet started making tithing payments) (2-ER-237—238) (2-ER-256) (3-ER-418);

- That in 1995, President Hinckley announced that "each year we put into the reserves of the Church a portion of our annual budget" (2-ER-246);

- That the 1995 announcement once again supposedly put Mr. Huntsman on notice that the there was a "reserve" fund comprised of tithings – even though the announcement, like the 1991 announcement, did not in any way indicate that the "reserves" came from tithing monies (it merely stated they came from the "annual budget") (2-ER-241—247) (3-ER-418);

- That beginning in 1997, and through a series of complex transactions involving numerous Church-affiliated entities (including EPA), the Church invested the tithing money in its "reserve" fund to generate "earnings" (3-ER-535, 3-ER-542—44);

- That it was only the "earnings" on the invested tithing monies that were used to develop the City Creek Mall (3-ER-534—37);

- That in 2003, when President Hinckley made his statement that "the earnings of invested reserve funds" had been used to

pay for the City Creek Mall (and that "tithing funds [had] not and [would] not be used" for that purpose), he was telling the truth (4-ER-682—83); and

- That the Church's subsequent statements concerning the non-use of tithing funds to pay for City Creek were also truthful, since only "earnings" were supposedly used to fund the project (6-ER-683).

Critically missing from the Church's narrative was any discussion whatsoever of how Beneficial Life Insurance was bailed out. Rather, the Church simply disregarded Mr. Huntsman's contentions on that issue by claiming that he had not pointed to any specific misrepresentation made by the Church concerning Beneficial Life. 3-ER-352—54; 3-ER-412; 4-ER-679. ***But the Church offered no evidence to refute Mr. Huntsman's contention (as supported by documentary evidence) that tithing money was used to bail out Beneficial Life —*** thus implicitly conceding that tithing funds were in fact used for that improper purpose. *See, e.g.,* 3-ER-532—41.

The Church's summary judgment motion was notably supported by only a <u>single</u> declaration – from its "Director of Risk Management," Paul

Rytting.[6] 3-ER-532—41.  Mr. Rytting's declaration attached and referred to numerous highly redacted financial documents, which he claimed (also through redacted testimony) were somehow demonstrative of how tithing funds were placed in a reserve fund and then invested (through various Church-affiliated entities) to create the "earnings" that ultimately paid for the development of City Creek Mall.  3-ER-542—75, 4-ER-577—662.

Curiously, however, not a single one of the financial documents attached to Mr. Rytting's declaration actually contained the word "tithing." *Id.* Nor did any of the documents specify that the monies used to pay for the City Creek Mall were in fact "earnings" on invested tithing funds. *Id.* Nor did the documents show that "earnings" on invested

---

[6] Contrary to how he held himself out in his declaration, Mr. Rytting was (and is still) the Church's long-time attorney and "director of risk management." https://www.linkedin.com/in/paul-rytting-5622303b/. 2-ER-92. As such, his self-described "responsibilities include administration of the risk management functions and services (safety, insurance, claims, *litigation*, contingency planning, etc.) for LDS Church operations in over 150 countries)." *See* https://www.acc.com/sites/default/files/resources/vl/public/ProgramMaterial/20099_1.pdf at page 2 (emphasis added). *Id.*  Of course, *none* of these responsibilities would appear to relate to the Church's internal financial affairs, much less the affairs of the Church's financial-arm (where David Nielsen worked and obtained personal knowledge of the Church's fraud).  Consequently, it is unclear how Mr. Rytting was even qualified to attest to the matters at issue in this case. *Id.*

tithing funds were kept separate (*i.e.,* not <u>commingled</u>) with principal tithing funds.[7] *Id.* Rather, all that the documents showed were that certain Church-related investments (accruing from <u>unspecified</u> sources of principal) ultimately generated earnings that exceeded the cost of the City Creek Mall. *Id.* Of course, such was far from definitive (or even credible) evidence that the mall was in fact paid for with "earnings" on "invested tithing funds," as the Church contended.

### 3. *Mr. Huntsman's Opposition To The Church's Motion*

On August 16, 2021, only one week after the Church's motion was filed, Mr. Huntsman filed his opposition thereto. 2-ER-86—108.

Because Mr. Huntsman had not yet been afforded the opportunity to challenge the Church's highly-redacted evidence though the discovery process, his opposition was premised on the only evidence that he could obtain on such short notice – namely, the sworn declaration of Church whistleblower David Nielsen, as well as an internal Church document that was submitted to the IRS with Mr. Nielsen's Whistleblower Complaint (which, as explained by Mr. Nielson, commemorated the

---

[7] As described above, David Nielson personally witnessed how EPA commingled principal tithing funds with the earnings thereon. 2-ER-79—85.

Church's use of tithing funds to pay for the City Creek Mall and bail out Beneficial Life Insurance). 2-ER-79—85. In his declaration, Mr. Nielsen attested, ***based on his personal knowledge***, as to the Church's fraud that he personally witnessed while working at EPA (as already described in detail above in Sections IV(A)(3)-(4)). *Id*.

With respect to the Church's primary "truth" defense, Mr. Huntsman's opposition pointed out that Mr. Nielsen's declaration was at <u>direct factual odds</u> with the Church's purported evidence. 2-ER-99. Specifically, whereas the Church's declarant – Mr. Rytting – had attested that tithing funds were not used to develop the City Creek Mall (and that only the "earnings" on invested tithing funds were used), Mr. Nielsen testified to the contrary (*i.e.*, that tithing funds were absolutely used to develop the mall). 2-ER-79—85. Hence, at a bare minimum, there was a triable issue of fact – indeed the ***most material fact*** (whether tithing funds were used to develop the mall) – precluding summary judgment.

Concurrently with his opposition, Mr. Huntsman also filed evidentiary objections to Mr. Rytting's declaration, pointing out that Mr. Rytting lacked the requisite personal knowledge to appropriately testify as to the Church's use of tithing funds. 3-ER-423—65. More specifically,

because Mr. Rytting was merely an attorney employed as the Church's "Director of Risk Management," and because he did not purport to actually be employed by or affiliated with any of the financial entities identified in his declaration (*i.e.*, EPA, City Creek Reserve, the Investment Policy Committee, or Property Reserve, Inc.), he (unlike David Nielsen, who was actually employed by EPA) could not have personal knowledge of how the Church paid for the City Creek Mall. 3-ER-424—25.

### 4. *The Church's Reply Papers*

On August 23, 2021, the Church filed a reply brief in support of its motion. 3-ER-405—422. While the reply for the most part simply rehashed the same arguments from the Church's motion, it was notable in two particular respects:

First, the reply was accompanied by a declaration from Roger Clarke – *i.e.*, the very same individual who, per David Nielsen's declaration, had admitted in March 2013 that tithing funds had in fact been used to develop City Creek Mall and bail out Beneficial Life Insurance, and who had stated to Mr. Nielsen that it was important people should not know EPA's role as the source of the funding. 2-ER-81—82, 3-ER-298—300. ***Critically, however, at no point in his***

28

***declaration did Mr. Clarke dispute or deny the facts concerning the March 2013 EPA meeting, nor did he deny that tithing funds were used to develop City Creek Mall and bail out Beneficial Life Insurance.*** 3-ER-298—300. Rather, his declaration simply purported to authenticate the financial documents that had previously been attached to Paul Rytting's declaration.[8] *Id.*

Second, notwithstanding the existence of David Nielsen's declaration – which had described in detail how tithing funds were used to bail out Beneficial Life Insurance – the Church's reply (like its motion) did not deny that tithing funds were used for this clearly improper purpose. 3-ER-405—22. Thus, the reply effectively doubled down on the Church's implicit concession that, at least with respect to the bailing out of Beneficial Life Insurance, tithing funds were used.

### 5. *The District Court's Order Granting Summary Judgment*

On September 10, 2021, the District Court issued an order granting summary judgment in the Church's favor. 1-ER-2—13. While the order

---

[8] In this regard, Mr. Clarke's declaration was effectively an admission that Mr. Rytting lacked the personal knowledge and foundation to authenticate the financial documentation upon with the Church had premised its motion in the first place (and thus, that the Church had failed to meet its burden of production in its moving papers).

correctly rejected the Church's two fallback arguments, it nevertheless agreed with the Church's primary "truth" defense – *i.e.*, that the Church had truthfully represented to Mr. Huntsman that it was only using the "earnings" from "invested tithing funds" to develop the City Creek Mall. 1-ER-12.

Critically, in reaching its conclusion, the District Court made a number of curious and unsupported factual findings. Namely:

- That President Hinckley's 1991 and 1995 statements had somehow specified that the Church's "reserve" fund would be comprised of tithing monies – even though (as discussed above) the statements were (at best) ambiguous in that regard. 1-ER-3, 1-ER-8.

- That Mr. Huntsman was somehow aware of President Hinckley's 1991 and 1995 statements and was thus on notice that the Church's "reserve" fund was comprised of tithings – even though there was no evidence in the record that he had ever read or heard the statements.[9] 1-ER-8.

---

[9] Mr. Huntsman had simply testified at his deposition that he had read President Hinckley's **subsequent** statements (starting in 2003) specifically concerning the City Creek Mall. He was not asked about the

- That the Church's "evidence" (*i.e.*, Paul Rytting's declaration and the accompanying financial statements) somehow unequivocally proved that only the "earnings on invested reserve tithing funds" (as opposed to the principal tithing funds) were used to develop the City Creek Mall – even though the word "tithing" did not appear in a single one of the financial statements, and even though Paul Rytting (unlike David Nielsen) lacked personal knowledge of how the mall was funded. 1-ER-8—10, 3-ER-542—75, 4-ER-577—662.

- That David Nielsen's testimony concerning the Church's use of tithing funds was non-credible simply because he was not employed by EPA until 2010 – even though Mr. Nielsen had attested that he was made personally aware (as part of his job at EPA) of how the Church had used tithing funds to develop the City Creek Mall and bail out Beneficial Life Insurance, and even though the Church's own declarant (Paul Rytting) was never employed by EPA at all. 1-ER-10, 2-ER-92.

---

prior statements in 1991 or 1995. *See, e.g.,* 2-ER-110, 2-ER-122, 2-ER-139, 2-ER-163.

Further, the District Court's order did not address Mr. Nielsen's sworn testimony that EPA had ***commingled*** principal tithing funds with the earnings thereon (thus resulting in the principal funds themselves being used to develop the City Creek Mall and bail out Beneficial Life Insurance), nor did the order address Mr. Nielsen's sworn testimony concerning the March 2013 EPA meeting (during which Roger Clarke had effectively admitted that the Church deceived the public about the use of tithing funds). 2-ER-79—85. This second omission was particularly surprising given that Mr. Clarke's declaration – proffered in support of the Church's reply brief – did not deny that the March 2013 meeting had taken place and did not deny that he had made the alleged statements at that meeting. 3-ER-298—302.

The District Court also rejected Mr. Huntsman's contentions regarding Beneficial Life Insurance on the basis that Mr. Huntsman had not alleged any specific misrepresentations by the Church on that topic. 1-ER-12—13. In doing so, the District Court necessarily ***weighed the evidence*** and overlooked/disregarded (1) Mr. Huntsman's testimony that he was repeatedly assured tithing funds would only be used for non-commercial purposes (which would obviously not include the bail out of a

32

commercial insurance company) (2-ER-44—45), (2-ER-257), and (2) the Church's unequivocal representation in 2012 (as quoted in the Salt Lake Tribute) that "**not one penny of tithing** goes to the church's for-profit endeavors." 2-ER-258, 3-ER-378.

## V.    STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed *de novo*. *Mull for Mull v. Motion Picture Indus. Health Plan*, 865 F.3d 1207, 1209 (9th Cir. 2017).  This Court must "determine, viewing the evidence in the light most favorable to the nonmoving party [*i.e.*, Mr. Huntsman], **whether there are any genuine issues of material fact** and whether the district court correctly applied the relevant substantive law." *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1131–32 (9th Cir. 2003) (emphasis added).

In reviewing the District Court's decision, this Court "**does not weigh the evidence** or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999) (emphasis added).  The substantive law at issue – in this case fraud – will identify which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine, and summary judgment is inappropriate, where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ibid*. Importantly, "at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249.

## VI.   <u>ARGUMENT</u>

### A.   <u>There Is Undeniably A Triable Issue Of Fact Here As To Whether The Church Mispresented Its Use Of Tithing Funds, And Thus Summary Judgment Was Improper</u>

Looking past the Church's efforts to confuse and complicate the issues in this case, the core dispute here actually boils down to nothing more than the following simple question:  <u>Did the Church use tithing funds to develop the City Creek Mall and bail out Beneficial Life Insurance notwithstanding its repeated representations that tithing funds were not used for such non-charitable purposes?</u>  If the answer is yes (which it is), Mr. Huntsman wins the case.  If the answer is no (as the Church has misled its members and the District Court to believe), Mr. Huntsman loses.

Critically, with respect to this core question, there was unmistakably a triable issue of fact before the District Court which precluded summary judgment. More specifically, while the Church's summary judgment motion relied entirely upon the sworn declaration of its "Director of Risk Management," Paul Rytting – who attested (albeit in the most confusing and long-winded way possible) that only the "earnings" on invested tithing funds were used to develop the City Creek Mall – Mr. Huntsman proffered the sworn declaration of former EPA employee David Nielsen – who attested based on personal knowledge that ***principal*** tithing funds (*i.e.*, not just the "earnings" thereon) were used by EPA to fund the City Creek Mall and bail out Beneficial Life Insurance. *Compare* 2-ER-79—85 *with* 3-ER-532—41. In fact, Mr. Nielsen testified in his declaration that (1) at least 1.4 billion dollars in tithing funds were used by EPA in a five-year period to develop the City Creek Mall, and (2) at least 600 million dollars in tithing funds were used in 2009 to bail out Beneficial Life Insurance. 2-ER-81. Moreover, Mr. Nielsen further attested as to how the Church was well-aware that its actions were in direct contravention of the representations that it had

made to the public, and yet intentionally concealed those actions from the public so that the public would not know the truth. 2-ER-81—82.

Simply put, the parties' dueling evidentiary declarations in the District Court created a literal "he said, he said" situation that could not be resolved on summary judgment. Rather, the trier of fact would ultimately need to determine whether Mr. Rytting or Mr. Nielsen was telling the truth about the use (or non-use) of tithing funds in connection with the City Creek Mall.

Nonetheless, in granting summary judgment to the Church, the District Court improperly weighed the parties' respective evidence and concluded (albeit, erroneously) that Mr. Rytting's declaration was somehow more credible than Mr. Nielsen's. 1-ER-2—13. Indeed, this weighing of evidence is perhaps most apparent from the fact that the District Court discounted Mr. Nielsen's testimony concerning EPA's use of tithing funds because he "did not begin working at EPA until 2010," while at the same time giving credence to Mr. Rytting's testimony concerning EPA's purported non-use of tithing funds – even though Mr. Rytting never worked for EPA at all. 1-ER-10. Stated otherwise, the District Court made a subjective determination that Mr. Rytting was to

be believed whereas Mr. Nielsen was not. Such was not an appropriate determination on summary judgment.

To be clear, this is not a case where both sides agreed on what happened and the District Court simply had to apply the law to undisputed facts. Rather, in this instance, both sides proffered *diametrically opposed* versions of the fundamental facts concerning the Church's use (or alleged non-use) of tithing funds, and the District Court made a subjective finding as to which version was correct.

In sum, because there was (at a minimum) a triable issue of material fact as to whether principal tithing funds (as opposed to only the "earnings" thereon) were used to develop the City Creek Mall, there was no basis for the District Court to grant summary judgment to the Church. For this reason alone, the District Court's order should be reversed.

## B. In Any Event, The Church's "Truth" Defense Is Unsupported By The Evidence

Even assuming that David Nielsen's declaration did not exist to create a triable issue of material fact here (it does), the Church's "truth" theory of defense – *i.e.*, that it honestly represented to Mr. Huntsman that only "earnings" on invested tithing funds would be used to fund the

City Creek Mall – is in any event unsupported by the record, and thus legally untenable on summary judgment. *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (the party moving for summary judgment has the initial burden of production, and must therefore "either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial").

*First*, nothing in the record shows that the Church ever made it clear to Mr. Huntsman that its "reserve" fund would be comprised solely of tithing monies. Although the Church points to President Hinckley's 1991 and 1995 announcements as evidence of this supposed disclosure, those statements were, at best, ambiguous as to the source of the "reserve" monies.

In the 1991 announcement, Hinckley stated that a fixed percentage of the Church's "income" would be "set aside" to "build reserves" for a possible "rainy day," but he did not specify where the "income" for the "reserves" would actually come from. 2-ER-237. To be clear, the announcement merely purported to describe, ***generally***, how

the Church spent **all** of its funds, not just tithing. *See Id.* ("[E]ighteen men-the Presidency, the Twelve, and the Presiding Bishopric-constitute the Council on the Disposition of the Tithes. What might be regarded as executive committees of this larger council include the Budget Committee and the Appropriations Committee. The expenditure of ***all Church funds*** comes under the purview of these bodies.") (emphasis added). And it was in the context of this ***general*** discussion that Hinckley stated: "In the financial operations of the Church, we have observed two basic and fixed principles: One, the Church will live within its means. It will not spend more than it receives. Two, a fixed percentage of the ***income*** will be set aside to build reserves against what might be called a possible 'rainy day.'" *Id.* Critically, the 1991 announcement did not specify that the referenced "income" was coming from tithing monies. To the contrary, Hinckley actually indicated that the Church's "income" was generated by sources other than just tithing, stating: "We have a few ***income-producing business properties***." 2-ER-238.

Nor did Hinckley's subsequent 1995 announcement clarify that the Church's "reserve" fund was made up of tithing monies. To the contrary,

Hinckley merely stated: "Not only are we determined to live within the means of the Church, but each year we put into the reserves of the Church a portion of our annual budget." 2-ER-246. But he notably did <u>not</u> state that the referenced "budget" was comprised in whole or in part by tithing funds.

Hence, there is no support in the record for the proposition that the Church ever disclosed tithing monies as the purported source of its "reserve" fund.

<u>*Second*</u>, even assuming that Hinckley's 1991 or 1995 announcements had drawn a cognizable connection between tithing funds and the Church's "reserve" (they did not), there is no evidence in the record that Mr. Huntsman was himself aware of those announcements. More specifically, while Mr. Huntsman testified at his deposition that he was aware of the five fraudulent statements at issue in this case – beginning with Hinckley's <u>2003</u> statement concerning City Creek Mall (2-ER-44, 2-ER-139) – Mr. Huntsman <u>never</u> admitted to knowledge of the 1991 or 1995 announcements (nor was he even asked about those announcements at his deposition). Nor was the Church able

to point to any such admission by Mr. Huntsman in its summary judgment papers.[10]

And yet, despite the lack of any evidence (1) showing that Hinckley unequivocally disclosed in 1991 or 1995 that tithing monies were the source of the Church's "reserve" fund, or (2) showing that Mr. Huntsman was even aware of Hinckley's 1991 and 1995 announcements, the Church brazenly claimed in the District Court that Mr. Huntsman must have understood Hinckley's 2003 statement – *i.e.*, that "earnings of invested <u>reserve</u> funds" were being used to fund the City Creek Mall – to mean that the Church was using earnings from invested <u>tithing</u> funds. 4-ER-683. To the contrary, such a claim is grounded in nothing more than speculation and conjecture.

*<u>Third</u>*, even assuming that the Church had actually disclosed to Mr. Huntsman that it would be using the "earnings" from invested <u>tithing</u> monies to fund the City Creek Mall (it did not), there is no

---

[10] To this point, while the Church contended in its reply brief that Mr. Huntsman "would have read President Hinckley's 1991 and 1995 addresses explaining how the Church would set aside some of his donations to create a reserve," the only evidence cited for this proposition was the announcements themselves. 3-ER-310—12, 3-ER-418. The Church did not (and could not) cite any testimony by Mr. Huntsman showing that he was actually aware of the announcements.

credible evidence that such "earnings" (as opposed to the principal tithing funds themselves) were actually used for that purpose. To the contrary, the Church's purported (and highly redacted) financial statements are completely unclear as to the source and use of the money reflected therein. For example, while the District Court relied on Exhibit 3 to Paul Rytting's declaration as purported evidence that "EPA was granted [REDACTED] in reserve tithing funds" in 1997 (1-ER-8) Exhibit 3 actually says no such thing. 3-ER-542—44. Nor does Mr. Rytting's declaration describe Exhibit 3 as reflecting a grant of "reserve tithing funds." It simply asserts that the Church gave an initial grant to EPA, without specifying the source of the granted sums. 3-ER-535.

It further bears noting that not a single one of the financial documents proffered by the Church even contains the word "tithing."[11] 3-ER-542—75, 4-ER-577—662. And since Mr. Rytting (unlike Mr. Nielsen) was never actually employed by EPA, he was in no position to credibly attest to what funds were or were not used by EPA for City Creek. *Compare* 2-ER-80 *with* 3-ER-533. Thus, while the Church

---

[11] In this regard, the Church's financials are far more notable for what is missing than what is actually contained therein.

contended in the District Court that its financial documents showed how earnings on invested <u>tithing</u> funds were used to develop the City Creek Mall, the documents merely showed how unspecified funds were moved around between various entities. 3-ER-535—41.

In sum, there is no credible evidentiary support in the record for the Church's "truth" defense, and thus there was no cognizable basis for the District Court to grant summary judgment to the Church.

### C. <u>In The Absence Of A Proper Disclosure To Mr. Huntsman, The Church's Use Of "Earnings" On Invested Tithing Funds To Develop The City Creek Mall Would Still Be Fraudulent</u>

As discussed above, there is no evidence in the record that the Church ever made clear to Mr. Huntsman that it would be using the "earnings" on invested <u>tithing</u> funds to develop the City Creek Mall.[12] Thus, in the absence of such a disclosure, whether principal tithing funds or earnings thereon were used for the City Creek Mall is a distinction without a difference – as in either scenario tithing funds were still technically "used" to develop the commercial mall project.

---

[12] And in any event, Mr. Nielsen attested that EPA commingled those "earnings" with the principal tithing funds, resulting in the principal itself being used for the City Creek project – a use which ran directly counter to the Church's repeated representations that no tithing funds would be used for that purpose. 2-ER-80.

Indeed, it has long been a maxim of Anglo-American law that "interest follows the principal as the shadow does the substance." *In re Beckman*, 14 A.2d 581, 583 (1940). As explained by our Supreme Court: "The rule that 'interest follows principal' has been established under English common law since at least the mid-1700's. Not surprisingly, this rule has become firmly embedded in the common law of the various States." (internal citations omitted). *See Phillips v. Washington Legal Found.*, 524 U.S. 156, 165 (1998).

Here, but for the tithings given to the Church by Mr. Huntsman and others under the pretense that their money would be used solely for charitable purposes, there would have been no "earnings" to pay for the development of the City Creek Mall or bail out Beneficial Life Insurance. Stated otherwise, even under the Church's unsupported version of the facts, tithing monies were still "used" for a commercial purpose, since those monies were a necessary component of the ultimate funding of the City Creek Mall.

Thus, because Mr. Huntsman was under the reasonable impression that tithing funds would not in any way, shape, or form be used for a commercial purpose, the Church's purported use of the

"earnings" on invested tithing funds for a commercial purpose would have in and of itself been <u>fraudulent</u>.

### D. The Lack Of A Specific Affirmative Misrepresentation Is Not Fatal To Mr. Huntsman's Claim Concerning Beneficial Life Insurance

Critically, the Church proffered no evidence in the District Court refuting Mr. Huntsman's claim concerning Beneficial Life Insurance. More specifically, whereas David Nielsen unequivocally attested, based on his personal knowledge, that $600 million in tithing funds was used to bail out Beneficial Life Insurance, the Church did not provide any contrary evidence. 2-ER-81—82. Thus, the Church effectively conceded that tithing funds were in fact used for the improper purpose of bailing out a private insurance company.

Rather than disputing that tithing funds were used to bail out Beneficial Life, the Church merely argued below that Mr. Huntsman had failed to point to any specific affirmative misrepresentations concerning Beneficial Life. 4-ER-682. In other words, the Church contended that, simply because it never specifically denied that tithing funds would be used to bail out Beneficial Life Insurance, it was not fraudulent to use tithing funds for that purpose.

However, the Church's position overlooks two critical points:

*First*, it is undisputed that in 2012, Keith B. McMullin (the head of the Church-affiliated entity known as Deseret Management Corporation) unequivocally stated that tithing funds had not been and would not be used for <u>commercial</u> purposes. More specifically, as reported by the *Salt Lake Tribune:* "McMullin said ***not one penny of tithing*** goes to the church's ***for-profit endeavors***." 2-ER-258, 3-ER-378. (emphasis added). Obviously, the use of tithing funds to bail out a commercial life insurance company would run directly contrary to this representation. Thus, while Mr. McMullin did not reference Beneficial Life by name, his statement was nonetheless an affirmative misrepresentation (especially in light of the fact that the Church has not disputed its use of tithing funds to bail out Beneficial Life) concerning the Church's use of tithing funds. For this reason alone, there was no basis to grant summary judgment to the Church on Mr. Huntsman's allegations concerning Beneficial Life.

*Second*, it is well-settled that the tort of fraud does not even require a specific affirmative misrepresentation. Rather, as recognized by the California Supreme Court (and by the District Court here notwithstanding its ultimate ruling to the contrary), a claim for fraud

may be premised on a "*concealment*" or "*nondisclosure*," as opposed to a specific "false representation." *See Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 173 (2003) ("The elements of fraud, which gives rise to the tort action for deceit, are (a) misrepresentation (false representation, *concealment, or nondisclosure*); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."); *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996) (same); *see also* 1-ER-5. More specifically, a fraud claim based on concealment/nondisclosure will lie where (as here) "the defendant makes representations but fails to disclose additional facts which materially qualify the facts disclosed, or which render the disclosure likely to mislead." *Roddenberry v. Roddenberry*, 44 Cal. App. 4th 634, 666 (1996).

Here, given that the Church repeatedly assured its members that tithing funds were only being used for non-commercial purposes (including in 2012, when it represented that "*not one penny of tithing* goes to the church's *for-profit* endeavors") ( 2-ER-258, 3-ER-378), it undeniably had a duty to disclose any use that would run counter to such assurances (which the bailout of a private insurance company obviously

would).  To this effect, Mr. Huntsman declared as follows in the District Court:

> "While it is true that I do not recall any specific statement by the Church denying that tithing funds were being used to bail out Beneficial Life Insurance, such a denial was ***unnecessary*** given that I was ***already assured*** through the Church's teachings that tithing funds would only be used for maintaining meeting houses and temples, sustaining missionary work, educating members, and other charitable endeavors, and I relied on those assurances.

2-ER-44—45. (emphasis added).  Likewise, when Mr. Huntsman was asked at his deposition if he could "point to any statements by Church leaders that tithing funds would not be used as a loan or other source of funding for the Beneficial Life Insurance Company," he responded:

> "***I didn't have to.***  I relied on Sunday School manuals, conference addresses [and] statements as to what tithing would be used for."

2-ER-163—64. (emphasis added).

48

In sum, the fact that the Church did not specifically deny using tithing funds to bail out Beneficial Life is not fatal to Mr. Huntsman's claim, since the Church had a duty to disclose that it <u>was</u> using tithing funds for that purpose – and failed to do so. Thus, in the absence of any evidence from the Church refuting Mr. Nielsen's sworn testimony that tithing funds were used bail out Beneficial Life Insurance, there was no basis for the Court to grant summary judgment to the Church on Mr. Huntsman's fraud claim concerning Beneficial Life.

## VII. <u>CONCLUSION</u>

For all the reason discussed above, Mr. Huntsman respectfully requests that this Court <u>reverse</u> the District Court's grant of summary judgment in the Church's favor and <u>remand</u> this case to the District Court so that Mr. Huntsman can proceed forward with his fraud claim.

Dated:  February 4, 2022      DAVID B. JONELIS
                              JAKE A. CAMARA
                              LAVELY & SINGER
                              PROFESSIONAL CORPORATION


                              By:      s/ David B. Jonelis
                                  _____
                                    DAVID B. JONELIS
                              Attorneys for Plaintiff and Appellant JAMES HUNTSMAN

49

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 21-56056

I am the attorney or self-represented party.

**This brief contains** | 9,419 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( • ) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ( ) it is a joint brief submitted by separately represented parties;

    ( ) a party or parties are filing a single brief in response to multiple briefs; or

    ( ) a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [    ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ David B. Jonelis | **Date** | 2/4/2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*