CASE NO. 21-56056

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

JAMES HUNTSMAN

*Plaintiff and Appellant,*

v.

CORPORATION OF THE PRESIDENT OF THE
CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS

*Defendant and Appellee.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT,
CENTRAL DISTRICT OF CALIFORNIA,
CASE NO. 2:21-CV-02504-SVW-SK,
HON. STEPHEN V. WILSON

---

## APPELLEE'S ANSWERING BRIEF

## REDACTED

---

**LARSON LLP**
RICK RICHMOND (SBN 194962)
*rrichmond@larsonllp.com*
TROY S. TESSEM (SBN 329967)
*ttessem@larsonllp.com*
555 South Flower Street, Suite 4400
Los Angeles, California 90071
Telephone: (213) 436-4888 - Facsimile: (213) 623-2000

*Attorneys for Defendant and Appellee Corporation of the President of the Church
of Jesus Christ of Latter-day Saints*

## CORPORATE DISCLOSURE STATEMENT

The Church of Jesus Christ of Latter-day Saints is a Utah corporation sole that issues no stock and has no parent corporation.

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF CONTENTS ................................................................ iii

TABLE OF AUTHORITIES .............................................................v

INTRODUCTION ...........................................................................1

JURISDICTIONAL STATEMENT .....................................................3

STATEMENT OF THE ISSUES ..........................................................4

STATEMENT OF THE CASE ............................................................4

I.      Statement of Facts ...............................................................4

        A.    The Church's history of community investment, tithing, and
              careful saving. .............................................................4

        B.    The Church funded City Creek from existing earnings on
              reserve funds ................................................................8

        C.    Huntsman's membership in the Church and later rejection of his
              faith ...........................................................................11

        D.    Procedural history ........................................................12

        E.    The district court's ruling. .............................................15

SUMMARY OF THE ARGUMENT ..................................................17

ARGUMENT ................................................................................21

I.      Statements About City Creek's Funding Were True ................22

        A.    The Church did not use tithing to fund City Creek. ............22

              1.    Property and funds contributed by PRI were not
                    "tithing." ..........................................................22

              2.    Funds provided by Ensign Peak were "earnings on
                    invested reserve funds." ......................................23

        B.    Nielsen's declaration does not create a disputed issue of
              material fact. ................................................................24

        C.    The district court did not weigh Nielsen's declaration against
              Rytting's declaration. ....................................................29

D. Huntsman's ignorance about the source of "reserves" does not make President Hinckley's statement false. ..............................................30

E. The Church's financial documents, and Rytting's declaration, prove that the money provided by Ensign Peak was "earnings on invested reserves." ..............................................33

F. Use of principal to generate interest does not eliminate the distinction between principal and interest. ..............................................34

II. The Church Did Not Make Any False Statement Regarding Funds Provided to Beneficial Life. ..............................................36

III. Huntsman Did Not Actually or Justifiably Rely on President Hinckley's Statement ..............................................42

A. There was no actual reliance. ..............................................42

B. There was no justifiable reliance. ..............................................44

IV. The First Amendment Bars Huntsman's Fraud Claim ..............................................47

CONCLUSION ..............................................53

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*,
   387 F. Supp. 3d 71 (D.D.C. 2019) .................................................20, 49

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..........................................................................21

*Brown v. Legal Found. of Wash.*,
   538 U.S. 216 (2003) ..........................................................................26

*In re California Trade Tech. Sch., Inc.*,
   923 F.2d 641 (9th Cir. 1991) .............................................................26

*In re Cath. Bishop of Spokane*,
   329 B.R. 304 (Bankr. E.D. Wash. 2005) ...........................................35

*Church of Scientology Flag Service Org., Inc. v. City of Clearwater*,
   2 F.3d 1514 (11th Cir. 1993) ..................................................20, 48, 49

*Corp. Presiding Bishop of The Church of Jesus Christ of Latter-day
   Saints v. Amos*,
   483 U.S. 327 (1986) (Brennan, J., concurring in the judgment) ...........20, 39, 49

*Dodd v. Hood River County*,
   59 F.3d 852 (9th Cir. 1995) .................................................18, 19, 31

*Elvig v. Calvin Presbyterian Church*,
   375 F.3d 951 (9th Cir. 2004) .............................................................46

*Employment Div. v. Smith*,
   494 U.S. 872 (1990)...........................................................................46

*In re Glenfield, Inc., Securities Litigation*,
   42 F.3d 1541 (9th Cir. 1994) .............................................................22

*Griffin v. Arpaio*,
   557 F.3d 1117 (9th Cir. 2009) .....................................................19, 41

*Hathaway v. Hathaway*,
　No. CV 09-1123-GHK (CTX), 2009 WL 10673230 (C.D. Cal.
　Sept. 29, 2009) ........................................................................19, 40, 41

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
　480 U.S. 136 (1987)...................................................................52

*L. F. v. Lake Washington Sch. Dist. #414*,
　947 F.3d 621 (9th Cir. 2020) .............................................21

*Larez v. City of Los Angeles*,
　946 F.2d 630 (9th Cir. 1991) .............................................37

*Padgett v. Wright*,
　587 F.3d 983 (9th Cir. 2009) .............................................33

*Phillips v. Washington Legal Found.*,
　524 U.S. 156 (1998)...................................................................34

*Puri v. Khalsa*,
　844 F.3d 1152 (9th Cir. 2017) .............................................53

*Smith v. Marsh*,
　194 F.3d 1045 (9th Cir. 1999) .............................................40

*The National Foundation v. First National Bank of Catawba*,
　288 F.2d 831 (4th Cir. 1961) .............................................35

*United States v. Ballard*,
　322 U.S. 78 (1944).................................................................45, 47

*United States v. Boone*,
　951 F.2d 1526 (9th Cir. 1991) .............................................26

*United States v. Kama*,
　394 F.3d 1236 (9th Cir. 2005) .............................................38

*United States v. Rasheed*,
　663 F.2d 843 (9th Cir. 1981), *cert denied*, 454 U.S. 1157 (1982) ...................52

*United States v. Sandoval-Lopez*,
　122 F.3d 797 (9th Cir. 1997) .............................................48

*Zetwick v. County of Yolo*,
  850 F.3d 436 (9th Cir. 2017) .............................................................21

**California Cases**

*Engalla v. Permanente Medical Group, Inc.*,
  15 Cal.4th 951 (1997) ......................................................................42

*Hall v. Time, Inc.*,
  158 Cal.App.4th 847 (2008) .............................................................42

*Hoffman v. 162 North Wolfe LLC*,
  228 Cal.App.4th 1178 (2014) ......................................................44, 45

*Katz v. Superior Ct.*,
  73 Cal. App. 3d 952 (Ct. App. 1977).................................................47

*In re Los Angeles Cty. Pioneer Soc.*,
  40 Cal.2d 852 (1953) ........................................................................35

*Molko v. Holy Spirit Assn.*,
  46 Cal.3d 1092 (1988) (Anderson, J., concurring and dissenting)..............45, 46

*OCM Principal Opportunities Fund v. CIBC*,
  157 Cal.App.4th 835 (2007) .........................................................28, 44

*Stansfield v. Starkey*,
  220 Cal. App. 3d 59 (Cal. Ct. App. 1990).........................................38

*Taylor v. Taylor*,
  66 Cal.App.2d 390 (1944) .................................................................26

*Wilhelm v. Pray, Price, Williams & Russell*,
  186 Cal.App.3d 1324 (1986) ............................................................42

**Other State Cases**

*In re Beckman*,
  141 Pa. Super. 315 (1940) ................................................................34

*Fowler v. Bailey*,
  844 P.2d 141 (Okla. 1992).................................................................35

*In re Godwin*,
  293 S.W.3d 742 (Tex. App. 2009)...............................................................21, 50

*Hawthorne v. Couch*,
  911 So.2d 907 (La. 2005) ........................................................................46

*Libhart v. Copeland*,
  949 S.W.2d 783 (Tex. App. 1997).............................................................52

*Morris v. Scribner*,
  508 N.E.2d 136 (N.Y. 1987)....................................................................35

*Schmidt v. Catholic Diocese of Biloxi*,
  18 So.3d 814 (Miss. 2009)................................................................49, 50, 51

*Stone v. Salt Lake City*,
  11 Utah 2d 196 (1960), *cert. denied*, 365 U.S. 860 (1961) .........................35, 39

*The Bible Way Church of Our Lord Jesus Christ of the Apostolic
  Faith of Washington D.C. v. Beards*,
  680 A.2d 419 (D.C. App. 1996) ................................................................50

*Webster v. Delgatto*,
  2006 WL 664214 (Tex. App. 2006) ..........................................................51

**California Statutes**

Cal. Civil Code
  § 1148.........................................................................................................35

Cal. Corp. Code
  § 9142.........................................................................................................35

  § 9143.........................................................................................................35

**Other Authorities**

First Amendment..........................................................................................*passim*

Fed. R. Evid. 801, 802 .....................................................................25, 27, 30

Federal Rule of Civil Procedure 56(d).........................................................14

## **INTRODUCTION**

There was no fraud.  The Church of Jesus Christ of Latter-day Saints did not make any false statements regarding the use of donations.  The Church did exactly what it said it would do:  it funded the City Creek project with returns on invested funds and with property and funds from commercial entities it owned.

There has never been a "fraud" case like this one.  There is no allegation that the Church did anything illegal with its donations.  There is no allegation of self-dealing or personal enrichment.  There is no claim that the Church, or any Church leader, benefited from the alleged fraud.  Nor does Huntsman allege that he was damaged by the alleged fraud.  If his allegations were true, it would mean only that some small portion of his "tithing" was invested for future religious purposes rather than being immediately used for missionary work, religious education, or some other aspect of the Church's mission.

Huntsman alleges that the Church invested in "purely commercial" enterprises for the purpose of "lining its own pockets."  But charities invest their financial reserves every day to  achieve their long-term charitable missions.  There is nothing wrong with a church investing its savings to increase the value of its assets for future religious or charitable works.  That is very different from diverting religious donations to "line the pockets" of organizational leaders and their friends, none of which is alleged here.  Huntsman accuses the Church of having been "wildly

successful" with its investment strategies, as though that is a bad thing instead of a blessing that will allow even greater religious and charitable works in the future.

This case is not really about how the Church uses its money. It's about a loss of personal faith. Huntsman's prefiling demand letter (which he placed in the record) makes clear that he wants his donations back because he no longer believes in what the Church teaches. He is a religious dissident. Under the First Amendment, Huntsman could not plead that the Church's teachings are false, so he tried to create a secular dispute by latching on to statements about how the Church invested in the City Creek project. Church leaders said no "tithing" would be used. Because he had no personal knowledge, Huntsman pleaded "on information and belief" that tithing was used. Based on this "belief," Huntsman demands a return of everything he ever donated to the Church, not just the miniscule portion that might have been allegedly misused under this theory.

But contrary to Huntsman's "belief," there was no misrepresentation. In April 2003, Church President Gordon B. Hinckley said the funds for City Creek would come from two sources: (1) "commercial entities" owned by the Church, and (2) "earnings on invested reserves." And that is exactly what happened. The Church moved for summary judgment and submitted 120 pages of verified financial documents that prove the funds came from these two sources.

Huntsman's response to the summary judgment motion, and now his appeal,

ignored these documents. Instead, he submitted a declaration from another dissident, David Nielsen, a former Church employee. But Nielsen does not address the financial documents and does not dispute that the money for City Creek came from these two sources. Rather, Nielsen says that what President Hinckley called "earnings on invested reserves" should, in his opinion, be called "tithing." Nielsen's personal preference for how to define "tithing" does not create a disputed issue of fact. As the district court explained:

> Plaintiff does not argue that earnings on invested tithing funds were not actually used …. Plaintiff does not identify any specific flaws in the accounting or calculations provided by Defendant's declarant. Instead, Plaintiff simply argues that there is no distinction between tithing funds and earnings on invested tithing funds…. However, Hinckley's statement is what creates a distinction between the two…. Hinckley's statement forms the basis for the fraud claim, and no reasonable juror could ignore the distinction within his statement.

2-SER-52–53 (citation and footnotes omitted).

Huntsman's complaint expressed the hope that this lawsuit would "put an end" to speculation about how the Church paid for City Creek. In that one respect, Huntsman's lawsuit was successful. The documents produced by the Church remove all doubt: City Creek was paid for just as the Church's president said it would be. There was no misrepresentation, no fraud. The Court should affirm.

## **JURISDICTIONAL STATEMENT**

Pursuant to Circuit Rule 28-2.2, Appellee agrees with Appellant's Statement

of Jurisdiction.  See Aplt.Br. at 5-6.

## STATEMENT OF THE ISSUES

1.     Huntsman alleges that the Church committed fraud when President
Hinckley said the Church would not use "tithing" for the City Creek project but
would use funds from other "commercial entities" and "earnings on invested
reserves."  The Church submitted undisputed financial documents proving that
monies from those two sources in fact funded the entirety of the City Creek project.
Did the district court err in granting summary judgment on the City Creek portion
of Huntsman's fraud claim?

2.     Huntsman alleges that the Church committed fraud by using "tithing"
to assist a Church-owned company called Beneficial Life Insurance.  Huntsman
testified that he could not identify any specific statement by the Church saying
tithing would not be used for this purpose.  Did the district court err in granting
summary judgment on the Beneficial Life portion of Huntsman's fraud claim?

## STATEMENT OF THE CASE

### I.     Statement of Facts[1]

### A.     The Church's history of community investment, tithing, and careful saving.

The Church of Jesus Christ of Latter-day Saints is a worldwide Christian

---

[1] Huntsman says the Church's statement of facts in support of its summary judgment
motion was "confusing due to the plethora of substantial redactions."  Dkt. No. 8

denomination with nearly 17 million members in 170 nations. The spiritual, organizational, and financial epicenter of the Church's worldwide religious activities is located at Church headquarters in Salt Lake City, Utah. 4-ER-671.

The Church was founded in 1830 by a prophet named Joseph Smith, Jr. 3-ER-304; 3-ER-533. Fleeing religious persecution, destitute Church members migrated to the Utah Territory between 1847 and 1860. 3-ER-304; 3-ER-533. Joseph Smith's successor, Brigham Young, served as the Church's president until 1877. 3-ER-304; 3-ER-533. In its early years, the Church constructed a temple in Salt Lake City and an adjoining Tabernacle (home to the Tabernacle Choir) on a block now commonly called Temple Square. 3-ER-305; 3-ER-533. The Church's headquarters border Temple Square. 3-ER-305; 3-ER-533.

Before completion of the transcontinental railroad, Utah was relatively isolated. 3-ER-306; 3-ER-533. Brigham Young knew the Church and its members needed to become self-reliant so the Church, as the only institution with enough resources, established numerous commercial enterprises including Zion's Cooperative Mercantile Institution ("ZCMI"), a general goods store. 3-ER-306–07; 3-ER-533–34. The Church also started the Hotel Utah, a chain of bookstores called Deseret Book, a newspaper called *Deseret News*, and the Deseret Gym. 3-ER-307;

---

("Aplt.Br."), at 8. That criticism is silly. Redactions were made only in the version of the documents made public and were minimal. More important, Huntsman and the district court had unredacted copies of the documents filed under seal, which, as of April 4, 2022, have also been ordered sealed by this Court.

3-ER-534.

Decades later, ZCMI became the anchor store for the ZCMI Center Mall, which was across the street from Temple Square. 3-ER-306–07; 3-ER-533. From 2006 to 2012, the Church revitalized that part of downtown Salt Lake City by transforming the ZCMI Center Mall into the City Creek Center. 3-ER-307; 3-ER-534. The funds used for that redevelopment are at the center of this case.

The Church is funded by charitable contributions from its members. 3-ER-307–09; 3-ER-534. Those contributions fall into different categories: fast offerings, missionary fund, humanitarian aid, and tithing. *Id*. Fast offerings are used by Church clergy to provide housing, shelter, food, and other essentials to the poor. 3-ER-309; 3-ER-534. Missionary contributions fund the Church's worldwide missionary efforts. *Id.* Humanitarian aid is used primarily for disaster relief. 3-ER-309–10; 3-ER-534. Tithing supports the Church's day-to-day operations throughout the world. 3-ER-308; 3-ER-534. With origins in the Old Testament, tithing is the practice of giving 10% of one's annual "increase" to the Church. 3-ER-308–09; 3-ER-534. Church doctrine teaches, and members believe, that tithing is a commandment from God. 3-ER-309; 2-ER-115.

For decades after its founding, the Church struggled financially. To create a better financial foundation, the Church began setting aside a percentage of donations to build a reserve. 3-ER-310; 3-ER-534. During the Church's April 1991 General

Conference (a semi-annual worship service with messages from Church leaders to worldwide Church membership), a senior Church leader, Gordon B. Hinckley, explained the Church's basic financial philosophy:

> In the financial operations of the Church, we have observed two fixed principles: One, the Church will live within its means. It will not spend more than it receives. Two, a fixed percentage of income will be set aside to build **reserves** against what might be called a possible "rainy day."

3-ER-310–11, 2-ER-237 (emphasis added).

During the October 1995 General Conference, Hinckley, by then elevated to Church President, reiterated: "Not only are we determined to live within the means of the Church, but each year we put into the **reserves** of the Church a portion of the annual budget…. Should there come a time of economic distress, we would hope to have the means to weather the storm." 3-ER-311–12; 2-ER-246 (emphasis added).

Until 1997, a Church department called the Investment Securities Department managed these reserve funds. 3-ER-313; 3-ER-535. In 1997, the Church formed Ensign Peak Advisors, Inc. ("Ensign Peak") as a nonprofit corporation to be its primary vehicle for investing in stocks, bonds, and securities. 3-ER-312; 3-ER-535. The Church transferred to Ensign Peak its existing reserves of ██████████ as an initial grant. 3-ER-312–13; 3-ER-535; 3-ER-544. The initial grant was subsequently invested and began to accrue earnings. 3-ER-313–314; 3-ER-535; 3-ER-544. The Church also uses a nonprofit entity called Property Reserve, Inc.

("PRI") to invest Church reserves in commercial real estate.  3-ER-314; 3-ER-536.

### B. The Church funded City Creek from existing earnings on reserve funds.

During the Church's April 2003 General Conference, President Hinckley announced that the Church planned to redevelop the ZCMI Shopping Mall and adjoining property in downtown Salt Lake City.  3-ER-314–15; 3-ER-536; 2-ER-250.  Although this would generate income for the Church's reserves, the proposed project also had an important religious purpose.  President Hinckley explained that Church leaders felt "a compelling responsibility to protect the environment of the Salt Lake Temple," which had deteriorated over time, as is often the case in downtown areas of significant cities. 3-ER-315; 2-ER-250.  President Hinckley then explained how this project would be financed:

> I wish to give the entire Church assurance that tithing funds have not and will not be used to acquire this property.  Nor will they be used in developing it for commercial purposes.  ***Funds for this have come and will come from those commercial entities owned by the Church. These resources, together with the earnings of invested reserve funds, will accommodate this program***.

3-ER-315–16; 3-ER-536; 2-ER-250 (emphasis added).

In four later statements, Church leaders or Church publications reiterated President Hinckley's assurance that no "tithing" would be used for the City Creek project.  Aplt.Br. at 11-13.  Because President Hinckley said where the funds *would* come from, these four subsequent statements are not especially relevant.  2-SER-53.

By December 31, 2003, just a few months after President Hinckley made this announcement, Ensign Peak's net assets had grown to ███████████, an increase of ███████████ from its original funding. 3-ER-316; 3-ER-536–37; 3-ER-546. During 2003 alone, Ensign Peak accumulated ███████████ in net investment earnings (interest, dividends, and gains) on the Church's reserve funds. 3-ER-317; 3-ER-536–37; 3-ER-547.

On January 1, 2004, Ensign Peak allocated ███████, out of the ███████ in earnings on invested reserves, for the City Creek project. 3-ER-318–19; 3-ER-537; 3-ER-549–50. These "earnings on invested reserve funds" were allocated ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████ *Id*. Obviously, the 2003 "earnings on invested reserve funds" of ███████, alone, were sufficient to create the ███████████████. *Id*. To reiterate, the ███████ allocated to the ███████ came exclusively from the "earnings on invested reserve funds." 3-ER-322; 3-ER-538.

The Church established ███████████████ a nonprofit corporation, to manage and own City Creek. 3-ER-322; 3-ER-538. During the project's development (2007-2012), ███████████████ authorized appropriations ███████████. 3-ER-323–24; 3-ER-538. The ███████ ███████████ is ███████████████████████████.

9

*Id.* With this authorization, ████████████████████████████████████ ████████████████████████████████████████████████████████████████. 3-ER-323–24; 3-ER-538; 3-ER-551–4-ER-604. The remaining assets in the ████████████████████████████████ 3-ER-324; 3-ER-538–39. The ████████ ████ was periodically "drawn down" during the project but never drawn down below zero dollars. 3-ER-324–25; 3-ER-538–39; 4-ER-605–658.

████████████████████ contained sufficient funds for every grant made to ██████. 3-ER-325; 3-ER-538–39; 3-ER-551–4-ER-658. By April 30, 2007, three years after the ████████████ was created with ████████████ of "earnings on invested reserve funds," but before Ensign Peak made any grants, the ████████████████████ ████████████████████████. 3-ER-326; 3-ER-539–40; 4-ER-606. Ensign Peak granted ████████ a total of ████████████ from the ████████████ for the City Creek project. 3-ER-327–28; 3-ER-540; 3-ER-552–54. Each grant came from the initial ████████████████████████████████████████████████████████████████ ████ and subsequent earnings on that initial allocation. 3-ER-327–28; 3-ER-540; 3-ER-551–4-ER-658. When the project was completed on March 31, 2012, the ████████████ had a remaining market value of ████████████. 3-ER-327; 3-ER-539–40; 4-ER-658.

Through PRI, the Church already owned most of the land for the City Creek project before President Hinckley's announcement, which was donated to the

project.  3-ER-329; 3-ER-540.  PRI also spent approximately ███████████

████████████████████████████████████.  3-ER-330; 3-ER-540.

No tithing funds were used as part of PRI's expenditures.  *Id.*

### C.     Huntsman's membership in the Church and later rejection of his faith.

James Huntsman was born into a family of devout Church members.  3-ER-331; 2-ER-113; 2-ER-155–56.  His maternal grandfather, David Haight, was one of the Church's highest-ranking leaders at the time President Hinckley announced the City Creek project.  3-ER-332; 2-ER-158.  Huntsman's father was also a high-ranking Church leader.  3-ER-332; 2-ER-159–60.

Huntsman considered himself one of the Church's most devout members.  3-ER-333; 2-ER-113.  As a boy, he learned about tithing from his parents and from Church meetings.  3-ER-333; 2-ER-114.  At age 19, he was ordained an "Elder" and accepted a two-year assignment as a Church missionary in Germany.  3-ER-334; 2-ER-122–23.  As a missionary, Huntsman taught people that tithing was a commandment from God and that God would bless those who gave tithes.  3-ER-334–35; 2-ER-124–25.  Huntsman taught people they should expect to give tithes if they became Church members.  3-ER-335; 2-ER-124–25.

Huntsman gave tithes to the Church from 1993 until 2015.  3-ER-335; 2-ER-126–27.  Huntsman placed no conditions on his donations: "Q. Did you place any restrictions on the contributions you made to the Church between 2003 and 2015 in

terms of how those contributions could be used by the Church? …. A. No." 2-ER-133–34. He believed he was obeying God's commandments and God would bless him. 3-ER-347; 2-ER-136–37.

Huntsman's last donation was on January 9, 2015. 3-ER-347; 2-ER-209. His decision to stop giving tithes had nothing to do with how City Creek was funded. 3-ER-347–48; 2-ER-211; 2-ER-280. Huntsman had become "disillusioned with the Church's doctrines …." Aplt.Br. at 9. Five years later, in 2020, Huntsman and his wife formally ended their Church membership because they "stopped believing certain doctrines" altogether. 3-ER-348; 2-ER-209–12.

During the years he gave tithes, Huntsman knew the Church owned several commercial businesses. 3-ER-348–50; 2-ER-117–20. Huntsman never asked where the money came from to fund these businesses. 3-ER-350; 2-ER-120–21.

### D. Procedural history.

Huntsman filed suit on March 22, 2021, pleading a single fraud claim with two parts. 2-ER-252–64. First, he alleged that President Hinckley's assurance that funds for City Creek would not come from "tithing" was false. Aplt.Br. at 10-11. Second, he alleged that the Church's use of funds to "bail out" a Church-owned company called Beneficial Life Insurance ("Beneficial Life") was contrary to unspecified representations about how Church funds would be used. Aplt.Br. at 10.

More broadly, Huntsman alleged that the Church promised that donated funds

"would be used for purely non-commercial purposes consistent with the Church's stated priorities – namely, to fund missionary work, member indoctrination, temple work, and other educational and charitable activities."  2-ER-253.  Instead of using all donated funds for these purposes, Huntsman says the Church "lined its own pockets" by investing in various commercial enterprises.  2-ER-253–54.  Huntsman alleged that the Church defrauded him "by falsely misleading him into believing his tithings would be used solely for charitable purposes around the world" instead of being "spent" on "purely commercial" purposes.[2]  2-ER-254, 260.  During his deposition, however, Huntsman defined his fraud claim as specifically concerning "City Creek Mall and Beneficial Life," not broader claims about how the Church used tithing funds.  2-ER-138.

At a status conference on June 28, 2021, the parties briefly set forth their positions.  After Mr. Jonelis explained Huntsman's contention that tithing funds had been used for the City Creek project, the Church's counsel, Mr. Richmond, explained that this matter could be quickly resolved by Church documents showing where the money came from.  2-ER-24–27.  The district court asked, "[I]s your position supportable on a summary judgment standard?"  2-ER-26.  Mr. Richmond

---

[2] In fairness to Huntsman, the Church has largely adopted his nomenclature.  But when Huntsman pleads that the Church "spent" money on "purely commercial" purposes, what he means is that the Church invested money in commercial enterprises, along with its investments in stocks, bonds, and other assets.

said it was and suggested the court "put the case into a position so that I can make that summary judgment motion" based on the financial documents. *Id.*

The court asked Huntsman's attorney, "[D]o you have any objection to testing the waters with a summary judgment motion?" 2-ER-27. Recognizing the benefit of a quick resolution if the Church could produce dispositive documents, which Huntsman's attorney described as "the fundamental evidence" in this case, he said "No." 2-ER-27–28. The court's clerk announced that the Church's motion would be due on August 9, 2021, Huntsman's opposition on August 16, 2021, and the Church's reply on August 23, 2021. 2-ER-30. Huntsman's attorney did not object, nor ask to take the deposition of any Church witnesses. 2-ER-27–30.

The Church submitted its summary judgment motion, supported by a declaration from Paul Rytting, the Director of Risk Management in the Church's Finance and Records Department (3-ER-532–41), along with 120 pages of "the fundamental evidence" in the form of financial documents (3-ER-542 to 4-ER-662). Huntsman did not say he needed additional discovery to respond to the motion, nor did he file an affidavit pursuant to Federal Rule of Civil Procedure 56(d).[3] Instead, Huntsman responded with declarations from himself (2-ER-43–78) and David

---

[3] Huntsman attempts to reframe the summary judgment schedule as unfair describing it as "Court ordered" and that he only had a single week to file an opposition without any discovery. Aplt.Br. at 20. This is disingenuous. Huntsman did not object to the schedule, did not request time to take depositions, and did not file a Rule 56(d) affidavit. 2-ER-27–30.

Nielsen (2-ER-79–85).

Huntsman questioned whether Rytting had the personal knowledge to verify the Church's financial documents. 2-ER-92. As a "belt-and-suspenders foundation for the business records," the Church submitted a declaration from Roger Clarke with its reply brief that did not add any substance to Rytting's declaration but merely provided a second verification of the financial records. 3-ER-411; 3-ER-298–300; 1-SER-3; 1-SER-5–7.

### E. The district court's ruling.

Having reviewed the financial documents submitted by the Church, the district court concluded that "no reasonable juror could find Defendant made a misrepresentation." 2-SER-49. The financial documents proved that the funds "came from earnings on Defendant's invested reserve tithing funds," just as President Hinckley had promised. 2-SER-51.

The court did not weigh the evidence or disregard Nielsen's declaration. The court explained "that Nielsen's testimony, *accepted as true*, does not create a genuine issue of material fact." 2-SER-51 (emphasis added).

> Nielsen conflates tithing funds with earnings on invested tithing funds. Specifically, he states that "EPA's senior leadership and other EPA employees referred to and revered all funds of EPA as 'tithing' money, regardless of whether they were referring to principal or earnings on that principal." *Id*. ¶6. It is on the basis of this statement that he then asserts that EPA directed approximately ████ in tithing funds to pay for the commercial development of the City Creek Mall. *Id*. ¶8.

> However, Hinckley expressly stated that earnings on invested tithing *would* be used to pay for the City Creek project …. And … that is exactly what happened. Accordingly, regardless of the nomenclature used by EPA employees, the distinction in Hinckley's statement renders his statement true.

2-SER-51.

The court pointed out that Huntsman "does not argue that earnings on invested tithing funds were not actually used …." 2-SER-52. He "simply argues that there is no distinction between tithing funds and earnings on invested tithing funds." 2-SER-52–53. The court rejected Huntsman's argument "that tithing funds and earnings on invested tithing funds are 'two sides of the same coin.'" 2-SER-11.

> This argument is unavailing for two reasons. First, for the purposes of this case, tithing funds and earnings on invested tithing funds are not two sides of the same coin because Hinckley expressly distinguished between the two. Second, because Plaintiff's argument effectively asks this Court to define the term "tithing funds," the First Amendment bars Plaintiff's argument. Specifically, determining whether the term "tithing funds" encompasses earnings on invested tithing funds would require an analysis of Church doctrines and teachings. Such an inquiry would entangle this Court or a jury in an interpretation of "ecclesiastical rule, custom or law."

2-SER-53 (citations omitted).

The court also rejected Huntsman's assertion that the Church's declarant, Paul Rytting, "lacks personal knowledge" and that the financial documents "lack authenticity." 2-SER-52. With citations to case law, the court was "persuaded that the contents of the Rytting declaration and its underlying documents would be

16

admissible at trial."[4] *Id.*

The court also rejected Huntsman's fraud claim related to Beneficial Life Insurance for two reasons. "First, Plaintiff does not identify a specific misrepresentation by Defendant" (2-SER-55), because the Church never said it would *not* use "tithing" to assist Beneficial Life. Second, the court could not look to "church teachings and doctrines" to determine whether it was appropriate for the Church to use "tithing" for such a purpose. *Id.*

## SUMMARY OF THE ARGUMENT

There was no fraud. The Church funded the City Creek project in the way President Hinckley said it would be funded: (1) through its "commercial entities" and (2) with "earnings on invested reserve funds." 3-ER-314–16; 3-ER-536; 2-ER-250. That is exactly what occurred, as proven by "the fundamental evidence" of the 120 pages of financial documents. Those documents prove that the Church's funding of City Creek came from PRI, which is a Church-affiliated entity that invests in commercial real estate, and from earnings on invested reserves managed by Ensign Peak. 3-ER-312–30; 3-ER-532–41; 3-ER-543 to 4-ER-662. Huntsman fails to rebut any of this fundamental evidence.

---

[4] Huntsman's opening brief raises questions about Rytting's personal knowledge (*see, e.g.*, Aplt.Br. at 25 n.2), but Huntsman's appeal does not challenge the district court's conclusion about the admissibility of his declaration and the accompanying documents. Further, just as the Church argued (2-SER-61–103), the district court concluded that the *content* of the evidence was admissible (2-SER-52 at n.3).

Instead, Huntsman argues that a genuine issue of material fact is created by the declaration of David Nielsen, a former Ensign Peak employee. Aplt.Br. at 34-37. But Nielsen's declaration does not state that the Church used tithing as opposed to "earning on reserves" to fund City Creek. Instead, Nielsen argues that "earnings on reserves" is the same thing as "tithing," despite President Hinckley's express distinction between the two. Accepting Nielsen's declaration as true, the district court correctly concluded that Nielsen "conflates tithing funds with earnings on invested tithing funds," and that regardless of Nielsen's arguments, "the distinction in Hinckley's statement renders his statement true." 2-SER-51. Thus, there is no genuine issue of material fact.

Huntsman contends the Church committed fraud by using tithing to support Beneficial Life. He relies on a statement "reported by the *Salt Lake Tribune,*" which was attributed to Church employee Keith B. McMullin, saying "not one penny of tithing goes to the church's for-profit endeavors." Aplt.Br. at 46. However, McMullin's alleged 2012 statement was three years after Ensign Peak provided funds for Beneficial Life, and thus cannot be the basis for a fraud claim. Aplt.Br. at 15.

Huntsman next argues that under a nondisclosure theory, he need not identify a misrepresentation. Aplt.Br. at 46-47. Because Huntsman never raised this theory in his opposition papers below (2-ER-86–108), it should be disregarded. *Dodd v.*

*Hood River County*, 59 F.3d 852, 863 (9th Cir. 1995). Regardless, Huntsman's nondisclosure theory necessarily requires a specific representation. Without specific representations, there cannot be a nondisclosure that makes what was said misleading, but Huntsman fails to point to one. *Hathaway v. Hathaway*, No. CV 09-1123-GHK (CTX), 2009 WL 10673230, at *6 (C.D. Cal. Sept. 29, 2009). Any reliance on general Church teachings also fails because it would require the court "to determine whether church teachings and doctrines prohibited the alleged transfer of tithing funds to Beneficial" and "the First Amendment prohibits" such an inquiry. 2-SER-55.

In sum, the undisputed evidence proves that President Hinckley's statement about City Creek's funding was true, and Huntsman failed to point to any specific representations about Beneficial Life. This Court should affirm summary judgment on that basis alone. But the Court can "affirm for any reason supported by the record." *Griffin v. Arpaio*, 557 F.3d 1117, 1121 (9th Cir. 2009). And there are two additional grounds for affirmance.

*First*, Huntsman did not actually or justifiably rely on President Hinckley's statement to give tithes. There was no actual reliance because President Hinckley was not soliciting contributions (2-ER-250), and Huntsman did not donate in response to President Hinckley's statement. Huntsman donated tithing for a decade before President Hinckley's statement, and for 12 years thereafter, because he

believed from the time he was a boy that tithing was a commandment from God. 3-ER-333–334; 3-ER-347; 2-ER-115; 2-ER-136–37. Also, Huntsman was a sophisticated member and admitted that he was aware of several of the Church's commercial investments. 3-ER-348–351; 2-ER-209–12. There is no evidence that Huntsman gave tithes because of President Hinckley's statement.

*Second*, Huntsman's claim runs afoul of the First Amendment. Huntsman's complaint makes clear that, in his view of the case, the "core issue" is the use of donations "to fund *any* commercial endeavors, *including* the development of a shopping mall." Aplt.Br. at 1. He claims that Church funds were not used "consistent with the Church's stated priorities …." 2-ER-253. In other words, Huntsman disagrees as a religious matter with how the Church uses its money.

This is precisely the kind of "intramural church conflict" the First Amendment prohibits. *Church of Scientology Flag Service Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1538 (11th Cir. 1993). The First Amendment guarantees religious organizations autonomy to "define their own doctrines, resolve their own disputes, *and run their own institutions.*" *Corp. Presiding Bishop of The Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 341 (1986) (Brennan, J., concurring in the judgment) (emphasis added). "How a church spends worshippers' contributions" is "central to the exercise of religion." *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 387 F. Supp. 3d 71, 80 (D.D.C. 2019). "[A]

20

determination of whether [the church's] financial expenditures were proper …
requires an inquiry into whether the expenditures were justified in light of [the
church's] religious doctrines and practices," which is just "the type of ecclesiastical
inquiry courts are forbidden to make." *In re Godwin*, 293 S.W.3d 742, 750 (Tex.
App. 2009).

For these reasons and those that follow, the Court should affirm the summary
judgment.

## **ARGUMENT**

"[S]ummary judgment is reviewed de novo." *L. F. v. Lake Washington Sch.
Dist. #414*, 947 F.3d 621, 625 (9th Cir. 2020). To defeat summary judgment, the
nonmoving party must submit "evidence such that a reasonable juror drawing all
inferences in favor of the respondent could return a verdict in the respondent's
favor." *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (quotation
marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)
("[T]here is no issue for trial unless there is sufficient evidence favoring the
nonmoving party for a jury to return a verdict for that party."). Huntsman submitted
no evidence that President Hinckley's statement was false and no evidence of any
false statement about Beneficial Life. The Church's financial documents
definitively prove President Hinckley's statement was true.

## I.    **Statements About City Creek's Funding Were True**

The most fundamental aspect of fraud is that "[t]he statement in question must be false …." *In re Glenfield, Inc., Securities Litigation*, 42 F.3d 1541, 1548 (9th Cir. 1994). When President Hinckley announced the City Creek project, he said "tithing funds have not and will not be used," but instead the money would come from (1) the Church's "commercial entities" and (2) "earnings on invested reserve funds." 3-ER-314–16; 3-ER-536; 2-ER-250. That is exactly what happened.

Huntsman argues that Nielsen's declaration creates a dispute of material fact (it does not), and that the district court improperly weighed Nielsen's declaration against Rytting's declaration (it did not). Huntsman further claims he was ignorant of what President Hinckley meant by "reserve fund," that the Church's financial records do not prove that no tithing was used, and that interest is the same as principal. Each argument is unavailing.

### A.    **The Church did not use tithing to fund City Creek.**

#### 1.    Property and funds contributed by PRI were not "tithing."

Huntsman does not contend that the property or money provided by PRI for the City Creek project was "tithing." PRI is a Church-affiliated entity that invests in commercial real estate. 3-ER-314; 3-ER-536. PRI granted properties to ███ and expended approximately ████████████████

22

████████████████████ 3-ER-329–30; 3-ER-540. Nielsen's declaration says nothing about PRI. 2-ER-79–85. There is no dispute of fact as to PRI.

    2.    <u>Funds provided by Ensign Peak were "earnings on invested reserve funds."</u>

President Hinckley explained the Church's basic financial philosophy. The Church would "live within its means" and "not spend more than it receives." 3-ER-311; 3-ER-534–35; 2-ER-237. And the Church would set aside "a fixed percentage of income to build reserves" for the future. *Id*. Ensign Peak is the Church-affiliated entity that invests these reserve funds. 3-ER-312; 3- ER-535. Huntsman does not dispute that when President Hinckley said the Church would fund City Creek with "earnings on invested reserves," President Hinckley was referring to the earnings on reserve funds invested by Ensign Peak. There is nothing else to which President Hinckley could have been referring. Ensign Peak is the entity that invests the Church's reserve funds. *Id*.

By December 31, 2003, just a few months after President Hinckley made this announcement, Ensign Peak's net assets had grown to ███████████, an increase of ██████████ from its original funding. 3-ER-316; 3-ER-536–37; 3-ER-546. During 2003 alone, Ensign Peak accumulated ██████████ in net investment earnings (interest, dividends, and gains) on the Church's reserve funds. 3-ER-317; 3-ER-536–37; 3-ER-547.

On January 1, 2004, consistent with President Hinckley's statement, the

Church set aside ▮▮▮▮▮, out of the ▮▮▮▮▮ in earnings on invested reserves, for the City Creek project. 3-ER-318–19; 3-ER-537; 3-ER-549–50. By April 30, 2007, three years after the ▮▮▮▮▮ had been created with "earnings on invested reserve funds," but before Ensign Peak made any grants, the ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮. 3-ER-326; 3-ER-539–40; 4-ER-606. Ensign Peak granted ▮▮▮ a total of ▮▮▮▮▮ from the ▮▮▮▮▮ for the City Creek project. 3-ER-327–28; 3-ER-540; 3-ER-552–54. Each grant came from the initial ▮▮▮▮▮ and earnings on that initial allocation. 3-ER-327–28; 3-ER-540; 3-ER-551–4-ER-658. Upon completion of the project on March 31, 2012, the ▮▮▮▮▮ had a remaining market value of ▮▮▮▮▮. 3-ER-327; 3-ER-539–40; 4-ER-658.

There is no evidence disputing that City Creek funding came from (1) the Church's "commercial entities," and (2) "earnings on invested reserves." There was no false statement and therefore no fraud.

### B. Nielsen's declaration does not create a disputed issue of material fact.

Huntsman makes five arguments based on Nielsen's declaration to support his assertion that "tithing" was used for City Creek.[5] None has merit.

---

[5] As Huntsman notes, Nielsen is a former Ensign Peak employee. He started at Ensign Peak in 2010, seven years after the Reserve Fund was created. Aplt.Br. at 4. His employment responsibilities had nothing to do with the ▮▮▮▮▮ 2-ER-80. His declaration is not based on personal knowledge, but for purposes of this

*First*, Nielsen says earnings on invested reserves should be deemed "tithing" because he was "informed" that Ensign Peak "was seeded with tithing money from the Church." 2-ER-80; Aplt.Br. at 13. Nielsen began working at Ensign Peak in 2010, 13 years after its formation, and has no personal knowledge of what occurred in 1997. 2-ER-80; 2-SER-105–06. He offers no basis for his hearsay claim that Ensign Peak was seeded with tithing. 2-ER-80; 2-SER-107; Fed. R. Evid. 801, 802. In any case, it makes no difference. Just because Nielsen would call investment earnings "tithing" does not change the fact that the President of the Church drew a distinction between the two, nor the fact that City Creek was funded with "earnings on invested reserves." 2-SER-51 ("[T]he distinction in Hinckley's statement renders his statement true."). Seed money is different than profits; principal is different than interest. Whatever the source of EPA's seed money, the undisputed evidence shows that City Creek was funded with earnings on that money. Thus, President Hinckley's statement was true.

*Second*, Nielsen testified that "earnings on invested reserves" is still "tithing" because it is "commingled" with the principal tithing. Aplt.Br. at 14. Nielsen offered no basis for his commingling allegation. In any case, "commingling" is a red herring. Ensign Peak used standard accounting practices to distinguish

---

appeal, the Church does not challenge it. Huntsman says that Nielsen filed a "whistleblower complaint" with the IRS in 2019 and that his complaint "is still pending with the IRS." Aplt.Br. at 17. This "whistleblower complaint" is not in the record. The Church has no knowledge that the IRS complaint is "still pending."

uninvested reserves from earnings on invested reserves, and it took the funds for City Creek from the latter. 3-ER-415. It is a prudent and accepted practice of corporations, financial institutions, and brokerage firms to aggregate funds into common accounts for efficient management while using standard accounting practices to track the source. *Id.*

Commingling can be problematic in completely different fiduciary settings, such as when an attorney commingles clients' funds with the attorney's funds; or a trustee commingles trust funds with personal funds. *See, e.g.*, *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 220-21 (2003) ("It has long been recognized that [attorneys] have a fiduciary obligation to avoid commingling their clients' money with their own."); *see also In re California Trade Tech. Sch., Inc.*, 923 F.2d 641, 646 (9th Cir. 1991); *United States v. Boone*, 951 F.2d 1526, 1538 (9th Cir. 1991). In such cases, a third party has a property interest in a portion of the commingled funds and the holder has no right to use those funds for his own benefit. *Id.* That is not what occurred here. No third party held any interest in donations made by Church members. *See Taylor v. Taylor*, 66 Cal.App.2d 390, 399 (1944) ("A voluntary gift divests the donor of his property and invests the donee with title irrevocably.").

*Third*, Nielsen testified that earnings on invested reserves are "tithing" because "EPA employees … referred to and revered **all** EPA funds as 'tithing' money, regardless of whether they were referring to the principal tithing itself or the

earnings on that principal."[6] Aplt.Br. at 13.

This is unattributed and inadmissible hearsay. Fed. R. Evid. 801, 802; 2-SER-108. Regardless, how EPA employees allegedly referred to these funds is irrelevant. 2-SER-51. What is relevant is that President Hinckley drew a distinction between "tithing" on the one hand, and earnings on invested reserves on the other, and then abided by that distinction. *Id.* ("[R]egardless of the nomenclature used by EPA employees, the distinction in Hinckley's statement renders his statement true.") Huntsman cannot make President Hinckley's statement false by ignoring what President Hinckley said and what the Church did.

*Fourth*, based on Nielsen's declaration, Huntsman contends that earnings on invested reserves are "tithing" because, like tithing, they "were administered by a committee known as the Council on the Disposition of Tithes," which by its "very nomenclature, was responsible for approving any distributions and/or withdrawals of tithing funds." Aplt.Br. at 14-15.

The governing body for Ensign Peak was the ███████████████████, not the Council on the Disposition of Tithes. 3-ER-323; 3-ER-538. Here too, however, it makes no difference because this argument actually admits that

---

[6] The Church considers all of its funds to be sacred and is grateful that Ensign Peak employees might refer to all such funds as "tithing" as a reminder of their obligation to exercise care in managing these funds. This does not eliminate the distinction between principal and investment earnings, and it does not make President Hinckley's statement false when he expressly made the same distinction.

"earnings on invested reserves" were used for City Creek, just as President Hinckley said.

Each of these four arguments requires ignoring the distinction President Hinckley made, and followed, between principal and earnings on invested principal. That distinction exists and a statement cannot be made false by ignoring it.[7]

*Fifth*, Huntsman argues that Nielsen says "that ***principal*** tithing funds (*i.e.*, not just the 'earnings' thereon) were used by EPA to fund the City Creek" project. Aplt.Br. at 35. Nielsen's declaration does not say this. Nielsen says that City Creek was funded with money that should be called tithing because, in his mind, "all of EPA's funds were tithing," including the earnings. 2-ER-82. Nielsen does not say principal tithing funds were used.

Huntsman contends that a slide from a presentation attended by Nielsen "specifically referenced how principal 'investment reserves' (*i.e.*, not the 'earnings' thereon) were withdrawn to pay for the City Creek Mall …." Aplt.Br. at 16. This is simply not true. Once again, Nielsen calls the money referred to on this slide "tithing" only because he says all funds handled by Ensign Peak should be called "tithing." 2-ER-82.

But what the slide does show is that the money for City Creek (and Beneficial

---

[7] Even if President Hinckley had not distinguished between tithing and earnings on invested reserves—if all he had said was no "tithing" would be used for City Creek—his statement would still be true because the distinction exists.

Life) came from "investment reserves" as distinguished from the "budget," *i.e.*, day-to-day Church funding that the Church does not turn over to Ensign Peak for investment. 2-ER-85. The "budget" was used to pay for a Conference Center and temples, for example. *Id*. Thus, the slide shows only that the funds for City Creek (and Beneficial Life) came from Ensign Peak's "investment reserves"; it does not say that it came from the principal reserves or earnings on invested reserves. *Id.* In contrast, the documents produced by the Church unequivocally prove that the funds for City Creek came from earnings on invested reserves. 3-ER-312–28; 3-ER-532–41; 3-ER-543 to 4-ER-662.

In sum, just as the district court concluded, Nielsen's declaration did not create a genuine issue of material fact. 2-SER-51.

### C. The district court did not weigh Nielsen's declaration against Rytting's declaration.

Huntsman says the district court "discounted Nielsen's testimony concerning EPA's use of tithing funds because he 'did not begin working at EPA until 2010.'" Aplt.Br. at 36. That is not correct. The district court accepted the Church's undisputed evidence that funds for City Creek were allocated on January 1, 2004, from earnings on invested reserves. 2-SER-52. Nielsen's declaration does not contradict this. 2-SER-51–53. There was nothing for the district court to "discount" on this point. *Id.* Nielsen's declaration says nothing about the source of the original allocation for City Creek. *Id.* The court merely pointed out that Nielsen could not

testify about this because he was not employed by Ensign Peak at that time.[8]

Huntsman says this case comes down to the question of "who is more believable?  Mr. Huntsman's declarant [David Nielsen] or the Church's declarant [Paul Rytting]?"  Aplt.Br. at 3.  But that is not the question because the two declarations do not conflict.  Nielsen's declaration does not dispute that the funds for City Creek came from (1) the Church's "commercial entities" and (2) "earnings on invested reserves."  3-ER-79–83.  The district court was right: "Nielsen's testimony, accepted as true, does not create a genuine issue of material fact."  2-SER-52.

### D.  <u>Huntsman's ignorance about the source of "reserves" does not make President Hinckley's statement false.</u>

Huntsman spends pages arguing that (1) the Church did not make it clear to him that its reserves came from tithing; and (2) he was unaware of President Hinckley's public statements describing the Church's governing financial principles.  Aplt.Br. at 37-40.  Huntsman says he did not know the source of Church reserves.

---

[8] Huntsman also tries to make something of Nielsen's claim that he attended a 2013 meeting in which Roger Clarke, then Ensign Peak's president, supposedly said, in Nielsen's words, "that it was important that people should not know EPA's role as the source of the funds" for City Creek. 2-ER-81–82. This hearsay allegation makes no sense. Fed. R. Evid. 801, 802; 2-SER-110.  President Hinckley said the funds would come from "earnings on invested reserves."  3-ER-315–16; 2-ER-250. Because Ensign Peak was the Church's investment vehicle (3-ER-312; 3-ER-535), President Hinckley's statement meant the funds would come from Ensign Peak. There was nothing to hide.  In any case, the financial documents prove the source of the funds.  Nielsen's alleged recollection of what Clarke said at this meeting does not create a disputed issue of fact about whether President Hinckley made a false statement.  The Church's financial records prove he did not. 3-ER-312–30; 3-ER-532–41; 3-ER-543 to 4-ER-662.

*Id.* at 3, 30.  He argues, "Although the Church points to President Hinckley's 1991 and 1995 announcements as evidence of this supposed disclosure [of where reserves came from], those statements were, at best, ambiguous as to the source of 'reserve' monies." *Id.* at 38.  Furthermore, he claims he never read or heard these statements. *Id.* at 30.

Huntsman did not raise this argument below and so it should be disregarded. *See Dodd*, 59 F.3d at 863 (courts generally do not consider an issue not raised below).  In any case, the argument is untenable.  President Hinckley's 1991 statement explains that the "financial program of the Church—both income and disbursement—is found in Sections 119 and 120 of the Doctrine and Covenants," which is Church scripture.  2-ER-236.  Explaining that Section 119 concerns tithing, President Hinckley then states that the Church will not spend more than it "receives" and will set aside a fixed percentage "to build reserves."[9]  2-ER-237.  Clearly, President Hinckley meant that the reserves would come from tithing.

In any event, Huntsman fails to explain why this matters.  The truth of

---

[9] Huntsman erroneously contends that President Hinckley's discussion of "reserves" and "income" refer to "income-producing business properties."  Aplt.Br. at 39. However, President Hinckley's reference to "a few income-producing business properties" is in a different section of his address, which did not concern how the Church managed its finances.  2-ER-237–38.  In fact, President Hinckley explained: "We have a few income-producing business properties, but the return from these would keep the Church going only for a very brief time.  *Tithing* is the Lord's law of finance."  2-ER-238 (emphasis added).

President Hinckley's statement does not depend on Huntsman's understanding.[10] President Hinckley's statement was true, as proven by the Church 120 pages of unrebutted financial documents. 3-ER-312–28; 3-ER-532–41; 3-ER-543 to 4-ER-662. And obviously, President Hinckley's statement was not misleading. President Hinckley explained that the Church would fund City Creek, in part, from earnings on reserves, and in 1991 and 1995, President Hinckley explained where those reserves came from. 3-ER-310–12, 2-ER-237; 2-ER-246.

Accepting Huntsman's argument would mean that anyone could allege fraud, claiming they did not understand another person's true statement but decided to nevertheless enter into a contract or (in this case) to make unrestricted tithing donations. A person cannot claim fraud based on not understanding one true statement while claiming ignorance of what the same speaker said on the same subject in the same forum in previous public statements. Huntsman knows this because he fails to cite to a single case supporting his position.[11] Aplt.Br. at 40-41.

---

[10] Huntsman's argument about his "understanding" undermines any claim of actual reliance. A reasonable person donating millions of dollars, who claims to have relied on a specific statement in making those donations, would try to understand the statement before making the donation.

[11] The fact that Huntsman was likely aware of these statements also undercuts his ignorance argument and ultimately his allegation that the Church concealed anything. President Hinckley's 1991 and 1995 statements were publicly made during the Church's annual general conference and then made publicly available in print form. 2-ER-233–247. In 1991 as a 19-year-old, Mr. Huntsman was not only an active member, but also a full-time missionary for the Church. 3-ER-334; 2-ER-122. Huntsman testified that in his 20's and 30's he did not ask his Church leaders how tithing contributions were spent because "the answer at the time was provided in Church manuals, priesthood manuals, General Conference, Church magazines,

**E.**    <u>The Church's financial documents, and Rytting's declaration, prove that the money provided by Ensign Peak was "earnings on invested reserves."</u>

Huntsman contends that the Church's financial documents do not "specify that the monies used to pay for the City Creek Mall were in fact 'earnings' on invested tithing funds." Aplt.Br. at 25. "[A]ll that the documents show[]," he argues, is "that certain Church-related investments … ultimately generated earnings that exceeded the cost of City Creek Mall." *Id*.

Here too, Huntsman did not raise this argument below and therefore cannot raise it on appeal. *See Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009) ("We will not review an issue not raised below unless necessary to prevent manifest injustice."). In any event, Huntsman bears the burden of proving that President Hinckley's statement was false, and he offers no such proof. Rytting's declaration and the Church's financial documents do, in fact, establish that the funds for City Creek came from "net investment income earnings" on invested funds, just as President Hinckley said they would. 3-ER-312–30; 3-ER-532–41; 3-ER-543 to 4-ER-662.

---

and Sunday school." 2-ER-122 at 30:7-16; 2-ER-163 at 126:12-17. He also testified that at the time of President Hinckley's 2003 statement it was his practice to read general conference addresses when they became available in printed form. 2-ER-139. Thus, Mr. Huntsman cannot claim that he was unaware of the Church's governing financial principles. Regardless, whether Huntsman knew or did not know, his ignorance does not make President Hinckley's 2003 statement false or misleading.

**F.**    <u>Use of principal to generate interest does not eliminate the distinction between principal and interest.</u>

Finally, Huntsman suggests that President Hinckley's statement was false because the Church "used" tithing to generate the "earnings." Aplt.Br. at 43. For support, Huntsman invokes the "maxim" that "interest follows principal," and relies on *In re Beckman*, 141 Pa. Super. 315, 317 (1940) and *Phillips v. Washington Legal Found.*, 524 U.S. 156, 165 (1998). *Id.* at 44. Huntsman's reliance on those inapposite cases is misplaced.

In *In re Beckman*, a Pennsylvania superior court explained that the principal extends to the interest earned if there is an outstanding debt to a creditor. *In re Beckhman*, 141 Pa. Super. at 316-320. Huntsman is not the Church's creditor and has no claim on the Church's reserves because he made voluntary, unrestricted donations. 3-ER-345–46; 2-ER-133–34. The unremarkable view that a creditor has claim on both the principal and the interest held by the debtor is quite different from the startling proposition that earnings on voluntary, unrestricted contributions are legally the same as the original contributions. They are not.

Similarly, in *Phillips*, the Supreme Court (applying Texas law) held that the interest earned from a client's funds held in a Texas Interest on Lawyers Trust Account was the private property of the client for purposes of the Takings Clause. 542 U.S. at 156. But the Court never suggested there was no difference between client funds and interest on those funds, only that the client owned both. Here,

Huntsman is not the owner and has no claim on the Church's reserves. Once Huntsman willingly donated to the Church without restriction, he divested his property interest in the donations. *In re Cath. Bishop of Spokane*, 329 B.R. 304, 330 (Bankr. E.D. Wash. 2005) ("[A] gift is a gift is a gift and by any other name (donation, offering, tithe) would still not result in a legally enforceable interest in assets of the donee."); 3-ER-345–346; 2-ER-133–34.[12]

Huntsman's cited maxim has nothing to do with this case. In fact, the maxim recognizes the distinction between principal and interest, which Huntsman's

---

[12] "Donations to one's church are viewed as no more than gifts." *Fowler v. Bailey*, 844 P.2d 141, 150 (Okla. 1992). A gift "cannot be revoked by the giver." Cal. Civil Code § 1148. Gifts can be restricted or unrestricted. In California, a donation is an unrestricted gift unless "the donor expressly impose[s] a charitable trust, in writing, at the time of the gift" (Cal. Corp. Code § 9142), or gives in response to a solicitation for a specific purpose as opposed to the "general support" of the charity's "activities" (§ 9143). In contrast, an unrestricted gift may be used in any manner "to carry out the objects for which the organization was created." *In re Los Angeles Cty. Pioneer Soc.*, 40 Cal.2d 852, 860 (1953). For a church, this includes the right to "invest its funds in income-producing property" to make its assets "more productive … to assure the continued validity of [its] spiritual objectives." *Morris v. Scribner*, 508 N.E.2d 136, 139–40 (N.Y. 1987) ("[I]f the courts will not interfere with the determination of the board of directors of a business corporation honestly and fairly arrived at, it certainly should not do so in the case of a religious corporation."); *see also Stone v. Salt Lake City*, 11 Utah 2d 196, 200-201 (1960) (explaining that unrestricted donations must ultimately "be applied to the purposes for which the [Church] exists and for which the funds were donated," but "common sense" make clear the "need for the exercise of management of such funds," which may "entail the keeping of collected funds in . . . real estate or any type of investment which, in the judgment of those in charge, best suits that purpose") Here, Huntsman did not place any restrictions on his tithing or expressly impose a trust. 2-ER-133–34; (*The National Foundation v. First National Bank of Catawba*, 288 F.2d 831, 835 (4th Cir. 1961) ("Unless a donor manifests an intention to impose . . . restrictive conditions, it should be assumed he intended to leave to the donee the right to exercise discretion . . . ." And Huntsman's lifetime of tithes were not given in response to a "special appeal for funds to serve a specific purpose." *See id.* at 834–36. Like other devoted Church members, Huntsman routinely gave tithes because of his religious devotion. Thus, because Huntsman's tithes were unrestricted gifts, not given in response to a specific solicitation, Church leaders could use those tithes as they believed best to further the Church's overall mission, including through investment for future use.

argument necessarily ignores. His insistence that there is no distinction between earnings and principal is like saying there is no distinction between an initial investment and profits. That would be news to the IRS. At bottom, Huntsman seems to be making almost a religious argument that the Church has a doctrinal or religious obligation to call all its funds "tithing" and cannot distinguish between principal and earnings. But under the First Amendment, this Court cannot give weight to that (false) doctrinal assertion. *See infra* Section IV. Whatever the case, his insistence on ignoring the plain meaning of different words does not create a genuine issue of material fact.

## II. The Church Did Not Make Any False Statement Regarding Funds Provided to Beneficial Life

Huntsman contends that the district court erred by granting summary judgment on his claim that the Church allegedly committed fraud by using "tithing" to "bail out" a Church-owned company called Beneficial Life. Aplt.Br. at 45-49. He argues that the Church "offered no testimony or evidence disputing that tithing funds were used to bail out Beneficial Life." Aplt.Br. at 15 n.2.

The Church does not concede that tithing was used for Beneficial Life, but the reason the Church did not offer evidence is because Huntsman admitted he could not point to any statement that would support his fraud claim with respect to Beneficial Life. 2-ER-44–45 ("I do not recall any specific statement by the Church denying

that tithing funds were being used to bail out Beneficial Life.").  Without such a statement, there is nothing for the Church to disprove.  In any case, it is Huntsman's burden to prove fraud, not the Church's burden to prove truthfulness.

On appeal, Huntsman relies on a statement "reported by the *Salt Lake Tribune,*" which is attributed to Church employee Keith B. McMullin, saying "not one penny of tithing goes to the church's for-profit endeavors." Aplt.Br. at 46.  That statement, Huntsman argues, makes the use of tithing to help Beneficial Life an alleged fraud.  *Id.*  Importantly, the statement is not a quote, but a newspaper's paraphrase or summary of a presumably longer conversation,[13] and is, therefore, inadmissible hearsay.  *Larez v. City of Los Angeles*, 946 F.2d 630, 643 (9th Cir. 1991) (holding statements in a newspaper article from a party-opponent were inadmissible hearsay).  Moreover, McMullin's alleged statement was in 2012, three years after Ensign Peak provided funds for Beneficial Life. Aplt.Br. at 15.  It cannot be the basis for a fraud claim concerning Beneficial Life.

After testifying that he could not identify any specific statement regarding Beneficial Life, Huntsman said he believed no money would go to Beneficial Life because of Church teachings "that tithing funds would only be used for maintaining meeting houses and temples, sustaining missionary work, educating members, and other charitable endeavors, and I relied on those assurances." 2-ER-44–45.  These

---

[13] Huntsman includes a link to the full article in his Complaint.  2-ER-258.

teachings were contained in "Sunday School manuals, conference addresses" and other "statements as to what tithing would be used for."[14]  2-ER-163–64.

The district court rejected this argument because "[r]esolving Plaintiff's claim on those grounds would require a court or jury to determine whether church teachings and doctrines prohibited the alleged transfer of tithing funds to Beneficial" and "the First Amendment prohibits" such an inquiry.  2-SER-55.  Huntsman's appeal ignores this holding and does not explain why the district court is wrong on this basic point of First Amendment law.  Accordingly, he has waived this argument. *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005) ("[A]n issue is waived when the appellant does not specifically and distinctly argue the issue in his or her opening brief.").

Regardless, general statements about what tithing is used for—*e.g.*, missionary work, church buildings, etc.—do not foreclose the possibility that funds not immediately used for such purposes may be invested for future use.  *Stone v. Salt Lake City*, 11 Utah 2d 196, 200-201 (1960) (investing donated funds does not divert them from a church's religious mission), *cert. denied*, 365 U.S. 860 (1961).  As stated earlier, in 1995, President Hinckley specifically stated that the Church "put[s] into

---

[14] Huntsman never pointed to a specific written statement to support this allegation, but merely made vague references to manuals and conference addresses.  2-ER-163–64.  This is fatal.  *See Stansfield v. Starkey*, 220 Cal. App. 3d 59, 73-74 (Cal. Ct. App. 1990) (fraud requires a showing of "how, when, where, to whom, and by what means the representations were tendered").

the **reserves** of the Church a portion of the annual budget…. Should there come a time of economic distress, we would hope to have the means to weather the storm." 3-ER-311–12; 2-ER-246 (emphasis added). In reality, all Church funds are ultimately dedicated to further the Church's mission, whether expended immediately or invested for future use, or used to support a previous investment. Huntsman makes no allegation that any Church funds have ever been permanently diverted from the Church's mission. *See infra* pp. 50-52 (discussing purpose of City Creek investment). And under the First Amendment, Huntsman's fraud claim cannot be based on his own theological understanding of the Church's general teachings about tithing and its religious mission and goals. Courts cannot adjudicate conflicting interpretations of religious doctrine. *Corp. Presiding Bishop of The Church of Jesus Christ of Latter-day Saints*, 483 U.S. at 341 (Brennan, J., concurring in the judgment) (The First Amendment guarantees religious organizations autonomy to "select their own leaders, define their own doctrines, resolve their own disputes, and run their own institutions").

Finally, trying to salvage his fraud claim, Huntsman argues that fraud can be based on concealment or nondisclosure. Aplt.Br. at 46-47. He argues that fraud can occur when "the defendant makes representations but fails to disclose additional facts which materially qualify the facts disclosed, or which render the disclosure likely to mislead." Huntsman's argument fails for three reasons.

39

*First*, Huntsman did not raise this nondisclosure argument in his opposition to the Church's summary judgment motion. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) (The Ninth Circuit does "not consider arguments that are raised for the first time on appeal," and it "will not consider issues not properly raised before the district court."). The Church specifically argued that Huntsman failed to point to specific statements concerning Beneficial Life. 4-ER-679; 4-ER-682 at n.4. In response, Huntsman doubled down on alleging affirmative misrepresentations. 2-ER-96–98 ("Did the Church use tithing funds to . . . bail out Beneficial Life Insurance notwithstanding its repeated representations that tithing funds were not used for such non-charitable purposes?"); *see also* 2-ER-104–105 at n.10. At no point did Huntsman contend that there need not be an affirmative misrepresentation about Beneficial Life based on a nondisclosure theory. 2-ER-86–108. The argument is waived.

*Second*, by necessity, Huntsman's new argument still requires that he point to specific representations made by the Church. Without specific representations, there cannot be a nondisclosure that makes what was said misleading; nor does Huntsman cite any authority to show that the Church had any duty of disclosure. *Hathaway*, 2009 WL 10673230, at *6 ("[F]or liability to attach for mere non-disclosure, the defendant must have been under some 'duty to disclose' the information, arising from . . . the making of affirmative representations which are materially qualified or

40

undermined by undisclosed facts."). Thus, Huntsman's nondisclosure theory runs into the same problems as his misrepresentation theory because he fails to point to specific misrepresentations.[15]

*Third*, there was no material nondisclosure, because tithing was not used to fund Beneficial Life. In its motion for summary judgment, the Church explained that "[e]ven if the claim were to procced, the facts would conclusively show . . . [that] Ensign Peak had sufficient earnings on reserves to provide the money Beneficial Life received." 3-ER-412 at n.2. Huntsman's claimed "nondisclosure" is merely disagreement with the distinction between tithing and earnings on reserves. 2-SER-53 at n.4 ("Plaintiff's argument effectively asks this Court to define the term 'tithing funds,' the First Amendment bars Plaintiff's argument."). The district court correctly ruled on Huntsman's claim concerning Beneficial Life.

The Court could, and perhaps should, stop reading here. There was no fraud. The Church's financial records are "the fundamental evidence" proving that what President Hinckley said was true. However, because this Court can "affirm for any reason supported by the record," *Griffin*, 557 F.3d at 1121, we describe below two additional grounds on which the Court can affirm summary judgment.

---

[15] In addition, any reliance on general teachings "would require a court or jury to determine whether church teachings and doctrines prohibited the alleged transfer of tithing funds to Beneficial," which "the First Amendment prohibits." 2-SER-55.

### III.  Huntsman Did Not Actually or Justifiably Rely on President Hinckley's Statement

Huntsman must prove that he relied on the allegedly false statements and that his reliance was justifiable.  "Plaintiffs must show 'actual' reliance, *i.e.*, that the representation was an 'immediate cause' that altered their legal relations…. [P]laintiffs must also show 'justifiable' reliance, *i.e.*, circumstances were such to make it reasonable for plaintiff to accept defendant's statements without an independent inquiry or investigation." *Wilhelm v. Pray, Price, Williams & Russell*, 186 Cal.App.3d 1324, 1331-32 (1986) (citation omitted).

#### A.  There was no actual reliance.

"Actual reliance occurs when a misrepresentation is an immediate cause of a plaintiff's conduct, which alters his legal relations, and when, absent such representation, he would not, in all reasonable probability, have entered into the contract or other transaction." *Engalla v. Permanente Medical Group, Inc.*, 15 Cal.4th 951, 976-77 (1997).  Reliance "is the same as causation …." *Hall v. Time, Inc.*, 158 Cal.App.4th 847, 855 n.2 (2008).

Statements about City Creek funding did not cause Huntsman to give or stop giving tithes.  President Hinckley's 2003 statement was not part of a negotiation, a transaction, or a solicitation.  3-ER-314–315; 3-ER-536; 2-ER-250.  President Hinckley was not soliciting funds based on a promise to spend them in a particular way.  2-ER-250.  He was talking about existing Church funds.  Huntsman's tithing

42

donations were not solicited or needed for that purpose because the Church already had sufficient earnings on existing reserve funds to pay for City Creek and earmarked those funds from earnings on reserves on January 1, 2004. 3-ER-318; 3-ER-537; 3-ER-549–50. President Hinckley was simply informing Church members that the Church had earned enough on its investment to pay for the City Creek project. 2-ER-250. Because there was no solicitation or transaction, Huntsman cannot claim that he gave tithes in reliance on President Hinckley's statement.

Also, Huntsman began giving tithes in 1993 when he returned home from two years of voluntary service as a Church missionary. 3-ER-335; 2-ER-126–127. Donations made in the decade *before* President Hinckley's statement were obviously not made in reliance on that statement. And Huntsman stopped giving tithes 12 years *after* President Hinckley's statement for reasons that had nothing to do with the City Creek project. 3-ER-347–48; 2-ER-209–12; 2-ER-280. This was at least four years before Huntsman (erroneously) concluded that President Hinckley's statement was false. 3-ER-347; 2-ER-209; 2-ER-223. In short, from 1993 to 2015, Huntsman gave tithes because he believed God wanted him to; and he stopped giving when he no longer believed in the Church's teachings. 3-ER-335–348; 2-ER-136–37; 2-ER-209–12; 2-ER-223. Huntsman's donations had nothing to do with any specific statement made during those 22 years; his tithing was an act of religious devotion based on a scaffolding of Church doctrine and teachings and his own religious

devotion. *Id.* Whether tithing or investment returns would be used for the City Creek project had nothing to do with his reasons for making contributions. *Id*.

Huntsman's alleged reliance is an advocate's afterthought. It is a post-hoc rationalization by a religious dissident who regrets giving money to a church in whose teachings he no longer believes. There is no triable issue on Huntsman's actual reliance.

### B.   There was no justifiable reliance.

Justifiable reliance means "(1) the matter was material in the sense that a reasonable person would find it important in determining how he or she would act; and (2) it was reasonable for the plaintiff to have relied on the misrepresentation." *Hoffman v. 162 North Wolfe LLC*, 228 Cal.App.4th 1178, 1194 (2014) (citations omitted). *See also OCM Principal Opportunities Fund v. CIBC*, 157 Cal.App.4th 835, 862 n.17 (2007) ("[M]ateriality in the context of fraud is generally examined as part of justified reliance."). Justifiable or reasonable reliance considers "a plaintiff's particular knowledge and experience." *Hoffman*, 228 Cal. App. 4th at 1194. A plaintiff cannot recover on a fraud claim where his conduct was manifestly unreasonable in light of his own intelligence and information. *Id.*

Huntsman's own argument proves the immateriality of President Hinckley's statement. Huntsman's argument is premised on the assertion that there is no meaningful distinction between "tithing" and "earnings on invested reserve funds."

To Huntsman, "whether tithing funds or earnings were used for a commercial purpose is a distinction without a difference." Aplt.Br. at 43-44. If that is true, then President Hinckley's statement could not have been material to how Huntsman acted in the aftermath of that statement. If it were, Huntsman would have stopped giving tithes when he heard that the Church was funding City Creek from "earnings on reserves."

Additionally, it would be impossible for a judge or jury to determine reasonable reliance or materiality in this unique case. It would require interpretation of Church doctrines and God's commands regarding tithing and whether Huntsman's reliance was reasonable in light of his particular knowledge, experience, and beliefs. *Hoffman*, 228 Cal. App. 4th at 1194. Under the First Amendment, no court can adjudicate these issues of religious doctrine and individual faith. *United States v. Ballard*, 322 U.S. 78, 86 (1944) (explaining that the First Amendment precludes a jury from determining the "truth or verity of a [person's] religious doctrines and beliefs"). Tithing is a religiously motivated practice. 3-ER-347; 2-ER-136–37. It is a matter of faith, not logic. "Religious behavior change induced by the mystery of faith cannot be proved or disproved" in a court of law, "which limits its scope of inquiry to tangible, rational and logical phenomena, comprehensible and explainable by human reasons." *Molko v. Holy Spirit Assn.*, 46 Cal.3d 1092, 1138 (1988) (superseded by statute on other grounds) (Anderson, J.,

concurring and dissenting). To evaluate why a person gives tithes, a court would have to evaluate Church doctrine and teachings regarding tithing, which the First Amendment prohibits. *See Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 958 (9th Cir. 2004) (First Amendment prohibits an "evaluation of religious doctrine or the reasonableness of the religious practices followed within the [religious institution]").

Assessing whether certain statements are material to a Church member's decision to give tithes would also require gauging how central the doctrine of tithing is to the Church and its members and the degree of their belief in the Church's teachings. "[I]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Employment Div. v. Smith*, 494 U.S. 872, 887 (1990) (quotation marks and citation omitted); *Hawthorne v. Couch*, 911 So.2d 907, 910-911 (La. 2005) (holding that "[t]he issue of tithing is at its core a purely ecclesiastical matter," and that First Amendment barred a fraud claim even though plaintiff masked "claims with legal terms such as 'consent,' 'error,' 'fraud,' and 'duress'").

In the Church's doctrines and practices, tithing is not a one-time donation for a particular purpose based on a particular solicitation or appeal. Tithing is not a *quid-pro-quo* transaction with competing values that can be judged from a secular perspective. It is a deeply embedded, longstanding Church doctrine and practice that

is part of a lifetime of religious sacrifice. There is a scaffolding of religious doctrine, belief, and experience that surrounds a believer's decision to obey God's commandment, as described in Old Testament language, to "[b]ring [your] tithes into the storehouse" and reap the spiritual blessings God pours out upon the believer. Malachi 3:10 (KJV). Assessing the materiality of one crossbar or bolt in that scaffolding would be impossible without valuing the importance or even truthfulness of the rest of that scaffolding, an inquiry which is forbidden by the First Amendment. *Katz v. Superior Ct.,* 73 Cal. App. 3d 952, 986 (Ct. App. 1977) ("The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, . . . the triers of fact . . . enter a forbidden domain."); *see also Ballard*, 322 U.S. at 86-87 ("Religious experiences which are as real as life to some may be incomprehensible to others."). The mysteries of religious faith cannot be adjudicated in secular courts.

Under these unique circumstances, a court would have to look into religious teachings and beliefs to evaluate justifiable reliance and materiality. The First Amendment prohibits that judicial evaluation.

## IV. The First Amendment Bars Huntsman's Fraud Claim

The district court concluded that it could resolve whether the funds used for the City Creek project were "tithing" or "earnings on invested reserves" without

delving into matters of faith and doctrine that the First Amendment puts off limits. 2-SER-48. The Church agrees. This Court should likewise conclude that the statements are true and thus avoid any constitutional questions. *See United States v. Sandoval-Lopez*, 122 F.3d 797, 802 n.9 (9th Cir. 1997) ("We avoid constitutional questions when an alternative basis for disposing of the case presents itself.").

Huntsman's complaint, however, makes clear that his overarching objection is not to the Church's alleged use of "tithing" for the City Creek project instead of investment earnings. Huntsman objects to the use of *any* Church funds for City Creek, which he believes "had nothing to do with charity." 2-ER-254. He also suggests in his appellate brief that the "core issue" in this case is the use of donations "to fund *any* commercial endeavors." Aplt.Br. at 1. Huntsman argues that such use of funds is contrary to the "charitable pursuits" he once believed the Church should be engaged in. 2-ER-254. In Huntsman's view, investing some of the Church's money in commercial ventures was not "consistent with the Church's stated priorities." 2-ER-253. Huntsman says the Church needs to "refocus its attention and efforts on following the path of righteousness." 2-ER-260. Put simply, Huntsman disagrees as a religious matter with how the Church uses its money.

This is precisely the kind of "intramural church conflict" the First Amendment prohibits. *Church of Scientology Flag Service Org., Inc.*, 2 F.3d at 1538. Civil courts "may not intervene on behalf of such dissidents." *Id*. at 1544. Church

membership comes "'with an implied consent'" to the church's form of government, and church members "'are bound to submit to it.'" *Id*. (quoting *Watson*, 80 U.S. (13 Wall.) 679, 728 (1871)). Members who do not like how a church uses religious donations (or administers its sacraments, or teaches its doctrine, etc.) "may attempt to reform the policy from within, … may acquiesce in the policy despite their objections or they may leave the church." *Id*. But they cannot "'invoke the supervisory power of the civil tribunals'" to override decisions made by the church's highest authorities regarding the use of church funds. *Id*. (quoting *Watson*, 80 U.S. at 731). The First Amendment guarantees religious organizations autonomy to "define their own doctrines, resolve their own disputes, *and run their own institutions*." *Corp. Presiding Bishop of The Church of Jesus Christ of Latter-day Saints*, 483 U.S. at 341 (Brennan, J., concurring in the judgment) (emphasis added).

"How a church spends worshippers' contributions" is "central to the exercise of religion." *Ambellu*, 387 F. Supp. 3d at 80. "Because a church's religious doctrine and practice affect its understanding of" how donated funds should be used, "seeking a court's review of [such] matters … is no different than asking a court to determine whether a particular church's grounds for membership are spiritually or doctrinally correct or whether a church's charitable pursuits accord with the congregation's beliefs." *Schmidt v. Catholic Diocese of Biloxi*, 18 So.3d 814, 829 (Miss. 2009)

(quoting *Harris v. Matthews*, 643 S.E.2d 566, 571 (N.C. 2007)).[16] "[A] determination of whether [the church's] financial expenditures were proper … requires an inquiry into whether the expenditures were justified in light of [the church's] religious doctrines and practices," which is just "the type of ecclesiastical inquiry courts are forbidden to make." *In re Godwin*, 293 S.W.3d at 750. "[C]ivil courts may not second-guess church administrative or management decisions, or substitute their judgment in place of the church's." *Schmidt v. Cath. Diocese of Biloxi*, 18 So. 3d 814, 829 (Miss. 2009).

The decision to invest in City Creek was infused with religious considerations. The Church could have invested in Amazon—an online shopping center—instead of a physical shopping center. The Church's leader, President Hinckley, explained that Church leaders "feel we have a compelling responsibility to protect the environment of the Salt Lake Temple." 2-ER-246. Safeguarding from urban blight the experience of worshipers and visitors at perhaps the Church's most iconic and sacred site—a place of devotion for millions of Church members—is a religiously vital and sensible endeavor. To suggest otherwise is simply hostility toward the Church and its beliefs. The First Amendment bars civil courts from second-guessing

---

[16] "[A] church's financial regime . . . reflects an array of decisions about a member's obligation to pledge funds, and about the leaders' corresponding responsibility to account for those funds, that a civil court cannot arbitrate without entangling itself in doctrinal interpretations[.]" *The Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington D.C. v. Beards,* 680 A.2d 419, 429 (D.C. App. 1996).

the religious priorities identified by the Church's prophet. *Schmidt*, 18 So. 3d at 829; *see also Webster v. Delgatto*, 2006 WL 664214 (Tex. App. 2006) (holding that plaintiff's claims against her church "relate to how and when [the church] may spend its resources and are thus ecclesiastical in nature" and restricted by the First Amendment).

Further, Huntsman's complaint is not just about the Church's investment in "purely commercial" endeavors. He complains about the Church's alleged "corporate greed" (2-ER-253) and about the Church "lin[ing] its own pockets" (2-ER-254). It appears Huntsman is concerned about the size of the Church's alleged worldwide "empire." 2-ER-254.

But the Church's decisions regarding the need for, and size of, a "rainy day" fund to meet the needs of its worldwide faith community are likewise based on religious doctrines and a belief that the Church will eventually spread to "every nation, and kindred, and tongue, and people" (Revelations 14:6 (KJV)), which is going to require a lot of money. The Church's "rainy day" funds are like the oil in the ten virgins' lamps: there must be enough to last until Jesus Christ comes, and we know "neither the day nor the hour" when that will happen. Matthew 25:1-13 (KJV). If that is absurd to Huntsman and others, so be it. Although the Church would welcome Huntsman back into the fold with open arms, he was free to believe differently, walk away, and stop giving. Civil courts cannot question the legitimacy

of such concerns or the truthfulness of the prophecies and revelations on which they are based. *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144 n.9 (1987) ("In applying the Free Exercise Clause, courts may not inquire into the truth, validity, or reasonableness of a claimant's religious beliefs.").

Huntsman does not claim that any Church leader diverted funds for personal enrichment.[17] Nor does he claim that money he donated for a specific purpose was diverted to a different use. He simply does not like the use to which his unrestricted donations were put, even though President Hinckley assured him and everyone else precisely how and why the City Creek project would be funded.

Moreover, this case presents unique constitutional concerns because of the way Huntsman pleaded it. He is not demanding a return only of donations used for the City Creek project, but the return of every penny he ever donated. 2-ER-51–52. Judging intent to defraud, reliance, and materiality in the context of a lifetime of devoted giving to a religious cause—giving inspired by religious faith, religious experiences, and belief in certain religious doctrines—cannot be done without diving

---

[17] In certain circumstances, churches and clergy are not immune from fraud claims. A pastor running a Ponzi scheme, for example, cannot escape prosecution by cloaking himself in religious garb. *See United States v. Rasheed*, 663 F.2d 843, 847 (9th Cir. 1981), *cert denied*, 454 U.S. 1157 (1982) (a classic Ponzi scheme involved religious leaders making "knowingly false representations to induce others to donate money"). Religious leaders cannot "by chicanery, deceit, and fraud, divert the property of a church organization … for their own selfish benefit …." *Libhart v. Copeland*, 949 S.W.2d 783, 794 (Tex. App. 1997) (First Amendment did not preclude judicial review of fraud claims against a pastor accused of misappropriating $55,000 in church property to buy a new home for himself). But Huntsman alleges nothing like that.

into matters of faith and doctrine. Huntsman's complaint places his "fraud" claim in a framework of religious faith and belief. The First Amendment "'limit[s] the role of civil courts in the resolution of religious controversies ....'" *Puri v. Khalsa*, 844 F.3d 1152, 1162 (9th Cir. 2017) (quoting *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 710 (1976)). The First Amendment places Huntsman's unique fraud claim off limits.

## CONCLUSION

For the foregoing reasons, the Church requests that the Court affirm the district court's grant of summary judgment.

Dated: April 6, 2022        Respectfully submitted,

LARSON LLP

By:   */s/ Rick Richmond*
        Rick Richmond
        Troy S. Tessem
Attorneys for Appellees
THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-56056

I am the attorney or self-represented party.

**This brief contains** | 13,030 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Rick Richmond | **Date** | Apr 6, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                          *Rev. 12/01/2018*