**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAMES HUNTSMAN, | No. 21-56056 |
| *Plaintiff-Appellant*, | D.C. No. 2:21-cv-02504-SVW-SK |
| v. | |
| CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, | OPINION |
| *Defendant-Appellee*, | |
| and | |
| DOES, 1-10, | |
| *Defendant*. | |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted November 15, 2022
Pasadena, California

Filed August 7, 2023

Before:  Kim McLane Wardlaw and William A. Fletcher,
Circuit Judges, and Edward R. Korman,[*] District Judge.

Opinion by Judge W. Fletcher;
Partial Concurrence and Partial Dissent by Judge Korman

## SUMMARY[**]

### Diversity/Fraud/ Ecclesiastical Abstention Doctrine

The panel reversed the district court's grant of summary judgment in favor of the Corporation of the President of the Church of Jesus Christ of Latter-Day Saints in a diversity action brought by James Huntsman, a former member of the Church, alleging fraud under California state law.

Huntsman alleged that he contributed substantial amounts of cash and corporate shares to the Church as tithes. He further alleged that he relied on false and misleading statements by the Church that tithing money was not used to finance commercial projects, when in fact the Church used tithing money to finance a shopping mall development and to bail out a troubled for-profit life insurance company owned by the Church.

The panel denied the Church's request to seal those portions of the opinion that include business and financial

---

[*] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

information relating to Church operations, noting that the opinion reveals very little of the Church's financial information and some of the relevant information has already been publicly revealed.

The panel rejected the Church's argument that Huntsman's fraud claims are barred by the First Amendment. The panel held that the ecclesiastical abstention doctrine did not apply because the questions regarding the fraud claims were secular and did not implicate religious beliefs about tithing itself. Nor was the panel required to examine Huntsman's religious beliefs about the appropriate use of church money.

The panel held that there was a genuine dispute of material fact as to whether the Church fraudulently misrepresented the source of money used to finance the shopping mall development. Based on the evidence in the record, including statements by church officials and in church publications, a reasonable juror could conclude that the Church knowingly misrepresented that no tithing funds were being or would be used to finance the shopping mall development and that Huntsman reasonably relied on the Church's misrepresentations.

The panel agreed with the district court that the evidence did not provide a sufficient basis for a fraud claim with respect to bail-out payments to the life insurance company.

Concurring in part and dissenting in part, District Judge Korman dissented from Part IV.B.1 of the majority opinion because in his view no reasonable juror could conclude that the Church fraudulently misrepresented the source of the money used to finance the shopping mall development. Summary judgment in favor of the Church was therefore appropriate on all claims.

**COUNSEL**

David B. Jonelis (argued), Lavely & Singer PC, Los Angeles, California; Jake A. Camara, Berk Brettler LLP, West Hollywood, California; for Plaintiff-Appellant.

Rick Richmond (argued) and Troy S. Tessem, Larson LLP, Los Angeles, California, for Defendant-Appellee.

Eric S. Baxter, Laura E. Wolk, and James J. Kim, The Becket Fund for Religious Liberty, Washington, D.C., for Amicus Curiae The Becket Fund for Religious Liberty.

---

**OPINION**

W. FLETCHER, Circuit Judge:

James Huntsman brought suit in federal district court against the Corporation of the President of the Church of Jesus Christ of Latter-Day Saints, alleging fraud under California law. Huntsman is a former member of the Church of Jesus Christ of Latter-Day Saints. (The Corporation is the legal entity behind the Church of Jesus Christ of Latter-Day Saints. We refer to both the Corporation and the Church as "the Church.") Huntsman alleged that, from 1993 until 2015, he contributed substantial amounts of cash and corporate shares to the Church as tithes. He alleged that during at least some of that time he relied on false and misleading statements by the Church about its use of tithing money. Huntsman alleged that the Church represented that tithing money was not used to finance commercial projects, but that, in fact, the Church used tithing money to finance a

shopping mall development and to bail out a troubled for-profit life insurance company owned by the Church.

After limited discovery, the district court granted the Church's motion for summary judgment. It held that no reasonable juror could find that the Church had fraudulently misrepresented how tithing funds were used. We disagree with respect to the shopping mall but agree with respect to the life insurance company. We hold that there is evidence in the record from which a reasonable juror could conclude that the Church knowingly misrepresented that no tithing funds were being or would be used to finance development of the shopping mall and that Huntsman reasonably relied on the Church's misrepresentations.

We reverse in part, affirm in part, and remand for further proceedings.

## I. Background

Huntsman grew up in a prominent family of observant members of the Church. Huntsman's father and grandfather served in high-ranking positions in church leadership. When he was nineteen, Huntsman accepted a two-year missionary assignment to Germany. During much of his adult life, Huntsman considered himself "to be one of the Church's most devout members."

Church doctrine, to which Huntsman subscribed while a member of the Church, teaches that giving tithes is a commandment from God. Members contribute ten percent of their incomes or profits annually to the Church. Tithing is members' principal financial contribution to the Church.

Huntsman tithed for twenty-two years, from 1993 to 2015. Huntsman stated in a declaration that the Church had represented in its "Sunday School manuals, conference

addresses [and] statements" that tithing "was restricted" to non-commercial, charitable purposes and would be used to fund "missionary work, member indoctrination, temple work, and other educational and charitable activities." It is undisputed that, between 2003 and 2011, Huntsman contributed in tithes $1,148,735 in cash, and that, between 2007 and 2015, he contributed in tithes 1,857 shares of Sigma Designs stock and 28,332 shares of Huntsman Corporation stock. Huntsman made his last tithing contribution to the Church on January 9, 2015. He stopped tithing because, in his words, he "became disillusioned with the Church's doctrines (including its support of polygamy and its open disdain for members of the LGBTQ community)."

In 1997, the Church incorporated Ensign Peak Advisors ("Ensign Peak") to serve as its primary investment vehicle for tithing funds received from church members. In 2003, the Church announced the City Creek Mall project, the redevelopment of a shopping mall bordering Temple Square in downtown Salt Lake City, across from the Church's headquarters and central temple. On or before January 1, 2004, Ensign Peak transferred $1.2 billion from Ensign Peak to an entity with a different name. Ensign Peak transferred additional, smaller amounts in 2007 and 2009. As of April 30, 2007, before any money was disbursed for the project, the money transferred from Ensign Peak, combined with earnings on that money, totaled over $1.68 billion.

The Church spent over $1.438 billion to develop the City Creek Mall project, over and above the value of the underlying properties. All of this development money came from funds transferred from Ensign Peak and later earnings on those funds. The City Creek Mall project was completed in 2012.

Beginning in 2003, Church officials and Church publications issued five statements about the source of the Church funds used to finance the City Creek Mall project. All five of them recited that no tithing funds would be or were being used to finance the City Creek Mall project. In his declaration in the district court, Huntsman stated: "I can unequivocally state that I read and/or heard each of those [five] statements shortly after they were published, and relied upon them in continuing to pay tithings to the Church."

In 2019, Huntsman learned of an IRS complaint filed by a former Senior Portfolio Manager at Ensign Peak, David Nielsen, that alleged that the Church spent tithing funds on commercial endeavors. Huntsman wrote in his declaration: "[I]t was only in 2019, after I learned of the facts contained in David Nielsen's IRS whistleblower complaint, and after I realized for the first time in my life that the Church had lied to me about where my tithing donations had gone, that I quietly asked for my tithing donations back on December 21, 2020." On December 21, 2020, Huntsman wrote a letter to the Church asking for a return of tithing donations totaling $2,621,562. The Church responded in a letter refusing to return the donations. Huntsman wrote again, asking for a return of the donations. The Church again refused to return them.

Huntsman then filed suit in federal district court, alleging fraud by the Church and seeking a return of his tithing donations. He also sought exemplary and punitive damages.

After limited discovery, the district court granted summary judgment in favor of the Church. The court first held that the First Amendment did not bar Huntsman's claim. The court then went on to rule for the Church on the

merits of Huntsman's fraud claim. It held that while a reasonable juror could conclude that Huntsman had relied on representations by the Church, "no reasonable juror could find that Defendant made a misrepresentation." We disagree with the district court's holding with respect to misrepresentation.

## II. Standard of Review

We review de novo a district court's grant of summary judgment. *See Delta Sav. Bank v. United States*, 265 F.3d 1017, 1021 (9th Cir. 2001). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must draw all inferences in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

## III. Request to Maintain Confidentiality of Financial Information

The Church has requested that we seal portions of our opinion that include "confidential and competitively sensitive business and financial information relating to the operation of the Church and its affiliated commercial entities." Mot. to Seal Disposition at 4, 21-56056, Dkt. No. 34. The Church contends that the "disclosure of such information would put the Church's commercial activities at an unfair disadvantage and cause the Church irreparable harm." *Id.* at 5. The Church further contends that Huntsman seeks to make public the Church's financial information "for improper purposes," and that disclosure of such information

"risk[s] . . . violating the Church's First Amendment rights." *Id.* at 6, 9.

There are no "compelling reasons" to seal the financial information in this opinion. *Center for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016). We reveal very little of the Church's financial information. We reveal only the amount transferred from Ensign Peak to finance the City Creek Mall (including earnings on that amount), Ensign Peak's earnings in 2003, and the amount spent to finance the Mall. The amount spent by the Church to finance the Mall has already been publicly revealed and, in any event, would not be protected information in the context of this suit. If this were a fraud case brought against a secular institution, there is nothing about the expenditure that would warrant protection. Further, as we discuss below, a religious institution is not protected by the First Amendment from a civil fraud suit. We therefore deny the Church's request.

## IV. Discussion

### A. First Amendment

As an alternative and independent basis for affirming the district court, the Church argues that Huntsman's fraud claim is barred by the First Amendment, under what the district court referred to as the "church autonomy doctrine."

We generally refer to the doctrine upon which the Church relies as the "ecclesiastical abstention doctrine." *Puri v. Khalsa*, 844 F.3d 1152, 1162–64 (9th Cir. 2017). The doctrine prohibits courts from deciding "internal church disputes involving matters of faith, doctrine, church governance, and polity." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655 (10th Cir. 2002); *see*

*also Jones v. Wolf*, 443 U.S. 595, 602 (1979); *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976). The doctrine is "a qualified limitation, requiring only that courts decide disputes involving religious organizations 'without resolving underlying controversies over religious doctrine.'" *Puri*, 844 F.3d at 1164 (quoting *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1248 (9th Cir. 1999)).

In support of its First Amendment argument, the Church contends that "Huntsman objects to the use of *any* Church funds for City Creek." (Emphasis in original.) In so contending, the Church selectively quotes from Huntsman's brief and misrepresents the nature of his claim. Huntsman does not object to the use of Church funds for the City Creek Mall project. Rather, he objects to how the Church represented the project would be funded. Huntsman contends that the Church solicited tithes from him by misrepresenting the purposes for which the tithes were being and would be used. Specifically, Huntsman contends that the Church denied that tithing funds would be and were used to pay for the City Creek Mall project when, in fact, tithing funds were being used for that purpose.

The ecclesiastical abstention doctrine protects First Amendment rights by avoiding court entanglement "in essentially religious controversies" or the state intervening on behalf of a particular religious doctrine. *See Serbian E. Orthodox Diocese*, 426 U.S. at 709. But these "considerations are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud . . . [is] alleged." *Gen. Council on Fin. & Admin. of the United Methodist Church v. Superior Ct. of Cal., Cnty. of San Diego*, 439 U.S. 1355, 1373 (1978) (Rehnquist, J., in

chambers).  That is because "under the cloak of religion, persons may [not], with impunity, commit frauds upon the public." *Id.* (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 306 (1940)).

While there is no in-circuit case directly on point, there is a closely analogous decision by a district court in the Tenth Circuit.  In *Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 551 F. Supp. 3d 1206, 1211, 1215 (D. Utah 2021), former members of the Church brought a civil RICO claim contending that the Church's statements about tithing were false.  The district court held that the First Amendment did not bar plaintiffs' claims because the claims "d[id] not implicate religious principles of the Church or the truth of the Church's beliefs concerning the doctrine of tithing . . . or [if] its members were acting in accord with what they perceived to be the commandments of their faith." *Id.* at 1225–26.  Like the fraud claims in *Gaddy*, the fraud claim here does not implicate religious beliefs about tithing itself.

The Free Exercise Clause is violated if "the truth or verity of respondents' religious doctrines or beliefs [is submitted] to the jury." *United States v. Ballard*, 322 U.S. 78, 86 (1944); *see also United States v. Rasheed*, 663 F.2d 843, 847 (9th Cir. 1981).  In the case before us, we are not required to rely on or interpret the Church's religious teachings to determine if it misrepresented how it was using tithing funds.  Nor are we required to examine Huntsman's religious beliefs about the appropriate use of church money.

Instead, as presented to us, the questions are secular.  The questions are whether the Church's statements about how it would use tithing funds were true, and whether Huntsman reasonably relied on those statements when he made tithing

contributions.  A court or jury can answer these questions based on secular evidence and analysis. *See Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 963 (9th Cir. 2004); *Puri*, 844 F.3d at 1167 ("The dispute, which 'concern[s] the [d]efendants' actions, not their beliefs,' turns entirely on 'what the [defendants] did, . . . and the texts guiding [their] actions can be subjected to secular legal analysis.'") (alterations in original) (emphasis removed) (quoting *Elvig*, 375 F.3d at 963, 968)).  A court or jury can look at public statements and relevant financial records of the Church to determine what church officials said about how the City Creek Mall project would be financed and to determine what funds were actually used to finance the project.  A court or jury can assess Huntsman's reliance by looking to the Church's and Huntsman's evidence and asking if Huntsman reasonably relied on the Church's statements in deciding whether to tithe.

## B.  Fraud Claims

Huntsman brings two fraud claims.  First, he claims that the Church fraudulently misrepresented that tithing funds would not be, and were not being, used to develop the City Creek Mall project.  Second, he claims that the Church fraudulently misrepresented that tithing funds would not be used to bail out the Beneficial Life Insurance Company.  We address these two claims in turn.

### 1.  City Creek Mall Project

The district court concluded that no reasonable juror could find that the Church fraudulently misrepresented that no tithing funds would be or were being used to finance the City Creek Mall project.

a.  Evidence in the Record

Huntsman relies on five statements made by Church officials or in Church publications to support his claim of fraudulent misrepresentation by the Church.  In chronological order, those statements are as follows.

First, at the Church's April 2003 General Conference, Church President Gordon B. Hinckley announced the City Creek Mall project and explained its funding sources.  He stated:

> We feel we have a compelling responsibility to protect the environment of the Salt Lake Temple . . . The property needs very extensive and expensive renovation.  We have felt it imperative to do something to revitalize this area.  *But I wish to give the entire Church the assurance that tithing funds have not and will not be used to acquire this property.  Nor will they be used in developing it for commercial purposes.  Funds for this have come and will come from those commercial entities owned by the Church.  These resources, together with the earnings of invested reserve funds, will accommodate this program.*

(Emphasis added.)

Second, on October 8, 2003, another Church official made a statement regarding the funding of the City Creek Mall project.  At a press conference concerning the project, Presiding Bishop H. David Burton stated:  "*None of this*

*money comes from the tithing of our faithful members.* That is not how we use tithing funds." (Emphasis added.)

Third, in December 2006, the Church's magazine *Ensign* reported:

> The Church first announced three years ago it was planning to redevelop the downtown area to energize the economy of the city that houses its headquarters and to bolster the area near Temple Square. *No tithing funds will be used in the redevelopment.*

(Emphasis added.)

Fourth, on March 27, 2007, the Church's newspaper *Deseret News* reported:

> *Money for the project is not coming from LDS Church members' tithing donations.* City Creek Center is being developed by Property Reserve, Inc., the Church's real-estate development arm, and its money comes from other real-estate ventures.

(Emphasis added.)

Fifth, on October 5, 2012, Keith McMullin, a Church leader and head of the Church-affiliated Deseret Management Corporation, was quoted in *The Salt Lake Tribune*: "McMullin said not one penny of tithing goes to the Church's for-profit endeavors. *Specifically, the church has said no tithing went toward City Creek Center.*" (Emphasis added.)

In each of these five statements, a church official or a church publication represented that no tithing funds were used to develop the City Creek Mall project.  Four of the five statements were unqualified.  Only President Hinckley's 2003 statement was arguably hedged.  He first stated that "tithing funds have not and will not be used to acquire this property."  He then went on to state that Church funds for the project would come from "earnings of invested reserve funds."  However, President Hinckley nowhere explained that, as he was using the terms, "reserve funds" were "tithing funds."

The record includes three sworn declarations.

Huntsman put into evidence a declaration of David Nielsen, dated August 15, 2021.  Nielsen had worked as a Senior Portfolio Manager at Ensign Peak from 2010 to 2019. Nielsen stated:

> During my employment at EPA [Ensign Peak Advisors], EPA's senior leadership and other EPA employees referred to . . . all funds of EPA as "tithing" money, regardless of whether they were referring to principal or earnings on that principal.  In addition, during my time at EPA, tithing donations from the Church's members were commingled with earnings that EPA had made.

Nielsen described a presentation given by Ensign Peak's President, Roger Clarke, at a meeting of Ensign Peak employees in March 2013.  Clarke presented a slide giving examples of "withdrawals" from Ensign Peak, which Nielsen attached as an exhibit to his declaration.  Two

examples of withdrawals were "City Creek: $1,400mm over 5 years" and "Beneficial Life: $600mm in 2009."

At the presentation, Nielsen asked Clarke "how the Church's public statements about no tithing funds being used for City Creek mall or Beneficial Life could be consistent with" the withdrawals for those projects. According to Nielsen, Clarke answered that funds for the City Creek Mall project were transferred from Ensign Peak to Property Reserve in order to conceal the source of the funds:

> Mr. Clarke responded that two other Church-affiliated entities (Property Reserve, Inc. and Deseret Management Corporation) had received from EPA the $1.4 billion and $600 million, respectively, paid by EPA [*i.e.*, Ensign Peak] for City Creek Mall and Beneficial Life, and essentially that, as a result, people would not know EPA was the source of this funding to City Creek mall and Beneficial Life. Mr. Clarke stated that it was important that people should not know EPA's role as the source of the funds.

The Church put into evidence two declarations. The first was a declaration by Paul Rytting. Rytting stated that he is "a Director within the Finance and Records Department of the Church," and that he "ha[d] worked in similar or related positions for over fifteen years." Neither Rytting's declaration nor anything else in the record shows that Rytting ever worked at or had any direct contact with Ensign Peak.

Rytting stated in his declaration that all of the $1.2 billion originally transferred from Ensign Peak to finance the

City Creek Mall project "came exclusively from earnings on the Church's reserve funds invested by Ensign Peak." Rytting also stated that additional amounts transferred from Ensign Peak to the project "came from the Church's earnings on its general reserve funds from Ensign Peak's main investment account."

The second was a declaration by Roger Clarke, responding to Nielsen's declaration. Clarke stated that he "was the President and Managing Director of Ensign Peak from its inception in 1997 until I retired in May 2020." Clarke stated, "I have knowledge of the Church policies and practices relating to the management of funds. I also have knowledge concerning the financing of the City Creek project. I make these statements based upon institutional and personal knowledge." The rest of Clarke's declaration consists only of confirmations that the documents attached to Rytting's declaration are "true and correct" copies of the originals and that Rytting's descriptions of the documents are accurate.

Even though Clarke had been President and Managing Director of Ensign Peak from 1997 to 2020 and was therefore in a position to know whether Nielsen's statements were true, he nowhere contradicted the statements in Nielsen's declaration: (1) that Ensign Peak employees referred to all funds held by Ensign Peak—both principal and earnings on principal—as tithing funds; (2) that Clarke had told Nielsen that the money for the City Creek Mall project was transferred to Property Reserve so that "people would not know [Ensign Peak] was the source of this funding to City Creek"; and (3) that Clarke had told Nielsen that "it was important that people should not know [Ensign Peak's] role as the source of the funds."

### b. City Creek Mall Fraud Claim

Under California law, "[t]he elements of fraud, which gives rise to the tort action of deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Small v. Fritz Companies*, 65 P.3d 1255, 1258 (Cal. 2003) (citation omitted). "Generally, the misrepresentation must be a material and knowingly false representation of fact." *Orient Handel v. U.S. Fid. & Guar. Co.*, 237 Cal. Rptr. 667, 693 (Cal. Ct. App. 1987). "[P]laintiffs must show (1) that they actually relied on the defendant's misrepresentations, and (2) that they were reasonable in doing so." *OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*, 68 Cal. Rptr. 3d 828, 855 (Cal. Ct. App. 2007). "Actual reliance occurs when a misrepresentation is 'an immediate cause of [a plaintiff's] conduct, which alters his legal relations,' and when, absent such representation, 'he would not, in all reasonable probability, have entered into the contract or other transaction.'" *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 919 (Cal. 1997) (quoting *Spinks v. Clark*, 82 P. 45, 47 (Cal. 1905)).

There are two questions before us. First, could a reasonable juror conclude that the Church fraudulently misrepresented that no tithing funds—neither tithing principal nor earnings on tithing principal—would be or were being used to finance the City Creek Mall project? Second, could a reasonable juror conclude that Huntsman justifiably relied on the Church's representations? We answer them in turn.

### (1) Fraudulent Misrepresentation

The Church argued below, and the district court agreed, that there was no misrepresentation—fraudulent or otherwise—because President Hinckley stated truthfully in April 2003 that the City Creek Mall project would be financed with earnings on "reserve funds."  Based on its conclusion that President Hinckley had made a true statement, the district court granted summary judgment to the Church.

This case cannot be so easily resolved.  The question before the district court, and before us, is whether a reasonable juror could conclude that the five statements by church officials and in church publications amounted to fraudulent misrepresentation by the Church.  *See Small*, 65 P.3d at 1258.  Huntsman contends that a reasonable juror could conclude from the five statements that the Church fraudulently misrepresented that neither tithing principal nor earnings on tithing principal were being or would be used to finance the City Creek Mall project.  We agree.

For the reasons that follow, we hold that a reasonable juror could conclude that the Church misrepresented the source of the funds used to finance the City Creek Mall project.

First, church officials and church publications made four unqualified statements that no tithing funds were being or would be used to finance the City Creek Mall project.  None of the four statements distinguished between tithing principal and earnings on tithing principal.  None of them referred to a "reserve fund" or earnings on "reserve funds."

Second, President Hinckley denied that "tithing funds" would be used to finance the City Creek Mall project. He stated in relevant part:

> I wish to give the entire Church the assurance that *tithing funds* have not been used to acquire [the City Creek] property. Nor will they be used in developing it for commercial purposes.
>
> Funds for this have come and will come from those commercial entities owned by the Church. These resources, together with the earnings of invested *reserve funds*, will accommodate this program.

(Emphasis added.)

President Hinckley first stated that "tithing funds" had not been used to acquire, and would not be used to develop, the City Creek Mall. He did not define "tithing funds." That is, he did not tell his listeners that, in denying that "tithing funds" would be used, he was denying only that tithing *principal* would be used. President Hinckley then stated that earnings on invested "reserve funds" would be used to develop the project. He did not define "reserve funds."

President Hinckley could have explained that, as he was using the terms, "reserve funds" were "tithing funds." If he had said that, his audience would have understood that earnings on "tithing funds" would be used to develop the City Creek Mall project. But President Hinckley did not say that. Instead, having stated that "tithing funds" *would not be* used to develop the project, President Hinckely then used an entirely different and undefined term, saying that earnings on "reserve funds" *would be* used.

The Church argues that President Hinckley did not intend to mislead his audience, and that the meaning of "reserve funds," as President Hinckley used the term, would have been clear to his audience. In support of its argument, the Church points to statements made by President Hinckley in 1991 and 1995, twelve and eight years earlier, respectively. The Church contends that President Hinckley had made clear in these statements that "reserve funds" were "tithing funds." We take the two statements in turn.

At the Church's 1991 General Conference, twelve years before the April 2003 statement at issue, President Hinckley answered the question, "What about the management of Church finances? He answered:

> The financial program of the Church— *both income and disbursements*—is found in sections 119 and 120 of the Doctrine and Covenants. Except for fast offerings and missionary funds, two statements found in these brief revelations constitute the Lord's law of finance and the management program of the fiscal affairs of the Church.
>
> *Section 119 simply states that all members "shall pay one-tenth of all their interest [that which is income] annually*; and this shall be a standing law unto them forever . . . saith the Lord." (D&C 119.4.)
>
> Then, concerning the disbursement of the money which comes from the tithing, the Lord has said: "Verily, thus saith the Lord, . . . it shall be disposed of by a council, composed of the First Presidency of my Church and of the bishop and his council, and

> by my high council; and by mine own voice
> unto them, saith the Lord."  (D&C 120.)
>
> These eighteen men—the Presidency, the
> Twelve, and Presiding Bishopric—constitute
> the Council on the Disposition of the Tithes.
> What might be regarded as executive
> committees of this larger council include the
> Budget Committee and the Appropriations
> Committee.  The expenditure of all Church
> funds comes under the purview of these
> bodies.
>
> *In the financial operations of the Church,
> we have observed two basic and fixed
> principles:  One, the Church will live within
> its means.  It will not spend more than it
> receives.  Two, a fixed percentage of the
> income will be set aside to build reserves
> against what might be called a possible
> "rainy day."*

(Emphases added.)

In its brief to us, the Church argues:

> President Hinckley's 1991 statement
> explains that the 'financial program of the
> Church—both income and disbursement—is
> found in Sections 119 and 120 of the Doctrine
> and Covenants," which is Church scripture.
> Explaining that Section 119 concerns tithing,
> President Hinckley then states that the
> Church will not spend more than it "receives"
> and will set aside a fixed percentage "to build

reserves." Clearly, President Hinckely meant that the reserves would come from tithing.

Our dissenting colleague agrees. He argues:

> [C]ontrary to the majority's assertion, Hinckley *did* make clear that "income" in his 1991 statement included tithing. Specifically, Hinckley said: "The financial program of the Church—both income and disbursement—is found in sections 119 and 120 of the Doctrine and Covenants." Hinckley then explained that section 119 refers to tithing. Because this statement roots the Church's "income and disbursement" in section 119, which refers to tithing, it is clear that income for the Church includes tithing. This renders irrelevant the majority's assertion that "[i]ncome is usually used as a secular term."

Dissenting Op. at 35–36.

In his 1991 statement, President Hinckley referred to "income" three times, never defining the term. *See* the italicized language, *supra*. President Hinckley first generally referred to "[t]he financial program of the Church—both income and disbursements." He then said that Church members shall pay ten percent of "their interest [that which is income] annually." In this passage, President Hinckley referred to members' "income," saying that members would pay tithes based on that income. Finally, he said the Church will live within its means, not spending more than it receives, and that a "fixed percentage" of the

Church's "income will be set aside to build reserves." In this passage, in saying that the Church would "live within its means, not spend[ing] more than it receives," President Hinckley refers to the Church's "income" rather than its members' "income."

Income is usually used as a secular term. In the case of an individual, "income" can include such things as a salary or bonus from employment, or dividends or interest from securities. In the case of a religious organization, "income" can include income from real property, businesses, or other investments. The Church has significant commercial assets and income from those assets. Indeed, President Hinckley referred to the Church's commercial assets in his 2003 statement, writing, "Funds for [financing City Creek Mall] have come and will come from those commercial entities owned by the Church." "Income" can, of course, also include money given to a religious organization, though such money is often referred to as "offerings," "contributions," or "tithing." But nothing in President Hinckley's 1991 statement defines "income" of the Church as tithing contributions to the Church.

At the Church's 1995 General Conference, eight years before his April 2003 statement, President Hinckley stated:

> Not only are we determined to live within the means of the Church, but each year *we put into the reserves of the Church a portion of our annual budget.* . . . Should there come a

> time of economic distress, we would hope to
> have the means to weather the storm.

(Emphasis added.)    President Hinckley neither defined "annual budget" nor specified the source of the funds in the annual budget.

The Church makes no specific argument in its brief to us with respect to President Hinckley's 1995 statement.    It writes only, "President Hinckley explained that the Church would fund City Creek, in part, from earnings on reserves, and in 1991 and 1995, President Hinckley explained where those reserves came from."    Our dissenting colleague contends that the "context" of President Hinckley's 1995 statement makes clear "that the Church's reserves derived from tithing."  Dissenting Op. at 36.  But our colleague is unable to point to any actual statement — by President Hinckley or anyone else — that the "portion of the annual budget" put into "the reserves of the Church" came from tithing.

Even if true, President Hinckley's 2003 statement about "reserve funds" is not necessarily a defense to Huntsman's fraud claim.    First, if President Hinckley had stated in English that "tithing funds" would not be used to finance the project, and had then added in a foreign language unknown to his audience that the financing came from earnings on tithing funds, the added statement would not defeat a fraud claim.    Nor would it defeat a fraud claim if President Hinckley spoke entirely in English, first saying in plain language that "tithing funds" would not be used, but then, using undefined or specialized terms that his audience would not understand, saying that some other money ("earnings on reserve funds") would be used.  In either event, the audience would have heard, stated in plain English, that tithing funds

would not be used to finance the project, and then would have heard, in opaque language, that earnings on some other kind of funds would be used. Second, when he spoke in 2003, President Hinckley made no reference to his 1991 and 1995 statements. Even if an astute listener could have understood the 1991 and 1995 statements as the Church would have us understand them, the listener would have to have had those statements in mind in order to understand the 2003 statement as the Church would have us understand it.

Third, there is evidence in the record indicating that the term "tithing funds," in common usage within the Church, refers both to tithing principal and to earnings on tithing principal. As noted above, Nielsen stated in his declaration:

> During my employment at EPA [Ensign Peak Advisors], EPA's senior leadership and other EPA employees referred to . . . all funds of EPA as "tithing" money, regardless of whether they were referring to principal or earnings on that principal.

Given this common usage, a reasonable juror could conclude that President Hinckley intended his audience to understand, when he said that no "tithing funds" would be used to fund the City Creek Mall project, that neither tithing funds principal nor earnings on tithing principal would be used.

Fourth, and perhaps most tellingly, Nielsen recounted in his affidavit that he questioned Roger Clarke, President of Ensign Peak, about the use of Ensign Peak funds to finance the City Creek Mall project. Referring to the transfer of funds from Ensign Peak to Property Reserve on or before January 1, 2004, for use on the City Creek Mall project, Clarke told Nielsen that the funds had been transferred to

Property Reserve in order to conceal their source. According to Nielsen, Clarke told him that the funds had been transferred in this manner so that "people would not know that [Ensign Peak] was the source of this funding to City Creek Mall." Clarke told Nielsen "that it was important that people should not know [Ensign Peak's] role as the source of the funds."

In sum, a reasonable juror could rely on the following evidence to conclude that the Church fraudulently misrepresented that neither tithing principal nor earnings on tithing principal would be or were being used to develop the City Creek Mall project: (1) the four unqualified statements by church officials and in church publications that tithing funds were not used to finance the City Creek Mall project; (2) the statement by President Hinckley, in which he denied that "tithing funds" would be used to develop the City Creek Mall project and in which he failed to tell his listeners that, as he was using the terms, "reserve funds" were "tithing funds"; (3) common usage in the Church under which the term "tithing funds" includes both tithing principal and earnings on tithing principal; and (4) Clarke's statement that money was transferred from Ensign Peak to Property Reserve in order to conceal the source of the funds used to develop the City Creek Mall project.

We therefore hold, contrary to the district court, that there is a genuine dispute of material fact as to whether the Church fraudulently misrepresented the source of the money used to finance the City Creek Mall project.

### (2)  Reliance

Misrepresentation and reliance are separate elements. The district court held that a reasonable juror could conclude that Huntsman relied on misrepresentations by the Church.

The Church argues that Huntsman understood Church officials and Church publications to say that earnings on tithing principal would be used to finance the City Creek Mall project.  Our dissenting colleague points out that Huntsman is a sophisticated man with deep and longstanding family ties to the Church.  In the view of our colleague, "Huntsman should have understood that 'earnings of invested reserve funds' referred to earnings on tithing principle."  Dissenting Op. at 40–41.

The district court pointed out that Huntsman declared that "he read and/or heard each of the [five statements by the Church] shortly after they were published," and that he relied on them in continuing to donate tithes to the Church. Huntsman declared that he did not understand President Hinckley to say that earnings on tithing funds would be used to finance the project.

In light of Huntsman's declaration that he believed, based on the five statements, that no tithing principal or earnings on principal were or would be used to finance the City Creek Mall project, the district court denied summary judgment.  It held that Huntsman's credibility could not be determined as a matter of law.  *See Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005) ("Summary judgment is an inappropriate vehicle for resolving claims that depend on credibility determinations.").  We agree.

### 2. Beneficial Life Insurance Company

The district court granted summary judgment to the Church on Huntsman's fraud claim with respect to bail-out payments to the Beneficial Life Insurance Company. The district court held that there was no actionable statement in the record by a representative of the Church with respect to Beneficial Life.

Huntsman points to "Sunday School manuals" and general church teachings about the use of tithing money. He also points to one brief statement, made in the context of a statement about the City Creek Mall project, to the effect that tithing money is not used for commercial projects. There is no statement in the record by any Church official denying that tithing funds—either tithing principal or earnings on tithing principal—would be or were used to finance the bail out of Beneficial Life.

We agree with the district court that this evidence does not provide a sufficient basis for a fraud claim with respect to the financing of Beneficial Life.

### Conclusion

We reverse the judgment of the district court with respect to Huntsman's fraud claim based on the Church's representations as to the use of funds to finance the City Creek Mall project. We affirm the judgment of the district court with respect to Huntsman's fraud claim as to the use of funds to bail out the Beneficial Life Insurance Company. We reverse and remand for further proceedings consistent with this opinion.

**Affirmed in part, Reversed in part, and Remanded.** Each side shall bear its own costs on appeal.

KORMAN, District Judge, concurring in part and dissenting in part:

The Church of Jesus Christ of Latter-day Saints traces its roots to Joseph Smith, who, in 1830, published the Book of Mormon and organized the church in New York.[1]  Smith faced persecution even before the church was organized, which continued in the decades to follow, and led to several forced migrations of members of the church.  Church members ultimately fled from Ohio to Missouri, where they were also persecuted and driven out of the state by 1839. Smith and church members built a new city in Illinois, and in 1844, Smith and his brother were imprisoned in a nearby jail and murdered by a mob.

Fleeing persecution, church members traveled to Utah, first arriving in 1847.  Brigham Young, the successor to Smith, served as the president of the church until his death in 1877.  In Utah, the church used contributions from members to build its temple in Salt Lake City, and Young established commercial enterprises, also financed by contributions to the church, intending to help church members become self-sufficient.  Indeed, in 1868, the church established a general goods store called Zion Cooperative Mercantile Institution (ZCMI), which was

---

[1] The history is largely based on information in the record and information in the Encyclopedia Britannica.  *See* J. Gordon Melton, *Church of Jesus Christ of Latter-day Saints*, Encyclopedia Britannica (last updated May 22, 2023), https://www.britannica.com/topic/Church-of-Jesus-Christ-of-Latter-day-Saints; *see also* Brett G. Scharffs, *The Journey from Persecution to Inclusion: A Case Study of the Church of Jesus Christ of Latter-Day Saints in America*, 97 Notre Dame L. Rev. Reflection 264, 266-69 (2022).

eventually transformed from 2006 to 2012 into the City Creek Center.

Since its early days in Utah, the church has grown substantially. As Church President Gordon Hinckley said in his 1991 "State of the Church" remarks, when he was the First Counselor in the First Presidency, the church was then "growing consistently and remarkably." At the same time, the church retained its commitment to "live within its means," always cognizant of the "dark times of the Great Depression" and the possibility of returning to such circumstances.

Subsequently, in 1995 remarks, Hinckley said the church was "in good condition," "healthy," and "growing in numbers." He explained that the church is "expanding geographically over the world," and "adding a million new members each three and a-half years." Indeed, according to a recent Wall Street Journal report, the church "has announced 133 new temples" in the past five years, which "would give the church 315 worldwide, up from 174 operating now."[2] The Wall Street Journal further reports that the church's "$100 billion investment portfolio helps ensure it can keep expanding globally" in light of the fact that its membership growth "is coming from developing countries that don't generate as much tithing revenue."[3] This extraordinary growth, in the face of the history described above, is a credit to the successful governance of the church by its leadership.

---

[2] Jonathan Weil, *Inside the Mormon Church's Globe-Spanning Real-Estate Empire* (June 29, 2023), https://www.wsj.com/articles/mormon-church-temple-spending-spree-utah-e167977f.

[3] *Id.*

Nonetheless, plaintiff James Huntsman accuses the Corporation of the President of the Church of Jesus Christ of Latter-Day Saints (the "Church") of "secretly lin[ing] its own pockets by using the funds to develop a multi-billion dollar commercial real estate and insurance empire that ha[s] nothing to do with charity." As a preliminary matter, Huntsman's claim falsely conjures an image of Church leaders enriching themselves at the expense of the Church. Such a proposition is entirely unsupported. Even to the extent the Church used contributions on commercial enterprises, such as the City Creek Mall, there is no suggestion that those endeavors did not in turn benefit the Church, including, as Hinckley described, by "protect[ing] the environment of the Salt Lake Temple."

Huntsman claims that the Church "lied about the intended use of [the tithing] funds," and specifically "misrepresented that tithing funds would not be used for the commercial development of the City Creek Mall." In his complaint, Huntsman points to five specific statements by the Church, allegedly stating "that tithing funds would not be used to fund any commercial profit ventures." Huntsman claims that such statements "were false, and Defendant[] knew them to be false" because defendant "did not intend to use Plaintiff's tithing funds solely for charitable and religious purposes," and in fact, defendant intended to use the funds for "purely commercial endeavors, including the construction of the City Creek Mall."

Today the majority concludes that the Church is not entitled to summary judgment on Huntsman's claim that the Church fraudulently misrepresented whether tithing contributions would be used to fund the development of the City Creek Mall. I cannot agree. The district judge correctly concluded that no reasonable juror could find that Hinckley

misrepresented the source of the funding for the project in 2003. Summary judgment in favor of the Church is therefore appropriate on all claims.[4]

To succeed on a claim for fraud, California law[5] requires, *inter alia*, a "misrepresentation (false representation, concealment, or nondisclosure)" with "knowledge of falsity." *Small v. Fritz Companies, Inc.*, 65 P.3d 1255, 1258 (Cal. 2003). In other words, there must generally be "a material and knowingly false representation of fact." *Orient Handel v. United States Fid. & Guar. Co.*, 237 Cal. Rptr. 667, 672 (Ct. App. 1987). Here, whether Hinckley intended to make such a false statement must be assessed in the context of what he would have expected Huntsman—the plaintiff—to understand. Simply, no reasonable juror could conclude that Hinckley intended to make a knowingly false representation to Huntsman, particularly because of Hinckley's knowledge of Huntsman's sophistication and substantial familiarity with the Church, a dispositive fact that is discussed further below.

The case hinges on the first of the allegedly fraudulent statements that Huntsman points to: a statement by Hinckley

---

[4] Because I agree with the majority that plaintiff does not succeed on his claim related to the Beneficial Life Insurance Company, I concur as to the majority's opinion on that claim (Part IV.B.2), and I dissent as to the City Creek Mall project claim (Part IV.B.1).

[5] Why California law applies in this case is perplexing. The Church, according to the complaint, "is a corporation duly organized and operating pursuant to the laws of the State of Utah." And Huntsman only moved from Utah to California on October 31, 2020. His complaint was filed less than five months later. But I apply California law nonetheless, as the majority does, because the parties have proceeded under California law. *See Montana Power Co. v. Pub. Util. Dist. No. 2 of Grant Cnty.*, 587 F.2d 1019, 1022 n.1 (9th Cir. 1978).

at the Church's April 2003 General Conference.    The
General Conference is a "semi-annual event consisting of
worship services and messages from Church leaders
broadcast to the worldwide Church."  The issue is whether
Hinckley accurately represented the source of funding for
the City Creek Mall project when he discussed the Church's
"decision to purchase the shopping mall property
immediately to the south of Temple Square."    Hinckley
explained of the project:

> We feel we have a compelling responsibility
> to protect the environment of the Salt Lake
> Temple. The Church owns most of the
> ground on which this mall stands. The
> owners of the buildings have expressed a
> desire to sell. The property needs very
> extensive and expensive renovation. We have
> felt it imperative to do something to revitalize
> this area.

He then explained the City Creek project's funding sources:

> But I wish to give the entire Church the
> assurance that tithing funds have not and will
> not be used to acquire this property. Nor will
> they be used in developing it for commercial
> purposes.  Funds for this have come and will
> come from those commercial entities owned
> by the Church. These resources, together
> with the earnings of invested reserve funds,
> will accommodate this program.

In that statement, Hinckley did represent "that tithing
funds have not and will not be used to acquire this property,"

but he then qualified that representation by explaining: "These resources, *together with the earnings of invested reserve funds*, will accommodate this program." (Emphasis added). To be clear, as the district judge found, "the earnings of invested reserve funds were the earnings of invested tithing funds." Hinckley thus clarified that the Church would use earnings from invested reserve tithing funds.

Indeed, statements by Hinckley in 1991 and 1995 made clear that the Church's "reserves" referred to tithing funds, and thus earnings on reserves would refer to the earnings on tithing funds. In 1991, Hinckley said the church would set aside a portion of the contributions it received in tithes. "In the financial operations of the Church," he said, "we have observed two basic and fixed principles: One, the Church will live within its means. It will not spend more than it receives. Two, a fixed percentage of income will be set aside to build reserves against what might be called a possible 'rainy day.'" In 1995, Hinckley reiterated that message: "Not only are we determined to live within the means of the Church, but each year we put into the reserves of the Church a portion of our annual budget." In context, these statements show that the Church's "reserves" encompass tithing money.

The majority's attempt to explain away the 1991 and 1995 statements is unpersuasive. First, contrary to the majority's assertion, Hinckley *did* make clear that "income" in his 1991 statement included tithing. Specifically, Hinckley said: "The financial program of the Church—both income and disbursement—is found in sections 119 and 120 of the Doctrine and Covenants." Hinckley then explained that section 119 refers to tithing. Because this statement roots the Church's "income and disbursement" in section 119, which refers to tithing, it is clear that income for the Church includes tithing. This renders irrelevant the

majority's assertion that "[i]ncome is usually used as a secular term."  Maj. Op. at 24.

Moreover, the 1991 statement is at odds with the majority's assessment that "[t]he Church has significant commercial assets and income from those assets."  Maj. Op. at 24.  Indeed, Hinckley stated in 1991 that the Church's income from its commercial assets was "relatively small" and that its other assets generally did not generate income. With respect to what Hinckley described as "substantial assets," he explained that "these are money-consuming assets and not money-producing assets"[6] as they are largely in particular types of real estate such as meeting facilities and schools, and in welfare projects, and the like.  And with respect to the Church's commercial assets, Hinckley specified: "We have a few income-producing business properties, but the return from these would keep the Church going only for a very brief time."  He then returned to discussing tithing.  Therefore, from the context of the 1991 statement, Hinckley's reference to "build[ing] reserves" from "income" meant that the Church would build reserves from, at least in part, tithing funds.

Second, the context of the 1995 statement is also clear that the Church's reserves derived from tithing.  Hinckley discussed tithing in the immediately preceding paragraphs to the statement that "we put into the reserves of the Church a portion of our annual budget."  Hinckley explained that

---

[6] One example of such a "money-consuming" asset is the Manhattan New York Temple, undoubtedly worth millions of dollars, located across from Lincoln Center on Columbus Avenue. *See* Manhattan New York Temple, The Church of Jesus Christ of Latter-day Saints (last visited July 20,                                                                                          2023), https://www.churchofjesuschrist.org/temples/details/manhattan-new-york-temple?lang=eng.

"[t]he Church has been living within its means, and it will continue to do so. I am profoundly grateful for the law of tithing." He then discussed the commandment to tithe and that the Church has "a compelling trust to use them carefully and wisely." Hinckley then referred back to the beginning of his discussion of tithing when discussing the reserves by saying: "Not only are we *determined to live within the means of the Church*, but each year we put into the reserves of the Church a portion of our annual budget." (Emphasis added). Thus, even if Hinckley did not expressly state that tithing funds would be placed into reserves, the context of his reference to the annual budget surrounded by a discussion of tithing makes it obvious they would be.

These 1991 and 1995 statements must inform our understanding of Hinckley's 2003 statement that "the earnings of invested reserve funds" would be used for the City Creek project. Indeed, they show that "reserve funds" refer to tithing funds. In other words, in his 2003 statement, Hinckley said that the Church would use earnings on tithings, not tithing principal, to fund the project. And that was true. The financial records of Ensign Peak Advisors ("Ensign Peak"), which the Church incorporated in 1997 to serve as the "primary investment vehicle for the Church's reserve funds in stocks, bonds, and securities," confirm this fact. In 2003 alone, as the district judge noted, Ensign Peak had enough earnings on invested reserves to fund the allocation of money to the fund designated for the City Creek project. To be more precise, the record reflects that Ensign Peak had earnings of over $3.9 billion in 2003. Then, on January 1, 2004, Ensign Peak earmarked $1.2 billion of its funds to an internal account for the City Creek project. Withdrawing $1.2 billion from an account that just earned

$3.9 billion cannot mean that Ensign Peak cut into the principal instead of the earnings.

The majority also argues that "there is evidence in the record indicating that the term 'tithing funds,' in common usage within the Church refers both to tithing principal and to earnings on tithing principal," and thus Hinckley intended his audience to understand that neither tithing principal nor earnings would be used. Maj. Op. at 26. But the majority places too much weight on the declaration of David Nielsen, who worked as a Senior Portfolio Manager at Ensign Peak from 2010 until 2019, because, as the district judge pointed out, Nielsen did not work at Ensign Peak at the time that the funds were allocated for the City Creek project, and even if Nielsen's statements could establish common usage at Ensign Peak during his employment there, it is a stretch to say that he could establish the common usage throughout the Church as a whole. Moreover, even this "common usage" would not change the conclusion that "the earnings of invested reserve funds were the earnings of invested tithing funds," and Hinckley therefore effectively clarified that the Church would use earnings from invested reserve tithing funds.

The subsequent statements made by the Church about the City Creek project also do not permit a fraud claim because they do not conflict with Hinckley's 2003 statement. The district judge rightly found that "[n]one of the four statements are inconsistent with Hinckley's statement." Thus, they do not change the fact that Hinckley said that "earnings of invested reserve funds" would be used. Any subsequent statement would have been understood in the context of that earlier statement.

The Church therefore did not make a false representation, and our analysis of plaintiff's fraud claim should end here. Indeed, as the district judge found on these facts: "a reasonable juror could only conclude that Defendant used 'the earnings of invested reserve funds' to fund the City Creek project—*i.e.*, Defendant did exactly what Hinckley said Defendant would do."

Nonetheless, the majority takes a further journey to find a false representation, contending that "[e]ven if true, President Hinckley's statement about 'reserve funds' is not necessarily a defense to Huntsman's fraud claim." Maj. Op. at 25. The majority suggests that Hinckley used an "undefined or specialized terms that his audience would not understand." Maj. Op. at 25. I agree in principle that adding a caveat in a foreign language or a specialized term that could not be understood would not defeat a fraud claim. But in this case, there is no evidence that Hinckley's statements would have been the equivalent of a foreign language to this specific plaintiff. Indeed, this is not a class action; Hinckley's audience for purposes of this action was Huntsman, a sophisticated individual who has been immersed in the Church for much of his life.

Hinckley had good reason to believe that Huntsman would have understood the language Hinckley used, and as the majority recognizes, Hinckley's intent, which is based on such an understanding, is a critical element of plaintiff's fraud claim. A reasonable juror could therefore not find that Hinckley made "a knowingly false representation of fact." *Orient Handel*, 237 Cal. Rptr. at 672. Born in 1971, Huntsman was raised in a prominent family in the Church, and, as the majority points out, he considered himself to be "one of the Church's most devout members." Indeed, "he was raised in the LDS Church where he faithfully attended

weekly meetings, watched biannual general conference broadcasts, tithed, and donated to the fast offering and missionary funds." In 1990, Huntsman was ordained an Elder and began a two-year mission to Germany, and he has since "held numerous leadership and teaching assignments within the Church," "including missionary zone leader and trainer (five times), Elders Quorum President, Ward Mission Leader, Stake Mission Presidency, High Council and Gospel Doctrine teacher (on and off for eight years)." Moreover, "Huntsman worked at Huntsman Corporation for 23 years, has run several businesses and currently owns and operates Blue Fox Entertainment."

Huntsman was aware that the Church owned commercial ventures, and he kept up to date on Church affairs, as his practice was to "read the complete conference sessions in the Ensign Special Edition." Indeed, as a young man, as early as in his 20s and 30s, Huntsman was curious about the Church's use of tithing contributions, but he did not need to ask how his contributions were being spent "[b]ecause the answer at the time was provided in Church manuals, priesthood manuals, General Conference, Church magazines, and Sunday school." In other words, Huntsman was familiar with the Church's operations and publications.

All this significantly weakens the majority's analogy to a foreign language. And, in my view, the record is clear that Hinckley would have expected Huntsman—from a prominent family and himself a leader in the Church—to understand the terminology Hinckley used. If Huntsman's background and sophistication are not enough alone, as discussed above, Hinckley explained in two statements in 1991 and 1995 that the Church would set aside tithing funds as reserves. Thus, Huntsman should have understood that "earnings of invested reserve funds" referred to earnings on

tithing principal. While Huntsman argues in his briefing that there is no evidence that he was aware of the 1991 or 1995 statements, a brief is not a substitute for an affidavit in the face of a record that establishes otherwise. As mentioned earlier, in his deposition, Huntsman indicated that he would have been aware of at least the following material during his 20's and 30's: "Church manuals, priesthood manuals, General Conference, Church magazines, and Sunday school." Thus, there is evidence Huntsman would have read the 1991 and 1995 statements.

In sum, Hinckley's earlier statements show that the Church would set aside tithing funds as reserves. This, in addition to the financial records, makes clear that Hinckley's 2003 statement was truthful and not a misrepresentation. Combined with Huntsman's sophistication and knowledge of the Church, there is also no question that Hinckley would have expected Huntsman to understand his statement, which entirely undermines any claim that Hinckley made a knowingly false representation. Again, this is not a question of what Huntsman understood, but of what Hinckley intended. Thus, no reasonable juror could conclude that the Church fraudulently misrepresented the source of the money used to finance the City Creek Mall project.

I respectfully dissent as to Part IV.B.1 of the majority opinion.