**No. 21-56056**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————

JAMES HUNTSMAN,

*Plaintiff-Appellant*,

v.

CORPORATION OF THE PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY SAINTS,

*Defendant-Appellee.*

and

DOES, 1-10,

*Defendants.*

————————

On Appeal from the United States District Court
for the Central District of California,
No. 21-cv-02504

————————

## PETITION FOR REHEARING OR REHEARING EN BANC

————————

RICK RICHMOND
ANDREW E. CALDERÓN
LARSON LLP
555 S. Flower Street
Suite 4400
Los Angeles, CA 90071
(213) 436-4888
rrichmond@larsonllp.com

PAUL D. CLEMENT
 *Counsel of Record*
ANDREW C. LAWRENCE*
CHADWICK J. HARPER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Defendant-Appellee*

September 20, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), The Church of Jesus Christ of Latter-day Saints certifies that it is a Utah corporation sole that issues no stock and does not have a parent corporation.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES..................................................................................... iii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 2

    A.    Religious Background ........................................................................... 2

    B.    Procedural Background ........................................................................ 6

REASONS FOR GRANTING REHEARING ....................................................... 10

I.    The Panel's Decision Contradicts Supreme Court Precedent. .................... 10

    A.    The Panel's Fraudulent-Misrepresentation Holding Violates the Church-Autonomy Doctrine..........................................................11

    B.    The Panel's Reasonable-Reliance Holding Impermissibly Requires Juries to Adjudicate Religious Disputes. ........................... 15

II.    This Case Raises An Exceptionally Important Question............................. 17

CONCLUSION ....................................................................................................... 19

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Harris v. Matthews*,
643 S.E.2d 566 (N.C. 2007) ..............................................................13

*Hoffman v. 162 N. Wolfe LLC*,
228 Cal.App.4th 1178 (2014) ...........................................................16

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012)....................................................................1, 11

*Jones v. Wolf*,
443 U.S. 595 (1979).............................................................. 12, 13, 15

*Kennedy v. Bremerton Sch. Dist.*,
142 S.Ct. 2407 (2022) ................................................................ 2, 18

*NLRB v. Cath. Bishop of Chi.*,
440 U.S. 490 (1979)..........................................................................17

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S.Ct. 2049 (2020)...................................................................2, 11

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
141 S.Ct. 63 (2020)...........................................................................17

*Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*,
426 U.S. 696 (1976)...................................................... 12, 13, 15, 17

*Watson v. Jones*,
80 U.S. (13 Wall.) 697 (1871)...........................................................11

**Rule**

Fed. R. App. 35(b)(1)................................................................. 10

**Other Authority**

The Church of Jesus Christ of Latter-day Saints, *Tithing*,
https://rb.gy/2b18i (last visited Sept. 19, 2023)....................................3

**INTRODUCTION**

This is no ordinary fraud case.  In the first place, it lacks the first essential ingredient of a fraud claim, *i.e.*, a misrepresentation.  Here, the President of The Church of Jesus Christ of Latter-day Saints explained to the faithful that an important building project would not be financed by tithing funds, but rather would be paid for through earnings on investments.  The Church then proceeded to do just that.

But this case is far more than a fraud claim in search of a misrepresentation.  By allowing this novel tithing-fraud claim to proceed, the panel ignored clear Supreme Court First Amendment teaching and created a profound threat to religious liberty.  Tithing differs from any other dynamic in which a person parts with money, as the terms of the exchange and the donor's motivation transcend the secular world.  Virtually any person who has fallen away from their faith may view their donations to the church during their faithful years as a waste, but that cannot mean each of them has a fraud claim that allows them to try to convince a secular jury that they were swindled.  The threat to churches and to the civil courts from such suits is obvious.

The panel mistakenly believed that those dangers could be avoided and this case could proceed on secular principles.  But its opinion runs afoul of a host of recent Supreme Court cases like *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), and *Our Lady of Guadalupe School v.*

*Morrissey-Berru*, 140 S.Ct. 2049 (2020). The problem in those cases was not that the claims could not be conceptualized as secular employment disputes. Rather, the problem was that allowing those suits to proceed before secular courts and secular juries posed a grave threat to church autonomy. The threat here is far more palpable. Every religion has adherents who lose their faith; opening the secular courts to their refund claims inevitably risks inquiries into church doctrine and the donor's spiritual motivations for tithing, along with invasive entanglements in internal religious affairs, that pose dire threats to religious liberty. This Court has been reversed before for failing to adhere to the Supreme Court's vision of religious liberty. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407 (2022); *Our Lady*, 140 S.Ct. 2049. The en banc court should intervene here to avoid another reversal.

## BACKGROUND

### A. Religious Background

1. Joseph Smith, Jr. founded the Church in 1830 in New York and served as its first president. *See* 3-ER-533. For nearly two decades thereafter, religious "persecution" resulted in "several forced migrations" of Church members, culminating in a move to Utah in 1847. Op.30 (Korman, D.J., dissenting in part); 3-ER-304. Upon arriving, Church leaders recognized the need to create commercial enterprises necessary for survival. *See* 3-ER-306. Those commercial enterprises included a general-goods store—Zion's Cooperative Mercantile Institution

(ZCMI)—located near the Church's headquarters in Salt Lake City.  *See* 3-ER-306-07; 3-ER-533.  In the 2000s, when the area surrounding the former ZCMI deteriorated, threatening the Church's iconic Temple Square, Church leaders felt a "compelling" religious "responsibility" to "revitalize" it.  Op.13.  Doing so required the investment of Church funds, which in turn gave rise to this dispute.

2.  Since 1838, the Church has taught that a core "commandment," Op.5, is that members must "tithe," which the Church defines as giving "one-tenth of their increase or income."  The Church of Jesus Christ of Latter-day Saints, *Tithing*, https://rb.gy/2b18i (last visited Sept. 19, 2023).  That religious obligation does not derive from the Church's current financial needs and thus does not ebb and flow as the Church takes on new projects or as Church membership grows in wealth or size.  Instead, the 10% "tithing" obligation is derived from sacred text.  Doctrine & Covenants 119:4.  Accordingly, if the Church collects more in tithing than it expends in any given year, it does not issue rebates or relax the next year's tithing obligation.  Nor does the Church increase its annual expenditures to match and exhaust that year's tithing contributions.  Instead, to ensure that the Church will have sufficient funds to operate and finance religious work, the Church has long set aside a portion of each year's tithes for a reserve fund.  *See* 3-ER-310; 3-ER-354.  The Church further distinguishes between the principal in that fund, which includes surpluses

from tithing in earlier years, and earnings created by investing that principal. *See* Church.Resp.Br.9.

As Gordon B. Hinckley, then a senior Church leader, explained at the April 1991 General Conference (a semi-annual worship service), "[t]he financial program of the Church" "is found in … the Doctrine and Covenants," and "Section 119" of that scripture states that all members of the Church "shall pay" tithing. 2-ER-236-37. He added that one "fixed principle[]" of the Church's "financial operations" is that "a fixed percentage of income"—*i.e.*, of annual tithing funds—"will be set aside to build reserves against what might be called a possible 'rainy day.'" 3-ER-310-11; 2-ER-237. After his elevation to Church President, he reaffirmed during the Church's October 1995 General Conference that "I am profoundly grateful for the law of tithing" and "each year we put into the reserves of the Church a portion of the annual budget." 2-ER-245-46; 3-ER-311-12. Although a Church department initially managed the reserve funds, the Church in 1997 established a nonprofit corporation—Ensign Peak Advisors—to "serve as its primary investment vehicle for tithing funds received from church members." Op.6.

3. Between 2003 and 2012, Church leaders or publications made five statements explaining that the Church would use earnings on invested tithing funds—not tithing funds themselves—to invest in and revitalize the area around the ZCMI site through a project now known as "City Creek." First, at the April 2003

General Conference, speaking as a religious leader and not a financial analyst, President Hinckley made the distinction between funds from tithing and the proceeds of prior investments clear:

> I wish to give the entire Church assurance that *tithing funds have not and will not be used to acquire this property*. Nor will they be used in developing it for commercial purposes. Funds for this have come and will come from those commercial entities owned by the Church. These resources, together with *the earnings of invested reserve funds, will accommodate this program*.

3-ER-316 (emphases added). Second, in October 2003, a Church bishop reiterated: "None of this money comes from the tithing of our faithful members." 3-ER-369. Third, the Church's magazine explained in December 2006: "No tithing funds will be used in the redevelopment." 3-ER-373. Fourth, in March 2007, the Church's newspaper wrote: "Money for the project is not coming from LDS Church members' tithing donations." 3-ER-375. Finally, in October 2012, a Church official said: "[T]he Church has said no tithing went towards City Creek Center." 3-ER-378.

4. The Church was true to its word. The Church spent about $1.4 billion on the City Creek project, Op.6—with all money coming from *earnings* on invested tithing funds. That fact is undisputed. More precisely, in January 2004, Ensign Peak allocated $1.2 billion for the project. *See* Op.6; 3-ER-538. And that initial allocation itself accrued significant earnings, allowing the Church to finance the City Creek project without touching current or past tithing funds. *See* 1-ER-8-9; 3-ER-327-28; 3-ER-539-40; 4-ER-658. The district court found exactly that, 1-ER-8-9, and the

5

panel majority never disagreed. Instead, the only dispute is what Church officials meant and what a then-faithful Church member understood by "tithing funds."

**B.    Procedural Background**

1.    James Huntsman grew up in a prominent Church family and considered himself "devout." Op.5. Beginning in 1993, Huntsman started giving tithes because "he believed he was obeying one of God's commandments and would receive blessings from God for doing so." 3-ER-347; Op.5.

Huntsman grew "disillusioned" with the Church and ceased giving tithes in 2015. Op.6. After relocating to California, Huntsman filed this suit in 2021 to recover at least $5 million in tithing donations, along with punitive damages. *See* 2-ER-263. Huntsman alleged that the Church committed fraud through the five statements detailed above, which Huntsman alleges falsely "represented that tithing money was not used to finance commercial projects." Op.4-5. Huntsman also argued that the Church committed fraud when "bail[ing] out the Beneficial Life Insurance Company." Op.12.

2.    The district court granted the Church summary judgment. As to City Creek, the court concluded that Huntsman's fraud claim faltered on the threshold—there was no misrepresentation. "[A] reasonable juror could only conclude that [the Church] used 'the earnings of invested reserve funds' to fund the City Creek project"

and not current or past tithing funds. 1-ER-9. Put simply, the Church "did exactly what Hinckley said [it] would do." 1-ER-9.

Accordingly, the district court concluded that it "need not" reach or apply the church-autonomy doctrine. 1-ER-6. But the court recognized that Huntsman's claim implicated it. As it explained, Huntsman's claim reflected his understanding that tithing funds and earnings on invested tithing funds are "two sides of the same financial coin," such that proceeds from invested tithing reserves constitute "tithing funds." 1-ER-11 n.4. But the court observed that "determining whether the term 'tithing funds' encompasses earnings on invested tithing funds would require an analysis of Church doctrines and teachings," and "[t]he First Amendment bars such an inquiry." 1-ER-11 n.4. The court acknowledged that Huntsman had submitted a declaration from a former Ensign Peak portfolio manager, who claimed that—during his 2010-2019 employment—some Ensign Peak "employees" "referred" to all funds at Ensign Peak as "'tithing' money, regardless of whether they were referring to principal or earnings on that principal." 1-ER-9. But the court deemed that evidence immaterial because it post-dated the relevant events and because it may have reflected an understanding different from that of religious leaders like President Hinckley, who expressly distinguished tithing from investment earnings. 1-ER-9-10.

Finally, the district court rejected Huntsman's claim implicating Beneficial Life, holding that Huntsman had failed to "identify a specific misrepresentation" and his position required consideration of "Sunday school manuals" and "the Church's teachings," which the First Amendment "prohibits." 1-ER-12-13.

3. On appeal, a divided panel reversed as to the City-Creek claim, but unanimously affirmed as to the Beneficial-Life claim. As to City Creek, the majority first determined that resolving Huntsman's claim would not implicate the church-autonomy doctrine. In its view, a jury can determine whether "the Church's statements about how it would use tithing funds were true, and whether Huntsman reasonably relied on those statements when he made tithing contributions," "based on secular evidence and analysis." Op.11-12.

Applying its purportedly "secular" analysis, the majority offered four reasons why "a reasonable juror" could find that the Church "misrepresented the source of the funds used to finance the City Creek Mall project." Op.19. First, the panel emphasized that Church officials or publications made "four unqualified statements" that "tithing funds were not used." Op.27. Second, although the panel recognized that President Hinckley's 2003 message distinguished between "earnings of invested reserve funds" and "tithing funds," the panel majority deemed the former phrase too "opaque"—*i.e.*, not "plain English"—and observed that President Hinckley "did not define" either "tithing funds" or "reserve funds." Op.20, 25-26. Third, the panel

stated that a juror could conclude from the former Ensign Peak portfolio manager's declaration that tithing funds encompass *earnings* on invested tithing. Op.27. Finally, invoking the same declaration, the panel noted that Ensign Peak employees allegedly sought to "conceal" the firm's "role" in the City Creek project. Op.27.

The majority then briefly addressed reliance and found that element too should go to a jury. According to the majority, it sufficed that Huntsman submitted a declaration stating that "he believed, based on the five statements, that no tithing principal or earnings on principal were or would be used to finance the City Creek Mall project." Op.28.

Turning to the Beneficial-Life claim, the panel affirmed the district court after finding "no statement in the record by any Church official denying that tithing funds—either tithing principal or earnings on tithing principal—would be or were used to finance the bail out of Beneficial Life." Op.29.

Judge Korman, sitting by designation, dissented as to the City-Creek claim. Like the district court, he concluded this was a fraud claim without a misrepresentation: "[N]o reasonable juror could find that Hinckley misrepresented the source of the funding for the project in 2003," and the later statements "do not conflict with Hinckley's 2003 statement." Op.32-33, 37-38. He also explained that the majority erred in placing weight on the former portfolio manager's declaration,

as it could not "establish the common usage" of the term "tithing funds" "throughout the Church." Op.38.

## REASONS FOR GRANTING REHEARING

En banc review is appropriate when a panel decision "conflicts with a decision of the United States Supreme Court" or involves a "question[] of exceptional importance." Fed. R. App. 35(b)(1)(A)-(B). Those standards are readily satisfied here. Indeed, the panel's decision squarely contradicts the church-autonomy doctrine and the bedrock rule that civil courts should not entangle themselves in religious disputes. The Supreme Court did not preclude employment discrimination claims by non-adherents, just to open the courts to fraud claims by former adherents who have lost the faith and want their contributions back. Such cases necessarily implicate religious leaders' statements and religious doctrines and do not belong in secular courts. The threat to religious liberty is palpable, as this case could not proceed if President Hinckley had either stayed mum or spoken with an accountant's precision. And the threat is not limited to any one church; many churches have tithing obligations and all lose some adherents who now view what they once took as dogma to be a lie. Further review is imperative.

## I. The Panel's Decision Contradicts Supreme Court Precedent.

This case need not have become a precedential decision threatening church autonomy and religious liberty, as it lacks the first essential of any fraud claim. As

the district court and Judge Korman demonstrated, the panel could and should have rejected Huntsman's fraud claim on the straightforward basis that there was no misrepresentation at all. President Hinckley distinguished between direct tithing funds and earnings on invested reserve funds with all the precision that can be expected from a religious leader speaking to his flock. But having unnecessarily sailed into constitutional waters, the panel issued a decision that necessitates further review.

### A. The Panel's Fraudulent-Misrepresentation Holding Violates the Church-Autonomy Doctrine.

1. As the Supreme Court has explained, the First Amendment's Religion Clauses protect the "power" of "religious organizations" to "decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor*, 565 U.S. at 186. "State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Our Lady*, 140 S.Ct. at 2060.

Although the Supreme Court has recently reaffirmed this church-autonomy doctrine, it is hardly new. In 1871, the Supreme Court held that "civil courts" have "no jurisdiction" to decide any matter that is "ecclesiastical in its character." *Watson v. Jones*, 80 U.S. (13 Wall.) 697, 733 (1871). The Supreme Court repeatedly reiterated the point throughout the 20th century. *See, e.g.*, *Jones v. Wolf*, 443 U.S.

595, 602 (1979) ("[T]he First Amendment prohibits civil courts from resolving … disputes on the basis of religious doctrine and practice."); *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 709 (1976) (similar). And the Supreme Court has made clear that even where this doctrine does not require abstention, it demands deference to church authorities on "issues of religious doctrine or polity." *Jones*, 443 U.S. at 602; *accord Milivojevich*, 426 U.S. at 709.

All of that should have made it clear that this case cannot proceed before a secular jury. What is true of religious employment is true, *a fortiori*, of tithing. How a church funds its operations, how it invests its money, and whether tithing is mandatory or voluntary, or rooted in sacred text or economic realities are all matters at the core of church autonomy. That is particularly true when it comes to the very definition of "tithing," which is a religious concept with differing meanings in different religions. *See* Becket.Amicus.Br.13-18. And the fraud claim here is all about a difference of opinion between a Church and its former member about the definition of "tithing funds." Huntsman's City-Creek claim is premised on the theory that the Church made "false" statements by saying it would not use "tithing funds" to finance the project, and then using *earnings* on invested tithing funds to finance that project. Op.11-12, 18. The dispositive question on the fraudulent-misrepresentation element is whether earnings on invested tithing funds constitute tithing funds. The Church says no; Huntsman thinks the answer is yes. That is not

a dispute for secular courts, but "precisely the type of ecclesiastical inquiry courts are forbidden to make." *Harris v. Matthews*, 643 S.E.2d 566, 571 (N.C. 2007). Instead, that inquiry is for the Church alone to resolve, and it has already declared that earnings on invested funds are *not* tithing funds. That distinction is rooted in longstanding church doctrine, which views tithing as an ongoing obligation to contribute "a tenth" of a Church member's "annual increase or income," 3-ER-308—a concept that excludes later investment earnings. That all should have been a clear signal for the panel to abstain from this dispute, or at least defer to Church officials on this disputed "issue[] of religious doctrine." *Jones*, 443 U.S. at 602.

2. The majority nevertheless held that whether "the Church's statements about how it would use tithing funds were true" is for a "reasonable juror" to decide "based on secular evidence and analysis." Op.11-12, 19. But each step in this so-called secular analysis confirms that this case is "a religious dispute the resolution of which … is for ecclesiastical and not civil tribunals." *Milivojevich*, 426 U.S. at 709.

First, the majority seized on the "four unqualified statements" that "tithing funds were not used to finance the City Creek Mall project." Op.27. But each of those statements followed President Hinckley's statement to the General Conference that distinguished between "tithing funds" (not to be used) and "the earnings of invested reserve funds" (to be used). Thus, when other Church officials referred to

tithing or "tithing funds," there is every reason to believe they were following President Hinckley's lead and using that phrase to cover only principal, not earnings from invested surpluses from past tithing.   At a minimum, as the district court recognized, "determining whether the term 'tithing funds' encompasses earnings on invested tithing funds would require an analysis of Church doctrines and teachings," and "[s]uch an inquiry would entangle [a] Court or a jury in an interpretation of 'ecclesiastical rule, custom or law,'" which the First Amendment "bars."  1-ER-11 n.4.

Second, the majority observed that, when President Hinckley "denied that 'tithing funds' would be used" for the City Creek project and clarified that "earnings on invested 'reserve funds' would be used," he "did not define" the terms "tithing funds" or "reserve funds."  Op.20, 27.  But at the point that secular judges are insisting that a religious leader define doctrinally infused terms in addressing his flock, the violation of the church-autonomy doctrine should be unmistakable.  It may well be that the faithful, steeped in their religion's doctrine, understood the distinction much better than Article III judges.  But both the definitions of religious terms and whether to leave certain terms undefined in addressing the faithful are plainly matters for Church officials, not secular courts.

Finally, the panel observed that some Ensign Peak employees used "tithing funds" to "refer[] both to tithing principal and to earnings on tithing principal" and

14

wanted Ensign Peak's role in financing the City Creek project to remain confidential. Op.26-27. But as both Judge Korman and the district court agreed, none of that matters. *See* Op.38; 1-ER-9-11. Even setting aside that the former portfolio manager who made these claims did not work at Ensign Peak during the relevant period, if the loose usage of portfolio managers differs from the understanding of Church authorities, the answer under binding Supreme Court precedent is clear: Courts must "defer" to ecclesiastical authorities. *Jones*, 443 U.S. at 602.

To be sure, none of this means that a church leader raising funds for hurricane relief can raid the collection basket to fund a pleasure trip. *See Milivojevich*, 426 U.S. at 712 (adverting to possibility of non-deference in cases involving "fraud, collusion, or arbitrariness"). But a fraud claim simply cannot turn on a difference in understanding of a religious term or the failure of a religious leader to define his terms with greater precision. Any other conclusion "would undermine the general rule that religious controversies are not the proper subject of civil court inquiry." *Id.* at 713.

**B.    The Panel's Reasonable-Reliance Holding Impermissibly Requires Juries to Adjudicate Religious Disputes.**

1.    The constitutional difficulties with the panel decision extend to the reliance element. The reliance prong requires a plaintiff to prove that "(1) the matter was material in the sense that a reasonable person would find it important in determining how he or she would act; and (2) it was reasonable for the plaintiff to

have relied on the misrepresentation," *Hoffman v. 162 N. Wolfe LLC*, 228 Cal.App.4th 1178, 1194 (2014) (citation omitted). Applying that standard in the tithing context is rife with First Amendment difficulties.

Indeed, the jury would violate the First Amendment right off the bat, as it would necessarily have to determine who a "reasonable" Church member is and whether that "reasonable" Church member would deem it "important" in his quest to comply with a religious commandment that the Church used earnings on invested tithing funds to finance the City Creek project—a project Church leaders believed they had a "compelling" religious "responsibility" to undertake. Op.13. That fraught inquiry would be further complicated by the reality that Church members have a religious obligation to tithe without respect to the destination of the funds. Judicial entanglement in religious affairs thus is inescapable.

2. The majority nevertheless held that the reliance element should proceed to the jury because Huntsman's declaration said that "he believed, based on the five statements, that no tithing principal or earnings on principal were or would be used to finance the City Creek Mall project." Op.28. But that analysis goes only to the second (subjective) question in the reasonable-reliance inquiry, not the first (objective) one. And even when focusing on Huntsman alone, the jury would still have to decide whether he acted "reasonably" in linking his decision to tithe to the Church's representations about the use of funds when he has acknowledged that,

16

when tithing, "he believed he was obeying one of God's commandments and would receive blessings from God for doing so." 3-ER-347. Thus, even under the majority's shortcut approach, the jury would "entangle[]" itself in "essentially religious controversies"—precisely what the First Amendment forbids. *Milivojevich*, 426 U.S. at 709.

## II. This Case Raises An Exceptionally Important Question.

The panel's decision is not just exceptionally wrong, but exceptionally consequential. Absent further review, the Church will lose its role as the decisive arbiter of what meets the definition of "tithing funds" and will have to cede that power to probing courts and juries. The First Amendment injury is self-evident. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67 (2020) (per curiam) ("The loss of First Amendment freedoms … unquestionably constitutes irreparable injury."); *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979) (noting potential harm from "very process of inquiry").

And the problems hardly end there. Huntsman ultimately seeks to recoup millions of dollars in tithing dating back to 2003 (and punitive damages to boot). If this Court allows his claim to move forward, copycat suits by other former believers based on years-old statements will inevitably follow.

And the panel's decision will have a palpable chilling effect on the Church's religious expression. The stark contrast between the panel's resolution of the City-

17

Creek and Beneficial-Life claims vividly illustrates the point.  The panel allowed the City-Creek claim to proceed because the Church addressed the source of funding and did not do more to define certain terms.  But the Beneficial-Life claim was dismissed because Church leaders made "no" such statements.  Op.29.  The lesson thus is unmistakable:  Church leaders must refrain from discussing how Church funds will be used and avoid terms like "tithing" unless they want to carefully define their terms.  That is intolerable in a Nation whose Constitution "doubly protects religious speech."  *Kennedy*, 142 S.Ct. at 2421.

Nor is the risk limited to the Church, as previous and forthcoming amicus briefs underscore.  Virtually every religion depends on contributions from its adherents, and every religion has some members who fall away from the faith.  Under the panel's decision, any disillusioned former adherent who finds his way to the Ninth Circuit can sue for a refund and attempt to get civil authorities to label their former church a liar.  It is hard to imagine a greater threat to religious liberty or a better reason to grant en banc review.

## CONCLUSION

The Court should grant rehearing or rehearing en banc.

Respectfully submitted,

s/Paul D. Clement

RICK RICHMOND
ANDREW E. CALDERÓN
LARSON LLP
555 S. Flower Street
Suite 4400
Los Angeles, CA 90071
(213) 436-4888
rrichmond@larsonllp.com

PAUL D. CLEMENT
*Counsel of Record*
ANDREW C. LAWRENCE*
CHADWICK J. HARPER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Defendant-Appellee*

September 20, 2023

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Circuit R. 32-1 because this brief contains 4,188 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

September 20, 2023

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement