# No. 21-56056

In The
# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

**JAMES HUNTSMAN,**
*Plaintiff-Appellant,*

*v.*

**CORPORATION OF THE PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY SAINTS,**
*Defendant-Appellee.*

---

Appeal from the United States District Court for the Central District of California
Stephen V. Wilson, District Judge • Case No. 2:21-CV-02504-SVW-SK

---

## AMICUS CURIAE BRIEF OF AYUDA HUMANITARIAN, CHARITYVISION, FIVE.12 FOUNDATION, AND THANKSGIVING POINT, IN SUPPORT OF PETITION FOR REHEARING AND REHEARING EN BANC

---

**HORVITZ & LEVY** LLP
JOHN A. TAYLOR, JR.
3601 West Olive Avenue, 8th Floor
Burbank, California 91505-4681
(818) 995-0800

**HORVITZ & LEVY** LLP
JEREMY B. ROSEN
505 Sansome Street, Suite 1550
San Francisco, California 94111-3175
(415) 462-5600

Attorneys for Amici Curiae
**AYUDA HUMANITARIAN, CHARITYVISION, FIVE.12 FOUNDATION, AND
THANKSGIVING POINT**

# DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, amici curiae Ayuda Humanitarian, CharityVision, Five.12 Foundation, and Thanksgiving Point certify they are nonprofit organizations with no corporate parents or stockholders.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................iii

INTEREST OF AMICI CURIAE ................................................................ 1

STATEMENT OF COMPLIANCE WITH FEDERAL RULE OF
APPELLATE PROCEDURE 29 ................................................................ 2

SUMMARY OF THE ARGUMENT .......................................................... 3

ARGUMENT ............................................................................................ 6

I.    The panel decision's unduly expansive interpretation of
fraud will inhibit the ability of nonprofit charitable
organizations to operate according to best practices. ...................... 6

     A.   It is standard practice for nonprofit charities to set
aside reserves from contributed funds for investment
by professional managers. ....................................................... 6

     B.   Fraud liability should not be based on a nonprofit's use
of standard terminology to describe use of its reserve
funds. ...................................................................................... 8

     C.   The panel's decision will result in less transparency in
nonprofit fundraising and increased liability exposure
to disgruntled contributors' claims. ...................................... 13

II.   The panel decision will harm nonprofit fundraising and
accounting practices. ..................................................................... 15

     A.   Nonprofit expense classification practices vary, with
incentives to minimize fundraising or administration
expenses. ............................................................................... 15

     B.   The panel decision will encourage litigation against
nonprofits based on standard nonprofit fundraising
practices and expenditure classifications. ............................. 18

         1.   Nonprofit fundraising ................................................... 18

      2.      Nonprofit accounting ....................................................... 20

   C.   The panel's decision will disproportionately impact small nonprofits like amici curiae........................................... 22

CONCLUSION......................................................................................... 25

CERTFICATE OF COMPLIANCE ........................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## Statutes

26 U.S.C. § 501(c)(3) ................................................................. 22

## Rules

Fed. R. App. P. 29 ..................................................................... 2

## Miscellaneous

*'100% to Program' Claims Confuse Donors*, Charity Watch
  (Aug. 4, 2022), https://tinyurl.com/claimsconfusedonors.................. 19

*America's Top 100 Charities*, Forbes (Dec. 13, 2022),
  https://tinyurl.com/topchar ................................................. 21

Ann Goggins Gregory & Don Howard, *The Nonprofit
  Starvation Cycle*, 7 Stan. Soc. Innovacation Rev. 49 (2009) .............. 15

Bill Bradley et al., *The Nonprofit Sector's $100 Billion
  Opportunity*, Harv. Bus. Rev. (May 2003),
  https://tinyurl.com/harvbusrev03......................................... 24

BoardSource, The Handbook of Nonprofit Governance
  (2010), https://tinyurl.com/nonprofgov ................................... 7

Brian Mittendorf, *Is the '100 Percent Promise' Right for Your
  Nonproft?*, Stan. Soc. Innovation Rev. (July 19, 2022),
  https://tinyurl.com/100percentpromise................................ 18, 19

City of New York (@nycgov), X (Jan. 9, 2022, 7:02 PM),
  https://tinyurl.com/nycgovpost ........................................... 18

*Did You Know 100% of Your Donation to UMCOR Goes
  Where You Specify?*, United Methodist Church,
  https://tinyurl.com/umcordonation ....................................... 18

Feeding Tampa Bay, Imagine a Future with More Smiles:
    21-22 Annual Report (2022),
    https://tinyurl.com/feedingtampabay22.................................................21

Inaugural Address, 1989, 25 Weekly Comp. Pres. Doc. 99
    (Jan. 20, 1989) ...........................................................................3

*Investment Policies for Nonprofits*, Nat'l Council of
    Nonprofits, https://tinyurl.com/investmentpols ....................................8

IRS, Instructions for Form 990 Return of Organization
    Exempt from Income Tax 43 (2022),
    https://tinyurl.com/irsinstructions990 ...............................................16

Jeff Williams, *In the Time of Coronavirus: What Is the Risk
    to Nonprofits Nationwide?*, Dorothy A. Johnson Ctr. (June
    30, 2020) https://tinyurl.com/dorothyajohnsoncenter ..........................23

John Zietlow et al., Financial Management for Non-Profit
    Organizations (3d. ed. 2018)...........................................................7

Kennard Wing et al., *Functional Expense Reporting for
    Nonprofits: The Accounting Profession's Next Scandal?*,
    CPA J. Aug. 2006,
    https://tinyurl.com/functionalexpensereporting..................................16

*Knights of Columbus Charities*, Knights Columbus,
    https://tinyurl.com/koccharities ........................................................18

Lewis Faulk et al., Urban Inst., Nonprofit Trends and
    Impacts 2021 (2021), https://tinyurl.com/urbaninstitute21.........22, 23

*(Mis)Understanding Overhead*, Nat'l Council of Nonprofits,
    https://tinyurl.com/misunderstover ...................................................17

*Operating Reserves for Nonprofits*, Nat'l Council of
    Nonprofits, https://tinyurl.com/operresnonp.....................................11

*Our Methodology*, Charity Navigator,
    https://tinyurl.com/ourmethod ........................................................16

iv

*Overhead Cost Definitions*, Propel Nonprofits,
  https://tinyurl.com/ovhcstdef .................................................................... 17

*Research Data on the Nonprofit Sector*, U.S. Bureau of Lab.
  Stats., https://tinyurl.com/researchdatanonprofit (May 14,
  2020) ................................................................................................................ 22

Restatement of Charitable Nonprofit Organizations (Am. L.
  Inst. 2021)
  § 2.04(b) ............................................................................................................ 6
  § 2.04(c) ............................................................................................................ 6
  § 2.04 cmt. a ...................................................................................................... 6

Suzanne Perry, *Overhead Costs Pose Dilemma for Charities*,
  Chron. of Philanthropy (May 19, 2013),
  https://tinyurl.com/overheadcosts ........................................... 17, 20, 21

Uri Gneezy et al., *Avoiding Overhead Aversion in Charity*,
  346 Sci. 632 (2014) ................................................................................. 15

**INTEREST OF AMICI CURIAE**

AYUDA Humanitarian is a nonprofit organization that for over five decades has provided dental care and humanitarian service to thousands of children and adults in underserved communities around the globe. Because its teams of volunteer dentists, physicians, and others pay their own expenses, AYUDA dedicates 100% of donations to supplies and equipment needed to treat patients.

CharityVision is a nonprofit organization that focuses on restoring curable sight impairments, with volunteer physicians providing cataract surgeries and prescription glasses worldwide to people affected by vision loss but who lack access to care. Over 36 years CharityVision has provided more than one million vision surgeries around the globe. In 2022, CharityVision's volunteers screened over 1.3 million patients and completed over 135,000 surgeries.

Five.12 Foundation is a nonprofit organization committed to ending child hunger. Five.12 volunteers purchase, pack, and deliver weekend backpacks full of food for Friday distribution to elementary school students who would otherwise return hungry on Monday.

1

Five.12 provides 1,800 backpacks of food each week to students in need from 50 partnered schools, using 100% all donated money and time.

Thanksgiving Point is a nonprofit indoor and outdoor farm, garden, and museum complex in Lehi, Utah, whose mission is to bring the joy of learning and wonders of the natural world to life in facilities dedicated to transformative family learning. Each year around 1.6 million guests from all 50 states and around the world visit Thanksgiving Point.

Amici curiae have a strong interest in this case, particularly concerning how the panel's decision will adversely impact their fundraising and donation-handling practices (and those of other nonprofit organizations similarly situated).

## STATEMENT OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 29

All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no other person except

amici curiae or their counsel contributed money to fund the preparation or submission of this brief.

## SUMMARY OF THE ARGUMENT

The en banc petition explains that the panel decision improperly entangles Article III courts in adjudicating points of church doctrine in plain violation of the First Amendment. (Pet. for Reh'g or Reh'g En Banc 10–18 ("Pet.").) That error alone requires en banc review. But the petition notes another serious error by the panel—there was no fraud because there was no misrepresentation. (Pet. 9–10.) Given their own fundraising and reserve funds experience, in this brief amici curiae highlight the dangerous impact of the panel decision's misrepresentation finding.

Nearly 2 million nonprofit organizations operate in the United States, spending almost $2 trillion per year. Small charities like amici curiae perform the bulk of the nation's philanthropic work. As President George H. W. Bush said in his 1989 inaugural address, these organizations are like "a thousand points of light . . . spread like stars throughout the Nation, doing good." Inaugural Address, 1989, 25 Weekly Comp. Pres. Doc. 99, 100 (Jan. 20, 1989).

Nonprofits face many challenges in explaining their financing to donors and the world at large as they receive money in kind and contributions from various sources. Many or most small nonprofits are lean operations with limited resources, and their reserve funds are inadequate to fund defenses against unexpected litigation. They rely heavily on individual donations, and would be disproportionately harmed by claims from disgruntled individuals seeking donation refunds.

The panel's decision creates new liability risks these small nonprofits can ill afford to bear. Standard nonprofit practice is to set aside reserves from donated funds, and have them invested by professional managers to fund the organization's purposes at a later date or as a hedge against hard economic times. When they describe their finances using standard nonprofit industry terms such as "reserves" and "earnings of reserve funds," as here, they should not have to speak with the precision of a Big 4 auditing firm accountant, or face fraud liability for failing to do so.

In addition, nonprofit expense classifications vary, and during fundraising charities commonly make representations about the

percentage of donations spent on programs rather than overhead.  In misconstruing the nature of statements by the Church of Jesus Christ of Latter-day Saints (the "Church") here about its use of donated funds, the panel decision invites litigation against every nonprofit who makes any fundraising promise containing terms that could be deemed imprecise, confusing, overly technical, or insufficiently defined.

If the panel's decision can stand, the result will be less transparency in fundraising, not more, lest the disclosure of information lead to the type of claims asserted here.  And in any event, the increased liability risks for nonprofits created by the panel decision will inhibit nonprofit fundraising, making it harder for nonprofits like amici curiae to secure the funds needed to continue their important humanitarian work.

# ARGUMENT

**I.    The panel decision's unduly expansive interpretation of fraud will inhibit the ability of nonprofit charitable organizations to operate according to best practices.**

**A.    It is standard practice for nonprofit charities to set aside reserves from contributed funds for investment by professional managers.**

Nonprofit organizations commonly assure donors that contributions will be used exclusively for the organization's charitable purposes.  Nonetheless, it is standard practice to set a portion of such contributions aside in a reserve fund managed by professional managers.  Earnings from such reserves may then permissibly be used at a later date to fund the organization's purposes, or to provide a stockpile of funds should the organization face later economic challenges.

Sections 2.04(b) and (c) of the Restatement of Charitable Nonprofit Organizations (Am. L. Inst. 2021) provide that a nonprofit charity must manage its funds "as a prudent investor would in light of the purposes of the charity" and may "accumulate" funds for investment or "appropriate" funds for expenditure.  *See id.* § 2.04 cmt. a (noting that a "charity often holds substantial assets that are meant to be

invested for the continuing operation of the charity to advance its purposes").

The terms "reserves" and "reserve funds" are standard terminology for assets so accumulated and invested. *The Handbook of Nonprofit Governance*, for example, states:

> Financial reserves are a safeguard for rainy days and permit an organization to adjust to seasonal variances in expenses and income. . . . And financial reserves let an organization seize an unexpected opportunity—such as financing a new venture, making an advantageous capital purchase, or expanding a program at an opportune moment.

BoardSource, The Handbook of Nonprofit Governance 151 (2010), https://tinyurl.com/nonprofgov; *see* John Zietlow et al., Financial Management for Non-Profit Organizations 535 (3d. ed. 2018) (distinguishing between "operating funds" and "reserve funds," and explaining that "'[r]eserve' cash meets calls on cash during seasonal revenue and support[s] low points as well as anticipated new program launches or volume expansion within the next year or two years").

A nonprofit may invest its reserve funds in stocks or other commercial financial instruments, and may delegate day-to-day responsibility for its investments to an outside professional manager.

*Investment Policies for Nonprofits*, Nat'l Council of Nonprofits, https://tinyurl.com/investmentpols (last visited Sept. 27, 2023). "Many nonprofits maintain . . . an operating reserve" and a "prudent way to serve as fiduciaries of a nonprofit's assets may be to invest some portion of the nonprofit's cash in investment vehicles such as stocks and bonds, money market funds, CDs, and other financial instruments." *Id.*

**B. Fraud liability should not be based on a nonprofit's use of standard terminology to describe use of its reserve funds.**

The panel's decision here rests on the assumption that the accurate use of standard nonprofit terminology can be viewed as fraudulent because phrases like "reserves" and "earnings of reserved funds" may be misconstrued by donors. But because those terms are standard vocabulary in the nonprofit world, any nonprofit officer would unlikely define those terms any more explicitly than here when describing the nonprofit's investment and expenditure programs.

Consistent with standard nonprofit practices, the Church sets aside a fixed percentage of each year's donations (or tithes) for a reserve fund. (*See* Pet. 3; slip op. 24 (quoting President Hinckley's General Conference statement that "each year *we put into the reserves of the*

8

*Church a portion of our annual budget. . . .*").) As is standard nonprofit practice, these reserve funds are invested to generate earnings to advance the Church's purposes. As President Hinckley explained to the Church's membership in 1991, this "fixed percentage of income will be set aside to build reserves against what might be called a possible 'rainy day.'" (Slip op. 22.) In its reserve funds, the Church distinguishes between principal (surplus tithing from prior years) and investment earnings from that principal. (*See* AB 9.)

Huntsman's fraud claim is based on a statement by President Hinckley about the City Creek project that distinguished between funds from tithing donations and the proceeds of prior reserve funds investments:

> I wish to give the entire Church assurance that *tithing funds have not and will not be used to acquire this property*. Nor will they be used in developing it for commercial purposes. Funds for this have come and will come from those commercial entities owned by the Church. These resources, together with *the earnings of invested reserve funds, will accommodate this program*.

(Slip op. 13 (emphasis deleted and added).) It is undisputed that the City Creek project was in fact financed with earnings on the reserve funds, and that no tithing principal was used. (*See* Pet. 5.)

9

The panel decision, though, concludes that Huntsman has asserted a viable fraud claim because a reasonable juror could understand President Hinckley's words to mean that "neither tithing funds principal *nor earnings on tithing principal* would be used" for the City Creek project. (Slip op. 27 (emphasis added).) But neither President Hinckley nor any other church official ever said that "earnings on tithing principal" would not be used; those words are solely the panel's. President Hinckley instead spoke about "earnings of invested reserve funds," and for his words to have been untrue, let alone fraudulent, the Church's reserve funds would have had to originate from earnings on sources other than tithes.

The panel decision concluded that Huntsman's misunderstanding of President Hinckley's words would be reasonable because a religious organization's "'income' can include income from real property, business, or other investments," and because the Church "has significant commercial assets and income from those assets." (Slip op. 24.) But since all Church income comes from tithing donations, such investments and commercial assets are necessarily derived from tithing if traced to the source of the principal for such investments. Thus, the

fundamental premise of the panel's decision—that members of the Church, including sophisticated investors like Huntsman, could understand President Hinckley's reserve funds reference to mean some source that had no origin in tithing donations—is nonsensical.

Nor was President Hinckley speaking some "foreign language unknown to his audience" when he used the term "earnings of invested reserved funds," as an analogy offered by the panel suggests. (Slip op. 25.) President Hinckley was using standard terminology for a standard nonprofit practice, as explained. In fact, his description of the Church's reserve funds as intended for a "rainy day" uses precisely the same language as standard handbooks describing best practices for nonprofit governance. *See Operating Reserves for Nonprofits*, Nat'l Council of Nonprofits, https://tinyurl.com/operresnonp (last visited Sept. 27, 2023) ("Many nonprofit boards adopt policies to maintain an operating reserve because it is prudent to have some cash set aside 'for a rainy day.'").

The panel also supported its conclusion by pointing to testimony by a former employee of Ensign Peak—manager of the Church's reserve funds—that some employees referred to all funds under its management as "tithing funds." (Slip op. 27.) From that testimony, the

panel inferred that it is "common usage in the Church" that "the term 'tithing funds' includes both tithing principal and earnings on tithing principal." (*Id.*) But the panel cited no evidence that Ensign Peak's internal vocabulary was in fact "common usage in the Church."

President Hinckley's statement expressly distinguished between "tithing funds" and "earnings of invested reserves," which should resolve how the Church defines tithing given his role as its president and prophet. (Slip op. 13.) But within Ensign Peak, viewing the source of funds under its management as tithing funds merely emphasized their sacred nature and the care Ensign Peak employees should take in managing such funds. How terms were used in that special context cannot show that a sophisticated investor like Huntsman would misunderstand what otherwise was standard nonprofit investment terminology.[1]

---

[1] The panel decision also cited a statement by Ensign Peak's president that City Creek project funds had been transferred from Ensign Peak to a differently named entity to "conceal their source." (Slip op. 27.) This concealment theory is also nonsensical. If Ensign Peak is the designated entity for the investment of Church reserves, the Church had no reason to hide the fact that the City Creek funds came from that very entity. Fraud cannot be inferred from an act that confirms the accuracy of precisely what President Hinckley said about the source of the City Creek funds.

In sum, that President Hinckley used common and accurate nonprofit nomenclature—"reserves" and "earnings of invested reserve funds"—undermines the panel's theory that he used "undefined or specialized terms" the Church membership would not understand. (Slip op. 25–26.) President Hinckley's use of the same terms found in standard nonprofit reference works dispels any inference of intent to defraud his membership with "opaque language" (slip op. 26) and renders incredible Huntsman's assertion that he understood the Church's reserves were not derived, initially, from tithing funds.

### C. The panel's decision will result in less transparency in nonprofit fundraising and increased liability exposure to disgruntled contributors' claims.

The panel's decision has substantial practical implications for nonprofits such as amici. As noted, the practice of setting aside reserves from contributed funds, and the terms used—"reserves" and "earnings of invested reserve funds"—are standard vocabulary in the nonprofit world. Any nonprofit officer describing their organization's investment program might use those same terms without perceiving any need to explicitly define them to avoid liability under the fraud theory applied by the panel here.

13

Nonprofits commonly assure donors that their contributions will be used exclusively for the organization. But as noted it is proper for a portion of those contributions to be set aside as reserve funds and invested, so they grow and can be used more effectively to serve the organization's purposes at a later date, or to provide a financial stockpile to meet future economic challenges.

Under the panel decision's analysis, however, disgruntled donors can assert reliance on the original assurances and misunderstanding about the source of reserve funds, and pursue litigation to claw back their contributions should they later have a falling out with the organization. Even if unsuccessful, such litigation will divert charitable funds to legal defenses and away from the nonprofit's charitable purposes.

Transparency in connection with nonprofit fundraising efforts will also be chilled by the fear of new litigation risks. Any nonprofit such as a hospital or university could be sued on the theory adopted by the panel—that the use of "opaque" or merely imprecise language that might result in misunderstanding may be construed as intentional fraud. The likely result will be that charities will disclose less

14

information during nonprofit fundraising. Indeed, the panel itself underscores the point, by sustaining the dismissal of claims based on the Church's alleged use of tithing funds to make bail-out payments to the Beneficial Life Insurance Company—as to which no disclosure to the Church's membership was made—but reinstating Huntsman's claims based on President Hinckley's accurate information about how the City Creek project would be funded.

## II.  The panel decision will harm nonprofit fundraising and accounting practices.

### A.  Nonprofit expense classification practices vary, with incentives to minimize fundraising or administration expenses.

Nonprofit donors strongly prefer that their contributions support programming rather than "overhead" administration or fundraising expenses—donation rates and total donation amounts soar when donors know their donations will not support overhead.[2]  *See* Uri Gneezy et al., *Avoiding Overhead Aversion in Charity*, 346 Sci. 632 (2014).  Watchdog organizations like Charity Navigator—which rates more than 160,000

---

[2]  This "overhead aversion" phenomenon is well documented.  *See, e.g.*, Ann Goggins Gregory & Don Howard, *The Nonprofit Starvation Cycle*, 7 Stan. Soc. Innovation Rev. 49 (2009).

nonprofits—use rating systems that evaluate charities based on their overhead spending on administration and fundraising. *See Our Methodology*, Charity Navigator, https://tinyurl.com/ourmethod (last visited Sept. 27, 2023).

Under IRS rules, a nonprofit's Form 990 must classify each expenditure in one of three ways: (a) programs, (b) management/ general, and (c) fundraising. *See* IRS, Instructions for Form 990 Return of Organization Exempt from Income Tax 43 (2022), https://tinyurl.com/irsinstructions990. Because of watchdog oversight and donor aversion to funding overhead expenses, nonprofits have incentives to use creative accounting to minimize expenses in the management/general and fundraising categories, and to maximize expenses in programs.[3]

Adding to classification inconsistencies among nonprofits themselves, the IRS and the Financial Accounting Standards Board

---

[3] One study found that a full 37% of nonprofits with at least $50,000 in contributions reported zero fundraising costs, while one in eight nonprofits reported zero management-and-general expenses, which the study authors found "defies plausibility." Kennard Wing et al., *Functional Expense Reporting for Nonprofits: The Accounting Profession's Next Scandal?*, CPA J., Aug. 2006, https://tinyurl.com/functionalexpensereporting.

16

("FASB") have different rules and norms. *See Overhead Cost Definitions*, Propel Nonprofits, https://tinyurl.com/ovhcstdef (last visited Sept. 27, 2023) (comparing standards between the organizations). As explained by the National Council of Nonprofits, the IRS and FASB "classify functional expenses in ways that are not always consistent with each other. Every nonprofit needs to use judgment and may need professional assistance" to sort out the appropriate allocation of costs. *(Mis)Understanding Overhead*, Nat'l Council of Nonprofits, https://tinyurl.com/misunderstover (last visited Sept. 27, 2023).

Inevitably, these ambiguities result in discrepancies between organizations in expense categorizations. As one nonprofit consultant put the problem, "You could talk to five accountants about the same organization's books and find five different answers about how to allocate expenses between programs, administration, and fundraising." Suzanne Perry, *Overhead Costs Pose Dilemma for Charities*, Chron. of Philanthropy (May 19, 2013), https://tinyurl.com/overheadcosts.

**B.    The panel decision will encourage litigation against nonprofits based on standard nonprofit fundraising practices and expenditure classifications.**

### 1.    Nonprofit fundraising

To minimize overhead aversion and watchdog criticism, nonprofits commonly make a "100 percent promise" to donate all new contributions to programming.  *See generally* Brian Mittendorf, *Is the '100 Percent Promise' Right for Your Nonprofit?*, Stan. Soc. Innovation Rev. (July 19, 2022), https://tinyurl.com/100percentpromise.  Although nonprofits all necessarily have some overhead expenses, such "100-percent" representations are ubiquitous.  *E.g.*, *Did You Know 100% of Your Donation to UMCOR Goes Where You Specify?*, United Methodist Church, https://tinyurl.com/umcordonation (last visited Sept. 27, 2023) ("When you make a gift [to us], you can be assured that every dollar will go to the project you specify."); *Knights of Columbus Charities*, Knights Columbus, https://tinyurl.com/koccharities (last visited Sept. 27, 2023) ("100% of your donation goes to those we serve through our charitable programs."); City of New York (@nycgov), X (Jan. 9, 2022, 7:02 PM), https://tinyurl.com/nycgovpost ("Your entire donation will go towards those impacted.").

These "100-percent" promises can be made by collecting donations into one fund to be used exclusively for program expenses, and using a separate fund to pay for overhead expenses. *See '100% to Program' Claims Confuse Donors*, Charity Watch (Aug. 4, 2022), https://tinyurl.com/claimsconfusedonors. This approach maximizes nonprofit fundraising efficacy—providing a "boon" to a wide variety of nonprofit organizations by attracting "donors who wish to know their funds are making an immediate impact" and who want a "simple-to-understand" spending assurance. Mittendorf, *supra*.

The Church's representations here were interpreted by the panel as a quasi-"100-percent" promise that no tithing funds would be used for the City Creek project. In misconstruing the Church's promise, the panel has all but invited litigation against any fundraising promise containing terms seen as imprecise, confusing, uncommon, over-technical, or merely (as here) insufficiently defined. All nonprofits that have made "100-percent" promises are threatened because under the panel's analysis any conclusory declaration like Huntsman's would suffice to show reasonable reliance.

19

Liability-creating hypotheticals abound.  A nonprofit might assure donors that "all your donations will be used to directly advance our mission," but then use some portion of the funds to hire new staffers.  A charity's fundraising letter might state that "100% of your contributions will be used to grow our impact," followed by use of the contributions to bolster its own fundraising.  Under the panel decision's analysis, these common, benign situations would merit litigation based on assertions that the terms "advance our mission" and "grow our impact" are insufficiently defined and are thus fraudulently misleading.

### 2.  Nonprofit accounting

Even organizations that stop short of promising a 100-percent-to-services model may face liability under the panel's decision, which invites litigation over a nonprofit's internal expenditure classifications.

As discussed, nonprofit expense classification practices vary, with incentives for nonprofits to enhance their program-spending and fundraising-efficiency ratios.  For example, United Services Organizations ("USO"), the well-known entertainer of military troops, has boasted that "90 percent of USO's expenses are directed to support our troops and their families."  Perry, *supra.*  Yet USO's Form 990

showed that just 72% of spending went to programs, with the rest to management, general expenses, and fundraising. *Id.* What explains the difference? USO got to 90% by counting more than $200 million in donated facilities, celebrity performances, and public-service advertisements—donations that free up programming money. *Id.* Those classification practices *do* in fact enhance donations, which are 5 to 10% higher when the 90% figure is included in fundraising letters. *Id.*

But these discrepancies will inevitably invite litigation if a disgruntled donor's understanding does not match the nonprofit's preferred accounting theory. Most broadly, every nonprofit will face increased risk of litigation, since Form 990 contains enough information about a nonprofit's internal accounting to provide the basis for grievance. Nonprofits publicize their expenditure classifications, and the annual reports of the country's largest charities reveal that nearly all feature some sort of revenues and expenses breakdown. *See America's Top 100 Charities*, Forbes (Dec. 13, 2022), https://tinyurl.com/topchar; *see also, e.g.*, Feeding Tampa Bay, Imagine a Future with More Smiles: 21–22 Annual Report 6 (2022),

https://tinyurl.com/feedingtampabay22 (reporting the portion of donations that goes to providing services).

### C. The panel's decision will disproportionately impact small nonprofits like amici curiae.

The panel's decision will most severely impact small charities, which perform the bulk of the country's philanthropy. Their small budgets have little or no capacity to bear the increased risks of litigation created by the panel's decision.

Some 1.8 million nonprofits operate in the United States, spending almost $2 trillion per year. Lewis Faulk et al., Urban Inst., Nonprofit Trends and Impacts 2021, at 1 (2021), https://tinyurl.com/urbaninstitute21. Most are small, shoestring operations. Roughly one-third of all public charities report expenses under $100,000, and two-thirds report expenses under $500,000. *Id.* at 8. Among the nation's roughly 170,000 nonprofits organized under 26 U.S.C. § 501(c)(3), about 40% have fewer than five employees. *Research Data on the Nonprofit Sector*, U.S. Bureau of Lab. Stats., https://tinyurl.com/researchdatanonprofit (May 14, 2020). More than half have fewer than ten employees. *Id.*

These small nonprofits are lean operations with limited cash in reserve funds, and they have little wiggle room for unexpected litigation expenses. In 2020, non-hospital and non-university nonprofits had a median of 2.2 months of cash and 4.5 months of cash and savings on hand, meaning that half of nonprofits had *less* than 2.2 months of cash on hand. Jeff Williams, *In the Time of Coronavirus: What Is the Risk to Nonprofits Nationwide?*, Dorothy A. Johnson Ctr. (June 30, 2020), https://tinyurl.com/dorothyajohnsoncenter. Nationally, organizations with less than one month of cash on hand employ roughly two-thirds of the nonprofit sector's employees. *Id.*

Small nonprofits rely heavily on donations from individuals, meaning they will be disproportionately harmed by disgruntled individuals like Huntsman who sue for refund of previous donations. Surveys show that a majority of U.S. nonprofits believe donations from individuals are "[e]ssential" or "[v]ery [i]mportant" to their work, with 85% of nonprofits having expenses less than $100,000 saying so. Faulk, *supra*, at 22 (boldface omitted).

The panel decision's creation of a wider aperture for fraud claims by individual donors will disproportionately impact small nonprofits,

23

who are especially vulnerable to litigation. Because of economies of scale, smaller charities have lower overhead-to-services ratios. Bill Bradley et al., *The Nonprofit Sector's $100 Billion Opportunity*, Harv. Bus. Rev. (May 2003), https://tinyurl.com/harvbusrev03 ("[S]cale economies work against small nonprofits, which on average have higher administrative cost ratios than larger peers."). These organizations will be easy litigation targets for individuals like Huntsman who assert fraud theories challenging their fundraising representations and later uses of donated funds.

In short, small nonprofits have slender budgets, lean staffing, and minimal capacity for substantial litigation expenses. The fraud theories endorsed by the panel will effectively shutter any nonprofit organization against whom such theories are asserted.

## CONCLUSION

The Court should grant the petition for rehearing en banc, and affirm the district court's judgment.

October 2, 2023

**HORVITZ & LEVY LLP**
JOHN A. TAYLOR, JR.
JEREMY B. ROSEN


By: _____s/John A. Taylor, Jr._____
John A. Taylor, Jr.

Attorneys for Amici Curiae
**AYUDA HUMANITARIAN,
CHARITYVISION, FIVE.12
FOUNDATION, AND
THANKSGIVING POINT**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-56056

I am the attorney or self-represented party.

**This brief contains** | 4,181 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [            ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/John A. Taylor, Jr. | **Date** | 10/02/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*