No. 21-56056

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JAMES HUNTSMAN,

*Plaintiff-Appellant,*

*v.*

CORPORATION of the PRESIDENT of THE CHURCH of JESUS CHRIST of LATTER-DAY SAINTS,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Central District of California, No. 2:21-cv-02504-SVW-SK Hon. Stephen V. Wilson, District Judge

## BRIEF OF THE BECKET FUND FOR RELIGIOUS LIBERTY AS *AMICUS CURIAE* IN SUPPORT OF PETITION FOR REHEARING

Eric S. Baxter
Laura Wolk Slavis
Benjamin A. Fleshman
  (*admission pending*)
The Becket Fund for
  Religious Liberty
1919 Pennsylvania Ave. NW,
  Suite 400
Washington, DC 20036
(202) 955-0095
ebaxter@becketlaw.org

*Counsel for* Amicus Curiae

## FRAP 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, The Becket Fund for Religious Liberty states that it has no parent corporation and that no publicly held corporation owns any part of it.

# TABLE OF CONTENTS

**Page(s)**

FRAP 26.1 CORPORATE DISCLOSURE STATEMENT ........................i

TABLE OF AUTHORITIES...................................................iv

INTEREST OF THE *AMICUS* ..............................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................1

ARGUMENT .........................................................................4

I.  The church autonomy doctrine bars courts from
    scrutinizing churches' internal religious decisions .........................4

II. Tithing disputes are inherently religious. ......................................6

    A.  Tithing itself is inherently religious. ........................................6

    B.  Decisions about expending tithes inherently involve
        inspiration and revelation. ..........................................9

    C.  Courts cannot second-guess the content of sermons
        about religious issues. .............................................13

III. Couching the dispute as fraud does not change
    the outcome. ...............................................................15

    A.  Huntsman identified no false statement. ...............................16

    B.  Huntsman did not prove reliance...........................................18

IV. Correcting the panel's error is important to stop
    wide-ranging negative effects on church-state relations. .............19

ii

CONCLUSION........................................................................... 19

CERTIFICATE OF COMPLIANCE ................................................... 21

CERTIFICATE OF SERVICE ........................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bryce v. Episcopal Church,*
289 F.3d 648 (10th Cir. 2002).......................................................5, 13

*Burch v. CertainTeed Corp.,*
246 Cal. Rptr. 3d 99 (Cal. Ct. App. 2019)..................................16

*Conroy v. Regents of Univ. of Cal.,*
203 P.3d 1127 (Cal. 2009) ............................................................18

*In re Diocese of Lubbock,*
624 S.W.3d 506 (Tex. 2021) ...........................................................1

*El Pescador Church, Inc. v. Ferrero,*
594 S.W.3d 645 (Tex. Ct. App. 2019)........................................12

*Fitzgerald v. Roncalli High Sch., Inc.,*
73 F.4th 529 (7th Cir. 2023) ...........................................................1

*Fowler v. Rhode Island,*
345 U.S. 67 (1953)................................................................13-14, 15

*Hosanna-Tabor Evangelical Lutheran*
*Church & Sch. v. EEOC,*
565 U.S. 171 (2012).....................................................................1, 5-6

*Kedroff v. St. Nicholas Cathedral of*
*Russian Orthodox Church in N. Am.,*
344 U.S. 94 (1952)..................................................................4, 5, 10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
140 S. Ct. 2049 (2020)......................................................................1

*Presbyterian Church in U.S. v. Mary Elizabeth*
*Blue Hull Mem'l Presbyterian Church,*
393 U.S. 440 (1969).......................................................................4, 5

iv

*Puri v. Khalsa,*
844 F.3d 1152 (9th Cir. 2017) ............................................................. 5

*Schmidt v. Catholic Diocese of Biloxi,*
18 So. 3d 814 (Miss. 2009) ................................................................. 17

*Serbian E. Orthodox Diocese for U.S. & Can.*
*v. Milivojevich,*
426 U.S. 696 (1976) ......................................................................... 4-5

*United States v. Ballard,*
322 U.S. 78 (1944) ............................................................................. 6

*Watson v. Jones,*
80 U.S. (13 Wall.) 679 (1872) ............................................................ 4

*White v. Smule, Inc.,*
75 Cal. App. 5th 346 (Cal. Ct. App. 2022) ...................................... 16

## Other Authorities

David A. Bednar, *The Windows of Heaven*, The Church of
Jesus Christ of Latter-day Saints (Oct. 2013) ................................... 8

The Book of Discipline of the United Methodist Church,
§ II, Art. IV (2016) ........................................................................... 11

The Church of Jesus Christ of Latter-day Saints, *General
Handbook: Serving in The Church of Jesus Christ of
Latter-day Saints*, § 8.2.1.2 (2023) ................................................. 14

The Church of Jesus Christ of Latter-day Saints, *General
Handbook: Serving in The Church of Jesus Christ of
Latter-day Saints*, § 9.2.1.2 (2023) ................................................. 14

The Church of Jesus Christ of Latter-day Saints, *Teachings
of the Church: Joseph F. Smith*, Chapter 31: Obedience to
the Law of Tithing ............................................................................. 7

*Deuteronomy* 14:22-29 ............................................................................ 7

Diana L. Eck, *The Religious Gift: Hindu, Buddhist, and Jain Perspectives on Dana,* 80 Social Research 359 (2013)..........................9

*Doctrine and Covenants* 120:1 ............................................................... 10

*General Conference*, The Church of Jesus Christ of Latter-day Saints...............................................................................17

*Genesis* 28:22 ........................................................................................7

Gordon B. Hinckley, *The Times in Which We Live*, The Church of Jesus Christ of Latter-day Saints (Oct. 2001) ...................8

*Handbook of SDA Theology*, Adventist Beliefs...................................9, 11

James E. Talmage, *Articles of Faith* 7 (12th ed. 1975)...........................14

Ken Walker, *Tithing: What should the church teach its members about giving*, Baptist Press (July 11, 2003)..........................8

*Leviticus* 27:30-32................................................................................7

*Local Church Autonomy*, SBC Life (Dec. 1, 1997).................................11

Dallin H. Oaks, *Tithing*, The Church of Jesus Christ of Latter-day Saints (Apr. 1994)..............................................................14

Parshas Vayeitzei, *Maaser: Give Me a Tenth!,* The Living Law (Nov. 15, 2018) ...........................................................9

*Tithing*, The Church of Jesus Christ of Latter-day Saints ...............7, 10

*Tithing Principles and Guidelines*, General Conference of Seventh-day Adventists....................................................................8

*Trust and Obey*, UMC Discipleship (Oct. 24, 2009) ...............................8

*Use of Tithe*, Seventh-day Adventist Church ....................................8, 11

*Viewpoint: Make a Payment of Faith*, The Church of Jesus Christ of Latter-day Saints (July 19, 2015) ..........................7, 10

*What Is Tithing?*, ComeuntoChrist...........................................................7

Ellen G. White, Gospel Workers (1915 ed.) ........................................... 11

*Zakat*, Islamic Relief Worldwide............................................................... 9

*Zakat: The Third Pillar of Islam*, Muslim Aid ........................................ 9

## INTEREST OF THE *AMICUS*[1]

The Becket Fund for Religious Liberty is a non-profit, nonpartisan law firm dedicated to protecting the free expression of all religious traditions. Becket has represented agnostics, Buddhists, Christians, Hindus, Jews, Muslims, Santeros, Sikhs, and Zoroastrians, among others. Becket regularly litigates church autonomy cases, both in the Supreme Court of the United States and in federal and state courts nationwide. *See, e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529 (7th Cir. 2023); *In re Diocese of Lubbock*, 624 S.W.3d 506 (Tex. 2021).

Becket submits this brief to urge the Court to correct the panel's erroneous conclusion that church autonomy has no application in fraud claims and its subsequent unconstitutional intrusion into a church's internal affairs.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiff James Huntsman objects to the way leadership of The Church of Jesus Christ of Latter-day Saints described during a worship service how it would finance a community revitalization project. Now he

---

[1] Counsel for both parties have consented to the filing of this brief. *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than *Amicus* and its counsel made any monetary contribution intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

1

claims fraud to get back the tithing he contributed as a member. His claim hinges on whether the Church intentionally misled members by accurately stating in its sermons and publications that it would use earnings on its invested reserve funds rather than direct tithes to fund a particular development project. That question can't be answered without the Court embroiling itself in an internal, religious dispute about the inherently religious definition of tithing within the Church. And that's precisely what happened here, with the Court ultimately embracing a definition that contradicts the Church's own.

The panel's holding violates the First Amendment's principle of church autonomy and requires immediate correction by the en banc court. Secular courts cannot define religious doctrines or adjudicate religious disputes. The First Amendment reserves the authority to govern internal spiritual matters to religious institutions, and for good reason. Freedom of religion could not survive if courts had power to investigate every complaint about a church's internal decisions, thus becoming endlessly entangled in religious decision-making.

A church's use of tithes fits squarely within this realm of internal church governance shielded from intrusive secular adjudication. Tithing is a profoundly spiritual issue for many denominations—including the Church of Jesus Christ—with deep scriptural roots. And many faith leaders appeal to inherently spiritual principles such as inspiration and revelation when discussing tithing with their congregations. Absent

evidence that the religious justifications for a church's use of tithes are a total sham, courts cannot second-guess how a church uses these funds.

Applying church autonomy principles, the court should have dismissed Huntsman's claim outright. It doesn't just invite improper second-guessing of the Church's internal religious decisions; it requires a court to weigh in on the doctrinal question of how churches define tithing. That's an inherently religious determination not fit for secular adjudication.

Completely disregarding these principles, the panel instead held that church autonomy categorically doesn't apply where fraud is alleged. Op.10-11. It then classified this dispute as purely secular even while it adopted a definition of tithing at odds with the Church's own. On its way to reaching that conclusion, the panel compounded its error by loosening the requirements for a fraud claim, rendering them virtually toothless. Under the panel's watered-down standard, churches can now be held liable for accurately describing spiritual decisions over internal operations during religious sermons if there is any chance their statements could be misunderstood by a single member of the congregation. The panel's opinion will drastically increase liability for churches and lead to many more cases where courts are called on to decide whether a church's spending of tithes aligns with its spiritual messaging. This Court should grant rehearing and correct the panel's error.

## ARGUMENT

### I. The church autonomy doctrine bars courts from scrutinizing churches' internal religious decisions.

The Constitution ensures "a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). This constitutional command requires courts to give religious organizations broad autonomy in conducting their internal religious affairs. As the Supreme Court has stated, "First Amendment values are plainly jeopardized when … litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). This is so partly because "[a]ll who unite themselves to [a religious] body do so with an implied consent" to the religious governance of that body and "are bound to submit to it." *Kedroff*, 344 U.S. at 114 (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 729 (1872)). Allowing challenges to internal religious decisions in secular courts "would lead to the total subversion of such religious bodies." *Id.* Thus, time and again, the Supreme Court has affirmed that the religion clauses prohibit civil courts from intruding into matters of "theological controversy, church discipline, ecclesiastical

4

government, or the conformity of [members] to the standard of morals required of them." *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 713-14 (1976); *cf. Puri v. Khalsa*, 844 F.3d 1152, 1162 (9th Cir. 2017).

Even in the most compelling circumstances, the Supreme Court has refused to second-guess churches' internal religious decisions. It has refused even where decisions appeared "arbitrary" and inconsistent with the institution's "own laws and procedures." *Milivojevich*, 426 U.S. at 712-13. So too where the church seemed to have been commandeered by a hostile government and infiltrated by "atheistic or subversive influences." *Kedroff*, 344 U.S. at 108-09. Also where the religious decision "departed from the tenets of faith and practice" congregants had relied on "at the time [they] affiliated with" the church. *Blue Hull*, 393 U.S. at 441.

Deference to churches' internal religious decisions is required even when other important rights are implicated. Courts must decline to adjudicate civil rights claims that arise from a church's internal religious affairs. *Hosanna-Tabor*, 565 U.S. 171 (no adjudication of employment discrimination claim by employee with important religious functions); *Bryce v. Episcopal Church*, 289 F.3d 648 (10th Cir. 2002) (no adjudication of sexual harassment claim arising from statements at church meetings). While the "interest of society" in enforcing civil rights is "undoubtedly important," "so too is the interest of religious groups in choosing … [how

5

to] carry out their mission." *Hosanna-Tabor*, 565 U.S. at 196. When these interests conflict, "the First Amendment has struck the balance for us." *Id.* Churches "must be free to choose" how to conduct their own religious affairs. *Id.*

Fraud claims do not alter the analysis. *See United States v. Ballard*, 322 U.S. 78 (1944) (reinstating district court's dismissal of fraud claim against faith healers). The founders "were not unaware of the varied and extreme views of religious sects." *Id.* at 87. Nor of the "lack of any one religious creed on which all men would agree." *Id.* Thus, they "fashioned a charter of government which envisaged the widest possible toleration of [religious] views." *Id.* Under this system of broad tolerance, even financial solicitations based on religious claims that "might seem incredible, if not preposterous, to most people" are not actionable via claims of fraud as to their "truth or falsity." *Id.*

## II. Tithing disputes are inherently religious.

At its core, Huntsman's claim involves a dispute about the use and definition of tithing. The panel should have refrained from deciding this fundamentally religious question.

### A. Tithing itself is inherently religious.

Tithing is the religious practice of giving a portion of one's income (typically one-tenth) to God as an act not only of charity, but also of faith

and trust.[2] Thus, tithing is not merely financial support for religious organizations. Rather, for millennia, religious adherents across many denominations and religious traditions have contributed tithes as a sign of their willingness to submit their will to, and put their trust in, God.

Members of The Church of Jesus Christ of Latter-day Saints are among such believers. The Church teaches that tithing is "a commandment of God" and that its members have an obligation to "give one-tenth of their income back to God through His Church."[3] According to the Church, tithing is a practice that not only "helps to proclaim the gospel" but also "strengthens faith in God."[4] Thus, members are encouraged to tithe as a reminder that their possessions come from God. Giving is a "privilege" that lets them demonstrate "their resolve to trust in the Lord rather than in material things."[5] "Tithing is about faith"[6] and "[o]bedience,"[7] not just financial support for the Church. Because tithes

---

[2]  A common reading of the Bible defines tithing as giving ten percent of one's increase. *See Genesis* 28:22; *Leviticus* 27:30-32; *Deuteronomy* 14:22-29.

[3]  *What Is Tithing?*, ComeuntoChrist, https://perma.cc/EJE6-N7YG.

[4]  *Id.*

[5]  *Tithing*, The Church of Jesus Christ of Latter-day Saints, https://perma.cc/AL7K-UNEL.

[6]  *Viewpoint: Make a Payment of Faith*, The Church of Jesus Christ of Latter-day Saints (July 19, 2015), https://perma.cc/KW5J-VMEN.

[7]  The Church of Jesus Christ of Latter-day Saints, *Teachings of the Church: Joseph F. Smith*, Chapter 31: Obedience to the Law of Tithing, https://perma.cc/M3JS-ZD2L.

are "the consecrated offerings of Church members,"[8] given in faith and "appropriated in the manner set forth by the Lord Himself," "[t]he tithes of the Church are sacred."[9]

The longstanding commitment to tithing as both financial support for a religious organization and an act of trusting in divine providence is hardly unique to the Church of Jesus Christ. Southern Baptists believe that tithing is an act of faithful stewardship that involves relinquishing control over their possessions and "trusting [God] to take care of their needs."[10] For members of the United Methodist Church, tithing "reflects our trust in God and our belief that God truly knows what is best for us."[11] For Seventh-day Adventists, tithing is "an act of worship."[12] It is the "practice" of showing "faithfulness [to] God's requirements."[13] Thus,

---

[8]    David A. Bednar, *The Windows of Heaven*, The Church of Jesus Christ of Latter-day Saints (Oct. 2013), https://perma.cc/Y8GF-Q34K.

[9]    Gordon B. Hinckley, *The Times in Which We Live*, The Church of Jesus Christ of Latter-day Saints (Oct. 2001), https://perma.cc/YFF5-LPDW.

[10]   Ken Walker, *Tithing: What should the church teach its members about giving*, Baptist Press (July 11, 2003), https://perma.cc/K9H6-KGSP; *see also* Southern Baptist Convention, *Baptist Faith & Message 2000* § XIII, https://perma.cc/4V7G-XB2H.

[11]   *Trust and Obey*, UMC Discipleship (Oct. 24, 2009), https://perma.cc/8MSJ-BC4Q.

[12]   *Use of Tithe*, Seventh-day Adventist Church, https://perma.cc/SEW4-HFM8.

[13]   *Tithing Principles and Guidelines*, General Conference of Seventh-day Adventists, https://perma.cc/THK6-2KY9.

8

when Adventists tithe, they also relinquish control over worldly possessions in "recognition of the sovereignty of God" and "His ownership of all things."[14] And Jews give *maaser* ("tithe" in Hebrew) as a reminder that their possessions are "a gift from G-d."[15]

These tithing principles have analogous precepts in other faith traditions. Muslims give *zakat* or alms to relinquish control over "worldly possessions"[16] and "acknowledge that everything [they] own belongs to [Allah]."[17] Buddhists and Hindus practice *dana*—giving and generosity— as a way to promote detachment from worldly possessions.[18] For each of these faiths, the act of giving is uniquely spiritual.

## B. Decisions about expending tithes inherently involve inspiration and revelation.

Not only do spiritual and scriptural concepts motivate many believers to give tithes, they also animate decisions by leadership on how to use those tithes. The Church of Jesus Christ, for instance, has significant spiritual discretion to determine how best to use tithing to carry out its

---

[14] *Handbook of SDA Theology*, Adventist Beliefs, https://perma.cc/9VAW-MYZ8.

[15] Parshas Vayeitzei, *Maaser: Give Me a Tenth!*, The Living Law (Nov. 15, 2018), https://perma.cc/B4SJ-NKRG.

[16] *Zakat: The Third Pillar of Islam*, Muslim Aid, https://perma.cc/V35B-ZNR2.

[17] *Zakat*, Islamic Relief Worldwide, https://perma.cc/8SV6-GQDX.

[18] Diana L. Eck, *The Religious Gift: Hindu, Buddhist, and Jain Perspectives on Dana*, 80 Social Research 359, 370, 375 (2013).

mission, a discretion which includes appeals to spiritual judgment, divine inspiration, and revelation. Church doctrine provides that a council comprising the Church's most senior leaders will determine the "specific ways to use the sacred funds" and "make[] decisions as they are directed by the Lord."[19] Accordingly, all tithes from local congregations are transferred to the Church's center in Salt Lake City, Utah.[20] Such "[t]ithing funds are always used for the Lord's purposes," which includes all aspects of the Church's mission as understood by its leaders: "to build and maintain temples and meetinghouses, to sustain missionary work, to educate Church members, and to carry on the work of the Lord throughout the world."[21] What precisely it means to "build and maintain" worship space, to "sustain" "missionary work," to "educate" others, or to "carry on" the "Lord's work" requires significant religious judgment, and is often influenced by inherently spiritual concepts such as the revelation and inspiration that arise from prayer. Those "who unite themselves" to the Church and tithe to support it thus "do so with an implied consent" that the Church will exercise its spiritual discretion to determine how best to use their tithes in pursuit of its religious mission. *Kedroff*, 344 U.S. at 114.

---

[19] *Viewpoint: Make a Payment of Faith*, *supra* n.6; *see also Doctrine and Covenants* 120:1, https://perma.cc/9QEV-4ZAY.

[20] *Tithing*, *supra* note 5.

[21] *Id.*

Many other faiths enjoy similar discretion—within the confines of their broad religious mission—over how they expend tithes. For example, because local Southern Baptist Convention churches are autonomous in functionality and governance,[22] each congregation has wide discretion in using tithing funds as it sees fit. Similarly, the General Conference of the United Methodist Church has wide discretion "[t]o determine and provide for … distributing funds necessary to carry on the work of the Church,"[23] "according to instructions from the church council."[24] And the Seventh-day Adventist Church broadly provides that "[t]he tithe is sacred, reserved by God for Himself," to be "used to sustain the gospel laborers in their work."[25] Local Seventh-day Adventist churches thus "remit 100 percent of the tithe contributed by the members to the conference or mission."[26] And the church—"acting collectively through the General Conference Session and the Annual Council of the General Conference Committee" and "in harmony with Scripture and Spirit of Prophecy principles"—then determines ways to administer the funds.[27] As with the

---

[22] *See Local Church Autonomy*, SBC Life (Dec. 1, 1997), https://perma.cc/L9GN-2FWE.

[23] The Book of Discipline of the United Methodist Church, § II, Art. IV ¶ 16(9) (2016), https://perma.cc/ZNB3-6LVT.

[24] *Id.* § VI, ¶ 258(17).

[25] Ellen G. White, Gospel Workers 226 (1915 ed.)

[26] *Handbook of SDA Theology*, *supra* n.14.

[27] *Use of Tithe*, supra n.12.

Church of Jesus Christ, faith leaders from these and many other traditions often have recourse to prayer, divine inspiration, and revelation when deciding how best to use tithes to carry out their spiritual missions.

In sum, across faith traditions and denominations, tithing not only provides for the temporal needs of the church, but also serves as an expression of individual faith, trust, and obedience. As a corollary, it is understood that churches and other religious organizations will exercise spiritual discernment in deciding how the tithes received will be spent.

Given this religious context, the panel's conclusion that it was "not required to rely on or interpret the Church's religious teachings to determine if it misrepresented how it was using tithing funds" is plainly wrong. Op.11. Courts second-guessing the use of tithes "would necessarily embroil the courts into membership, church discipline, and church governance matters." *See El Pescador Church, Inc. v. Ferrero*, 594 S.W.3d 645, 658 (Tex. Ct. App. 2019) (rejecting fraud-based tithing claim).

Even answering the panel's "secular" question obviously requires a court to determine whether the earnings of invested reserve funds fall under the Church's definition of tithing. *See* Pet. for Reh'g.12 The panel's framing of the question for a jury makes that clear: "could a reasonable juror conclude that the Church fraudulently misrepresented that no tithing funds—neither tithing principal nor earnings on tithing

12

principal—would be or were being used to finance the [revitalization] project?" Op.18; *accord* Op.27. That question wrests the authority to define tithing away from the Church, treating as a matter of law that both tithing principal and earnings on tithing principal qualify as tithing within the Church. Courts cannot usurp religious governance to make such doctrinal determinations.

## C. Courts cannot second-guess the content of sermons about religious issues.

Huntsman's claim also hinges in part on alleging that then-President (and Prophet) Gordon Hinckley made false statements about tithes during the Church's 2003 General Conference. Op.13. His claim thus not only implicates tithing generally, but also the spiritual speech that inheres in religious sermons. To resolve his claim, civil courts will have to probe what Church leadership meant and what Church members would have understood about religious statements made during a religious service. Courts have no authority to second-guess such speech.

The Constitution provides special protection for the contents of religious sermons. Courts have long recognized that the church autonomy doctrine "is rooted in protection of the First Amendment rights of the church to discuss church doctrine and policy freely." *Bryce*, 289 F.3d at 658. Thus, it is not "in the competence of courts under our constitutional scheme to approve, disapprove, classify, regulate, or in any manner control sermons delivered at religious meetings." *Fowler v. Rhode Island*,

345 U.S. 67, 70 (1953). But that is precisely what Huntsman sought to do (and what the Court did) by finely parsing President Hinckley's General Conference statements.

The Church's General Conference takes place biannually over the course of a weekend and "consist[s] of worship services and messages from Church leaders broadcast to the worldwide Church." Op.34 (Korman, J., dissenting in part). It replaces regular Sunday worship services because the sermons delivered by church leaders are considered scripture "of equal validity with the doctrines of the written word."[28] Conference sermons also become the topics of dedicated Church Sunday classes in between conferences.[29] At General Conference, Church leaders—including the Prophet and his counselors—address numerous topics of spiritual significance, including tithing.[30]

Placed in proper context, then, President Hinckley's remarks are far more than a mere "statement[] by [a] Church official[]," as the panel would have it. Op.13. Rather, they arose as part of the Prophet's religious address to the entire Church—given with the authority of Scripture—

---

[28] James E. Talmage, *Articles of Faith* 7 (12th ed. 1975).

[29] The Church of Jesus Christ of Latter-day Saints, *General Handbook: Serving in The Church of Jesus Christ of Latter-day Saints*, §§ 8.2.1.2, 9.2.1.2 (2023), https://perma.cc/E2ZJ-E3EJ.

[30] *See, e.g.*, Dallin H. Oaks, *Tithing*, The Church of Jesus Christ of Latter-day Saints (Apr. 1994), https://perma.cc/8FJJ-7LLN.

14

which the panel had no authority to "regulate." *Fowler*, 345 U.S. at 70; Pet. for Reh'g.14.

Allowing a jury to determine what President Hinckley actually intended during a church service and whether that reasonably could have misled members is deeply entangling. It would require asking what is the "true" meaning of "tithing" as defined by church law, whether that was fully understood by the membership, and whether President Hinckley intentionally departed from it—all religious questions outside the competence of a secular court.

## III. Couching the dispute as fraud does not change the outcome.

The panel determined that church autonomy categorically does not apply where plaintiffs raise fraud claims. Op.10-11. As explained above, that position is inconsistent with bedrock principles of church autonomy. But even placing that to the side, Huntsman's fraud claim should never have made it past the pleadings. *See* Becket.Amicus.Br.22-24. The summary-judgment evidence confirmed this, conclusively demonstrating that the Church accurately described how it would fund the revitalization project. Rather than recognizing this, the panel lowered the bar for fraud claims, contrary to its own precedent and dramatically expanding potential liability not only for religious institutions but any nonprofit for decisions regarding the use of donations received.

15

**A. Huntsman identified no false statement.**

Huntsman put forth no evidence proving a fundamental element of a fraud claim: a knowing misrepresentation *made with "intent to defraud." Burch v. CertainTeed Corp.*, 246 Cal. Rptr. 3d 99, 106 (Cal. Ct. App. 2019) (emphasis added); *see also* Compl. ¶¶ 35-37 (acknowledging this scienter requirement); Op.33 (Korman, J., dissenting in part). No one disputes that the Church used only the earnings on reserve funds, not tithing principal, to fund the renovations. *See* Pet. for Reh'g.6. And neither Huntsman nor the panel identified any evidence suggesting that Church leaders *actually intended* to mislead members *when explaining the project*—a prerequisite for satisfying this element. *Burch*, 246 Cal. Rptr. 3d at 108; *accord White v. Smule, Inc.*, 75 Cal. App. 5th 346, 359 (Cal. Ct. App. 2022) ("[T]he essence of the fraud is the existence of an intent at the time of the promise not to perform it."); Op.41 (Korman, J., dissenting in part).

The panel waived all this aside, opining instead that even an objectively true statement might have been intended to mislead the listener. Op.25. It then relied on evidence showing only the *possibility* that a listener might have misunderstood President Hinckley's statements to find this element satisfied. Op.27. But misunderstanding is a far cry from intentional deception. The panel thus significantly watered down the standard for fraud and compounded the risk of religious entanglement, replacing the high bar of scienter with evidence

16

merely showing that a hypothetical listener could have subjectively misunderstood the statement. *See* Op.25-26.

The panel's suggestion that the phrase "earnings on reserve funds" was akin to a "foreign language," *id.*, underscores why fraud claims require an intent to deceive, not merely the chance of misunderstanding. The Church's General Conference is broadcast in about 70 languages around the world.[31] Many of those listening to President Hinckley's statement would have been listening to a translation. Those listeners would have had a heightened (and possibly unavoidable) risk of misunderstanding President Hinckley's statements due to language barriers. But the potential for misunderstanding does not mean that President Hinckley intended to mislead them in any way. The panel's reasoning opens the door to myriad fraud claims for churches with diverse, multilingual membership, even when there is no evidence that church leadership intended to deceive their flock.

The panel also failed to identify any solicitation of funds from the Church's statements. *See Schmidt v. Catholic Diocese of Biloxi*, 18 So. 3d 814, 830 (Miss. 2009) (donor must demonstrate that "the funds [were] solicited by the church"). Indeed, the Church's statements assured Church members that their tithes were *not* needed for the revitalization project because the Church planned to use funds from other available

---

[31] *General Conference*, The Church of Jesus Christ of Latter-day Saints, https://perma.cc/RY2T-9D6D.

sources. ER-257-58. Each of the statements that Huntsman and the panel relied on concerned only the Church's plans to use money that it had already set aside. *Id.* They were simply statements describing internal church operations, not solicitations of funds.

**B. Huntsman did not prove reliance.**

The panel also ignored another key component of a fraud claim: plaintiffs must show "[a]ctual reliance," which "occurs when a misrepresentation is an immediate cause of a plaintiff's conduct, which alters his legal relations." *Conroy v. Regents of Univ. of Cal.*, 203 P.3d 1127, 1136 (Cal. 2009) (cleaned up). Neither Huntsman nor the panel identified any evidence that Huntsman relied on the identified statements to continue tithing. Nor could they. Huntsman explicitly stated that he paid tithing because he believed he was obeying God's commandments and would be blessed for doing so. Pet. for Reh'g.6. And as a member of a "prominent family" in the Church who held "numerous leadership and teaching assignments within the Church," Op.39-40 (Korman, J., dissenting in part), he well knew the Church's distinction between direct tithes and reserve funds. It is thus unsurprising that he presented no evidence that President Hinckley's 2003 General Conference remarks induced him to continue offering tithes. For this reason, too, his fraud claim fails. *See Conroy*, 203 P.3d at 1136.

**IV. Correcting the panel's error is important to stop wide-ranging negative effects on church-state relations.**

The panel's ruling dramatically expands liability for religious and secular organizations alike. But religious groups will feel the burden most acutely. Under the panel's opinion, any time a religious leader announces how a church, synagogue, or mosque will use congregants' donations, the religious group opens itself up to a fraud claim unless it defines every term with a secular dictionary and an accountant's precision. Even then, a jury may still get to second-guess the church's representations if just one listener can claim he somehow misunderstood religious concepts—no matter how unreasonable the misunderstanding. Religious leaders do not even need to solicit funds to be liable for fraud, under the panel's opinion. They simply need to speak with such slight doctrinal ambiguity that a congregant *might* misunderstand them. The panel's opinion must be corrected.

## CONCLUSION

The Court should grant rehearing en banc.


October 2, 2023

                              Respectfully submitted,

                              /s/ *Eric S. Baxter*
                              Eric S. Baxter
                              Laura Wolk Slavis
                              Benjamin A. Fleshman
                                *(admission pending)*
                              The Becket Fund for Religious Liberty

1919 Pennsylvania Ave NW,
  Suite 400
Washington, D.C. 20036
(202) 995-0095
*ebaxter@becketlaw.org*

*Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

I hereby certify that this *amicus* brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) and Cir. R. 29-2(c)(2) because it contains 4,182 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a 14-point proportionally spaced typeface using Microsoft Word 2019.

Dated: October 2, 2023                    /s/ *Eric S. Baxter*
                                          Eric S. Baxter
                                          *Attorney for* Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of October, 2023, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the Court's CM/ECF system. I further certify that service was accomplished on all parties via the Court's CM/ECF system.

/s/ *Eric S. Baxter*
Eric S. Baxter
*Attorney for Amicus Curiae*