No. 21-56056

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JAMES HUNTSMAN,

*Plaintiff-Appellant,*

v.

CORPORATION OF THE PRESIDENT OF THE CHURCH
OF JESUS CHRIST OF LATTER-DAY SAINTS,

*Defendant-Appellee,*

DOES, 1–10,

*Defendants.*

On Appeal from the United States District Court
for the Central District of California
Case No. 2:21-cv-02504-SVW-SK | Hon. Stephen V. Wilson

## BRIEF OF THE J. REUBEN CLARK LAW SOCIETY AS
## *AMICUS CURIAE* IN SUPPORT OF REHEARING *EN BANC*

Joseph E. Barakat
Katie Rose Talley
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas  75201
Telephone:  (214) 698-3100

Katherine L. Montoya
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500

Blaine H. Evanson
 *Counsel of Record*
Joseph Edmonds
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, Suite 1200
Irvine, California  92612
Telephone:  (949) 451-3800

*Attorneys for* Amicus Curiae *The J. Reuben Clark Law Society*

# CORPORATE DISCLOSURE STATEMENT

As required by Federal Rules of Appellate Procedure 26.1 and 29(A)(4)(a), the J. Reuben Clark Law Society certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

Dated: October 2, 2023

/s/ *Blaine H. Evanson*
Blaine H. Evanson

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT.............................................i

TABLE OF AUTHORITIES .................................................... iii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................vii

INTRODUCTION ......................................................................1

ARGUMENT ...........................................................................6

I.   The First Amendment Bars Judicial Inquiry into Ecclesiastical Matters Such as the Collection, Allocation, and Disposition of Tithing. ....................................................................6

II.  Church Scripture and Doctrine Commit the Management of Tithing to Senior Church Leadership, Whose Decisions on These Matters Are Religiously Authoritative and Judicially Unreviewable. ...................................................................9

III. Determining Whether Mr. Huntsman's Reliance on the Church's Statements Was Justifiable Would Require the Jury to Judge Whether Mr. Huntsman Faithfully Followed the Tenets of the Church. .....................................................17

CONCLUSION .......................................................................21

CERTIFICATE OF COMPLIANCE .............................................22

CERTIFICATE OF SERVICE.....................................................23

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bible Way Church of Our Lord Jesus Christ of the Apostolic
Faith of Wash. v. Beards*,
680 A.2d 419 (D.C. 1996) ........................................................ 8

*Demkovich v. St. Andrew the Apostle Par.*,
3 F.4th 968 (7th Cir. 2021) ...................................................... 6

*Gonzalez v. Roman Cath. Archbishop of Manila*,
280 U.S. 1 (1929) ..................................................................... 8

*Harris v. Matthews*,
643 S.E.2d 566 (N.C. 2007) ..................................................... 8

*Hawthorne v. Couch*,
911 So. 2d 907 (La. Ct. App. 2005) ......................................... 8

*Hernandez v. Comm'r*,
490 U.S. 680 (1989) ............................................................... 17

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) ...................................................... 1, 7, 8

*Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*,
650 F.2d 430 (2d Cir. 1981) .................................................... 8

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*,
344 U.S. 94 (1952) .............................................................. 2, 7

*Kirby v. Lexington Theological Seminary*,
426 S.W.3d 597 (Ky. 2014) ..................................................... 5

*Moon v. Family Fed'n for World Peace & Unification Int'l*,
281 A.3d 46 (D.C. 2022) .......................................................... 8

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S. Ct. 2049 (2020) ........................................ 1, 2, 4, 6, 7

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem.
Presbyterian Church*,
393 U.S. 440 (1969) .................................................................. 2, 5, 6, 7

*Ran-Dav's Cnty. Kosher, Inc. v. New Jersey*,
608 A.2d 1353 (N.J. 1992) ..................................................... 16

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*,
867 F.3d 338 (3d Cir. 2017) ................................................... 6

*Serbian E. Orthodox Diocese v. Milivojevich*,
426 U.S. 696 (1976) ............................................................... 7, 17

*Small v. Fritz Cos.*,
30 Cal. 4th 167 (2003) ........................................................... 17

*Tenafly Eruv Ass'n Inc. v. Borough of Tenafly*,
309 F.3d 144 (3d Cir. 2002) ................................................... 20

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
450 U.S. 707 (1981) ............................................................... 17, 20

*Tilton v. Marshall*,
925 S.W.2d 672 (Tex. 1996) ................................................... 8

*United States v. Ballard*,
322 U.S. 78 (1944) ................................................................. 7

*Watson v. Jones*,
80 U.S. 679 (1871) ................................................................. 7

*Wilson v. Christ Alive Christian Ctr.*,
152 N.Y.S.3d 318 (N.Y. App. Div. 2021) ............................... 8

**Scripture**

*Acts* (King James) ......................................................................... 9

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Genesis* (King James) ................................................................ 9

*Luke* (King James)................................................................... 11

*Malachi* (King James) ............................................................... 9

The Church of Jesus Christ of Latter-day Saints, *Doctrine and Covenants* ............................................................................ 10

**Other Authorities**

Gérald Caussé, *The Spiritual Foundations of Church Financial Self-Reliance*, Ensign Magazine (July 2018) .................... 14

J. Reuben Clark, Jr., *General Conference Address: Against the Time of Need* (Apr. 1948) ................................................... 13

The Church of Jesus Christ of Latter-day Saints, *Church Finances* ........................................................................... 13, 14

The Church of Jesus Christ of Latter-day Saints, *Do I Pay Tithing on My Income Before Taxes Are Taken out or on What I Receive After Taxes?* (Feb. 2008) ............................... 18

The Church of Jesus Christ of Latter-day Saints, *Doctrinal Study: Prophets* .................................................................. 12

The Church of Jesus Christ of Latter-day Saints, *General Handbook* (2020) ........................................................... 10, 19

James E. Faust, *General Conference Address: Opening the Windows of Heaven* (Oct. 1998)........................................ 18, 19

Robert D. Hales, *General Conference Address: Tithing: A Test of Faith with Eternal Blessings* (Oct. 2002)........................ 18

Gordon B. Hinckley, *BYU Devotional: The Widow's Mite* (Sept. 1985)....................................................................... 11

# TABLE OF AUTHORITIES
### (continued)

Page(s)

Gordon B. Hinckley, *General Conference Address: Of Missions, Temples, and Stewardship* (Oct. 1995) ............................... 14

Gordon B. Hinckley, *General Conference Address: Rise to a Larger Vision of the Work* (Apr. 1990) ......................................... 11, 12

Gordon B. Hinckley, *General Conference Address: The State of the Church* (Apr. 1991) .................................................................... 14

Spencer W. Kimball, *General Conference Address: The Law of Tithing* (Oct. 1980) ............................................................................. 11

David W. Smith, *The Development of the Council on the Disposition of the Tithes*, BYU Studies Quarterly 57:2 (2018) .... 10, 13

Tad Walch, *In CBS's '60 Minutes' Segment on Church Finances, It Missed the Sweeping Rags-to-Riches History of Faith*, Deseret News (June 29, 2023) ....................................... 12, 13

John A. Widtsoe, *Evidences and Reconciliations* (1970) ......................... 11

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

The J. Reuben Clark Law Society is a worldwide faith-based organization of approximately 10,000 lawyers and law students supported by the J. Reuben Clark Law School at Brigham Young University, the flagship university of The Church of Jesus Christ of Latter-day Saints. The Society's mission is to affirm the strength brought to the law by a lawyer's personal religious conviction, and its members strive through public service and professional excellence to promote fairness and virtue founded upon the rule of law. The Society has a strong interest in advancing the proper interpretation and application of the First Amendment, and has a particularly strong interest in this case, given the Society's connection to the Church.[1]

---

[1] As required by Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* states that no counsel for any party authored this brief in whole or in part, and that no person or entity, other than *amicus* and its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. No judicial member of the Society participated in any way in the decision to file this brief or in the drafting or review thereof. The parties have consented to the filing of this brief. 9th Cir. R. 29-2(a).

## INTRODUCTION

The First Amendment guarantees religious organizations the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012) (citation omitted). The principle of "church autonomy" or ecclesiastical abstention thus bars courts from interfering with religious organizations' "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020).

The panel refused to apply the First Amendment's church autonomy protection here because it considered the questions before it to be "secular." Panel Op. 11. As the panel saw it, the truthfulness of statements by The Church of Jesus Christ of Latter-day Saints and its leaders about the Church's management and disposition of tithing funds, and whether a Church member reasonably relied on those statements when he donated tithing, could be answered without examining the Church's faith, doctrine, or polity. *See id.* at 9–11.

1

But characterizing these issues as "secular" was, respectfully, conclusory and incorrect. *Any* claim against a religious institution can be considered "secular" if one strips away the underlying religious history, context, and doctrine. For instance, a trespass claim is "secular" if you ignore the doctrinal dispute animating the claim. *But see Presbyterian Church v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U.S. 440, 449–50 (1969) (adjudicating a trespass claim between church denominations violated the church autonomy doctrine). An employment discrimination claim is secular if you ignore the religious doctrine that gave rise to the employee's discharge. *But see Our Lady of Guadalupe*, 140 S. Ct. at 2069 (the First Amendment forbids adjudicating an employment dispute between a teacher and a religious school). And a corporate dispute is secular if you ignore that the corporation at issue is a church. *But see Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 119–21 (1952) (applying secular legal principles to church corporate governance violated the church autonomy doctrine).

Resolving Mr. Huntsman's claims here would *require* the Court and the jury to intrude into areas the First Amendment reserves for the Church.

*First*, the primary statement at issue was delivered by the leader of the worldwide Church at the time, President Gordon B. Hinckley, who is considered by adherents to be a prophet and whose statements on Church doctrine, policy, and practice are authoritative. The statement was made in a religious sermon during the Church's semiannual General Conference, a spiritual gathering where Church leaders preach on religious matters. And the statement concerned an area that the Church's scripture entrusts to senior Church leaders.

Specifically, President Hinckley stated that the funds used to acquire and develop property near the Church's headquarters in Salt Lake City came from "commercial entities owned by the Church" and "earnings of invested reserve funds," and that "tithing funds" were not used on the acquisition or development. Panel Op. 13. Mr. Huntsman claims reserve funds (and their investment returns) *are* tithing funds and that President Hinckley's statement was therefore false. But what funds constitute "tithing" is an ecclesiastical matter: Church scripture, doctrine, and historical practice commit to senior Church leaders the decision of which funds donated as tithing are used to run the Church, and which are reserved and invested for other purposes such as

preparing for the future or investing in and revitalizing the neighborhood surrounding Church headquarters. Allowing a plaintiff to contradict President Hinckley's statement on a matter of Church doctrine and practice would invade the autonomy of the Church in a way the First Amendment forbids. *See Our Lady of Guadalupe*, 140 S. Ct. at 2060 (church autonomy doctrine protects religious institutions' "autonomy with respect to internal management decisions that are essential to the institution's central mission").

*Second*, determining whether Mr. Huntsman *relied* on the statements, and whether his reliance was justified, would require a jury to evaluate the Church's doctrine of tithing as taught in scripture and by Church leaders, to judge Mr. Huntsman's adherence to that doctrine, and to determine whether Mr. Huntsman's views were out of step with believing members of the faith. Church doctrine is clear that members pay tithing based on a scriptural commandment to return ten percent of their increase to God, not based on how the Church spends the donated money. Mr. Huntsman's claim that he made tithing payments in reliance on the challenged statements contradicts settled Church doctrine and thus invites a jury "to determine matters at the very core of a religion—

the interpretation of particular church doctrines and the importance of those doctrines to the religion." *Presbyterian Church*, 393 U.S. at 450.

These fundamental errors in the panel's opinion on this important question of constitutional law warrant *en banc* rehearing. Absent review, the chilling effect of the panel's ruling would be broad and severe. *See Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 619 (Ky. 2014) ("[T]he ecclesiastical abstention doctrine is primarily interested in preventing any chilling effect on church practices as a result of government intrusion in the form of secular courts."). The panel faulted President Hinckley for making "unqualified statements," for not "distinguish[ing] between tithing principal and earnings on tithing principal," for not "defin[ing] 'tithing funds,'" and for not "explain[ing] that, as he was using the terms, 'reserve funds' were 'tithing funds.'" Panel Op. 19–20. This level of scrutiny into a religious sermon delivered by the leader of a global faith grossly offends the First Amendment. The panel's cramped view of church autonomy will force faith leaders to make inherently religious decisions about what to preach and how to fund their missions knowing that federal courts—decades in the future—may second-guess their word choices based on secular definitions. "[T]he First

Amendment forbids civil courts from playing such a role." *Presbyterian Church*, 393 U.S. at 450.

## ARGUMENT

### I. The First Amendment Bars Judicial Inquiry into Ecclesiastical Matters Such as the Collection, Allocation, and Disposition of Tithing.

The ecclesiastical abstention doctrine has "a rich lineage" that predates the founding of our nation and demarcates the boundaries between the political and religious realms. *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 975 (7th Cir. 2021). Tracing back to Magna Carta, the doctrine is enshrined in the religion clauses of the First Amendment, "'which give[] special solicitude to the rights of religious organizations,' and recognize[] their 'independence from secular control or manipulation.'" *Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 352 (3d Cir. 2017).

The ecclesiastical abstention doctrine safeguards religious organizations' "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe*, 140 S. Ct. at 2061. Because "[m]an's relation to his God [is] no concern of the state," the doctrine exists to prevent courts from "enter[ing] a

6

forbidden domain" (*United States v. Ballard*, 322 U.S. 78, 87 (1944)) and "becom[ing] entangled in essentially religious controversies" (*Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976)). Put simply, the First Amendment "leaves the civil courts *no* role in determining ecclesiastical questions." *Presbyterian Church*, 393 U.S. at 447.

This doctrine extends even to otherwise "valid and neutral" laws. *Hosanna-Tabor*, 565 U.S. at 190 (citation omitted). The relevant question is not whether neutral legal principles *could* be applied in a given case; it is whether doing so would require the court to wade into religious matters. *See Kedroff*, 344 U.S. at 119 (applying cy-près doctrine to church property dispute did not "avoid[] the constitutional rule" against governmental resolution of issues implicating church doctrine and governance).

This rule has been applied in many different contexts, including disputes over church polity (*e.g.*, *Milivojevich*, 426 U.S. at 721–24; *Kedroff*, 344 U.S. at 119–20), property (*e.g.*, *Presbyterian Church*, 393 U.S. at 449–52; *Watson v. Jones*, 80 U.S. 679, 733–34 (1871)), and the selection and retention of ministers (*e.g.*, *Our Lady of Guadalupe*, 140 S.

7

Ct. at 2060–61; *Hosanna-Tabor*, 565 U.S. at 188–90; *Gonzalez v. Roman Cath. Archbishop of Manila*, 280 U.S. 1, 16 (1929)).

"[T]ithing is at its core a purely ecclesiastical matter" (*Hawthorne v. Couch*, 911 So. 2d 907, 910 (La. Ct. App. 2005)), and "a church's financial regime" and its practice of collecting and allocating financial contributions thus fall squarely within ecclesiastical abstention (*Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Wash. v. Beards*, 680 A.2d 419, 429 (D.C. 1996); *see also*, *e.g.*, *Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 442 (2d Cir. 1981) ("solicitation of contributions is central to missionary evangelism"); *Tilton v. Marshall*, 925 S.W.2d 672, 679–80 (Tex. 1996) ("no jury can be allowed to determine the[] truth or falsity" of a pastor's sermon on tithing, "for when triers of fact undertake that task, they enter a forbidden domain") (cleaned up); *Moon v. Family Fed'n for World Peace & Unification Int'l*, 281 A.3d 46, 67–71 (D.C. 2022) (dismissing tithing misappropriation claim); *Wilson v. Christ Alive Christian Ctr.*, 152 N.Y.S.3d 318 (N.Y. App. Div. 2021) (similar); *Harris v. Matthews*, 643 S.E.2d 566, 571 (N.C. 2007) (similar); *Hawthorne*, 911 So. 2d at 911 (dismissing claim that church fraudulently induced tithing)).

II. **Church Scripture and Doctrine Commit the Management of Tithing to Senior Church Leadership, Whose Decisions on These Matters Are Religiously Authoritative and Judicially Unreviewable.**

The panel's decision would permit a jury to review statements from the Church on matters that Church scripture and doctrine consider a core religious stewardship committed to senior Church leaders. The panel's decision plainly trespasses the boundary of church autonomy.

A. The doctrine of tithing has ancient roots, dating back to Abel offering the "firstlings of his flock" as a sacrifice to the Lord. *Genesis* 4:4 (King James). The ancient prophet Abraham "gave ... tithes of all" to Melchizedek, King of Salem and priest of God. *Id.* 14:18–20. The prophet Malachi taught that to withhold "tithes and offerings" is to "rob God." *Malachi* 3:8 (King James). He promised that "the windows of heaven" will "open" and God will shower blessings on those who give freely, such that "there shall not be room enough to receive it." *Id.* 3:10. In the New Testament, faithful Christians "[h]aving land, sold it, and brought the money and laid it at the apostles' feet." *Acts* 4:37 (King James).

The doctrine of tithing was established in The Church of Jesus Christ of Latter-day Saints through a July 1838 revelation received by the Church's first modern prophet, Joseph Smith, Jr., and recorded in the

9

Doctrine and Covenants, which is considered canon alongside the Bible and Book of Mormon. *See* The Church of Jesus Christ of Latter-day Saints, *Doctrine and Covenants* § 119:3, *available at* https://tinyurl.com/49rjpatb. The Church defines "tithing" as "the donation of one-tenth of one's income to God's church." The Church of Jesus Christ of Latter-day Saints, *General Handbook* § 34.3.1 (2020), *available at* https://tinyurl.com/5n78z6bh. Tithing funds are generally used to build and maintain temples and meetinghouses, share the "gospel throughout the world," support "programs of the Church, such as education and family history," and provide "food, shelter, and other necessities to people in need." *Id*. § 34.0.

The allocation, management, and disposition of tithing donations are committed by scripture to what is called "The Council on the Disposition of the Tithes," comprised of several senior Church leaders. *See Doctrine and Covenants* § 120:1; *see generally* David W. Smith, *The Development of the Council on the Disposition of the Tithes*, BYU Studies Quarterly 57:2, at 131–36, 149 (2018). Through this Council, "the tithes of the people are administered by the Presidency of the Church, assisted by the Council of the Twelve [Apostles] and the Presiding Bishopric."

10

John A. Widtsoe, *Evidences and Reconciliations* 286 (1970). "These men exercise prayerful care in the use of tithing," and "[i]t is disbursed with scrupulous care, *for it is sacred*." *Id*. (emphasis added).

"[T]he Council on the Disposition of Tithes ... meets regularly under the inspiration of the Lord to determine and approve the disbursement of the tithes of the Lord's church." Spencer W. Kimball, *General Conference Address: The Law of Tithing* (Oct. 1980), *available at* https://tinyurl.com/6c57zy96. President Hinckley explained that "[a]ll of these meetings are opened with prayer, invoking divine guidance," and that "in this process the will of the Lord is sought and His inspiration is received." Gordon B. Hinckley, *General Conference Address: Rise to a Larger Vision of the Work* (Apr. 1990), *available at* https://tinyurl.com/3m884sfb. President Hinckley viewed this stewardship through the lens of "the widow's mite" (*see Luke* 21:1–4 (King James)), even keeping a framed mite in his office "as a constant reminder of the fearsome responsibility of spending that which comes of the consecrations of the members of the Church." Gordon B. Hinckley, *BYU Devotional: The Widow's Mite* (Sept. 1985), *available at* https://tinyurl.com/2zf6pj2x. He taught that Church leaders must ultimately "answer[] to the Lord" on how they administer

11

the sacred funds entrusted to them. Hinckley, *Rise to a Larger Vision of the Work*.

The Council is led by the President of the Church, who is no mere executive—Church members view him as a prophet. Church doctrine teaches that the President of the Church is a "prophet, seer, and revelator—the only person on the earth who receives revelation to guide the entire Church"—and that his "teachings reflect the will of the Lord." The Church of Jesus Christ of Latter-day Saints, *Doctrinal Study: Prophets*, *available at* https://tinyurl.com/2p98netp. The Council operates under the direction and authority of the President of the Church.

Senior leaders of the Church have managed the Church's tithing funds, as part of their core religious duties, dating back to the founding of the religion. For the early decades of its existence, the Church struggled financially. *See* Tad Walch, *In CBS's '60 Minutes' Segment on Church Finances, It Missed the Sweeping Rags-to-Riches History of Faith*, Deseret News (June 29, 2023), *available at* https://tinyurl.com/2dz83f4h. In the 1890s, Congress's Edmunds-Tucker Act "attacked church businesses and seized church assets," and in conjunction with the Panic

12

of 1893, forced the Church to take out a large loan to keep Church-owned banks solvent. *Id.*

In the 1930s and 40s, the Council on the Disposition of the Tithes, in an effort led by *amicus*'s namesake President J. Reuben Clark (a counselor to Church President Heber J. Grant), sought to "ensure that the Church never spent more than what came in and had a sufficient cash reserve to cover contingencies." Smith, *The Development of the Council on the Disposition of the Tithes*, at 145; *see also* J. Reuben Clark, Jr., *General Conference Address: Against the Time of Need* (Apr. 1948) ("The budget authorized by the Council on the Distribution of Tithes is made up of two parts: 1. The regular approved authorizations for the various items covered by the budget ... ; and 2. A contingent reserve out of which can be met any unusual expenditures not provided for in the budget"), *available at* https://tinyurl.com/2th8xuub. But the Church's international expansion during the 1960s made this difficult, and the Church's deficit spending continued. *See* The Church of Jesus Christ of Latter-day Saints, *Church Finances*, *available at* https://tinyurl.com/2vmzz4be.

13

Beginning in 1963, under the direction of President N. Eldon Tanner (a counselor to Church President David O. McKay), "the faithful contributions of Latter-day Saints resulted in the Church building significant reserves …." *Id*. And since then, senior leaders of the Church have set aside and invested some portion of tithing funds as "reserves" for other uses, and have distinguished between these categories of funds. *See*, *e.g.*, Gérald Caussé, *The Spiritual Foundations of Church Financial Self-Reliance*, Ensign Magazine (July 2018) ("The moneys set aside are then added to the investment reserves of the Church. They are invested in stocks and bonds; majority interests in taxable businesses (some of which date to the Church's early Utah history); commercial, industrial, and residential property; and agricultural interests."), *available at* https://tinyurl.com/4fb5erbx; Gordon B. Hinckley, *General Conference Address: Of Missions, Temples, and Stewardship* (Oct. 1995) ("each year we put into the reserves of the Church a portion of our annual budget"), *available at* https://tinyurl.com/yc3c9ymm; Gordon B. Hinckley, *General Conference Address: The State of the Church* (Apr. 1991) ("a fixed percentage of [Church] income will be set aside to build reserves"), *available at* https://tinyurl.com/44khy9b7.

14

The decisions on how much tithing to spend, whether to borrow money to facilitate expansion, and what to set aside and invest—along with all other policy decisions regarding the management, allocation, and disposition of Church funds—have been made by senior Church leaders exercising the stewardship committed to them by scripture to manage the sacred funds received as tithing donations.

**B.** This background on the doctrine and history of tithing, the Council on the Disposition of Tithes, and the prophetic role of the President of the Church highlights the error in the panel's conclusion that the questions presented by Mr. Huntsman's claims are "secular."

The "genuine dispute of material fact" the panel thought precluded summary judgment is that, while the Church's statements surrounding the investment in the mall drew a distinction between "tithing" and "earnings on invested reserve funds," Mr. Huntsman produced a declaration from a former Church financial advisor (a disaffected former Church member) claiming that all these funds are considered "tithing." Panel Op. 20, 27. As a result, Mr. Huntsman claims when the Church and President Hinckley said the funds for the investment in the mall

were taken from "earnings on invested reserve funds" and not "tithing," they were lying.

Allowing the jury to side with Mr. Huntsman and his declarant over the Church and its leaders on the proper allocation and characterization of Church funds would invade the religious work of the Council on the Disposition of the Tithes and contradict the leader of the worldwide Church on a matter that canonized scripture commits to him. *See Ran-Dav's Cnty. Kosher, Inc. v. New Jersey*, 608 A.2d 1353, 1366 (N.J. 1992) (invalidating state regulation on what can be characterized "kosher" because "the truths being marketed [we]re, in essence, religious truths"). The decisions on how funds donated as tithing are treated—whether they are allocated to run the operations of the Church, or whether they are set aside as reserves that are invested for future growth or other purposes— are all made by the senior leaders of the Church, under the authority and direction of the President of the Church, as part of their religious stewardship.

As a result, the views expressed by Mr. Huntsman and the Church's former financial advisor are incorrect not simply as a matter of *law*, but as a matter of *religious doctrine*. Mr. Huntsman relies on *secular*

definitions of the terms used (*see* Panel Op. 24), where the authoritative source was *scripture* and *Church doctrine*. But "[c]ourts are not arbiters of scriptural interpretation" (*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981)), and "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds" (*Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989)).

## III. Determining Whether Mr. Huntsman's Reliance on the Church's Statements Was Justifiable Would Require the Jury to Judge Whether Mr. Huntsman Faithfully Followed the Tenets of the Church.

For the jury to determine whether Mr. Huntsman paid tithing in reliance on the challenged statements, and whether his reliance was justifiable (as the law requires, *see Small v. Fritz Cos.*, 30 Cal. 4th 167, 173 (2003)), jurors would need to determine whether Mr. Huntsman's tithing practice contradicted Church doctrine as taught by Church leaders and practiced by faithful adherents. But this is "a religious dispute[,] the resolution of which … is for ecclesiastical and not civil tribunals." *Milivojevich*, 426 U.S. at 709.

A.  Calculating and paying tithing is a matter of faith. "What amounts to 10 percent of our individual income is between each of us and

17

our Maker. There are no legalistic rules." James E. Faust, *General Conference Address: Opening the Windows of Heaven* (Oct. 1998), *available at* https://tinyurl.com/mu5r5p5u. While the panel stated that "[i]ncome is usually used as a secular term" (Panel Op. 24), Church doctrine on tithing expressly *forbids* a secular definition of income (*see* The Church of Jesus Christ of Latter-day Saints, *Do I Pay Tithing on My Income Before Taxes Are Taken out or on What I Receive After Taxes?* (Feb. 2008) ("[T]he way you define your income, and consequently your tithing, is a matter between you and the Lord. Prayerfully seek the Lord's guidance on issues like taxes, gifts, scholarships, and other matters to determine what qualifies as a full tithe."), *available at* https://tinyurl.com/2tbzvef6).

A Church member's decision to donate tithing is spiritually significant. "Tithing … teaches us to control our desires and passions for the things of this world …. We learn to trust that what we have been given, through the blessings of the Lord and our own diligent efforts, is sufficient for our needs." Robert D. Hales, *General Conference Address: Tithing: A Test of Faith with Eternal Blessings* (Oct. 2002), *available at* https://tinyurl.com/323nkzsj. Whether a member regularly contributes

tithing is one of several qualifying factors that determine whether a member may enter the Church's temples—sacred places of worship (distinct from ordinary meeting houses) where the highest religious ceremonies in the Church are performed. *See General Handbook* § 26.3.3.1.

Because "[t]ithing is a principle of *sacrifice*," Church members relinquish their control over tithes after they are donated. Faust, *Opening the Windows of Heaven* (emphasis added). Church doctrine is clear that "[w]hen tithes and other offerings are given to the Church, they belong to the Lord. They are consecrated to Him." *General Handbook* § 34.3.7. Tithes are paid as "freewill offerings" and are "made without reservation of purpose, retention of control, [or] ownership in any form." *Id*. Unlike membership dues or subscription fees, tithes are paid with no "expectation of any benefit by the donor other than the Lord's blessings." *Id.*

**B.** To prevail on his claim, Mr. Huntsman would have to prove—contrary to Church doctrine—that he paid tithing *because of* the Church's statements regarding how it allocated, characterized, and disposed of Church funds. And he would need to show (again, contrary to Church

19

doctrine) that a reasonable member of the Church would decide whether to tithe not out of a desire to sacrifice for their faith, to receive Biblically promised blessings, or to qualify to enter the Church's temples, but rather based on whether they support the Church's spending priorities.

Mr. Huntsman's claims contradict Church doctrine and the practice of tithe-paying Church members (making his alleged reliance *not* justifiable), but the more important point is that these are issues that no court or jury is permitted to adjudicate. *See Tenafly Eruv Ass'n Inc. v. Borough of Tenafly*, 309 F.3d 144, 171 (3d Cir. 2002) ("adjudicat[ing] controversies over religious authority or dogma" are "tasks that are not within the judicial ken") (cleaned up). Educating a jury on religious doctrine would entangle the judiciary in a matter walled off by the First Amendment. And the idea that a jury would stand in judgment as to whether Mr. Huntsman's tithe-paying was in keeping with the faith is particularly offensive in the context of a religion where that decision "is a matter between [him] and the Lord." *Supra* p. 18.

"[I]t is not within the judicial function and judicial competence to inquire whether the [Church] or [its member] more correctly perceived the commands of their common faith." *Thomas*, 450 U.S. at 716. The

reasons Mr. Huntsman made religious offerings, whether his practice was in keeping with the tenets of his former faith, and whether his views contradicted that of other members of the faith, are simply not the purview of the judiciary.

## CONCLUSION

The Court should grant the petition for rehearing *en banc*, and affirm the district court's judgment.

Dated:  October 2, 2023

Respectfully submitted,

*/s/ Blaine H. Evanson*

Joseph E. Barakat
Katie Rose Talley
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas  75201
Telephone: (214) 698-3100
Facsimile:  (214) 571-2900
*jbarakat@gibsondunn.com*
*ktalley@gibsondunn.com*

Blaine H. Evanson
  *Counsel of Record*
Joseph Edmonds
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, Suite 1200
Irvine, California  92612
Telephone:  (949) 451-3800
Facsimile:   (949) 451-4220
*bevanson@gibsondunn.com*
*jedmonds@gibsondunn.com*

Katherine L. Montoya
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile:  (202) 467-0539
*kmontoya@gibsondunn.com*

COUNSEL FOR *AMICUS CURIAE* THE J. REUBEN CLARK LAW SOCIETY

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this motion was prepared in 14-point New Century Schoolbook, a proportionally spaced typeface, using Microsoft Word 2019. *See* Fed. R. App. P. 29(a)(4), 32(g)(1). This brief complies with the type-volume limitation of Circuit Rule 29-2(c)(2) because it contains 4,198 words, excluding the parts exempted under Rule 32(f).

Dated: October 2, 2023          */s/ Blaine H. Evanson*
                                                   Blaine H. Evanson

22

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 2, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 2, 2023                    /s/ *Blaine H. Evanson*
                                          Blaine H. Evanson