No. 21-56056

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

JAMES HUNTSMAN,

*Plaintiff-Appellant,*

v.

CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
Case No. 2:21-cv-02504-SVW-SK
Hon. Stephen V. Wilson, U.S. District Court Judge

**BRIEF OF THE ASSOCIATION OF CATHOLIC COLLEGES AND
UNIVERSITIES, BRIGHAM YOUNG UNIVERSITY–HAWAII,
BRIGHAM YOUNG UNIVERSITY–IDAHO, CALIFORNIA BAPTIST
UNIVERSITY, AND THE COUNCIL FOR CHRISTIAN COLLEGES AND
UNIVERSITIES AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT
APPELLEE'S PETITION FOR REHEARING *EN BANC***

*Attorneys for Amici Curiae*
Steven M. Sandberg
 *Counsel of Record*
David M. Andersen
BRIGHAM YOUNG UNIVERSITY
Office of the General Counsel
A360 ASB
Provo, Utah 84602
(801) 422-4722

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae certify that none of them has a parent corporation, and that no publicly held corporation has an ownership interest of 10% or more in any of them.

## STATEMENT OF AUTHORSHIP AND CONTRIBUTORS

Pursuant to Fed. R. App. P. 29(a)(4)(E), amici curiae certify that (1) no party or party's counsel authored this brief, in whole or in part; (2) no party, nor their counsel, contributed money that was intended to fund the preparation or submission of this brief; and (3) no person other than amici curiae and their counsel contributed money that was intended to fund the preparation or submission of this brief.

## STATEMENT OF AUTHORITY TO FILE

Amici curiae further certify that they have authority to file under Fed. R. App. P. 29(a)(2) because all parties have consented to this filing.

Dated: October 2, 2023      /s/ Steven M. Sandberg
                                      Steven M. Sandberg
                                      David M. Andersen
                                      BRIGHAM YOUNG UNIVERSITY
                                      *Counsel for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................ii

STATEMENT OF AUTHORSHIP AND CONTRIBUTORS ................................ii

STATEMENT OF AUTHORITY TO FILE ........................................................ ii

TABLE OF AUTHORITIES....................................................................................iv

IDENTITY AND INTEREST OF AMICUS CURIAE ...........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.......................................3

ARGUMENT .........................................................................................................7

   I.   A donor's subjective misunderstanding is insufficient to establish fraud against a nonprofit college or university.......................................................7

   II.  A nonprofit college or university's truthful use of reserve funds cannot constitute fraud..........................................................................................10

   III. Donors cannot use fraud claims to convert unrestricted gifts to restricted gifts, and donors are not damaged when donations are not used for the alleged restricted purpose...........................................................................14

CONCLUSION .....................................................................................................18

CERTIFICATE OF COMPLIANCE .....................................................................20

CERTIFICATE OF SERVICE...............................................................................21

# TABLE OF AUTHORITIES

## Cases

*Ahern v. Apple Inc.*, 411 F. Supp. 3d 541 (N.D. Cal. 2019)....................................10

*Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423 (D. Md. 2014)....................9

*City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148 (5th Cir. 2010) ........10

*Courts v. Annie Penn Mem'l Hosp., Inc.*, 431 S.E.2d 864 (N.C. App. 1993) ...........19

*Dailey v. Medlock*, 551 F. App'x 841 (6th Cir. 2014) ............................................16

*Freeman v. U.S. Bank Nat. Ass'n*, 527 F. App'x 619 (9th Cir. 2013)......................8

*Huntsman v. Corporation of the President of The Church of Jesus Christ of Latter-day Saints*, 76 F.4th 962 (9th Cir. 2023).....................................8, 10, 12

*Kruse v. Bank of America*, 202 Cal. App. 3d 38 (Ct. App. 1988) ..........................20

*Lesperance v. N. Am. Aviation, Inc.*, 217 Cal. App. 2d 336 (Ct. App. 1963) ..........21

*MacDonald v. Thomas M. Cooley L. Sch.*, 724 F.3d 654 (6th Cir. 2013)................9

*Martens v. Minnesota Min. & Mfg. Co.*, 616 N.W.2d 732 (Minn. 2000) ..............11

*McAlpin v. Am. Gen. Life Ins. Co.*, 601 S.W.3d 188 (Ky. Ct. App. 2020) ..............9

*Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807 (Ct. App. 1996).................20

*Pearson's Pharmacy, Inc. v. Express Scripts, Inc.*, 505 F. Supp. 2d 1272 (M.D. Ala. 2007)................................................................................................10

*State Farm Cnty. Mut. Ins. Co. of Texas v. Moran*, 809 S.W.2d 613 (Tex. App. 1991)................................................................................................16

*Taylor v. Taylor*, 66 Cal. App. 2d 390 (1944).........................................................18

*Yetter v. Ford Motor Co.*, 428 F. Supp. 3d 210 (N.D. Cal. 2019)...........................8

## Statutes

Cal. Civ. Code § 1146 (2023) .................................................................................18

Cal. Civ. Code §§ 1135–48 and 1127–31 .............................................................18

Uniform Prudent Management of Institutional Funds Act (UPMIFA), Cal. Prob. Code § 18500–510 ................................................................15, 16, 18

**Other Authorities**

American Council on Education (ACE), *Comments to the Senate Finance Committee on Tax Reform and Higher Education* (July 17, 2017), https://www.acenet.edu/ Documents/Comments-Senate-Finance-Committee-tax-reform.pdf ...................4

Association of Catholic Colleges and Universities, *About ACCU*, https://www.accunet.org/about.html ...................1

Boston Univ., *Managing Restricted Funds: A Guide for Fund Administrators*, https://www.bu.edu/cfo/files/2022/01/Restricted-Fund-Training-06.17.21-Presentation.pdf ...................12

BYU–Hawaii Mission and Vision, https://about.byuh.edu/about-byuh/mission-and-vision ...................1

BYU–Idaho Mission Statement, https://www.byui.edu/about/byu-idaho-mission-statement ...................1

California Baptist University Mission, https://calbaptist.edu/about/mission ...................1

Council for Christian Colleges and Universities, *Our Work and Mission*, https://www.cccu.org/about/ ...................1

Eric Smith, *Perspective: I teach tax law. This is what I wish reporters understood about church finances,* DESERET NEWS (Sept. 15, 2023) ...................16

Karin Fischer, *The Shrinking of Higher Ed.*, CHRONICLE OF HIGHER EDUCATION (Aug. 12, 2022), https://www.chronicle.com/article/ the-shrinking-of-higher-ed ...................3

Lee Gardner, *Colleges Fear Cost of Doing Business Will Become Much Costlier*, CHRONICLE OF HIGHER EDUCATION (Feb. 24, 2023), https://www.chronicle.com/ article/colleges-fear-cost-of-doing-business-will-become-much-costlier ...................3

Liam Knox, *Higher Education Giving Up by Double Digits*, INSIDE HIGHER ED (Feb. 15, 2023), https://www.insidehighered.com/news/2023/02/15/ donations-higher-ed-had-biggest-boost-20-years ...................4

*Maintaining Nonprofit Operating Reserves*, An Organizational Imperative for Nonprofit Stability, Nonprofit Operating Reserves Initiative (2008), https://www.nonprofitaccountingbasics.org/sites/default/files/01-OperatingReservesWhitePaper2009.pdf ...................11

NAICU, *Charitable Giving*, https://www.naicu.edu/policy-advocacy/ issue-brief-index/tax-policy/charitable-giving ...................4

v

NAICU, *Shaping Lives and Anchoring Communities* (2021),
https://www.naicu.edu/research-resources/about-private-colleges/
shaping-lives-and-anchoring-communities ...........................................................3

National Association of Independent Colleges and Universities (NAICU),
*Key Facts 2023: Private, Nonprofit Higher Education*, https://www.naicu.edu/
research-resources/about-private-colleges/key-facts-2023 ...............................3, 4

Nonprofit Hub, *Nonprofit Reserve Funds: A Primer*,
https://nonprofithub.org/nonprofit-reserve-funds-a-primer .................................10

Oregon St. Univ., *Interest Earnings*, Fiscal Policy No. 03-150-106,
https://fa.oregonstate.edu/fiscal-policy-program/03-150-106-interest-earnings....11

RESTATEMENT OF THE LAW, CHARITABLE NONPROFIT ORGS.
(AM. L. INST. 2021) .........................................................................................12, 16

Stanford Univ., Administrative Guide, https://adminguide.stanford.edu .................11

THE HANDBOOK OF NONPROFIT GOVERNANCE, BOARDSOURCE (2010),
http://gife.issuelab.org/resources/19261/19261.pdf .............................................11

Univ. Oregon, Business Affairs, Definition of *Endowment Funds*,
https://ba.uoregon.edu/financial-statements-definitions .......................................11

## Rules

Fed. R. App. P. 26.1 ................................................................................................ ii

Fed. R. App. P. 29(a)(2) .......................................................................................... ii

Fed. R. App. P. 29(a)(4) .........................................................................................25

Fed. R. App. P. 29(a)(4)(E) ..................................................................................... ii

Fed. R. App. P. 29(b)(4) .........................................................................................25

Fed. R. App. P. 32(f) ...............................................................................................25

Fed. R. App. P. 32(g)(1) .........................................................................................25

Ninth Circuit Rule 29-2(c)(2)..................................................................................25

**IDENTITY AND INTEREST OF AMICUS CURIAE**

The Association of Catholic Colleges and Universities ("ACCU") serves as the collective voice for Catholic higher education and represents 230 Catholic institutions in the U.S.[1] Brigham Young University–Hawaii ("BYU–Hawaii") and Brigham Young University–Idaho ("BYU–Idaho") are religious nonprofit universities that were and are founded, guided, and supported by The Church of Jesus Christ of Latter-day Saints ("Church"), and whose missions are to develop disciples of Jesus Christ who are leaders in their families, the Church, and their communities.[2] California Baptist University ("CBU") is a private Christian university in Southern California that provides a Christ-centered educational experience that integrates academics with spiritual and social development.[3] The Council for Christian Colleges and Universities ("CCCU") is a higher education association of more than 185 Christian institutions around the world, whose missions are Christ-centered and rooted in the historic Christian faith.[4]

---

[1] *See* Association of Catholic Colleges and Universities, *About ACCU*, https://www.accunet.org/about.html.

[2] *See* BYU–Hawaii Mission and Vision, https://about.byuh.edu/about-byuh/mission-and-vision; BYU–Idaho Mission Statement, https://www.byui.edu/about/byu-idaho-mission-statement.

[3] *See* California Baptist University Mission, https://calbaptist.edu/about/mission.

[4] *See* Council for Christian Colleges and Universities, *Our Work and Mission*, https://www.cccu.org/about/.

ACCU, BYU–Hawaii, BYU–Idaho, CBU, and CCCU (collectively, "Amici") are institutions within the Ninth Circuit or associations with members in the circuit. Amici and their members all regularly receive charitable gifts from donors who wish to support the missions and goals of these institutions. These donations are critical to the educational institutions' ability to fulfill their unique missions and goals. From time to time, donors disagree with decisions of private colleges and universities in pursuit of their institutional missions and goals and become disaffected from the institutions they have supported.

Amici are concerned that the panel's decision could destabilize higher education fundraising by subjecting nonprofit institutions to unsupported fraud claims by dissatisfied donors. Specifically, the panel's ruling would allow donors to assert fraud claims as a way to seek refunds of *unrestricted* gifts based on disagreements or misunderstandings over how institutional funds are spent—even *without* any objective misrepresentation by the institution, *despite* the institution following standard practices within the nonprofit industry, and *without* any damage to the donors themselves.

For the reasons outlined herein, Amici believe the panel erred in its decision reversing the District Court's grant of summary judgment. Therefore, Amici ask the Court to grant the petition for rehearing *en banc*.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Private nonprofit institutions of higher education play a vital role in sustaining our nation's economic, social, and cultural vitality. The 1,700 private nonprofit colleges and universities in the United States enroll more than 5.2 million students in all 50 states, employ 1.1 million people, and create an annual economic impact of $591.5 billion.[5] Both within their communities and throughout the country, these institutions not only educate a diverse array of talented students but also increase economic and social stability and quality of life, promote volunteerism and philanthropy, and drive innovation and research.[6]

In recent years, all colleges and universities, but in particular private nonprofit institutions, have faced unprecedented financial challenges because of declines in enrollment, record inflation, economic uncertainty, and other factors.[7] Higher education institutions rely heavily on charitable giving (a total of $59.5

---

[5] National Association of Independent Colleges and Universities (NAICU), *Key Facts 2023: Private, Nonprofit Higher Education* (hereafter "*Key Facts*"), https://www.naicu.edu/research-resources/about-private-colleges/key-facts-2023.
[6] NAICU, *Shaping Lives and Anchoring Communities* (2021), https://www.naicu.edu/research-resources/about-private-colleges/shaping-lives-and-anchoring-communities.
[7] Lee Gardner, *Colleges Fear Cost of Doing Business Will Become Much Costlier*, CHRONICLE OF HIGHER EDUCATION (Feb. 24, 2023), https://www.chronicle.com/article/colleges-fear-cost-of-doing-business-will-become-much-costlier; *see also* Karin Fischer, *The Shrinking of Higher Ed.*, CHRONICLE OF HIGHER EDUCATION (Aug. 12, 2022) https://www.chronicle.com/article/the-shrinking-of-higher-ed.

billion in donor gifts last year), which is a major component of these institutions'
annual budgets and fills key gaps resulting from recent financial downturns.[8]
Private nonprofit institutions especially "have always relied upon charitable gifts to
achieve their educational missions," and "many private institutions owe their very
existence to generous charitable gifts."[9] "Because of the lack of state support,
private colleges and universities in particular rely strongly on charitable gifts to
sustain student financial aid and minimize tuition increases."[10]

Nonprofit organizations, especially private nonprofit institutions of higher
education, must be able to raise funds without fear that their general statements
might be misconstrued. And institutions should not be subject to fraud claims by
donors seeking refunds of their gifts based on donors' disagreements with, or
misunderstandings of, how institutional funds are spent. The panel's ruling
diminishes the long-term financial stability of private nonprofit institutions by
subjecting them to potential fraud claims by disaffected former donors.

---

[8] Liam Knox, *Higher Education Giving Up by Double Digits*, INSIDE HIGHER ED
(Feb. 14, 2023), https://www.insidehighered.com/news/2023/02/15/donations-
higher-ed-had-biggest-boost-20-years.
[9] American Council on Education, *Comments to the Senate Finance Committee on
Tax Reform and Higher Education* (July 17, 2017), https://www.acenet.edu/
Documents/Comments-Senate-Finance-Committee-tax-reform.pdf.
[10] NAICU, *Charitable Giving*, https://www.naicu.edu/policy-advocacy/issue-brief-
index/tax-policy/charitable-giving; *see also Key Facts*, *supra* note 1 (showing that
four-year private nonprofit colleges provide 79% of student aid from institutional
resources, compared to 33% for four-year public colleges).

Specifically, the panel's decision and reasoning improperly lower the bar for fraud, harm private nonprofit colleges and universities, and ineluctably lead to these three erroneous conclusions:

1.      A donor's subjective misunderstanding about general or ambiguous statements from an institution's representative *is sufficient to establish fraud*.

2.      Although it is standard practice for nonprofits to invest donations and add the returns to reserve funds, an institution's true statement that donations will not be used on a project but earnings of invested reserve funds will be used on the project *can be fraud*.

3.      A donor *can use a fraud claim* to effectively convert unrestricted gifts into restricted gifts, and can claim damages when donations are not used for the alleged restricted purpose.

These errors in the panel's decision will disrupt and chill fundraising efforts in the nonprofit industry, especially by private nonprofit colleges and universities. For example, upholding the panel's decision could make the following completely lawful actions by nonprofits subject to triable fraud claims in the Ninth Circuit:

- assuring donors that contributions will be used only for charitable, noncommercial purposes, and then setting aside a portion of contributions for investment purposes to build a reserve fund;

- making vague or general public statements—not in connection with or contemporaneous with any charitable solicitation, donation, or gift instrument—about how institutional funds will be used;

- using terms understood in the nonprofit world (e.g., "reserve fund" or "endowment"), but that not every lay person understands, when describing resources that will be used to fund capital projects or other ventures; or

- failing to clarify public statements about institutional spending when the nonprofit institution is not even aware of potential misunderstandings by past, current, or future donors.

Allowing these and similar acts and omissions to give rise to triable fraud claims could be devastating to private nonprofit institutions of higher education.

# ARGUMENT

## I. A donor's subjective misunderstanding is insufficient to establish fraud against a nonprofit college or university.

The panel lowered the bar for fraud by allowing a donor's subjective misunderstanding of undefined terms in a statement to create a triable issue of fact. *Huntsman v. Corporation of the President of The Church of Jesus Christ of Latter-day Saints*, 76 F.4th 962, 976 (9th Cir. 2023). But to establish fraud, the alleged misrepresentation must be *objectively false*. *See Yetter v. Ford Motor Co.*, 428 F. Supp. 3d 210, 234 (N.D. Cal. 2019) (holding that to establish fraud, "[a]n actionable statement must make a 'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact'"); *see also Freeman v. U.S. Bank Nat. Ass'n*, 527 F. App'x 619, 621 (9th Cir. 2013) (affirming summary judgment on negligent misrepresentation claim because of the lack of evidence that the statement was "objectively false"). Even on a review of summary judgment, the panel's reliance on a donor's subjective interpretation of the terms used in a nonprofit institution's statements was in error.

It is widely accepted that "[a] plaintiff's subjective misunderstanding of information that is not objectively false or misleading cannot mean that a defendant has committed the tort of fraudulent misrepresentation." *MacDonald v. Thomas M. Cooley L. Sch.*, 724 F.3d 654, 663 (6th Cir. 2013) (holding that a law school had not made fraudulent statements about graduate employment statistics

simply because statements were unclear to plaintiff); *see also McAlpin v. Am. Gen. Life Ins. Co.*, 601 S.W.3d 188, 194 (Ky. Ct. App. 2020) (holding that a "subjective inference [that the plaintiff] may have drawn from a truthful representation is not enough" to establish a misrepresentation); *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 458 (D. Md. 2014) (finding no misrepresentation by characterizing a fee as a "service charge" because that statement was "not objectively false").

The panel faulted the Church's president for using what it called "undefined or specialized terms" and "opaque language" such as "tithing funds," "earnings of invested reserve funds," and "annual budget." *Huntsman*, 76 F.4th at 975. But "an undefined or ambiguous term . . . , without more, cannot give rise to a claim of fraud." *Pearson's Pharmacy, Inc. v. Express Scripts, Inc.*, 505 F. Supp. 2d 1272, 1277 (M.D. Ala. 2007). A statement that has "a variety of interpretations" or even another "equally plausible meaning" is "inherently vague" and cannot constitute the material misrepresentation necessary to establish a fraud claim. *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 153 (5th Cir. 2010). Further, a generalized statement is "not actionable even if a consumer subjectively believes it means something more specific." *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 562 (N.D. Cal. 2019); *see also Martens v. Minnesota Min. & Mfg. Co.*, 616 N.W.2d 732, 747 (Minn. 2000) (holding that "statements that are 'general and indefinite'" do not qualify as "representations of fact" sufficient to support a fraud claim).

If the panel's ruling stands, a nonprofit institution's lack of precision or failure to define terms in a statement about how the institution spends donated funds would be enough to sustain a fraud claim. It is unreasonable to demand that higher education institutions such as Amici must ensure that donors fully understand every word in statements about how gifted funds will be used. Colleges and universities make public statements on a variety of topics that might interest donors (e.g., facilities, academic programs, athletics) and in a variety of forums (e.g., websites, brochures, statements at events or gatherings). These institutions cannot be expected to centrally correlate and manage every one of these statements to ensure that there are no ambiguities that donors might misunderstand. Otherwise, donors could point to a mere lack of clarity to avoid summary judgment on their fraud claims, which runs contrary to both law and public policy.

The law already has protections for donors to ensure that donations are used properly, as more fully described in Section II below. These protections allow donors to place restrictions on how their donations may be used and provide legal redress when funds are misused or used in a way contrary to law or the donor's contractual restrictions. The panel's decision, however, would allow a disgruntled donor who, for any number of reasons disagrees with a decision by the college (e.g., the college changes its mascot, introduces or eliminates different academic programs, stops sponsoring a particular sport, takes down a statue, renames a

building or even the entire institution, or adopts policies the donor dislikes) to retroactively search through years of statements to find some that are ambiguous enough, or that do not have exactly the right caveats, and bring a fraud claim for the return of unrestricted donations given a decade or more earlier. The law simply does not countenance such fraud claims.

## II.  A nonprofit college or university's truthful use of reserve funds cannot constitute fraud.

The panel held that a nonprofit could be defrauding donors by committing not to use donations for a project while acknowledging use of "earnings of invested reserve funds" for the same project. *Huntsman*, 76 F.4th at 974–75. That holding is fundamentally wrong and ignores the reality of how nonprofits operate.

Private nonprofit colleges and universities (like most large nonprofits) regularly invest donations that become part of their reserve funds. The commonly used term "reserve fund" or "operating reserve" is standard nomenclature in the nonprofit world and refers to "unrestricted funds set aside from normal operating funds," including those funds that are "set aside from a surplus at the end of a fiscal year, *given from a donor*, or accrued from an operating budget."[11] Nonprofit organizations often rely on their reserve funds as "a safeguard for rainy days," including to respond to "market forces, economic downshifts, natural disasters, or

---

[11] Nonprofit Hub, *Nonprofit Reserve Funds: A Primer*, https://nonprofithub.org/nonprofit-reserve-funds-a-primer/ (emphasis added).

other unexpected expenses," *as well as* to "seize an unexpected opportunity—such as financing a new venture, making an advantageous capital purchase, or expanding a program at an opportune moment."[12] In the nonprofit industry, it is widely known and expected that investing is a key part of building and managing a reserve fund and a best practice for large nonprofit organizations.[13]

It is also standard practice for universities and donors to write into their signed gift agreements the understanding that the interest earned on the original corpus of the gift will be used for the purposes of the gift. However, when no such agreement is put into writing, then no such agreement exists, and interest earned is unrestricted.[14] Common examples of agreeing to restrict interest income include

---

[12] THE HANDBOOK OF NONPROFIT GOVERNANCE, BOARDSOURCE 151 (2010), http://gife.issuelab.org/resources/19261/19261.pdf.

[13] *See generally Maintaining Nonprofit Operating Reserves*, *An Organizational Imperative for Nonprofit Stability*, Nonprofit Operating Reserves Initiative (2008), https://www.nonprofitaccountingbasics.org/sites/default/files/01-OperatingReservesWhitePaper2009.pdf.

[14] *See, e.g.*, Oregon St. Univ., *Interest Earnings*, Fiscal Policy No. 03-150-106 (distinguishing between "unrestricted earned interest" that may be used for any purpose, and funds that are contractually or legally required to retain earned interest), https://fa.oregonstate.edu/fiscal-policy-program/03-150-106-interest-earnings; Univ. Oregon, Business Affairs, Definition of *Endowment Funds* ("The income from the principal may be restricted or unrestricted as designated by the donor or the University."), https://ba.uoregon.edu/financial-statements-definitions; Stanford Univ., Administrative Guide § 4.1.1 ("Absent stipulations of purpose from the donor, gifts will be recorded as unrestricted expendable funds to support University purposes."), https://adminguide.stanford.edu; *id.* § 3.3.2 (providing that investment income will be added to "restricted funds" "only when stipulated by donor requirement," whereas "investment returns on other funds" [known as zero-interest accounts] will not be allocated to the individual fund"); *see also* Boston

scholarships where the interest is awarded to successive students over the years, or faculty chairs, where the income supports the chair but the corpus is preserved. But without specifically providing for the purposes of the interest on the original gift, universities use the proceeds as they think best for other purposes.[15]

These practices are not just industry standards; they are expressly authorized by law, which allows nonprofit institutions to "accumulate" and "invest" their assets (such as reserve funds) "in light of the purpose of the charity." RESTATEMENT OF THE LAW, CHARITABLE NONPROFIT ORGS. § 2.04 (AM. L. INST. 2021). In fact, the Uniform Prudent Management of Institutional Funds Act (UPMIFA) authorizes and establishes requirements to "manage and invest [an institutional] fund in good faith," including diversification and consideration of economic conditions and the needs of the institution. Cal. Prob. Code § 18503(b) & (e). Also, UPMIFA specifically allows "[a]n institution [to] pool two or more institutional funds for purposes of management and investment," and makes clear that "an institution may invest in any kind of property or type of investment

---

Univ., *Managing Restricted Funds: A Guide for Fund Administrators* (noting that "restrictions and designations can be on principal, on income, or both"), https://www.bu.edu/cfo/files/2022/01/Restricted-Fund-Training-06.17.21-Presentation.pdf.

[15] Even where a donor specifies a donation be placed in an endowment, the uniform law provides that this restriction does not apply to earnings from the endowment as they are appropriated for expenditure. "Unless stated otherwise in the gift instrument, the assets in an endowment fund are donor-restricted assets *until appropriated for expenditure by the institution*." Cal. Prob. Code § 18504(a) (emphasis added).

consistent with [UPMIFA]." *Id.* § 18503(d)–(e). Nothing in UPMIFA prevents an institution from using investment income from reserve funds for purposes other than those anticipated by the original donation that was invested. Thus, it is lawful, and even expected, that nonprofits invest donations and pool income as part of reserve funds.

The panel's decision erroneously concluded that, in referencing how donations will be used, a nonprofit's use of undefined terms of art in the industry (e.g., "earnings of invested reserve funds") supports a triable fraud claim. But using standard industry terminology cannot constitute a material misrepresentation, even if those terms are unclear to a donor or consumer. *See Dailey v. Medlock*, 551 F. App'x 841, 847–48 (6th Cir. 2014) (holding that a bank's accurate use of a term of art in a private placement memorandum could not be a material misrepresentation, even if the plaintiff was misled by the term); *State Farm Cnty. Mut. Ins. Co. of Texas v. Moran*, 809 S.W.2d 613, 620–21 (Tex. App. 1991) (holding that an insurer's use of a "term of art within the insurance industry" was not a "misrepresentation," despite the plaintiff's "mistaken belief" about its meaning).

A statement that donations themselves will not be used on a project but earnings from invested reserve funds will be used on the project cannot constitute fraud. First, it is common knowledge that nonprofits invest donations to generate earnings that become part of reserve funds. Second, the earnings from invested

donations are separate and distinct from the donated principal and are generally accounted for as such. Just because a donor claims to have misunderstood (or claims to have been misled by) a statement that donations would not be used on a project, but earnings of invested reserve funds would be used on the project, does not mean that the donor has been defrauded.

If upheld, the panel's ruling would subject private nonprofit colleges and universities to potential fraud claims based even on accurate uses of standard nonprofit terminology. Private nonprofit higher education institutions should not be subject to fraud claims when they make truthful statements about their business decisions to use reserve funds, or to use earnings of invested reserve funds. Lowering the bar for fraud claims in this manner could undermine the ability of private nonprofit institutions to raise and invest the reserve funds necessary to fulfill their missions.

## III. Donors cannot use fraud claims to convert unrestricted gifts to restricted gifts, and donors are not damaged when donations are not used for the alleged restricted purpose.

The panel's ruling, if upheld, would effectively allow donors to use a fraud claim to convert unrestricted gifts into restricted gifts, even if the donors themselves were not damaged because their actual donations were not spent on the alleged restricted purpose. This would significantly lower the standard for proving

fraud in the inducement and would conflict with other laws that govern acquisition and use of charitable gifts.

How nonprofit organizations receive and use gifts is already regulated through other state laws, such as statutes governing the transfer of personal property, Cal. Civ. Code §§ 1127–31 and 1135–48 (2023), and the expenditure and investment of institutional funds, UPMIFA, Cal. Prob. Code §§ 18500–510. In California, "a gift is a transfer of personal property, made voluntarily, and without consideration." Cal. Civ. Code § 1146 (2023). "A gift . . . cannot be revoked by the giver." *Id.* § 1148. "A voluntary gift divests the donor of his property and invests the donee with title irrevocably." *Taylor v. Taylor*, 66 Cal. App. 2d 390, 399 (1944). "To allow conditions to attach after the gift has been completed would effectively allow for the revocation of an unconditional gift, which the law does not permit" and "would put the donee in a position fraught with uncertainty regarding his or her rights to the property received." *Courts v. Annie Penn Mem'l Hosp., Inc.*, 431 S.E.2d 864, 868 (N.C. App. 1993) Thus, unrestricted gifts may not be revoked or restricted after the fact. As one legal expert succinctly explained:

> When an individual makes a donation to charity, she makes a gift. In order to complete the gift, she relinquishes all dominion and control

over the transferred property. That is, she retains no legal right or economic benefit in the transferred property.[16]

In this case, the donor's tithing payments to the Church—made over a period of decades—were indisputably unrestricted. Such a donor cannot later, *ipso facto*, convert these unrestricted gifts into restricted gifts by pointing to midstream statements, which were not made in connection with any solicitation, about how funds would be used.[17] If the law allowed otherwise, a donor would be able to restrict previously unrestricted gifts by simply pointing to statements about how the funds will be spent, which the donor either disagreed with or misunderstood. The law does not allow this.

Even if a donor could restrict donations after the fact, the panel's decision failed to identify any harm to the donor when the institution does not use his donations for the alleged restricted purpose. In doing so, the panel ignored a fundamental element of a fraud claim—namely, damages.

"Deception without resulting loss is not actionable fraud." *Service by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807, 1818 (Ct. App. 1996)). "It is

---

[16] Eric Smith, *Perspective: I teach tax law. This is what I wish reporters understood about church finances,* DESERET NEWS (Sept. 15, 2023), https://www.deseret.com/opinion/2023/9/15/23875139/mormon-lds-church-finances-tax-laws.

[17] *See* RESTATEMENT OF THE LAW, CHARITABLE NONPROFIT ORGANIZATIONS § 4.02 (AM. L. INST. 2021) (RECOGNIZING that restrictions on charitable assets may be established only through (1) the terms of a gift instrument, (2) a solicitation by a charity, or (3) the circumstances surrounding the actual donation of the asset, usually only in combination with (1) and (2)).

axiomatic that to obtain a recovery for fraud, a claimant must prove, inter alia, that damages were sustained as a proximate cause of the fraudulent conduct." *Kruse v. Bank of America*, 202 Cal. App. 3d 38, 60 (Ct. App. 1988); *see also Lesperance v. N. Am. Aviation, Inc.*, 217 Cal. App. 2d 336, 345 (Ct. App. 1963) ("[The plaintiff's] asserted injury or damage must not only be directly alleged but its causal connection with his reliance on defendant's representations must be shown.").

In this case, it is undisputed that the donor's actual tithing dollars—the principal amounts that he paid to the Church—were not spent on the project for which the Church said it would not use tithing funds. The donor failed to point to any statement from the Church (or any reasonable interpretation thereof) that the Church would not invest his tithing donations to make returns above and beyond the principal amount of the donations. Nor did the donor point to any statement suggesting that earnings from investments on his tithing principal would not be used on the project. Rather, the donor simply complains that the Church promised that it would not spend his donations on the project. But the Church did fulfill that promise: the actual money he donated was not spent for the alleged improper or restricted purpose of which he complains. Hence, the donor was not damaged in any way, and his fraud claim fails for lack of damages.

The panel's decision would allow donors to assert fraud claims against a nonprofit institution of higher education without having to establish that they were

actually damaged by the alleged fraudulent statement about how their donations would not be used. For example, if an institution commits not to spend a donor's gift to build an athletic facility, the donor is not damaged when the institution spends other funds (including returns on invested donations) on the facility. If the panel's ruling stands, donors to nonprofit colleges and universities could ostensibly seek a return of donations that were not even spent on any improper or allegedly deceptive purpose. Donors to nonprofit colleges and universities whose money is not spent on the projects that they were allegedly told their money would not be spent on should have no standing to assert a fraud claim. Those donors have not suffered any damages or any other "injury in fact."

## CONCLUSION

Charitable giving is vital to the survival of private nonprofit institutions of higher education. Lowering the bar on fraud claims by donors and former donors could seriously impair the ability of colleges and universities to raise funds and spend those funds to fulfill their institutional missions. Allowing donors and former donors to recover their donations based on disagreement with or misunderstanding of spending statements would disincentive institutions from making basic statements about how donated funds are used and instead would chill those communications. Further, allowing claims to be made over a decade after completed *unrestricted* gifts have been made, as evidenced by the facts in this case, would further destabilize the

ability of nonprofit institutions of higher education to use donated funds for their operations, building projects, and other college and university needs.

For the foregoing reasons, Amici respectfully request that this Court grant Defendant-Appellee's petition for rehearing or rehearing *en banc* and affirm the District Court's grant of summary judgment in favor of Defendant-Appellee.

Date: October 2, 2023

/s/ Steven M. Sandberg
Steven M. Sandberg
David M. Andersen
BRIGHAM YOUNG UNIVERSITY
*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Fed. R.
App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because
this motion was prepared in 14-point Times New Roman, a proportionally spaced
typeface, using the latest version of Microsoft Word. *See* Fed. R. App. P. 29(a)(4),
(b)(4), 32(g)(1). This brief complies with the type-volume limitation of Ninth Circuit
Rule 29-2(c)(2) because it contains 4,196 words (according to Microsoft Word),
excluding the parts exempted under Fed. R. App. P. 32(f).

    Dated: October 2, 2023        /s/ David M. Andersen

                                          David M. Andersen

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 2, 2023        /s/ David M. Andersen
                                     David M. Andersen