No. 21-56056

---

In the United States Court of Appeals
for The Ninth Circuit

---

JAMES HUNTSMAN,

*Plaintiff-Appellant,*

v.

CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS,

*Defendant-Appellee,*

and

DOES, 1-10,

*Defendants.*

---

Appeal from the United States District Court
for the Central District of California
Honorable Steven V. Wilson
(2:21-cv-02504-SVX-SK)

---

**BRIEF *AMICI CURIAE* OF
TEN MAJOR RELIGIOUS ORGANIZATIONS
IN SUPPORT OF REHEARING OR REHEARING EN BANC**

---

JAMES C. PHILLIPS
CHAPMAN UNIVERSITY
DALE E. FOWLER SCHOOL OF LAW
1 University Drive
Orange, CA 92866

GENE C. SCHAERR
  *Counsel of Record*
SCHAERR | JAFFE LLP
1717 K St. NW, Suite 900
Washington, DC 20006
(202) 787-1060
*gschaerr@schaerr-jaffe.com*

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

*Amici* have no parent corporations. They have no stock, and

therefore no publicly held company owns 10% or more of their stock.

Dated: October 2, 2023

/s/ *Gene C. Schaerr*
Gene C. Schaerr
*Attorney for* Amici Curiae

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT................................................i

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION AND INTEREST OF *AMICI* ........................................1

ARGUMENT ........................................................................................3

    I.    The Majority's Erroneous Decision Threatens All Religious Denominations.............................................................3

        A.    The decision's logic is not unique to any particular religion. ......................................................................5

        B.    Under the decision, religious organizations throughout the Ninth Circuit now risk a deluge of dubious lawsuits over their use of donated funds..............6

    II.    By Wading Into a Religious Doctrinal Dispute and Authorizing a Jury or Judge to Do the Same, the Majority Violated the First Amendment. ...................................................7

    III.    Courts Cannot Avoid First Amendment Constraints By Redefining As "Secular" A Matter That A Church Reasonably Understands As a Matter of Religious Doctrine. ....................................................................... 16

CONCLUSION....................................................................................19

APPENDIX ........................................................................................21

CERTIFICATE OF COMPLIANCE.......................................................23

CERTIFICATE OF SERVICE...............................................................24

# TABLE OF AUTHORITIES

## Cases

*Callahan v. Woods*, 658 F.2d 679 (9th Cir. 1981) ................................... 13

*Cath. League for Religious & C.R. v. City & Cnty. of San Francisco*, 567 F.3d 595 (9th Cir. 2009) ........................................... 8, 13

*Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints,* 551 F. Supp. 3d 1206 (D. Utah 2021) .............................. 16

*Gen. Council on Fin. & Admin. of the United Methodist Church v. Superior Ct. of Cal., Cnty. of San Diego*, 439 U.S. 1355 (1978) ...... 16

*Hernandez v. Comm'r*, 490 U.S. 680 (1989) ............................................. 11

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012) ....................................................................... 17

*Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 76 F.4th 962 (9th Cir. 2023) .......... *passim*

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952) ....................................................... 17, 18

*Maryland & Va. Churches of God v. Church at Sharpsburg*, 396 U.S. 367 (1970) ......................................................................... 8

*Morrison v. Garraghty*, 239 F.3d 648 (4th Cir. 2001) .............................. 9

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020) .............................................................. 8, 11, 17

*Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440 (1969) ....... 8, 9, 17

*Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976) .................................................................. 8, 9, 10

*Thomas v. Review Bd.*, 450 U.S. 707 (1981) ...................................... 13, 14

*United States v. Ballard*, 322 U.S. 78 (1944) ........................................ 19

*United States v. Lee*, 455 U.S. 252 (1982)........................................ 13, 14

*Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014) ............................ 11

**Other Authorities**

Ezra Taft Benson,
   *Fourteen Fundamentals in Following the Prophet* (1981).................. 12

Deuteronomy................................................................................... 1

Doctrine & Covenants ................................................................. 12

Tzvi Freeman & Yehuda Shurpin,
   "Moneylending and Jewish Law," Chabad.org .................................. 19

Genesis ........................................................................................... 1

*Journal of Discourses* ................................................................. 12

Malachi........................................................................................... 1

Numbers......................................................................................... 1

*Teachings of the Living Prophets* ............................................... 12

## INTRODUCTION AND INTEREST OF *AMICI*[1]

This is a case about the meaning of a religious term: tithing. The Judeo-Christian practice of paying tithes is at least four millennia old. *See* Genesis 14:20; Numbers 18:21–28; Deuteronomy 14:23, 28. Today, millions of Jews and Christians alike try to heed the words in the Book of Malachi to "[b]ring ye all the tithes into the storehouse." Malachi 3:10 (KJV).

But despite being long- and widely practiced, there is hardly a religious consensus on tithing. Is it required or just recommended? Is it 10% of one's income or any amount? If the former, is it calculated on gross or net income, or some other measure. Is it still called tithing after receipt by the religious organization? And if so, does tithing refer just to the original donation, or does it also include any interest or return that may have accrued on the donation after it was transferred? Both across faiths and within faiths, there are a host of opinions on these issues. Yet somehow the panel majority deemed a district judge or jury to possess

---

[1] All parties consent to this *amicus* brief's filing. No party's counsel authored any part of this brief. No party or party's counsel, or person other than *amici*, contributed money to the brief's preparation or submission.

sufficient theological prowess to answer the last of these questions, which is the religious dispute at the heart of this case. In so doing, however, the panel ran through the guardrail of the First Amendment— a collision the majority's decision cannot survive.

Indeed, the panel's decision runs afoul of that Amendment in at least three ways: First, it authorizes a jury or judge to decide what amounts to an intra-church dispute between the top leader and employees of The Church of Jesus Christ of Latter-day Saints over the meaning of tithing. Second, and perhaps alternatively (it's not clear), the decision authorizes a government decisionmaker to determine which of two possible religious meanings of tithing Church leaders were invoking when they made the statements challenged by Huntsman. And third, the decision allows a jury to interpret the Church's scripture. In all three respects, the decision gravely offends the First Amendment.

*Amici* (each described in the Appendix) collectively represent approximately 24 million Americans, and they are deeply troubled by the panel's constitutional violation. That is not because *amici* are in theological agreement with the Church about tithing. Their concern, rather, is that if the panel's decision stands, no religious organization

2

within the Ninth Circuit—the nation's largest circuit, both geographically and demographically—will be safe from judicial or jury intrusion into internal religious issues. *Amici* therefore urge the Court to grant review and reverse this dangerous and erroneous decision.

## ARGUMENT

### I. The Majority's Erroneous Decision Threatens All Religious Denominations.

To understand the threat the panel's decision poses to religious denominations of all stripes, it first helps to see exactly what the panel did. Because the parties describe this in great detail, just a few highlights will suffice. The panel concluded that a reasonable jury could determine that the Church made misleading comments regarding its use of tithing funds for the following reasons. First, the panel majority cited "four unqualified statements by church officials and in church publications that tithing funds were not used to finance the City Creek Mall project." *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 76 F.4th 962, 975 (9th Cir. 2023). Second, the majority observed that the Church's highest leader, President Hinckley—the ultimate authoritative voice in the Church—stated that "tithing funds have not and will not be used to acquire this property.

Funds for this have come and will come from those commercial entities owned by the Church[,] … together with the earnings of invested reserve funds." *Id*. at 969. Despite President Hinckley's clearly referencing "tithing funds" as *not* including "earnings of invested reserve funds," the majority determined that "he failed to tell his listeners that, as he was using the terms, 'reserve funds' were 'tithing funds.'" *Id*. at 975. Third, the panel concluded that "under" "common usage in the Church," "'tithing funds' includes both tithing principal and earnings on tithing principal." *Id*. How did the majority determine this "common usage"? The only evidence cited was usage by some *employees* in a single Church-directed entity that only handled financial matters. Fourth, the majority relied on a statement by a former employee that his director alleged that money had been transferred "in order to conceal the source of the funds used to develop the [mall]." *Id*. at 975-76. Finally, the majority determined that the questions it faced were "secular." *Id*. at 969. Yet the question it faced was the meaning of a religious term. And if that is "secular," then nothing is sacred.

It is not difficult to see why the panel's analysis poses an enormous threat to *amici* and, indeed, virtually all religious organizations operating in this Circuit.

## A.   The decision's logic is not unique to any particular religion.

One obvious concern is that there is nothing about the panel majority's treatment of the dispute over the meaning of "tithing" that would cabin that logic to cases involving The Church of Jesus Christ of Latter-day Saints, or even just Christian organizations, or even just the meaning of tithing. If a court can reframe an inquiry into the meaning of a religious term, as indicated by a church's highest ecclesiastical leader, as purely "secular" in nature, then there is no sacred ground left under the First Amendment for religious organizations. Under the panel's logic, every religious dispute can be recharacterized as secular, gutting constitutional protections for religious entities and societies. For example, Catholic teaching that the bread and wine consumed during Mass have been transformed into the body and blood of Christ could be considered a secular question, with the Catholic Church's liability for making that claim determined by scientists. Or religious claims by Muslims about events in the life of

Mohammed could be investigated by historians and liability imposed depending on their findings.

This game of transforming the sacred into the secular has no limiting principle. It seems to be cabined only by judicial imagination. Hence, the panel's logic, if left to stand, will create a general threat to religious groups operating in the Ninth Circuit that their internal religious matters will be dragged through courts for judges or juries to decide—with liability determining by their supposedly "secular" findings.

**B.    Under the decision, religious organizations throughout the Ninth Circuit now risk a deluge of dubious lawsuits over their use of donated funds.**

But that broad threat is not the only one: Any time a religious organization, via one of its leaders—even its highest leader—or via an official publication, says something about the religious status and use of donated funds that can be contradicted by an allegation from a disgruntled, former employee or member, a jury or judge (under the panel's reasoning) will now get to decide which party has the better theological understanding. This means, thanks to the *Huntsman* decision, that former members will likely spring up everywhere to sue

over some comment made at some time about some use of funds that the member donated *generally* to his or her religious organization. And, instead of being dismissed out of the gate under the ecclesiastical abstention/church autonomy doctrine, courts will be bound by the *Huntsman* decision to let a jury decide. While that is perhaps an attractive outcome for plaintiffs' lawyers, it will also breed constitutional chaos.

## II. By Wading Into a Religious Doctrinal Dispute and Authorizing a Jury or Judge to Do the Same, the Majority Violated the First Amendment.

To be sure, the panel majority claimed that "[i]n the case before us, we are not *required* to rely on or interpret the Church's religious teachings to determine if it misrepresented how it was using tithing funds." *Huntsman*, 76 F.4th at 968-69. Exactly. Yet that, in fact, is what the majority did and, in so doing, it both violated the Church's First Amendment rights and created an enormous threat to the First Amendment rights of every other religious organization.

As this Court has often observed, that Amendment "prohibits government from intervening in a religious dispute." *Cath. League for Religious & C.R. v. City & Cnty. of San Francisco*, 567 F.3d 595, 608 (9th

Cir. 2009), *on reh'g en banc*, 624 F.3d 1043 (9th Cir. 2010). Likewise, as the Supreme Court has declared, "[t]he First Amendment protects the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) (internal quotation marks omitted). This means that "civil courts exercise no jurisdiction" over "a matter which concerns theological controversy." *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713-14 (1976). *Accord Maryland & Va. Churches of God v. Church at Sharpsburg*, 396 U.S. 367, 368 (1970) (per curiam) (holding that courts cannot adjudicate doctrinal disputes).

This constitutional rule avoids the "substantial danger that the State will become entangled in essentially religious controversies," *Serbian Eastern Orthodox Diocese*, 426 U.S. at 709, and the "hazards … ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern," *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). That is why the First Amendment leaves "civil courts no role to play in reviewing

ecclesiastical decisions." *Serbian Eastern Orthodox Diocese*, 426 U.S. at 713.

As summarized previously, the majority's decision violated these constitutional commands in three distinct ways. First, the panel purported to resolve a dispute between the highest Church leaders and a few Church employees over the meaning of "tithing" and "tithing funds." Church leaders, especially the president of the Church, used the term to exclude earnings based on tithing principal and to encompass only the principal itself. *See Huntsman*, 76 F.4th at 969, 975. Yet a small group of Church employees who work for a particular money-management entity of the Church's use the term to refer to both tithing principal *and* earnings on donations already received. *See id.* at 975. The panel, by determining that a judge or jury can decide this theological dispute, committed the "error of intrusion into a religious thicket." *Serbian Eastern Orthodox Diocese,* 426 U.S. at 719. That is because the First Amendment "forbids" courts from "determin[ing] matters at the very core of a religion—the interpretation of particular church doctrines." *See, e.g., Presbyterian Church,* 393 at 450. *See also Morrison v. Garraghty*, 239 F.3d 648, 659 (4th Cir. 2001) ("Differing beliefs and

9

practices are not uncommon among followers of a particular creed, and it is not within the judicial function and judicial competence to inquire whether the petitioner or another practitioner more correctly perceives the commands of their common faith.") (internal quotation marks and citations omitted).

Second, the majority purported to resolve—or set in process a motion for resolving—a fight over which of two meanings of tithing were invoked by the Church's president. There is a narrower, ordinary sense, which only covers tithing principal, and a broader, technical financial sense, which covers both principal and earnings. At different times Church leaders and employees use one or the other sense. The panel majority authorized a judge or jury to decide which sense church leaders were using when they said no tithing would be spent on the mall project. But that too is a theological inquiry that neither court nor jury is authorized to make: It "is exactly the inquiry that the First Amendment prohibits," and "recogni[zing] . . . an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry." *Serbian Eastern Orthodox Diocese,* 426 U.S. at 713.

Besides a lack of authority, there is a lack of expertise. As then-Judge Gorsuch observed, "judges [and juries] are hardly fit arbiters of the world's religions." *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014). To attempt to be such "would risk in the attempt … many mistakes[,] … given our lack of any comparative expertise when it comes to religious teachings, perhaps especially the teachings of less familiar religions." *Id. See also Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question … the validity of particular litigants' interpretations of [a faith's] creeds."). Likewise, no jury is competent—even a jury of 12 Church members—to determine that the Church's President was mistaken in using one sense of a religious term over another in speaking to the faithful. And, even if a judge or jury were somehow competent to engage in such theological linguistics, "[t]he First Amendment outlaws such intrusion." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060.

Third, the panel engaged in scriptural interpretation, whether directly or indirectly. As to the latter, as noted by the majority, tithing is defined in Church scripture. *See Huntsman*, 76 F.4th at 974 (citing Doctrine & Covenants 119). By finding that the term tithing was

11

ambiguous and therefore allowing a judge or jury to determine whether that scripturally defined religious term encompasses earnings on previously donated tithing funds, as well as sufficiently interpreting the scriptural term to decide (or have the district court decide) whether the question should go to a jury, the panel has engaged in scriptural interpretation. After all, at some level one has to *interpret* scripture before one can determine it to be ambiguous or silent on the question at hand.

In addition, as described above, the panel engaged in directly interpreting the words of the Church's president and prophet. *See id*. at 975. In the Church's teachings, the words of the Church's president are scripture when he is speaking for God.[2] Thus, in the panel decision,

---

[2] *See* Doctrine & Covenants 21:5 ("For his [the Church president's] word ye shall receive, as if from mine [the Lord's] own mouth, in all patience and faith."); *Teachings of the Living Prophets*, Chapter 2 ("In addition to interpreting and reaffirming existing scripture, a prophet acts as the agent through whom the Lord can give new scripture, according to the needs of the people. Speaking under the direction of the Holy Ghost, the living prophet's words take precedence over other statements on the same issue."), available at https://www.churchofjesuschrist.org/study/manual/teachings-of-the-living-prophets-student-manual/chapter-2?lang=eng; Ezra Taft Benson, *Fourteen Fundamentals*

federal judges interpreted the scriptural words of the highest leader of a religious organization, who was in turn implicitly interpreting other scripture.

This double scriptural interpretation offends the Constitution twice over. As the Ninth Circuit has made clear, "courts 'are not arbiters of scriptural interpretation.'" *Cath. League for Religious & C.R.*, 567 F.3d at 608 (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 716 (1981)). *Accord Callahan v. Woods*, 658 F.2d 679, 686 (9th Cir. 1981) (noting the constitutionally required "abstention from evaluating the merits of a scriptural interpretation"). Under the Supreme Court's interpretation of the First Amendment, "[i]t is not within 'the judicial function and judicial competence,' … to determine whether [defendant] or the [plaintiff] has the proper interpretation of the [Latter-day Saint] faith." *United States v. Lee*, 455 U.S. 252, 257 (1982) (quoting *Thomas*, 450 U.S. at 716).

---

*in Following the Prophet* (1981) (teaching by late Church president that "[t]he prophet does not have to say 'Thus saith the Lord' to give us scripture."), available at https://speeches.byu.edu/talks/ezra-taft-benson/fourteen-fundamentals-following-prophet/; Brigham Young, *Journal of Discourses*, 13:95 (statement by early Church president that "I have never yet preached a sermon and sent it out to the children of men, that they may not call scripture.").

So, for example, when the federal government "contend[ed] that payment of social security taxes will not threaten the integrity of the Amish religious belief or observance," the U.S. Supreme Court refused to countenance that argument. Rather, it determined that under the First Amendment "[i]t is not within the judicial function and judicial competence, … to determine whether appellee or the Government has the proper interpretation of the Amish faith; courts are not arbiters of scriptural interpretation." *Lee*, 455 U.S. at 257 (cleaned up).

And, in a case involving a Jehovah Witness seeking unemployment compensation after being fired for refusing to make tanks for religious reasons, a state court "appear[ed] to have given significant weight to the fact that another Jehovah's Witness had no scruples about working on tank turrets; for that other Witness, at least, such work was 'scripturally' acceptable." *Thomas*, 450 U.S. at 715. But the Supreme Court concluded that "the judicial process is singularly ill equipped to resolve [interfaith] differences." *Id*. And so the Court reversed the state court, *id*. at 720, because "in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow

worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation," *id*. at 716.

So too here. Neither the Court itself, nor a jury under the Court's blessing, may interpret the scriptural term "tithing" or the clarification given it by the Church's highest leader, countenancing one reading over another, without crossing constitutional bounds set by the First Amendment. Even if the Church president's sermon might be deemed by a secular court as failing to adequately clarify whether interest or other returns earned on donated funds is itself "tithing," this remains a doctrinal matter beyond judicial cognizance.

For all these reasons, the First Amendment requires dismissal of the fraud claims here because they cannot be decided without making theological determinations judges and juries have no authority to make. And allowing those claims to proceed is a threat to the First Amendment rights of every religious organization operating in this Circuit.

### III. Courts Cannot Avoid First Amendment Constraints By Redefining As "Secular" A Matter That A Church Reasonably Understands As a Matter of Religious Doctrine.

To avoid these constitutional pitfalls, the majority attempted to redefine this case as only involving a "secular" dispute. *See Huntsman*, 76 F.4th at 969 ("[A]s presented to us, the questions are secular. … A court or jury can answer these questions based on secular evidence and analysis."). For authority, the majority relied on a one-justice denial of a temporary stay, *see Gen. Council on Fin. & Admin. of the United Methodist Church v. Superior Ct. of Cal., Cnty. of San Diego*, 439 U.S. 1355, 1373 (1978) (Rehnquist, J., in chambers), and a district court opinion in another circuit, *see Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints,* 551 F. Supp. 3d 1206, 1211, 1215 (D. Utah 2021). In stretching for such weak authority, the panel overlooked the case law summarized above.

And, in attempting to redefine a theological dispute as a secular one, the panel misunderstood the very type of inquiry in which it engaged: interpreting the words of the Church's highest spiritual leader who was, in turn, providing a doctrinal interpretation of religious term

based on Church scripture and his theological understanding. It is hard to see an issue that is *less* secular than that.

Just because there may be secular aspects to a religious dispute, that does not open the door to turning the dispute into a secular one for courts or juries to resolve. The Supreme Court has warned of such sleight of hand, describing the "hazards . . . ever present of … implicating secular interests in matters of purely ecclesiastical concern." *Presbyterian Church*, 393 at 449.

That is why the Supreme Court has consistently refused to allow courts to hide theological elephants in secular mouseholes. For example, the Americans with Disabilities Act is as secular a statute as they come. Yet the Court has held that disputes between ministerial employees and their religious employers over whether the latter violated the ADA are not appropriately resolved under the First Amendment. *See generally Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020).

Or consider the property dispute in *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952).

Property disputes are perhaps usually secular in nature, but not when there is a dispute between two religious factions. And the Supreme Court has declared that, "[e]ven in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls. This under our Constitution necessarily follows in order that there may be free exercise of religion." *Id*. at 120-21.

Here, the Church, through its highest leader, declared that "tithing funds" and "reserve funds" were not the same, and that the former were not being used on the mall project. The Constitution prohibits any further inquiry, even if there are secular dimensions to the case, because the ultimate inquiry is a theological one.

Nor does the fact that some of the other terms at issue connected to "tithing"—such as "income" or "reserve funds"—carry both secular and religious meaning provide a backdoor to a court or jury to secularize this theological dispute. Consider for example another term, "interest," which has an obvious secular meaning. And yet in some faiths it also has a religious meaning—in Judaism, for example, it is forbidden to take "interest," or *ribit*. *See, e.g.,* Tzvi Freeman & Yehuda Shurpin,

"Moneylending and Jewish Law," Chabad.org.[3]  A court cannot simply look to the secular definition to understand the meaning of "interest" in Judaism.

In short, the panel's attempt to hide its religious analysis behind the label "secular" cannot and does not save its analysis from constitutional condemnation.

## CONCLUSION

Because the panel majority required that "the truth or veracity of [the Church's] religious doctrine or beliefs [on tithing be submitted] to a jury," the panel violated the First Amendment. *United States v. Ballard*, 322 U.S. 78, 86 (1944). For multiple reasons, that ruling poses an enormous threat to religious organizations operating throughout this Circuit.  The Court should therefore grant the petition and reverse.

---

[3] Available at https://tinyurl.com/2p9fnwhj.

Respectfully submitted,

/s/ Gene C. Schaerr

JAMES C. PHILLIPS             GENE C. SCHAERR
CHAPMAN UNIVERSITY[4]            Counsel of Record
FOWLER SCHOOL OF LAW        SCHAERR | JAFFE LLP
1 University Drive           1717 K St. NW, Suite 900
Orange, CA 92866             Washington, DC 20006
                             (202) 787-1060
                             gschaerr@schaerr-jaffe.com

October 2, 2023

---

[4] Institutional affiliation is provided for identification purposes only and does not indicate an institutional endorsement of the positions taken in this brief.

# APPENDIX

**Agudath Israel of America** ("Agudath Israel") is a 100-year-old nonprofit Orthodox Jewish umbrella organization. Headquartered in New York City, Agudath Israel serves over 30 states with its network of regional and state offices (including in California), affiliated synagogues, summer camps, special education, youth services, and religious study programs across the country.

**The Christian and Missionary Alliance** is a U.S. evangelical Christian denomination with approximately 400,000 participants, approximately 2,000 churches, three colleges, a seminary, three retirement communities, and over 20 camps.

**The Ethics and Religious Liberty Commission** ("ERLC") is the moral concerns and public policy entity of the Southern Baptist Convention ("SBC"), the nation's largest Protestant denomination, with over 13 million members in roughly 50,000 churches and congregations. The ERLC is charged by the SBC with addressing such issues as religious liberty, marriage and family, the sanctity of human life, and ethics. The **California Southern Baptist Convention** is a state convention entity in partnership with the SBC; it has over 2,200 affiliated churches in that state, and it shares the values of the ERLC and other Southern Baptists.

**The General Conference of Seventh-day Adventists** is the national administrative body for the Seventh-day Adventist Church, a Protestant Christian denomination with more than 22 million members.

**The General Council on Finance and Administration of The United Methodist Church**, ("GCFA") an Illinois corporation, is the financial and administrative arm of The United Methodist Church ("UMC"). The UMC is a worldwide religious denomination with approximately thirteen million members. Through its various agencies, The UMC performs mission work in over 165 countries. The UMC is one of the largest religious denominations in the United States. It has approximately 26,000 local churches and over six million members in the United States.

**International Church of the Foursquare Gospel** seeks to declare the unchanging ministry of Jesus Christ worldwide. To that end, the Foursquare Church has congregations in nearly 150 countries, totaling approximately eight million global members. Foursquare Gospel is a California nonprofit religious corporation.

**The Jewish Coalition for Religious Liberty** ("JCRL") is an incorporated group of rabbis, lawyers, and professionals who practice Judaism and are committed to defending religious liberty.

**The Lutheran Church—Missouri Synod** (Synod) is a national Lutheran denomination headquartered in St. Louis, Missouri. It has around 6,000 member congregations and nearly 2 million baptized members. Additionally, the Synod has numerous Synod-wide related entities and universities, two seminaries, the largest Protestant parochial school system in America, and hundreds of recognized service organizations operating all manner of charitable nonprofit corporations throughout the country. This includes two district offices and a university in California.

**The Union of Orthodox Jewish Congregations of America** (Orthodox Union) is the nation's largest Orthodox Jewish synagogue organization, representing nearly 1,000 congregations as well as more than 400 Jewish non-public K-12 schools across the nation.

22

## CERTIFICATE OF COMPLIANCE

I hereby certify that this *amicus* brief complies with Cir. R. 29-2(c)(2), as it contains 4,156 words, including the Appendix, but excluding the portions exempted by Fed. R. App. P. 32(f). The brief's typesize and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

Dated: October 2, 2023                */s/ Gene C. Schaerr*
                                                Gene C. Schaerr
                                                *Attorney for* Amici Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of October, 2023, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the Court's CM/ECF system. I further certify that service was accomplished on all parties via the Court's CM/ECF system.

Dated: October 2, 2023
    /s/ *Gene C. Schaerr*
    Gene C. Schaerr
    *Attorney for* Amici Curiae