No. 21-56056

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

JAMES HUNTSMAN,

*Plaintiff-Appellant*,

v.

CORPORATION OF THE PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY SAINTS,

*Defendant-Appellee.*

On Appeal from a Final Judgment of the
United States District Court for the Central District of California
Case No. 2:21-cv-2504, Hon. Stephen V. Wilson

**APPELLANT'S RESPONSE IN OPPOSITION
TO REHEARING OR REHEARING EN BANC**

DAVID B. JONELIS
Lavely & Singer, P.C.
2049 Century Park East,
 Ste. 2400
Los Angeles, CA 90067
(310) 556-3501
*djonelis@lavelysinger.com*

BRADLEY GIRARD
JENNY SAMUELS
Americans United for Separation
 of Church and State
1310 L St. NW, Ste. 200
Washington, DC 20005
(202) 466-3234
*girard@au.org*

*Counsel for Appellant*

# TABLE OF CONTENTS

Table of Authorities...........................................................................ii

Introduction ................................................................................... 1

Statement.........................................................................................3

I.   Factual Background ................................................................3

II.  Procedural Background.........................................................5

Argument .........................................................................................9

I.   The panel decision is consistent with controlling precedent on the ecclesiastical-abstention doctrine. ...................................9

II.  The panel did not decide questions of exceptional importance. ..........15

Conclusion.......................................................................................18

Certificate of Service .....................................................................

Certificate of Compliance..............................................................

i

# TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*Bollard v. Cal. Province of the Soc'y of Jesus*,
196 F.3d 940 (9th Cir. 1999) ...................................................................10

*Friedman v. Medjet Assistance, LLC*,
No. 09-cv-7585, 2010 WL 11462853 (C.D. Cal. Nov. 1, 2010) ................11

*Gen. Council on Fin. & Admin. of the United Methodist Church
v. Superior Ct.*,
439 U.S. 1355 (1978) ...............................................................................16

*Hoffman v. 162 N. Wolfe LLC*,
228 Cal.App.4th 1178 (Cal. Ct. App. 2014) ........................................12, 13

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) .................................................................................15

*Kwikset Corp. v. Superior Ct.*,
246 P.3d 877 (Cal. 2011) ..........................................................................13

*Libhart v. Copeland*,
949 S.W.2d 783 (Tex. App. 1997) .............................................................14

*Maffei v. Roman Cath. Archbishop of Bos.*,
867 N.E.2d 300 (Mass. 2007) ...................................................................14

*Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*,
179 F.3d 1244 (9th Cir. 1999) ..................................................................10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S.Ct. 2049 (2020) ..............................................................................15

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull
Mem'l Presbyterian Church*,
393 U.S. 440 (1969) .................................................................................10

*Puri v. Khalsa*,
844 F.3d 1152 (9th Cir. 2017) ..................................................................10

*Schmidt v. Cath. Diocese of Biloxi*,
18 So.3d 814 (Miss. 2009) ........................................................................14

## TABLE OF AUTHORITIES—continued

*Serbian E. Orthodox Diocese v. Milivojevich,*
426 U.S. 696 (1976) ........................................................................14

*United States v. Annamalai,*
939 F.3d 1216 (11th Cir. 2019) ...................................................14

*United States v. Cooley,*
947 F.3d 1215 (9th Cir. 2020) .....................................................15

*United States v. Rasheed,*
663 F.2d 843 (9th Cir. 1981) .................................................14, 15

*United States v. Wylie,*
625 F.2d 1371 (9th Cir. 1980) .......................................................9

**Rules & Other Authorities**

Fed. R. App. P. 35(a) .........................................................................9

Restatement (Second) of Torts § 527 (1977) ...............................11

*PTL Fund Raising a Tangled Saga*, Wash. Post (May 23,
1987), https://tinyurl.com/bdzk3paa............................................17

## INTRODUCTION

James Huntsman has consistently maintained that his claim against the Church of Jesus Christ of Latter-Day Saints is about fraud, not faith. And every judge to consider this case—the district court, the panel majority, and the dissent—has agreed that this case presents a secular dispute that does not require interpretation of Church doctrine.

The facts are simple: Huntsman would never have given millions of dollars to the Church had the Church honestly disclosed that the money would fund purely for-profit businesses like the $1.4 billion City Creek Mall. Rather, Huntsman gave money because the Church made repeated, explicit, public misrepresentations that "not one penny of tithing" went to City Creek. The Church assured its congregants that the mall was being developed by "the Church's real-estate development arm, and its money comes from other real-estate ventures." Huntsman heard and relied on these repeated assurances. But when an employee of the Church's investment arm filed an IRS whistleblower complaint, Huntsman discovered that the Church had indeed financed City Creek with tithing funds and concealed that fact from its members.

Huntsman privately sought to resolve the issue with the Church. When the Church rebuffed him, he sued for fraud. The panel held that a reasonable jury could conclude that the Church deliberately misled Huntsman and that he reasonably relied on the repeated statements that his money would not be used for City Creek. And because there was no need

1

to resolve any questions of Church doctrine, the First Amendment did not bar Huntsman's suit. That narrow, unremarkable conclusion aligns with the longstanding rule that a religious institution's right to control religious doctrine does not allow it to defraud its members.

The Church now demands the extraordinary procedure of rehearing to challenge that fact-specific conclusion. But the Church does not identify any conflict with ecclesiastical-abstention precedent—instead it stretches quotations from ministerial-exception cases to concoct a split. And the Church argues that this case is exceptionally important by spinning it as something that it is not: a case about who gets to decide how a church spends its money and who gets to define religious terms.

Those questions are not relevant in this case. The First Amendment guarantees that the Church generally can spend its money how it wants. And the First Amendment gives the Church the unfettered right to define religious terms. What the First Amendment does not do, however, is give carte blanche to the Church to induce its members to donate by explicitly promising one thing and then secretly doing the opposite. *That* is the extent of the panel's holding. The decision was correct. And this Court should not waste its time and resources to revisit it.

## STATEMENT

## I. Factual Background

James Huntsman made annual tithing payments to the Church from 1993 until 2015. 3-ER-335. In contributing what ultimately added up to millions of dollars, Huntsman relied on the Church's representations that tithing would be used only for noncommercial purposes; he would not have tithed had he known that the money would go to for-profit enterprises. 2-ER-44-45.

In 2003, the Church announced a project to redevelop the City Creek Mall in Salt Lake City. 3-ER-314-15. On five occasions, the Church publicly stated that tithing funds would not be used to finance the project.

First, in April 2003, Church President Gordon B. Hinckley stated:

> I wish to give the entire Church the assurance that tithing funds have not and will not be used to acquire this property. Nor will they be used in developing it for commercial purposes.
>
> Funds for this have come and will come from those commercial entities owned by the Church. These resources, together with the earnings of invested reserve funds, will accommodate this program.

2-ER-250.

Second, on October 8, 2003, at a press conference about City Creek, Presiding Bishop H. David Burton stated that "[n]one of this money comes from the tithing of our faithful members. That is not how we use tithing funds." 3-ER-369.

3

Third, in December 2006, the Church's official magazine promised that "[n]o tithing funds will be used in the redevelopment" of the City Creek Mall. 3-ER-373.

Fourth, a March 2007 article published in the Church-owned newspaper, *Deseret News*, stated: "Money for the project is not coming from LDS Church members' tithing donations." 3-ER-523. Indeed, the article went further and defined the *non*tithing funds that would be used: "City Creek Center is being developed by Property Reserve Inc., the Church's real-estate development arm, and its money comes from other real-estate ventures." 3-ER-523.

Fifth, in 2012, Keith B. McMullin (the head of a Church-affiliated commercial entity) told *The Salt Lake Tribune* that "not one penny of tithing goes to the church's for-profit endeavors," specifying that "no tithing went toward City Creek Center." 3-ER-378.

Huntsman was aware of all five of these statements, and he relied on them in continuing to make tithing payments. 2-ER-44.

Despite its repeated assurances, the Church was in fact using tithing money to fund the City Creek Mall. This information was made public by David Nielsen, who worked for the Church's investment arm, Ensign Peak Advisors, from 2010 until 2019. 2-ER-80. According to Nielsen, Ensign Peak's senior leadership and other employees referred to all of Ensign Peak's funds "as 'tithing' money, regardless of whether they were referring to principal or earnings on that principal." 2-ER-80. And, during Nielsen's

4

time at the company, "tithing donations from the Church's members were commingled with" Ensign Peak's other earnings. 2-ER-80.

Over a five-year period, the Church committee tasked with administering Ensign Peak's funds approved Ensign Peak's withdrawal of approximately $1.4 billion in tithing funds to pay for City Creek. 2-ER-80-81, 2-ER-85. When Nielsen confronted Ensign Peak's President, Roger Clarke, about the inconsistency between the Church's public statements and how it was actually using tithing funds, Clarke explained that Ensign Peak funneled the money for City Creek through two other Church-affiliated entities to hide the source of the funding from the public. 2-ER-81. Clarke also stated that it was important that people should not know Ensign Peak's role as the source of the funds. 2-ER-82.

Huntsman learned of Nielsen's whistleblower complaint in 2019 and realized that the Church had deceived him about where his donations had gone. 2-ER-45. He sought to resolve the issue privately with the Church, but the Church refused. 2-ER-51-78. So Huntsman sued for fraud. 2-ER-252-64.

## II. Procedural Background

Just three months after Huntsman filed his complaint, the district court allowed the Church to forgo the typical discovery process and file an expedited summary-judgment motion. 2-ER-29-30. The briefing schedule did not allow for any discovery, except that, at the Church's request, the court ordered Huntsman to sit for an expedited deposition. 2-ER-26-29. The

court gave the Church six weeks to file its motion but gave Huntsman just one week to respond. 2-ER-30.

The district court granted summary judgment in favor of the Church. 1-ER-2. But in doing so, the court rejected the Church's argument that Huntsman's fraud claim was barred by the First Amendment under the church-autonomy doctrine (also referred to as "ecclesiastical abstention"). 1-ER-6. As the court explained, the central question of the case—whether the Church spent tithing funds on the City Creek Mall project—is a "purely secular" one, the resolution of which involves "no analysis of church policy or doctrines." 1-ER-6.

Turning to the merits, the district court ruled that Huntsman could not prevail on his fraud claim because he could not prove any material misstatement. 2-ER-7. In the court's view, when Hinckley said in 2003 that "tithing funds have not and will not be used to" finance the City Creek project, it was not a misrepresentation because Hinckley also stated that "the earnings of invested reserve funds" would be used. 2-ER-7-8. And according to the district court, the phrase "earnings of invested reserve funds" apparently meant "earnings of invested *tithing* funds" because of two statements that Hinckley made in the 1990s. 2-ER-8. In 1991, Hinckley announced that a "fixed percentage" of the Church's "income" would be "set aside to build reserves" for a "rainy day." 2-ER-237. And in 1995, Hinckley announced that "each year we put into the reserves of the Church a portion of our annual budget" so that, "[s]hould there come a time of economic

6

distress, we . . . have the means to weather the storm." 2-ER-246. Neither of the statements defined "reserve funds" or "tithing funds." Yet according to the court, the 1991 and 1995 statements clarified Hinckley's 2003 promise (even though Hinckley did not reference either statement in his 2003 speech and there is no evidence that Huntsman was aware of the 1991 and 1995 statements in 2003).

A panel of this Court reversed as to the City Creek claim.[1] Op.29. At the outset, the panel agreed with the district court and rejected the Church's argument that Huntsman's claim is barred by the ecclesiastical-abstention doctrine. The panel explained that the questions presented are secular ones: "whether the Church's statements about how it would use tithing funds were true, and whether Huntsman reasonably relied on those statements when he made tithing contributions." Op.11-12. And those questions could be answered "based on secular evidence and analysis," including, for example, by looking at "public statements and relevant financial records of the Church to determine what church officials said about how the City Creek Mall project would be financed and to determine what funds were actually used to finance the project." Op.12.

The panel disagreed with the district court on the merits of Huntsman's claim, finding that a reasonable juror could "conclude that the Church

---

[1] The panel upheld the district court's dismissal of Huntsman's claim regarding the Church's use of tithing funds to bail out a private insurance company. Op.29.

fraudulently misrepresented that neither tithing principal nor earnings on tithing principal would be or were being used to develop the City Creek Mall project." Op.27.

The panel relied on four pieces of evidence. First, church leaders and church publications made "four unqualified statements" that no tithing funds would be used to finance City Creek. Op.19. Second, Ensign Peak's leadership and employees referred to all funds—whether principal or earnings on that principal—as tithing money, "indicating that the term 'tithing funds,' in common usage within the Church, refers both to tithing principal and to earnings on tithing principal." Op.26. Third, Clarke told Nielsen that Ensign Peak purposefully concealed the source of funds for City Creek. Op.26-27. And fourth, Hinckley stated in 2003 that "tithing funds" had not and would not be used to finance City Creek. Op.20.

The panel recognized that Hinckley's statement—unlike the other four—arguably was qualified because he said that "earnings of invested reserve funds" would be used. Op.20. But the panel explained that Hinckley did not define "reserve funds" in 2003, Op.20, nor did he define "reserve funds" in 1991 or 1995, Op.24-25. And even if the 1991 and 1995 statements had defined the term, that would not negate the effect of Hinckley's 2003 statement, which, apart from making "no reference" to the earlier statements, said in "plain English" that no tithing funds would be used to finance the project. Op.25-26.

The panel also explained that the reliance element of Huntsman's fraud claim hinged on a dispute between Huntsman and the Church about what Huntsman knew about the meaning of "reserve funds." Op.28. The panel agreed with the district court that this type of credibility determination was not resolvable on summary judgment. Op.28.

Judge Korman dissented. He agreed with the Church that Hinckley's 1991 and 1995 statements clarified Hinckley's 2003 statement, as well as the other four statements on which Huntsman relied. Op.35, 38. Thus, according to Judge Korman, no reasonable juror could find that the Church fraudulently misrepresented its use of tithing funds. Op.41. But Judge Korman did not disagree with the panel's First Amendment holding.

## ARGUMENT

Rehearing en banc is "disfavored," *United States v. Wylie*, 625 F.2d 1371, 1378 n.10 (9th Cir. 1980), and should be granted only when "necessary to secure or maintain uniformity of the court's decisions" or when "the proceeding involves a question of exceptional importance." Fed. R. App. P. 35(a). Neither condition is present here.

## I. The panel decision is consistent with controlling precedent on the ecclesiastical-abstention doctrine.

The panel explained—agreeing with the district court and dissent—that Huntsman's fraud claim can be resolved without deciding religious doctrinal questions. Op.11. That conclusion was correct. And the Church fails to

highlight any splits in authority that would make this case worthy of rehearing.

**1.** The ecclesiastical-abstention doctrine forbids courts "to evaluate religious doctrine or the 'reasonableness' of the religious practices followed." *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 946, 950 (9th Cir. 1999). But the prohibition on resolving "controversies over religious doctrine and practice" does not "completely bar[] judicial inquiry." *Puri v. Khalsa*, 844 F.3d 1152, 1163-64 (9th Cir. 2017) (quoting *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969)). Instead, the ecclesiastical-abstention doctrine requires "only that courts decide disputes involving religious organizations 'without resolving underlying controversies over religious doctrine.'" *Id.* at 1164 (quoting *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1248 (9th Cir. 1999)).

**a.** The Church argues that the "dispositive question" here is ecclesiastical because Huntsman challenges the Church's religious definition of "tithing." Pet.12. That is flatly wrong. Huntsman has never argued, and the panel did not hold, that the Church incorrectly defined tithing. And the question is not who gets to define tithing as a religious matter.[2]

---

[2] So cases in which courts rejected challenges to scriptural interpretation or general church expenditures are beside the point. *See* J. Reuben Clark Law Br.8; Becket Br.6-13.

The question is whether the Church materially misrepresented the source of funding for City Creek. It did. The Church has explained that the term tithing refers only to principal funds, not interest earned investing those funds. Pet.13. But Neilsen's declaration shows that Ensign Peak comingled principal and earnings. 2-ER-80. Church officials internally referred to the mixed funds as "tithing" money, used those funds for City Creek, and then purposefully tried to conceal the allocation of those mixed funds (a fact the Church does not dispute). 2-ER-80-82. That alone is sufficient to survive summary judgment.

Even if, counterfactually, the Church used only interest on tithing funds to bankroll City Creek, a reasonable juror could still conclude that the Church's repeated statements were intended to, and did, mislead Huntsman into thinking that neither principal nor interest would be used. An ambiguous statement can be the basis for a fraud claim if the speaker intended to mislead the listener. *See, e.g.*, *Friedman v. Medjet Assistance, LLC*, No. 09-cv-7585, 2010 WL 11462853, at *14 (C.D. Cal. Nov. 1, 2010) (collecting cases). So, as here, the Church's use of the term tithing would be a misrepresentation if it was used "with the intention that it be understood in the sense in which it is false," no matter how it is correctly defined. Restatement (Second) of Torts § 527 (1977).

Huntsman provided sufficient evidence that the Church used the term tithing "with the intention that it be understood" to include both principal and interest. *Id.* For one, the Church stated four times, without

11

qualification, that tithing funds would not be used for City Creek. On one of those occasions, the Church explained that the funds specifically came from the Church's "other real-estate ventures." 3-ER-523. And Ensign Peak's comingling of the funds and concealment are probative to whether the Church honestly meant to convey that tithing meant principals (and not earnings) in statements about City Creek.

As for Hinckley's 2003 statement—the only statement that mentions the use of "reserve funds"—it said nothing about the meaning of that term, much less the distinction between principal and interest. And the Church relies on two statements—made in 1991 and 1995—to argue that the mention of "reserve funds" would have indicated to a listener in 2003 that the interest generated from tithing funds would be used. The Church insists that Huntsman *should have* been aware of those statements and their meaning, and thus there was no misstatement. But that is a credibility argument—it has nothing to do with the correct meaning of Church doctrine.

**b.** The Church also argues that a factfinder cannot—as a matter of law— evaluate whether Huntsman's reliance was justified without getting entangled in religious controversies. Pet.16-17. To show justifiable reliance, Huntsman would have to show that (1) the misrepresented matter was material, and (2) it was reasonable for him to have relied on the misrepresentation. *Hoffman v. 162 N. Wolfe LLC*, 228 Cal.App.4th 1178,

12

1194 (Cal. Ct. App. 2014). The Church contends that both showings would necessarily violate the First Amendment. The Church is doubly wrong.

First, the Church argues—without a single supporting authority—that Huntsman cannot show materiality without violating the First Amendment because it would require determining who is a "reasonable" Church member. Pet.16. But the Church's argument would foreclose *every* fraud claim against a church. That cannot be right. And in fact it is wrong: Materiality can be satisfied by a showing that the maker of the misrepresentation knows that the listener is likely to regard the matter as important in determining his choice of action. *See Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 892 (Cal. 2011). Huntsman has submitted enough evidence—including Ensign Peak's deliberate concealment of funds—to make that showing at summary judgment without wading into doctrinal waters.

Likewise, the Church argues that Huntsman cannot show subjective reliance because a jury would be required to hear that Huntsman's belief in a religious duty to donate was among his considerations in tithing. Pet.16-17. The Church ignores that both the district court and the panel correctly concluded that this element is a credibility determination, inappropriate for summary judgment. 1-ER-12 n.5; Op.28. But worse, the Church argues that the possibility of a religious justification for Huntsman's actions somehow violates the *Church's* First Amendment rights. Pet.16-17. The Church cites no authority for that sweeping proposition. And we are aware of none.

13

In all, the questions in this case are whether the Church's statements were intended to mislead Huntsman, and "whether Huntsman reasonably relied on those statements when he made tithing contributions." Op.11-12. To answer those questions, a jury would not be "required to rely on or interpret the Church's religious teachings to determine if it misrepresented how it was using tithing funds." Op.11. Nor would a jury need to "examine Huntsman's religious beliefs about the appropriate use of church money." Op.11. There is no ecclesiastical-abstention issue in the case.

**2.** The Church does not even attempt to identify any circuit or Supreme Court precedent that conflicts with the panel's commonsense, fact-bound conclusion. The Church cites a handful of ecclesiastical-abstention cases in passing but fails to show how the panel decision contradicts any of them. *See* Pet.11-12. Quite the opposite: The Church's cases highlight that fraud claims should *not* fail under ecclesiastical abstention. *See, e.g.*, Pet.15 (citing *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 712 (1976)). And the weight of authority agrees.[3]

---

[3] *See, e.g.*, *United States v. Annamalai*, 939 F.3d 1216, 1224-25 (11th Cir. 2019) (First Amendment did not bar charges against priest who perpetrated fraud on religious adherents); *Schmidt v. Cath. Diocese of Biloxi*, 18 So.3d 814, 831-32 (Miss. 2009) (First Amendment did not bar claims that church fraudulently misrepresented use of donations to solicit contributions); *Maffei v. Roman Cath. Archbishop of Bos.*, 867 N.E.2d 300, 315-16 (Mass. 2007) (evaluating claims that Archbishop and clergy members misrepresented certain facts in soliciting gifts); *Libhart v. Copeland*, 949 S.W.2d 783, 794 (Tex. App. 1997) (First Amendment did not bar fraud claims against a pastor accused of misappropriating church property to buy a new home for himself); *United States v. Rasheed*, 663 F.2d 843, 847-49

Instead, the Church argues that the panel opinion "runs afoul" of Supreme Court decisions about the ministerial exception—an entirely different doctrine. *See* Pet.1 (citing *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012), and *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049 (2020)).

The ministerial exception is rooted generally in the "principle of church autonomy." *Morrissey-Berru*, 140 S.Ct. at 2061. But it means only that a church's choice of ministerial employees—who necessarily "shape its own faith and mission"—is an inherently ecclesiastical decision. *See Hosanna-Tabor*, 565 U.S. at 188. The Church does not point to a single case that likewise treats fraud as categorically ecclesiastical. That's because there are none.

## II.  The panel did not decide questions of exceptional importance.

The panel's decision was not just consistent with legal precedent, it was also a narrow decision for which "the practical implications are limited." *United States v. Cooley*, 947 F.3d 1215, 1216 (9th Cir. 2020) (Berzon & Hurwitz, JJ., concurring in denial of rehearing en banc). The Church attempts to catastrophize the panel's holding. But it is the Church's arguments, not Huntsman's, that would dramatically change the law.

**1.** The Church contends that the decision will open the floodgates to "copycat suits by other former believers" who want to challenge church

---

(9th Cir. 1981) (First Amendment did not bar judicial inquiry into church-run Ponzi scheme).

expenditures. Pet.17. And the Church's amici argue that the decision will allow disgruntled donors to bring fraud suits based on "merely imprecise language" and to invoke fraud as a means of converting unrestricted gifts to restricted gifts. Ayuda Br.14; Ass'n of Cath. Colls. Br.14. But Huntsman has never argued that he deserves his funds back because he did not like how the Church spent them or because the Church's repeated assurances about its use of tithing funds were "merely imprecise." The decision would not allow congregants to impose after-the-fact conditions on donations. Instead, the decision simply allows a church to be held accountable for spending donated funds in the exact way that the church explicitly and repeatedly led listeners to believe the funds would not be used.

The Church continues its doomsaying by arguing that Huntsman's suit will "have a palpable chilling effect on the Church's religious expression." Pet.17. But nothing in the panel decision requires Church leaders to "refrain from discussing how Church funds will be used" or to speak with "an accountant's precision." Pet.10, 18. The decision—which, again, merely denied summary judgment against Huntsman—holds only that Church leaders cannot fraudulently misrepresent how Church funds will be used. Op.11. That keeps with the well-established principle that "the cloak of religion" does not give religious organizations a free pass to "commit frauds upon the public." Op.11 (quoting *Gen. Council on Fin. & Admin. of the United Methodist Church v. Superior Ct.*, 439 U.S. 1355, 1373 (1978)).

**2.** At bottom, the Church's argument is that a religious organization cannot be held liable for fraud whenever it uses religious language in perpetrating that fraud.

The Church's own hypothetical proves the point. The Church insists without any explanation that a church *could* be sued for fraud if it raised money for hurricane relief but used the funds for a pleasure trip instead. Pet.15. Yet under the Church's theory, the hypothetical church could argue that "pleasure" and "relief" have religious meanings that the church gets to define and that necessarily accord with the meanings understood by church members. That conclusion would be demanded no matter what evidence showed about how the terms were *actually* used or understood. So any legal challenge involving those terms would fail out of the blocks. The same is true for the Church's reliance argument—any fraud suit would be forbidden once the church argued that church members had a religious obligation to donate regardless of the church's use of funds for personal trips instead of hurricane relief.

Consider, for example, Jim Bakker, a televangelist with a long rap sheet of defrauding church members. On one occasion, Bakker raised money for a nonprofit ministry through promises of "good works" but instead funneled that money to a for-profit religious theme park.[4] Under the Church's reasoning, there could be no misrepresentation as a matter of constitutional

---

[4] *See PTL Fund Raising a Tangled Saga*, Wash. Post (May 23, 1987), https://tinyurl.com/bdzk3paa

law if Bakker argued that his religious beliefs were that the theme park was a part of his "good works"—no matter how Bakker communicated to donors. Further, the First Amendment would prohibit anyone who donated to Bakker under false pretenses from showing reliance. According to the Church, the potential that a misled donor also believed in a religious duty to donate would categorically preclude showing reliance on Bakker's misstatements. The Church cannot justify such a dramatic change in the law.

## CONCLUSION

The panel decision does not stop the Church from defining religious terms or deciding how to spend its funds. The panel merely held that Huntsman survived summary judgment because a reasonable jury could conclude that the Church deliberately misled him into donating money to for-profit ventures that he would not have otherwise funded.

The Court should deny rehearing and rehearing en banc.

Respectfully submitted,

s/ *Bradley Girard*

| | |
|---|---|
| DAVID B. JONELIS | BRADLEY GIRARD |
| Lavely & Singer, P.C. | JENNY SAMUELS |
| 2049 Century Park East, | Americans United for Separation |
|   Ste. 2400 |   of Church and State |
| Los Angeles, CA 90067 | 1310 L St. NW, Ste. 200 |
| (310) 556-3501 | Washington, DC 20005 |
| *djonelis@lavelysinger.com* | (202) 466-3234 |
| | *girard@au.org* |

*Counsel for Appellant*

November 13, 2023

## CERTIFICATE OF SERVICE

I certify that on November 13, 2023, this brief was electronically filed with the Clerk of the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

<u>s/ *Bradley Girard*</u>

November 13, 2023

## CERTIFICATE OF COMPLIANCE

Under Circuit Rule 40-1(a), I certify that this response to the Church's petition for rehearing:

(1) Was prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6), and

(2) satisfies the type-volume limitations of Circuit R. 40-1(a) because it contains 4,170 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

s/ *Bradley Girard*

November 13, 2023