**No. 21-56056**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JAMES HUNTSMAN,

*Plaintiff-Appellant,*

v.

CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,

*Defendant-Appellee,*

and

DOES, 1-10,

*Defendants.*

Appeal from the United States District Court
for the Central District of California
Honorable Steven V. Wilson (2:21-cv-02504-SVX-SK)

## BRIEF *AMICI CURIAE* OF 11 MAJOR RELIGIOUS ORGANIZATIONS IN SUPPORT OF DEFENDANT-APPELLEE AND REVERSAL

GENE C. SCHAERR
  *Counsel of Record*
JAMES C. PHILLIPS
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amici Curiae*

MARCH 22, 2024

## CORPORATE DISCLOSURE STATEMENT

*Amici* have no parent corporations. They have no stock, and therefore no publicly held company owns 10% or more of their stock.

Dated: March 22, 2024

/s/ *Gene C. Schaerr*
Gene C. Schaerr

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES......................................................................iv

INTRODUCTION AND INTEREST OF *AMICI* ......................................1

ARGUMENT .........................................................................................3

    I.    The Majority's Erroneous Decision Threatens All Religious Denominations.............................................................3

        A.    The decision's logic is not unique to any particular religion. ...............................................................5

        B.    Under the decision, religious organizations throughout the Ninth Circuit now risk a deluge of dubious lawsuits over their use of donated funds—a deluge which is starting. ...................................................6

        C.    Plaintiffs in other circuits, relying on the panel's decision, have launched copycat lawsuits. ..........................8

    II.    On The Issue Of Misrepresentation, The Panel Waded Into a Religious Doctrinal Dispute and, In So Doing, Violated the First Amendment.......................................................9

    III.    On The Issue Of Reasonable Reliance, The Panel Set In Motion Yet Another First Amendment Violation. ....................17

        A.    To assess the fraud claim, a judge or jury would have to inquire into Huntsman's reliance on intrinsically religious representations, something the Church Autonomy Doctrine forbids. ...........................17

        B.    A fraud exception to the Church Autonomy doctrine is not clearly established in this Circuit or the Supreme Court, nor could it be triggered here. ...............21

    IV.    Courts Cannot Avoid First Amendment Constraints by Redefining As "Secular" A Matter That A Church

    Reasonably Understands As a Matter of Religious
    Doctrine ......................................................................... 23

 V. By Treating a Religious Organization Less Favorably
    than Secular Charitable Organizations as to Donor-
    Imposed Conditions, the Panel Violated the Free Exercise
    Clause .............................................................................. 27

CONCLUSION ..................................................................... 32

APPENDIX ........................................................................... 34

CERTIFICATE OF COMPLIANCE ..................................... 36

CERTIFICATE OF SERVICE .............................................. 37

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Bryce v. Episcopal Church in Diocese of Colo.*,
289 F.3d 648 (10th Cir. 2002) ............................................................ 18

*Callahan v. Woods*,
658 F.2d 679 (9th Cir. 1981) ............................................................. 15

*Cantwell v. Connecticut*,
310 U.S. 296 (1940) .................................................................... 21, 23

*Cath. League for Religious & C.R. v.*
*City & Cnty. of San Francisco*,
567 F.3d 595 (9th Cir. 2009) ........................................................... 9, 15

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ............................................................... 28, 29, 31

*Corp. of Presiding Bishop of Church of*
*Jesus Christ of Latter-day Saints v. Amos*,
483 U.S. 327 (1987) .................................................................... 19

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ............................................................... 27, 29, 30

*Gaddy v. Corp. of President of Church of*
*Jesus Christ of Latter-Day Saints*,
551 F. Supp. 3d 1206 (D. Utah 2021) ................................................. 24

*Gen. Council on Fin. & Admin. of United*
*Methodist Church v. Superior Ct. of Cal.*,
439 U.S. 1355 (1978) ................................................................. 24

*Gonzalez v. Archbishop*,
280 U.S. 1 (1929) .................................................................... 22, 23

*Hernandez v. Comm'r of Internal Revenue*,
490 U.S. 680 (1989) .................................................................. 13

*Hoffman v. 162 N. Wolfe LLC,*
  228 Cal.App.4th 1178 (2014) ............................................................ 18

*Hosanna-Tabor Evangelical Lutheran*
  *Church & Sch. v. E.E.O.C.,*
  565 U.S. 171 (2012) ............................................................ 25

*Huntsman v. Corp. of the President of the*
  *Church of Jesus Christ of Latter-Day Saints,*
  76 F.4th 962 (9th Cir. 2023) ..................................... 4, 9, 11, 13, 14, 23

*Jones v. Wolf,*
  443 U.S. 595 (1979) ............................................................ 22

*Kedroff v. St. Nicholas Cathedral of Russian*
  *Orthodox Church in North America,*
  344 U.S. 94 (1952) ............................................................ 25

*Maryland & Va. Churches of God v. Church at Sharpsburg,*
  396 U.S. 367 (1970) ............................................................ 10

*Mitchell v. Helms,*
  530 U.S. 793 (2000) ............................................................ 20

*Morales v. Trans World Airlines, Inc.,*
  504 U.S. 374 (1992) ............................................................ 21

*Morrison v. Garraghty,*
  239 F.3d 648 (4th Cir. 2001) ............................................................ 11

*NLRB v. Catholic Bishop of Chi.,*
  440 U.S. 490 (1979) ............................................................ 20

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
  140 S. Ct. 2049 (2020) ..................................... 10, 13, 19, 25

*Presbyterian Church in the U.S. v. Mary Elizabeth*
  *Blue Hull Mem'l Presbyterian Church,*
  393 U.S. 440 (1969) ..................................... 10, 11, 24

*Roman Catholic Diocese v. Cuomo,*
  141 S. Ct. 63 (2020) ............................................................ 28

*Serbian E. Orthodox Diocese v. Milivojevich*,
   426 U.S. 696 (1976) ............................................................ 10, 11, 12, 22

*Tandon v. Newsom*,
   593 U.S. 61 (2021) ...................................................................... 27, 28

*Thomas v. Review Bd.*,
   450 U.S. 707 (1981) .................................................................... 15, 16

*United States v. Ballard*,
   322 U.S. 78 (1944) .......................................................................... 32

*United States v. Lee*,
   455 U.S. 252 (1982) ........................................................................ 15

*Watson v. Jones*,
   80 U.S. 679 (1871) .......................................................................... 22

*Wilhelm v. Pray, Price, Williams & Russell*,
   186 Cal.App.3d 1324 (1986) ............................................................ 18

*Yellowbear v. Lampert*,
   741 F.3d 48 (10th Cir. 2014) ...................................................... 12, 13

## Other Authorities

Ezra Taft Benson,
   Mbr. of the Quorum of the Twelve Apostles of
   The Church of Jesus Christ of the Latter-day Saints,
   Devotional Address at Brigham Young Univ.:
   *Fourteen Fundamentals in Following the Prophet*
   (Feb. 26, 1981) ............................................................................... 14

Class Action Compl.,
   *Brawner v. Corp. of the President of the*
   *Church of Jesus Christ of Latter-day Saints*,
   No. 3:23-cv-01361 (M.D. Tenn. Dec. 22, 2023) .................................. 9

Class Action Compl.,
   *Judson v. The Church of Jesus Christ of Latter-Day Saints*,
   No. 2:24-cv-00796-MWF-PD (C.D. Cal. Jan. 29, 2024) ........................ 7

Class Action Compl.,
  *Long v. Corp. of the President of the Church
  of Jesus Christ of Latter-Day Saints*,
  No. 3:23-cv-03950-NJR (S.D. Ill. Dec. 15, 2023) .................................. 8

Class Action Compl.,
  *Risdon v. Corp. of the President of the Church
  of Jesus Christ of Latter-day Saints*,
  No. 2:23-cv-00372-SAB (E.D. Wash. Dec. 21, 2023) ............................ 7

*Deuteronomy* ................................................ 1

*The Doctrine and Covenants of The Church of
  Jesus Christ of Latter-day Saints* ................................. 13, 14

Tzvi Freeman & Yehuda Shurpin,
  *Moneylending and Jewish Law*, Chabad.org .................................... 26

*Genesis* ........................................................ 1

*Malachi* (KJV) ................................................. 1

Nancy A. McLaughlin & W. William Weeks,
  *In Defense of Conservation Easements:
  A Response to the End of Perpetuity*,
  9 Wyo. L. Rev. 1 (2009) ........................................................ 28

*Numbers* ........................................................ 1

Proposed Class Action Compl.,
  *Chappell v. Corporation of the President
  of the Church of Jesus Christ of Latter-Day Saints*,
  No. 2:23-cv-00794-TS-DBP (D. Utah Oct. 31, 2023) ............................ 8

Brigham Young, *Journal of Discourses* (2004) ....................................... 14

## INTRODUCTION AND INTEREST OF *AMICI*[1]

This case is about the meaning of a religious term: tithing. The Judeo-Christian practice of paying tithes is at least four millennia old. *See Genesis* 14:20; *Numbers* 18:21–28; *Deuteronomy* 14:23, 28. Today, millions of Jews and Christians alike try to heed the words in the scripture to "[b]ring ye all the tithes into the storehouse." *Malachi* 3:10 (KJV).

But despite being long and widely practiced, there is hardly a religious consensus on tithing. Is it required or just recommended? Is it 10% of one's income or any amount? If 10%, is it calculated on gross or net income, or some other measure. Is it still called tithing after receipt by the religious organization? And if so, does tithing refer just to the original donation, or does it also include any interest or return that may have accrued on the donation? Both across faiths and within faiths, there are a host of opinions on these issues. Yet somehow the panel majority deemed a district judge or jury to possess sufficient theological prowess

---

[1] All parties consented to this *amicus* brief's filing. No party's counsel authored any part of this brief. No party or party's counsel, or person other than *amici*, contributed money to the brief's preparation or submission.

to answer the last of these questions, which is the religious dispute at the heart of this case. In so doing, however, the panel ran through the guardrail of the First Amendment—a collision the majority's decision cannot survive.

Indeed, the panel's decision runs afoul of that Amendment in at least three ways: First, it authorizes a jury or judge to decide what amounts to an intra-church dispute between the top leader and employees of The Church of Jesus Christ of Latter-day Saints over the meaning of tithing. Second, and perhaps alternatively (it's not clear), the decision authorizes a government decisionmaker to determine which of two possible religious meanings of tithing Church leaders were invoking when they made the statements challenged by Huntsman, and then to determine whether Huntsman reasonably relied on those statements. Third, in allowing donors to religious organizations to impose conditions on the use of their donations, the decision treats religious organizations less favorably than similarly situated secular organizations. In all these respects, the decision gravely offends the First Amendment.

*Amici* (each described in the Appendix) collectively represent approximately 24 million Americans, and they are deeply troubled by the

panel's constitutional violation. That is not because *amici* are in theological agreement with the Church about tithing (nor do *amici* endorse any of the Church's beliefs or materials described or cited in this brief). Their concern, rather, is that if the panel's decision stands no religious organization within the Ninth Circuit—the nation's largest circuit, both geographically and demographically—will be safe from judicial or jury intrusion into internal religious issues. *Amici* therefore urge the Court to reverse this dangerous and erroneous panel decision.

## ARGUMENT

### I. The Majority's Erroneous Decision Threatens All Religious Denominations.

To understand the threat the panel's decision poses to religious denominations of all stripes, it first helps to see exactly what the panel did. Because the parties describe this in great detail, just a few highlights will suffice. The panel concluded that a reasonable jury could determine that the Church made misleading comments regarding its use of tithing funds for the following reasons. First, the panel majority cited "four unqualified statements by church officials and in church publications that tithing funds were not used to finance the City Creek Mall project." *Huntsman v. Corp. of the President of the Church of Jesus Christ of*

3

*Latter-Day Saints*, 76 F.4th 962, 975 (9th Cir. 2023). Second, the majority observed that the Church's highest leader, President Hinckley—the ultimate authoritative voice in the Church—stated that "tithing funds have not and will not be used to acquire this property. Funds for this have come and will come from those commercial entities owned by the Church[,] … together with the earnings of invested reserve funds." *Id.* at 969. Despite President Hinckley's clearly referencing "tithing funds" as *not* including "earnings of invested reserve funds," the majority determined that "he failed to tell his listeners that, as he was using the terms, 'reserve funds' were 'tithing funds.'" *Id.* at 975. Third, the panel concluded that "under" "common usage in the Church," "'tithing funds' includes both tithing principal and earnings on tithing principal." *Id.* How did the majority determine this "common usage"? The only evidence cited was usage by some *employees* in a single Church-directed entity that only handled financial matters. Fourth, the majority relied on a statement by a former employee that his director alleged that money had been transferred "in order to conceal the source of the funds used to develop the [mall]." *Id.* at 975–76. Finally, the majority determined that the questions it faced were "secular." *Id.* at 969. Yet the question it faced

4

was the meaning of a religious term. And if that is "secular," then nothing is sacred.

It is not difficult to see why the panel's analysis poses an enormous threat to *amici* and, indeed, virtually all religious organizations operating in this Circuit.

## A. The decision's logic is not unique to any particular religion.

One obvious concern is that there is nothing about the panel majority's treatment of the dispute over the meaning of "tithing" that would cabin that logic to cases involving The Church of Jesus Christ of Latter-day Saints, or even just Christian organizations, or even just the meaning of tithing. If a court can reframe an inquiry into the meaning of a religious term, as indicated by a church's highest ecclesiastical leader, as purely "secular" in nature, then there is no sacred ground left under the First Amendment for religious organizations. Under the panel's logic, every religious dispute can be recharacterized as secular, gutting constitutional protections for religious entities and societies. For example, Catholic teaching that the bread and wine consumed during Mass have been transformed into the body and blood of Christ could be considered a secular question, with the Catholic Church's liability for

making that claim determined by scientists. Or religious claims by Muslims about events in the life of Mohammed could be investigated by historians and liability imposed depending on their findings.

This game of transforming the sacred into the secular has no limiting principle. It seems to be cabined only by judicial imagination. Hence, the panel's logic, if left to stand, will create a general threat to religious groups operating in the Ninth Circuit that their internal religious matters will be dragged through courts for judges or juries to decide—with liability determining by their supposedly "secular" findings.

**B.** **Under the decision, religious organizations throughout the Ninth Circuit now risk a deluge of dubious lawsuits over their use of donated funds—a deluge which is starting.**

But that broad threat is not the only one: Any time a religious organization, via one of its leaders or an official publication, says something about the religious status and use of donated funds that can be contradicted by an allegation from a disgruntled former employee or member, a jury or judge (under the panel's reasoning) will now get to decide which party has the better theological understanding. This means, thanks to the panel decision, that former members will likely spring up everywhere to sue over some comment made at some time about some

use of funds that the member donated *generally* to his or her religious organization. And, instead of being dismissed out of the gate under the ecclesiastical abstention/church autonomy doctrine, courts will be bound by the panel decision to let a jury decide. While that is an attractive outcome for plaintiffs' lawyers, it will breed constitutional chaos.

And that chaos has already begun, both in this circuit and without. In this circuit, after the panel's August 2023 decision, a new lawsuit was filed in the Eastern District of Washington just four months later. *See* Class Action Compl., *Risdon v. Corp. of the President of the Church of Jesus Christ of Latter-day Saints*, No. 2:23-cv-00372-SAB (E.D. Wash. Dec. 21, 2023), ECF No. 1. That suit, a class action, raised a tithing-based fraud claim identical to the on in this case. *See id.* at 24–25, 43–48.

The next month in the Central District of California, another class action was filed that raises the same fraud and fraudulent concealment claims as in this case, and, not surprisingly, cites the panel decision several times. *See* Class Action Compl. at 7, 18 & nn.35–38, 21 & n.44, *Judson v. The Church of Jesus Christ of Latter-Day Saints*, No. 2:24-cv-00796-MWF-PD (C.D. Cal. Jan. 29, 2024), ECF No. 1.

As long as the panel decision is good law, there will be many more suits like these in the Ninth Circuit.

## C. Plaintiffs in other circuits, relying on the panel's decision, have launched copycat lawsuits.

The risk noted above has become a reality in other circuits too—with cases launched late last year in the Sixth, Seventh, and Tenth Circuits: In late October 2023, a class action lawsuit was filed in the District of Utah, raising a fraud claim analogous to the one here. *See* Proposed Class Action Compl., *Chappell v. Corp. of the President of the Church of Jesus Christ of Latter-day Saints*, No. 2:23-cv-00794-TS-DBP (D. Utah Oct. 31, 2023), ECF No. 1. In December 2023, another class action was filed, this time in the Southern District of Illinois, raising fraud and fraudulent concealment claims akin to those in this case. *See* Class Action Compl., *Long v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, No. 3:23-cv-03950-NJR (S.D. Ill. Dec. 15, 2023), ECF No. 1. A week later a class action was filed in the Middle District of Tennessee, bringing a *Huntsman*-like fraud claim, and mentioning several times this litigation. *See* Class Action Compl. at 22–25 & nn.34–38, 27 & n.43, *Brawner v. Corp. of the President of the Church*

*of Jesus Christ of Latter-day Saints*, No. 3:23-cv-01361 (M.D. Tenn. Dec. 22, 2023), ECF No. 1.

Thus, the panel decision has spawned copycat litigation throughout the nation—posing an additional risk to all organizations of faith.

## II. On The Issue Of Misrepresentation, The Panel Waded Into a Religious Doctrinal Dispute and, In So Doing, Violated the First Amendment.

To be sure, the panel majority claimed that, "[i]n the case before us, we are not *required* to rely on or interpret the Church's religious teachings to determine if it misrepresented how it was using tithing funds." *Huntsman*, 76 F.4th at 968–69. Exactly. Yet that, in fact, is what the majority did and, in so doing, it both violated the Church's First Amendment rights and created an enormous threat to the First Amendment rights of every other religious organization operating in this Circuit.

1. As this Court has often observed, that Amendment "prohibits government from intervening in a religious dispute." *Cath. League for Religious & C.R. v. City & Cnty. of San Francisco*, 567 F.3d 595, 608 (9th Cir. 2009), *aff'd on reh'g en banc*, 624 F.3d 1043 (9th Cir. 2010). Likewise, as the Supreme Court has declared, "[t]he First Amendment protects the

9

right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) (internal quotation marks omitted). This means that "civil courts exercise no jurisdiction" over "a matter which concerns theological controversy." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713–14 (1976). *Accord Maryland & Va. Churches of God v. Church at Sharpsburg*, 396 U.S. 367, 368 (1970) (per curiam) (holding that courts cannot adjudicate doctrinal disputes).

This constitutional rule avoids the "substantial danger that the State will become entangled in essentially religious controversies," *Milivojevich*, 426 U.S. at 709, and the "hazards … ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern," *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). That is why the First Amendment leaves "civil courts no role to play in reviewing ecclesiastical decisions." *Milivojevich*, 426 U.S. at 713.

2.     As summarized previously, the panel's decision violated these constitutional commands in three distinct ways. First, the panel purported to resolve a dispute between the highest Church leaders and a few Church employees over the meaning of "tithing" and "tithing funds." Church leaders, especially the president of the Church, used the term to exclude earnings based on tithing principal and to encompass only the principal itself. *See Huntsman*, 76 F.4th at 969, 975. Yet a small group of Church employees who work for a particular money-management entity of the Church's used the term to refer to both tithing principal *and* earnings on donations already received. *See id*. at 975. The panel, by determining that a judge or jury can decide this theological dispute, committed the "error of intrusion into a religious thicket." *Milivojevich,* 426 U.S. at 719. That is because the First Amendment "forbids" courts from "determin[ing] matters at the very core of a religion—the interpretation of particular church doctrines." *See, e.g., Presbyterian Church,* 393 U.S. at 450. *See also Morrison v. Garraghty*, 239 F.3d 648, 659 (4th Cir. 2001) ("Differing beliefs and practices are not uncommon among followers of a particular creed, and it is not within the judicial function and judicial competence to inquire whether the petitioner or

11

another practitioner more correctly perceives the commands of their common faith.") (internal quotation marks and citations omitted).

Second, the majority purported to resolve—or set in process a motion for resolving—a fight over which of two meanings of "tithing" was invoked by the Church's president. There is a narrower, ordinary sense of that term, which only covers tithing principal, and a broader, technical financial sense, which covers both principal and earnings. At different times Church leaders and employees use one or the other sense.

Here the panel majority authorized a judge or jury to decide which sense church leaders were using when they said no tithing would be spent on the mall project. But that too is a theological inquiry that neither court nor jury is authorized to make: It "is exactly the inquiry that the First Amendment prohibits," and "recogni[zing] ... an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry." *Milivojevich,* 426 U.S. at 713.

Besides a lack of authority, there is a lack of expertise. As then-Judge Gorsuch observed, "judges [and juries] are hardly fit arbiters of the world's religions." *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014). To attempt to be such "would risk in the attempt ... many

mistakes[,] … given our lack of any comparative expertise when it comes to religious teachings, perhaps especially the teachings of less familiar religions." *Id. See also Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question … the validity of particular litigants' interpretations of [a faith's] creeds."). Likewise, no jury is competent—even a jury of 12 Church members—to determine whether the Church's President was mistaken in using one sense of a religious term over another in speaking to the faithful. And, even if a judge or jury were somehow competent to engage in such theological linguistics, "[t]he First Amendment outlaws such intrusion." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060.

Third, the panel engaged in scriptural interpretation, whether directly or indirectly. As to the latter, as noted by the majority, tithing is defined in Church scripture. *See Huntsman*, 76 F.4th at 974 (citing *The Doctrine and Covenants of The Church of Jesus Christ of Latter-day Saints* 119 ("*Doctrine & Covenants*")). By finding that the term tithing was ambiguous and therefore allowing a judge or jury to determine whether that scripturally defined religious term encompasses earnings on previously donated tithing funds, as well as sufficiently interpreting

the scriptural term to decide (or have the district court decide) whether the question should go to a jury, the panel has engaged in scriptural interpretation. After all, at some level one has to *interpret* scripture before one can determine it to be ambiguous or silent on the question at hand.

3.     In addition, as described above, the panel directly engaged in interpreting the words of the Church's president and prophet. *See id*. at 975. Yet, in the Church's teachings, the words of the Church's president are scripture when he is speaking for God.[2] Thus, in the panel decision, federal judges interpreted the scriptural words of the highest leader of a religious organization, who was in turn implicitly interpreting other scripture.

---

[2] *See Doctrine & Covenants* 21:5 (Church members should receive the president's words as though from the Lord); The Church of Jesus Christ of Latter-day Saints, *Teachings of the Living Prophets Student Manual*, ch. 2 (2010) (church's president can be the agent via which the Lord gives new scripture), available at https://tinyurl.com/y6vv3fp3; Ezra Taft Benson, Mbr. of the Quorum of the Twelve Apostles of The Church of Jesus Christ of the Latter-day Saints, Devotional Address at Brigham Young Univ.: *Fourteen Fundamentals in Following the Prophet* (Feb. 26, 1981) (same), available at https://tinyurl.com/3pk4tf6r; 13 Brigham Young, *Journal of Discourses* 95 (2004) (statement by early Church president that his sermons could be called scripture), available at https://tinyurl.com/bdfn778r.

14

This scriptural interpretation offends the Constitution twice over. As this Court has made clear, "courts 'are not arbiters of scriptural interpretation.'" *Cath. League for Religious & C.R.*, 567 F.3d at 608 (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 716 (1981)). *Accord Callahan v. Woods*, 658 F.2d 679, 686 (9th Cir. 1981) (noting the constitutionally required "abstention from evaluating the merits of a scriptural interpretation"). Under the Supreme Court's interpretation of the First Amendment, "[i]t is not within 'the judicial function and judicial competence,' … to determine whether [defendant] or the [plaintiff] has the proper interpretation of the [Latter-day Saint] faith." *United States v. Lee*, 455 U.S. 252, 257 (1982) (quoting *Thomas*, 450 U.S. at 716).

So, for example, when the federal government "contend[ed] that payment of social security taxes will not threaten the integrity of the Amish religious belief or observance," the Supreme Court refused to countenance that argument. Rather, it determined that, under the First Amendment, "[i]t is not within the judicial function and judicial competence, … to determine whether appellee or the Government has the proper interpretation of the Amish faith; courts are not arbiters of scriptural interpretation." *Lee*, 455 U.S. at 257 (cleaned up).

And, in a case involving a Jehovah Witness seeking unemployment compensation after being fired for refusing to make tanks for religious reasons, a state court "appear[ed] to have given significant weight to the fact that another Jehovah's Witness had no scruples about working on tank turrets; for that other Witness, at least, such work was 'scripturally' acceptable." *Thomas*, 450 U.S. at 715. But the Supreme Court concluded that "the judicial process is singularly ill equipped to resolve [interfaith] differences." *Id*. And so the Court reversed the state court, *id*. at 720, because "in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation," *id*. at 716.

So too here. Neither the Court itself, nor a jury under the Court's blessing, may interpret the scriptural term "tithing" or the clarification given it by the Church's highest leader, countenancing one reading over another, without crossing constitutional bounds set by the First Amendment. Even if the Church president's sermon might be deemed by a secular court as failing to adequately clarify whether interest or other

16

returns earned on donated funds is itself "tithing," this remains a doctrinal matter beyond judicial cognizance.

For all these reasons, the First Amendment requires dismissal of the fraud claims here because they cannot be decided without making theological determinations judges and juries have no authority to make. And allowing those claims to proceed is a threat to the First Amendment rights of every religious organization operating in this Circuit.

## III. On The Issue Of Reasonable Reliance, The Panel Set In Motion Yet Another First Amendment Violation.

In all events, adjudicating Huntsman's fraud claim would necessarily require a reasonable reliance analysis into religious statements and doctrines, which a court, under the Church Autonomy Doctrine, is neither constitutionally authorized nor competent to perform. And even if there were an exception to that doctrine for such an inquiry, any such exception would not be satisfied here.

### A. To assess the fraud claim, a judge or jury would have to inquire into Huntsman's reliance on intrinsically religious representations, something the Church Autonomy Doctrine forbids.

To prove his fraud claim, Huntsman must show both "actual" and "justifiable" reliance. *Wilhelm v. Pray, Price, Williams & Russell*, 186

Cal.App.3d 1324, 1331–32 (1986) (citation omitted). "Justifiable" reliance means that "a reasonable person would find [the misrepresentation] important in determining how he or she would act," and "it was reasonable for the plaintiff to have relied on the misrepresentation." *Hoffman v. 162 N. Wolfe LLC*, 228 Cal.App.4th 1178, 1194 (2014) (citations omitted).

But assessing Huntsman's reasonable reliance would require an inquiry into reliance on *religious* representations—statements by church leaders and in church materials—as to how tithing funds would be used and what tithing funds are. That how and what are internal policies or doctrines of the Church, and the Church Autonomy Doctrine prohibits a court from even inquiring into such matters.

That doctrine recognizes that religious organizations maintain the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor*, 565 U.S. at 186 (quoting *Kedroff*, 344 U.S. at 116). *See also Bryce v. Episcopal Church in Diocese of Colo.*, 289 F.3d 648, 655, 658 (10th Cir. 2002) ("The church autonomy doctrine ... [provides] that churches have autonomy in making decisions regarding their own internal affairs.").

And "[t]he independence of religious institutions in matters of faith and doctrine is closely linked to independence in what we have termed matters of church government." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060 (internal quotation marks and citation omitted). *See also Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 341–42 (1987) (Brennan, J., concurring) ("[R]eligious organizations have an interest in autonomy in ordering their internal affairs, so that they may be free to: ... define their own doctrines, resolve their own disputes, and run their own institutions" (internal quotation marks and citation omitted)).

How a religious organization decides to use tithing funds and what is defined as tithing are quintessential "matters of church government" that go to the core of allowing such organizations to "run their own institutions." After all, tithing is not just some donation—it is a donation given by the faithful for religious reasons. And Huntsman is seeking to co-opt a federal court to essentially punish the Church for what he alleges was a use of tithing funds inconsistent with *his* understanding of church teachings on the subject. This will require a court to enter a constitutionally forbidden thicket to determine whether Huntsman

reasonably relied on church statements and teachings on a religious issue. And this Court should avoid that First Amendment trap because "[i]t is not only the conclusions that may be reached by [a court or jury] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to the findings and conclusions." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979). *See also Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion) ("It is well established ... that courts should refrain from trolling through a person's or institution's religious beliefs.").

Even if the Church had changed its position on the use of tithing funds, as Huntsman (falsely) alleges, a court or jury cannot second-guess a religious organization's determination on how to use those funds. It is as much an internal decision of a religious organization when it decides whether and how to *change* its intended use of donated funds as it is to determine in the first instance how those funds will be used. Past or present, those are matters of religious doctrine and internal ecclesiastical policy—two places courts cannot tread. And that reality would make it impossible for a court to assess whether Huntsman reasonably relied on

any Church statements about the uses to which tithing donations would be put.

> **B. A fraud exception to the Church Autonomy doctrine is not clearly established in this Circuit or the Supreme Court, nor could it be triggered here.**

In all events, the panel could find no Ninth Circuit case law establishing a fraud exception to the Church Autonomy Doctrine. So instead it pointed to an out-of-circuit district court case and an in-chambers opinion by a single U.S. Supreme Court justice that quoted *Cantwell v. Connecticut*, 310 U.S. 296, 306 (1940). *See Gaddy*, 551 F. Supp. 3d at 1211, 1215; *Gen. Council on Fin. & Admin.*, 439 U.S. at 1373 (Rehnquist, J., in chambers).

1. But those two non-authoritative opinions cannot establish a church-autonomy-fraud exception in this Circuit for obvious reasons. *Cantwell* also cannot be read to establish such an exception because *Cantwell* is a Free Exercise Clause case, not a church autonomy case. And the specific church autonomy doctrine must control any general free exercise doctrine. *Cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[T]he specific governs the general.").

21

Nor has a fraud exception been established in Supreme Court case law. This is clear from *Milivojevich*, 426 U.S. 696. There the Court observed that, though *Gonzalez v. Archbishop*, 280 U.S. 1, 16 (1929), had attempted to add a fraud exception to *Watson v. Jones*, 80 U.S. 679 (1871), the discussion of that exception "was dictum only." *Milivojevich*, 426 U.S. at 712. Furthermore, "although references to the suggested exceptions appear in opinions in cases decided since the *Watson* rule has been held to be mandated by the First Amendment, no decision of this Court has given concrete content to or applied the 'exception.'" *Id*. (citations omitted). And the *Milivojevich* Court declined to recognize a fraud exception to the Church Autonomy Doctrine. *Id*. at 713. Since *Milivojevich*, the Supreme Court has yet to clearly recognize a church-autonomy-fraud exception.[3] It thus does not exist.

2.    Even if somehow a fraud exception to the Church Autonomy Doctrine did exist, it would be very narrow and not triggered here. Both *Caldwell* and *Gonzalez* dealt with third parties outside a religious

---

[3] In a footnote, *Jones v. Wolf*, 443 U.S. 595, 609 n.8 (1979), raises the possibility of such an exception, but the aside is dictum for the same reason as *Gonzalez* since fraud was not at issue in *Jones*.  And, to the extent *Jones* reads *Milivojevich* to establish such an exception, *Jones* is mistaken. *See id*. Erroneous dictum is not the stuff of legal doctrine.

organization: people answering their door or walking along a city street, and the executor of a will, respectively. *See Cantwell*, 310 U.S. at 301–03; *Gonzalez,* 280 U.S. at 11–12. And those third parties would allegedly have been duped out of money but for the fraud.

But there was no third party involved in the donations in this case. Rather, there was a church and a church member (even if that church member has now left his church), making this effectively an internal ecclesiastical dispute. Thus, the narrow fraud exception, should it exist, does not and cannot apply to this case—once again confirming that no court can constitutionally adjudicate Huntsman's claim that he reasonably relied upon any Church statements about the use of tithing donations.

## IV. Courts Cannot Avoid First Amendment Constraints by Redefining As "Secular" A Matter That A Church Reasonably Understands As a Matter of Religious Doctrine.

To avoid these constitutional pitfalls, the majority attempted to redefine this case as only involving a "secular" dispute. *See Huntsman*, 76 F.4th at 969 ("[A]s presented to us, the questions are secular. … A court or jury can answer these questions based on secular evidence and analysis."). For authority, the majority relied on a one-justice denial of a

temporary stay, *see Gen. Council on Fin. & Admin. of United Methodist Church v. Superior Ct. of Cal.*, 439 U.S. 1355, 1373 (1978) (Rehnquist, J., in chambers), and a district court opinion in another circuit, *see Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints,* 551 F. Supp. 3d 1206, 1211, 1215 (D. Utah 2021). In stretching for such weak authority, the panel overlooked the case law summarized above.

And, in attempting to redefine a theological dispute as a secular one, the panel misunderstood the very type of inquiry in which it engaged: interpreting the words of the Church's highest spiritual leader who was, in turn, providing a doctrinal interpretation of religious term based on Church scripture and his theological understanding. It is hard to imagine an issue *less* secular than that.

Just because there may be secular aspects to a religious dispute, that does not open the door to turning the dispute into a secular one for courts or juries to resolve. The Supreme Court has warned of such sleight of hand, describing the "hazards ... ever present of ... implicating secular interests in matters of purely ecclesiastical concern." *Presbyterian Church*, 393 U.S. at 449.

That is why the Supreme Court has consistently refused to allow courts to hide theological elephants in secular mouseholes. For example, the Americans with Disabilities Act is as secular a statute as they come. Yet the Court has held that disputes between ministerial employees and their religious employers over whether the latter violated the ADA are not appropriately resolved under the First Amendment. *See generally Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012); *Our Lady of Guadalupe Sch.*, 140 S. Ct. 2049.

Or consider the property dispute in *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94 (1952). Property disputes are perhaps usually secular in nature, but not when there is a dispute between two religious factions. And the Supreme Court has declared that, "[e]ven in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls. This under our Constitution necessarily follows in order that there may be free exercise of religion." *Id*. at 120–21.

Here, the Church, through its highest leader, implicitly declared that "tithing funds" and "reserve funds" were not the same, as a matter

of church doctrine, even as he expressly declared that the former were not being used on the mall project. The Constitution prohibits any further inquiry, even if there are secular dimensions to the case, because the ultimate inquiry is a theological one.

Nor does the fact that some of the other terms at issue connected to "tithing"—such as "income" or "reserve funds"—carry both secular and religious meanings provide a backdoor to a court or jury to secularize this theological dispute. Consider for example another term, "interest," which has an obvious secular meaning. And yet in some faiths it also has a religious meaning—in Judaism, for example, it is forbidden to take "interest," or *ribit*. *See, e.g.,* Tzvi Freeman & Yehuda Shurpin, *Moneylending and Jewish Law*, Chabad.org, https://tinyurl.com/2p9fnwhj (last visited Mar. 20, 2024). A court cannot simply look to the secular definition to understand the meaning of "interest" in Judaism.

In short, the panel's attempt to hide its religious analysis behind the "secular" label cannot and does not save its analysis from constitutional condemnation.

**V.  By Treating a Religious Organization Less Favorably than Secular Charitable Organizations as to Donor-Imposed Conditions, the Panel Violated the Free Exercise Clause.**

An additional consequence of the panel ruling is that it effectively enables donors to a *religious* organization to attach strings to a donation long after such a donation is made—something that donors to a secular charitable organization cannot do. And that differential treatment itself violates the Free Exercise Clause.

1.  Under that Clause, government action "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021). *See also Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (government actions "are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise").

So, for example, in *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, a city adopted ordinances prohibiting animal sacrifice, a religious practice, to allegedly protect public health, but there was no ordinance regulating secular disposal of animal carcasses, such as by

hunters or restaurants, which posed the same health threat. *See* 508 U.S. 520, 524–28, 544–45 (1993). And the Supreme Court concluded that this meant the ordinances lacked general applicability. *Id*. at 545–46.

Likewise, in two cases about Covid-related restrictions on gathering, the Court determined strict scrutiny applied because challenged "regulations cannot be viewed as neutral because they single out houses of worship for especially harsh treatment," *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 66 (2020), and a state "treat[ed] some comparable secular activities more favorably than at-home religious exercise," *Tandon*, 593 U.S. at 63.

2. The same constitutional problem exists here. Under the law of charitable donations, unless a donor stipulates that a donation can only be used for a certain purpose, once the donation is made a charitable organization may use the donation for any purpose consistent with its mission.[4] But the panel seems to require that a religious organization use

---

[4] *See, e.g.*, Nancy A. McLaughlin & W. William Weeks, *In Defense of Conservation Easements: A Response to the End of Perpetuity*, 9 Wyo. L. Rev. 1, 2 (2009) ("An unrestricted charitable gift is a contribution of money or property that the donor makes without attaching any

money donated to it with no specific requirement for its use to use the money only in the way the donor thought it would be used. In other words, religious organizations have less flexibility and more potential liability for the use of donations than secular organizations. Hence, the panel is treating a religious activity (the use of religious funds by a religious organization) less favorably than a secular one, triggering strict scrutiny.

That exacting standard cannot be met here. As the Supreme Court put it in *Fulton,* "[a] government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." 593 U.S. at 541 (quoting *Lukumi*, 508 U.S. at 546). So "[a] law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in *rare* cases." *Lukumi*, 508 U.S. at 546 (emphasis added).

---

conditions on its use by the recipient entity or organization. An entity or organization in receipt of an unrestricted charitable gift is free to use that gift as it sees fit in accomplishing its general public or charitable mission.").

As for a government interest requirement, moreover, it is not sufficient to claim that enforcing fraud statutes satisfies that requirement because that is too "high [a] level of generality"—"the First Amendment demands a more precise analysis." *Fulton,* 593 U.S. at 541. Thus, "[r]ather than rely on broadly formulated interests, courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Id.* (cleaned up).

In *Fulton*, for instance, in analyzing whether a compelling governmental interest existed, the Court observed that "[t]he question . . . is not whether the [government] has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to [the religious organization in that case]." *Fulton*, 593 U.S. at 541. And the Court concluded that, "[o]nce properly narrowed, the [government's] asserted interests are insufficient" because the government "fail[ed] to show that granting [the religious organization] an exception will put those goals at risk." *Id.* at 541–42.

Likewise, a government fails to show a government interest of the highest order when it leaves unregulated or underregulated nearly all

equivalent secular conduct that produces the same harm as the regulated religious conduct. *See Lukumi*, 508 U.S. at 547 ("[A] law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." (cleaned up)). Accordingly, in *Lukumi*, the Court concluded that the challenged "ordinances are underinclusive to a substantial extent with respect to each of the interests that respondent has asserted, and it is only conduct motivated by religious conviction that bears the weight of the governmental restrictions." *Id*. So the Court determined that strict scrutiny was not satisfied because, "[w]here government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling." *Id*. at 546–47.

These same defects—generality and under-inclusivity—interact here and doom the panel decision. It is impossible to see a government interest of the highest order in allowing a fraud claim to go forward against the Church when secular organizations would not be held to the same standard under ordinary charitable donation laws. After all, where

31

it occurs, it is just as harmful for a secular organization to mislead donors or misuse funds as it is for a religious organization.[5] Accordingly, this is not and cannot be one of the "rare" instances where strict scrutiny is satisfied.

## CONCLUSION

Because the panel majority required that "the truth or veracity of [the Church's] religious doctrine or beliefs [on tithing be submitted] to a jury," the panel violated the First Amendment. *United States v. Ballard*, 322 U.S. 78, 86 (1944). For multiple reasons, that ruling poses an enormous threat to religious organizations operating throughout this Circuit. The Court should therefore reverse.

---

[5] Moreover, given that tithing was and is a commandment that the faithful must obey to be in good standing in the Church, what the Church allegedly claimed it would use the tithing funds for in this case was irrelevant to the religious mandate that rested on church members, who paid their tithing with no strings attached. Huntsman, then, was not lured into a donation based on religious representations—those representations were irrelevant to his religious duty to pay tithing.

32

March 22, 2024    Respectfully submitted,

*/s/Gene C. Schaerr*
GENE C. SCHAERR
  *Counsel of Record*
JAMES C. PHILLIPS
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amici Curiae*

33

# APPENDIX

**Agudath Israel of America** ("Agudath Israel") is a 100-year-old nonprofit Orthodox Jewish umbrella organization. Headquartered in New York City, Agudath Israel serves over 30 states with its network of regional and state offices (including in California), affiliated synagogues, summer camps, special education, youth services, and religious study programs across the country.

**The Christian and Missionary Alliance** is a U.S. evangelical Christian denomination with approximately 400,000 participants, approximately 2,000 churches, three colleges, a seminary, three retirement communities, and over 20 camps.

**The Ethics and Religious Liberty Commission** ("ERLC") is the moral concerns and public policy entity of the Southern Baptist Convention ("SBC"), the nation's largest Protestant denomination, with over 13 million members in roughly 50,000 churches and congregations. The ERLC is charged by the SBC with addressing such issues as religious liberty, marriage and family, the sanctity of human life, and ethics.

**The California Southern Baptist Convention** is a state convention entity in partnership with the SBC; it has over 2,200 affiliated churches in that state, and it shares the values of the ERLC and other Southern Baptists.

**The General Conference of Seventh-day Adventists** is the national administrative body for the Seventh-day Adventist Church, a Protestant Christian denomination with more than 22 million members.

**The General Council on Finance and Administration of The United Methodist Church**, ("GCFA") an Illinois corporation, is the financial and administrative arm of The United Methodist Church ("UMC"). The UMC is a worldwide religious denomination with approximately thirteen million members. Through its various agencies, The UMC performs mission work in over 165 countries. The UMC is one of the largest religious denominations in the United States. It has

approximately 26,000 local churches and over six million members in the United States.

**International Church of the Foursquare Gospel** seeks to declare the unchanging ministry of Jesus Christ worldwide. To that end, the Foursquare Church has congregations in nearly 150 countries, totaling approximately eight million global members. Foursquare Gospel is a California nonprofit religious corporation.

**The Jewish Coalition for Religious Liberty** ("JCRL") is an incorporated group of rabbis, lawyers, and professionals who practice Judaism and are committed to defending religious liberty.

**The Lutheran Church—Missouri Synod** ("Synod") is a national Lutheran denomination headquartered in St. Louis, Missouri. It has around 6,000 member congregations and nearly 2 million baptized members. Additionally, the Synod has numerous Synod-wide related entities and universities, two seminaries, the largest Protestant parochial school system in America, and hundreds of recognized service organizations operating all manner of charitable nonprofit corporations throughout the country. This includes two district offices and a university in California.

**Church of Scientology International** ("CSI") oversees the ecclesiastical activities of thousands of Scientology Churches, Missions and affiliated Groups throughout the world and sees that individual Churches receive guidance in their ministries. CSI also administers Scientology's extensive humanitarian initiatives and community programs around the world.

**The Union of Orthodox Jewish Congregations of America** ("Orthodox Union") is the nation's largest Orthodox Jewish synagogue organization, representing nearly 1,000 congregations as well as more than 400 Jewish non-public K-12 schools across the nation.

35

## CERTIFICATE OF COMPLIANCE

I hereby certify that this *amicus* brief complies with Cir. R. 29-2(c)(3), as it contains 6,996 words, including the Appendix, but excluding the portions exempted by Fed. R. App. P. 32(f). The brief's typesize and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

Dated: March 22, 2024                    */s/ Gene C. Schaerr*
                                         Gene C. Schaerr
                                         *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of March, 2024, the foregoing brief was electronically filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the Court's CM/ECF system. I further certify that service was accomplished on all parties via the Court's CM/ECF system.

Dated: March 22, 2024              /s/ *Gene C. Schaerr*
                                   Gene C. Schaerr

                                   *Counsel for Amici Curiae*

37