# In the United States Court of Appeals for the Ninth Circuit

---

JAMES HUNTSMAN,
*Plaintiff-Appellant,*

v.

CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,
*Defendant-Appellee,*

DOES, 1–10,
*Defendants.*

---

On Appeal from the United States District Court
for Central California, Los Angeles
Case No. 2:21-cv-02504-SVW-SK (Hon. Stephen V. Wilson)

---

## BRIEF OF PROFESSOR ROBERT W. TUTTLE AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE

---

THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*thomas@guptawessler.com*

April 5, 2024                    *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Table of authorities ........................................................................................................ ii

Interest of amicus curiae .............................................................................................. 1

Introduction ................................................................................................................... 1

Argument ........................................................................................................................ 4

    I.    For over half a century, courts across the country have recognized that a neutral-principles approach protects religious freedom, individual rights, and state interests. ........................................ 4

        A.    The neutral-principles doctrine was developed and refined over decades of cases involving hotly contested disputes between and within religious organizations. ................................ 5

        B.    *Jones v. Wolf*'s preference for the neutral-principles approach remains the law of the Supreme Court and of this Court. ........................................................................................ 8

        C.    Longstanding principles of ecclesiastical abstention have not been displaced by caselaw on the narrow issue of a religious organization's choice of faith leaders. .......................... 14

    II.    Mr. Huntsman's claims can be adjudicated under neutral principles of civil law by a properly instructed jury. ........................... 19

        A.    A jury can determine justifiable reliance under settled principles of California fraud law, without adjudicating any questions of religious doctrine. ............................................. 21

        B.    A jury could determine that defendants made misrepresentations under settled principles of California fraud law, without adjudicating any questions of religious doctrine. ...................................................................................... 26

Conclusion .................................................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Belya v. Kapral,*
  45 F.4th 621 (2d Cir. 2022) ..................................................................16

*Bjorkman v. Protestant Episcopal Church in the U.S. Diocese of Lexington,*
  759 S.W.2d 583 (Ky. 1988) ..................................................................13

*Brown v. Arizona,*
  82 F.4th 863 (9th Cir. 2023) ...............................................................20

*Cafasso, U.S. ex rel. v. General Dynamics C4 System, Inc.,*
  637 F.3d 1047 (9th Cir. 2011) ............................................................ 26

*deNourie & Yost Homes, LLC v. Frost,*
  854 N.W.2d 298 (Neb. 2014) ..............................................................27

*El Dorado Irrigation District v. Traylor Bros., Inc.,*
  2005 WL 8155281 (E.D. Cal. Oct. 7, 2005) .........................................27

*Episcopal Church Cases,*
  198 P.3d 66 (Cal. 2009) ........................................................................9

*Friedman v. Medjet Assistance, LLC,*
  2010 WL 11462853 (C.D. Cal. Nov. 1, 2010) .......................................27

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021) ............................................................................18

*Garrick v. Moody Bible Institute,*
  95 F.4th 1104 (7th Cir. 2024) ..............................................................16

*General Motors Acceptance Corp. v. Central National Bank of Mattoon,*
  773 F.2d 771 (7th Cir. 1985) ...............................................................27

*Hernandez v. Commissioner,*
  490 U.S. 680 (1989) ............................................................................17

*Hinojos v. Kohl's Corp.,*
  718 F.3d 1098 (9th Cir. 2013) .............................................................22

*Hoffman v. 162 North Wolfe LLC,*
175 Cal. Rptr. 3d 820 (2014) ..............................................................21, 25

*Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.,*
565 U.S. 171, 188 (2012)......................................................................15, 16

*Jeffs v. Stubbs,*
970 P.2d 1234 (Utah 1998) .......................................... 9, 10, 18, 26

*Jones v. Slade,*
23 F.4th 1124 (9th Cir. 2022) ..............................................................17

*Jones v. Wolf,*
443 U.S. 595 (1979)............................................................................*passim*

*Kumar v. Salov North America Corp.,*
2016 WL 3844334 (N.D. Cal. July 15, 2016) ...........................23

*Kwikset Corp. v. Superior Court,*
246 P.3d 877 (Cal. 2011) .....................................................................22

*Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar,*
179 F.3d 1244 (9th Cir. 1999) ...........................................................10, 13

*Maryland & Virginia Eldership of Churches of God v. Church of God at
Sharpsburg, Inc.,*
396 U.S. 367 (1970)..................................................................................6

*McCarthy v. Fuller,*
714 F.3d 971 (7th Cir. 2013) ..............................................................20

*McRaney v. North America Mission Board of the Southern Baptist Convention, Inc.,*
966 F.3d 346 (5th Cir. 2020) ..............................................................16

*Metropolitan Life Insurance Co. v. Ditmore,*
729 F.2d 1 (1st Cir. 1984)....................................................................27

*Ollerman v. O'Rourke Co.,*
288 N.W.2d 95 (Wis. 1980)................................................................27

*Our Lady of Guadalupe School v. Morrissey-Berru,*
140 S. Ct. 2049 (2020) ...................................................................12, 13

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*,
  393 U.S. 440 (1969) ................................................................................................ 6

*Public Employees' Retirement System v. Moody's Investors Service, Inc.*,
  172 Cal. Rptr. 3d 238 (2014) ............................................................................ 21, 25

*Puri v. Khalsa*,
  844 F.3d 1152 (9th Cir. 2017) ............................................................. *passim*

*Serbian E. Orthodox Diocese for U.S. & Canada v. Milivojevich*,
  426 U.S. 696 (1976) ................................................................................................ 7

*Small v. Fritz Companies, Inc.*,
  65 P.3d 1255 (Cal. 2003) ...................................................................................... 20

*Spreitzer v. Hawkeye State Bank*,
  779 N.W.2d 726 (Iowa 2009) .............................................................................. 27

*Sprint Communications, Inc. v. Jacobs*,
  571 U.S. 69 (2013) ................................................................................................ 18

*Tenneco Oil Co. v. Joiner*,
  696 F.2d 768 (10th Cir. 1982) ............................................................................ 27

*Thomas v. Review Board of Indiana Employment Security Division*,
  450 U.S. 707 (1981) .............................................................................................. 24

*United States v. Ballard*,
  322 U.S. 78 (1944) .................................................................................................. 6

*Watson v. Jones*,
  80 U.S. 679 (1871) .................................................................................................. 5

*Wells ex rel. Glover v. Creighton Preparatory School*,
  82 F.4th 586 (8th Cir. 2023) ............................................................................... 16

## Treatises

5 Witkin, Summary of Cal. Law (9th ed.) Torts ...................................................... 27

Restatement (Second) of Torts (1977) ............................................................... 22, 27

**Other Authorities**

Kent Greenawalt,
  *Hands Off! Civil Court Involvement in Conflicts over Religious Property*, 98
  Colum. L. Rev. 1843 (1998)..........................................................................12, 14, 26

Michael W. McConnell & Luke W. Goodrich,
  *On Resolving Church Property Disputes*, 58 Ariz. L. Rev. 307 (2016)...................... *passim*

## INTEREST OF AMICUS CURIAE[1]

*Amicus* Robert W. Tuttle is the David R. and Sherry Kirschner Berz Research Professor of Law and Religion at the George Washington University Law School. He is also a Professor of Religion in the University's Columbian College of Arts & Sciences. Professor Tuttle has written extensively about the Religion Clauses of the Constitution, and more specifically about limits on government competence to interpret questions of religious doctrine. He has also provided legal counsel and advice to religious organizations for decades, including in disputes involving the application of *Jones v. Wolf*, 443 U.S. 595 (1979), to questions of donations and gifts, as well as property and trusts. Professor Tuttle's academic work and experience have instilled in him the importance of the weighty interests on both sides of these questions, and he has an interest in ensuring a workable regime of civil law and religious freedom.

## INTRODUCTION

For decades, the Supreme Court has provided courts with the following guidance for resolving civil suits involving religious organizations: If such suits can be resolved by resort to neutral principles of secular law, without adjudicating any questions of religious doctrine, they may proceed. But a secular court may not

---

[1] All parties consent to the filing of this brief, and no counsel for any party authored it in whole or in part. Apart from *amicus curiae*, no person, party, or party's counsel contributed money intended to fund the brief's preparation and submission.

determine which party is correct about a matter of faith. As courts across the country and commentators across the spectrum have recognized, this doctrine of "ecclesiastical abstention" protects religious freedom for religious organizations and believers alike. And both benefit from the predictability and consistency of applying longstanding private law rules to legal disputes.

By contrast, reflexively deferring to religious authorities whenever disputes relate to issues that are important to religious organizations would lead civil courts into the dangerous waters of determining the locus of religious authority in a given faith—an especially perilous enterprise in a nation of religious pluralism. Furthermore, that approach would disproportionately benefit traditionally hierarchical religious organizations, giving them absolute protection from all manner of secular claims, to the disadvantage of the countless religious communities in this country whose structure does not neatly fall into traditional categories.

Ecclesiastical abstention doctrine both governs and resolves the First Amendment question here. Mr. Huntsman alleges that defendants misrepresented the source of funds for a commercial mall project by claiming that the money would not come from "tithing funds" but from "the Church's real-estate development arm," whose "money," in turn, "comes from other real-estate ventures." Mr. Huntsman offers whistleblower testimony that the mall project was actually funded by millions of dollars from an account that commingled tithes with interest earned

on those tithes, and that church officials sought to hide this fact by passing the money through two separate companies. Defendants counter that Mr. Huntsman's common-law fraud claims cannot proceed without adjudicating questions of religious doctrine. That is incorrect.

Under longstanding California common law, Mr. Huntsman's claims survive summary judgment if, viewing the evidence in the light most favorable to him, a reasonable juror could conclude that defendants: (1) knew some church members would attach importance to whether tithes and funds derived from tithing were used for the mall project; and (2) intended to deceive those members through repeated assurances that no "tithing funds" would be used for the project. A properly instructed jury could resolve these entirely factual questions simply by determining what defendants knew and why they acted. Thus, Mr. Huntsman "ask[s] the courts to decide what amounts to a secular factual question" that "is quintessentially susceptible to decision by neutral principles." *Puri v. Khalsa*, 844 F.3d 1152, 1167 (9th Cir. 2017).

There are important interests on both sides of this case. For many faith traditions, donation is more than just an obligation. Support for the faith community by money and work is an important part of how believers bind themselves to their faith. By supporting the survival of religious communities and promoting good works, donations ensure the rich tapestry of religious life that our country has always

prized. Unfortunately, our history also shows that solicitations of funds by religious leaders and organizations can sometimes be cover for fraud. This harms believers and demeans their gesture of faith. Decades of precedent from this Court and the Supreme Court confirm that in navigating these important concerns, the neutral-principles approach best protects religious freedom and guards against judicial entanglement in matters of faith.

## ARGUMENT

### I. For over half a century, courts across the country have recognized that a neutral-principles approach protects religious freedom, individual rights, and state interests.

The neutral-principles doctrine has a long history. Forty-five years ago, in *Jones v. Wolf*, the Supreme Court offered the modern articulation of the doctrine and described its benefits in detail. Building on years of precedent, the Court explained how this doctrine serves the goals of the Establishment Clause by preventing "civil courts … from entanglement in questions of religious doctrine, polity, and practice." 443 U.S. at 603.[2] As for the Free Exercise Clause, ecclesiastical abstention protects religious communities' ability to make their own doctrinal rules, and it treats religious organizations and persons equally. Ever since *Jones v. Wolf*, courts across the country, including this one, have concluded that a neutral-principles approach best protects religious freedom for religious communities and believers alike.

---

[2] Unless otherwise specified, all internal quotation marks, emphases, alterations, and citations are omitted from quotations throughout.

**A.    The neutral-principles doctrine was developed and refined over decades of cases involving hotly contested disputes between and within religious organizations.**

In our nation, churches have never received a blanket exemption from secular law. From early on, however, the Supreme Court recognized that secular courts were ill-suited to decide questions of religious doctrine.

In an 1871 decision involving a dispute between two factions claiming ownership of a local Presbyterian church, the Supreme Court held that "a broad and sound view of the relations of church and state under our system of laws" required civil courts to defer to religious authorities on "questions of discipline, or of faith, or ecclesiastical rule, custom, or law." *Watson v. Jones*, 80 U.S. 679, 727 (1871). To determine where authority was located, the Court required an analysis of whether the faith was hierarchical or "congregational," *id.* at 722–34—a dichotomy that even at the time was an oversimplification. Notably, however, if the "express terms" of a legal instrument governed the use of church property, it would "be the obvious duty of the court" to apply the terms of that document. *Id.* at 722–24.

While many ecclesiastical abstention cases involved property disputes, not all did. In another case, after religious leaders were convicted of mail fraud for raising funds by claiming to be able to cure incurable diseases, the Court approved of jury instructions that "withheld from the jury all questions concerning the truth or falsity

of the religious beliefs or doctrines of [the defendants]." *United States v. Ballard*, 322 U.S. 78, 79–80, 88 (1944).

Around the middle of the twentieth century, the Supreme Court reaffirmed and refined the parameters of this doctrine through a series of decisions that, like *Watson*, involved schisms. In an initial 1969 case, the Court explained that "[c]ivil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property," and "there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). On the other hand, "First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Id.* Thus, the First Amendment "commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine." *Id.*

Subsequent cases reinforced this, holding that no First Amendment violation had occurred where a "court's resolution of the dispute involved no inquiry into religious doctrine." *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970). By contrast, the First Amendment barred a suit that would have required a civil court to decide a "dispute, strictly and purely

ecclesiastical in its character," about whether a bishop was properly defrocked. *Serbian E. Orthodox Diocese for U.S. & Canada v. Milivojevich*, 426 U.S. 696, 714, 717–18 (1976).

In *Jones v. Wolf*, the Court synthesized this caselaw and offered what remains the authoritative statement on ecclesiastical abstention. On the one hand, prior cases reflected that "[t]he State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." 443 U.S. at 602. However, the cases also taught that "the [First] Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." *Id.* When properly applied, "the neutral principles of law approach is consistent with the foregoing constitutional principles." *Id.*

The Court set out the virtues of this approach in detail.

- Civil courts are presumptively competent to resolve secular legal disputes. "There can be little doubt about the general authority of civil courts" to employ this approach, which "relies exclusively on objective, well-established concepts" of civil law that are "familiar to lawyers and judges." *Id.* at 602–03.

- Because the approach "is completely secular in operation," it will "free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Id.* In contrast, "a rule of compulsory deference to religious authority" would risk a greater "entanglement." *Id.* at 605. In every case, a court would need to determine the proper ecclesiastical authorities, and if "the locus of control would be ambiguous," courts would need to undertake "a searching and therefore impermissible inquiry into church polity." *Id.*

- The neutral-principles approach is "flexible enough to accommodate all forms of religious organization and polity." *Id.* at 603. By contrast, the compulsory-deference approach relied on an artificial dichotomy between congregational and hierarchical faiths.

- "[T]he neutral-principles analysis shares the peculiar genius of private-law systems in general-flexibility in ordering private rights and obligations to reflect the intentions of the parties." *Id.* at 603.

- Churches are not exempt from civil law, and "[t]he neutral-principles approach cannot be said to 'inhibit' the free exercise of religion, any more than do other neutral provisions of state law" such as those governing "purchas[ing] goods." *Id.* at 606.

In other words, the default is that courts of law can resolve disputes of law. That includes disputes between and within religious organizations—even when those disputes arise out of and relate to hotly contested questions of religious doctrine—so long as a court would not need to adjudicate "issues of religious doctrine or polity." *Id.* at 602. And while *Jones v. Wolf* ultimately left states with a choice between the neutral-principles approach or compulsory deference to church hierarchy, it "suggested a clear preference for the neutral-principles approach." *Puri*, 844 F.3d at 1166.

### B. *Jones v. Wolf*'s preference for the neutral-principles approach remains the law of the Supreme Court and of this Court.

The neutral-principles approach to ecclesiastical abstention remains the law of the Supreme Court and of this Court, as well as the overwhelming majority of state high courts. And the Supreme Court has continually declined to revisit the doctrine, despite repeated and recent requests to do so. *See, e.g.*, Petition for Writ of

Certiorari, *Episcopal Diocese of Fort Worth v. Episcopal Church*, 602 S.W.3d 417 (Tex. Oct. 19, 2020) (No. 20-536), 2020 WL 6259543, at *31 (asking the Court to "grant certiorari to reconsider the neutral-principles approach itself"); *see also* Michael W. McConnell & Luke W. Goodrich, *On Resolving Church Property Disputes*, 58 Ariz. L. Rev. 307, 310 (2016) (noting 12 denials of certiorari over 6 years). That's because, when properly applied, this doctrine works.

**1.** While *Jones v. Wolf* left states with a choice, the neutral-principles doctrine has been by far the dominant approach. *See* Appendix to Brief in Opposition at App.1a–6a, *Episcopal Church v. Episcopal Diocese of Fort Worth*, 602 S.W.3d 417 (Tex. Dec. 23, 2020) (No. 20-536), https://perma.cc/8N6T-BG7Y (compiling states). This includes not only California, but also Utah, where defendants are located. *See Episcopal Church Cases*, 198 P.3d 66, 79 (Cal. 2009); *Jeffs v. Stubbs*, 970 P.2d 1234, 1250–51 (Utah 1998). As the Utah Supreme Court explained decades ago in a dispute between a religious organization and its former members:

> It would be simple indeed to deal with all these conflicts with a policy of noninvolvement. But courts serve neither the church nor its members by placing their affairs in a special law-free zone. Law free is also lawless, and the consequence is that neither the faithful, nor the church or those with which it deals, can rely on the other parties playing by the rules, for there are then no enforceable rules.

*Jeffs*, 970 P.2d at 1240 & n.1, 1250–51. Closing the courthouse doors to these parties would deny their fundamental right "to resolve legal disputes before a neutral tribunal." *Id.* And determining which religious faction has the authority to decide the

dispute might itself "constitute an action violative of state or federal Establishment and Free Exercise Clauses." *Id.* It is hard to imagine that a state with as proud a tradition of religious freedom as Utah adopted an approach that is catastrophic for religious organizations, but that no one has noticed for decades.

This Court also has "a clear preference for the neutral-principles approach." *Puri*, 844 F.3d at 1166–67. Like other courts, this Court recognized that the default is that civil courts are open to litigants to decide their legal claims, and depriving religious persons "recourse to the protections of civil law that are available to all others" simply because the parties involved are religious "would raise its own serious problems under the Free Exercise Clause." *Id.* (quoting *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1248 (9th Cir. 1999)). Neutral principles avoid "entanglement in questions of religious doctrine, polity, and practice." *Id.* at 1162–66. In contrast, the hierarchical-deference approach, in requiring courts to adjudicate controversies about the locus of religious authority in every case, poses a serious "danger of unconstitutional entanglement." *Kianfar*, 179 F.3d at 1249.[3]

And the benefits of the neutral-principles approach have been recognized by commentators from across the spectrum. From proponents of an expansive approach to religious freedom such as Professor Michael McConnell, to noted

---

[3] The neutral-principles approach is particularly important when it is the law of the relevant state and the court is applying state law, as is true here. *Puri*, 844 F.3d at 1167.

advocates of separation of church and state such as Professor Marci Hamilton, many commentators agree that a neutral-principles approach "frees civil courts from the danger of entanglement in church affairs and better protects the religious liberty of denominations and congregations alike." Brief for Professors Randy Beck et al., *Protestant Episcopal Church in The Diocese of South Carolina v. Episcopal Church*, No. 17-1136, 2018 WL 1556993, at *3–4 (S.C. Mar. 29, 2018); *see also* McConnell & Goodrich at 307 (neutral-principles approach "is fully consistent with the church autonomy principles of the First Amendment").[4]

**2.** Time has only borne out *Jones v. Wolf*'s understanding of the value of the neutral-principles approach—and the perils of the compulsory-deference approach.

*First*, the risk that the deference approach will result in courts deciding religious questions has become only more salient as our nation has become even more religiously diverse. Under the deference approach, in every single case, "civil courts would always be required to examine the polity and administration of a church." *Jones*, 443 U.S. at 605. Yet the *Watson* dichotomy of sorting religious organizations into either hierarchical or congregationalist is hopelessly simplistic; it doesn't even map well onto "'mainline' Protestant denominations such as

---

[4] While commentators differ on the precise manner the neutral-principles doctrine should be applied, this Court need not decide that question to resolve this case. *See Puri*, 844 F.3d at 1167 n.5. Relatedly, while some commentators differ on whether this doctrine should apply primarily to property disputes, this Court has held that it applies more broadly to "other types of church disputes." *Id.* at 1165.

Methodists, Presbyterians, and Lutherans." McConnell & Goodrich at 327–28. "The Evangelical Lutheran Church in America, for example, emphasizes that it is organized neither as a hierarchical church in the Roman Catholic tradition nor as a congregational church in the Anabaptist tradition, but as a church in which all levels are 'interdependent partners sharing responsibility in God's mission.'" *Id.* Further, many "non-Christian religious organizations, which often do not share the Christian notions of 'assembly' and 'membership' that underlie the hierarchical-congregational dichotomy," are even worse fits for this doctrine, such as "Hindu temples, Islamic mosques, Sikh temples, and some Jewish groups." *Id.* The Supreme Court has warned against an approach that asks whether non-Christian faiths have "the counterparts" of certain traditional Christian structures. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020).

Nor can this problem be avoided simply by discarding the hierarchical-congregational dichotomy. "The two-category approach to church government is crude, but the more courts attempt to refine distinctions, asking whether hierarchical bodies have authority over particular subjects in particular circumstances, the more their classifications in individual cases may turn on disputable ecclesiastical matters." Kent Greenawalt, *Hands Off! Civil Court Involvement in Conflicts over Religious Property*, 98 Colum. L. Rev. 1843, 1879–80 (1998). This search for the true "locus of control" over

a particular religious question, guided by religious texts and practices, quickly becomes an "impermissible inquiry into church polity." *Jones*, 443 U.S. at 605.

For example, in a dispute between two Sufi Muslim groups, this Court refused to decide whether "the Oveyssi Order is hierarchical, and whether a hierarchical decision was made identifying and investing the Forty–Second Teacher." *Kianfar*, 179 F.3d at 1248–49. Given the "real" "danger of unconstitutional entanglement," this Court took the much simpler approach of resolving the secular claims in the case— trademark infringement, false designation of origin, and tortious conversion—by resort to neutral principles. *Id.* at 1249–50.

*Second*, compulsory deference "puts a heavy thumb on the scales in favor of a more 'hierarchical' form of polity." McConnell & Goodrich at 327. "[I]n every case, regardless of the facts, compulsory deference would result in the triumph of the hierarchical organization." *Bjorkman v. Protestant Episcopal Church in the U.S. Diocese of Lexington*, 759 S.W.2d 583, 586 (Ky. 1988). Faith organizations with a traditional religious hierarchy would benefit greatly from receiving total deference from civil courts on a whole range of legal issues. This would "risk privileging religious traditions with formal organizational structures over those that are less formal." *Our Lady*, 140 S. Ct. at 2064.

*Third*, there is a real risk of uncertainty and unpredictability when civil courts reflexively defer to religious authority. This harms institutions and believers alike.

When a religious organization invokes hierarchical deference to use donations "given on [an] express condition" in a manner inconsistent with that condition, "[t]hat is a recipe for making congregants unwilling to contribute." McConnell & Goodrich at 340; *see also* Greenawalt, *Hands Off!*, 98 Colum. L. Rev. at 1865. The result is "deep uncertainty and a host of difficulties, all of which are unnecessary." McConnell & Goodrich at 340.

In sum, time has only further confirmed that the neutral-principles doctrine protects religious freedom for religious organizations and believers alike, while protecting the rights of individuals and the interests of the state in the administration of justice.

C.   **Longstanding principles of ecclesiastical abstention have not been displaced by caselaw on the narrow issue of a religious organization's choice of faith leaders.**

Defendants' doctrinal arguments focus on whether Mr. Huntsman's claims would require the adjudication of questions of religious doctrine. That makes sense, as this is what precedent requires. However, defendants at times seem to suggest that there might be some other analysis—one calling for a free-floating inquiry into the extent to which a particular case implicates particularly important questions for religious organization. The result would be ill-defined zones where neutral-principles doctrine doesn't apply and civil courts must defer to church authorities even in purely legal disputes. Such an inquiry would be misguided.

**1.** Defendants invoke recent Supreme Court decisions involving the "ministerial exception" doctrine, which dictates that civil courts may not interfere with "the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012). This doctrine requires a careful, fact-specific analysis of an employee's role in a religious institution. *Id.* The Supreme Court has also emphasized the doctrine's limited scope. The Court has only applied it to the employment context, and even in that context was careful to "express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." *Id.* at 195–96.

That's because outside of the employment context where the ministerial exception applies, ecclesiastical abstention governs lawsuits involving religious organizations—including disputes within those organizations—ranging from property to torts to trademark law. *See, e.g.*, *Puri*, 844 F.3d at 1165–66. There is no "authority or reason precluding courts from deciding … church disputes by application of purely secular legal rules, so long as the dispute does not fall within the ministerial exception and can be decided without resolving underlying controversies over religious doctrine." *Id.* Other courts of appeals agree, including in the wake of the ministerial exception cases on which defendants rely: "When a case can be resolved by applying well-established law to secular components of a dispute,

such resolution by a secular court presents no infringement upon a religious association's independence." *Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 2609 (2023); *see also Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1112 (7th Cir. 2024); *Wells ex rel. Glover v. Creighton Preparatory Sch.*, 82 F.4th 586, 594 n.4 (8th Cir. 2023); *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 348 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2852 (2021). And even defendants don't claim that *Jones v. Wolf* is inapposite; to the contrary, they cite it as providing the proper standard. Defs. Petn. 11–13.

In sum, while both have their roots in the Religion Clauses, these are two distinct doctrines. The Supreme Court developed the "doctrine of ecclesiastical abstention" "[l]ong before it formally recognized a ministerial exception." *Puri*, 844 F.3d at 1162. Any argument that the neutral-principles approach is inconsistent with the ministerial exception "conflates two fundamentally different types of dispute." McConnell & Goodrich at 336. And indeed, the two doctrines have long coexisted. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 188 (citing the "uniform[]" position of lower courts on the ministerial exemption stretching back decades).

**2.** Beyond these two doctrines, there is no additional, ill-defined First Amendment shield preventing a court from applying neutral principles to disputes that relate to an unspecified category of "core" issues, as defendants at times appear to suggest (at 12). Such an approach would be flatly inconsistent with the decades of

caselaw on which defendants themselves rely. The property cases that gave rise to the doctrine of ecclesiastical abstention almost always arose during hotly contested schisms between factions of religious organizations over fundamental matters of religious doctrine. These cases had significant religious consequences for the groups involved, such as determining who controls religious buildings, which are typically sacred and vital sites for the faith. Whether a religious organization has a place of worship is certainly "core" to its religious mission. *Id.* Yet if that were enough to create an absolute bar on civil courts' adjudicating any such disputes, then decades of cases heard by the Supreme Court and this Court would have been wrongly decided.

A free-floating analysis about which issues are "core" or "central" to a religious organization would also invite the kind of inquiry that this Court and the Supreme Court have warned against: "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith." *Jones v. Slade*, 23 F.4th 1124, 1145 (9th Cir. 2022) (quoting *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989)). And neither defendants nor their *amici* explain how this could be resolved without examining religious doctrine.

Further, doctrines based in both Religion Clauses, like ecclesiastical abstention and the ministerial exception, impose an absolute bar. Standalone Free Exercise claims involve questions of state interests, requisite levels of tailoring, and interest

balancing. *See, e.g.*, *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021). But under ecclesiastical abstention, courts do not ask whether there is a compelling state interest in adjudicating questions of religious doctrine, nor whether this would be the least restrictive means of furthering that interest. Instead, the doctrine is an absolute bar; civil courts simply are not competent to decide such questions. Courts must therefore be especially careful in delineating the scope of such protections, at the risk of placing all church "affairs in a special law-free zone." *Jeffs*, 970 P.2d at 1250–51. Ecclesiastical abstention reflects this, ensuring that when a controversy may be resolved by ordinary legal principles, the courthouse doors are not closed. *Cf. Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (noting in the context of abstention doctrines that "[j]urisdiction existing, this Court has cautioned, a federal court's obligation to hear and decide a case is virtually unflagging.").

This case illustrates the unmanageability of any carve-out for "core" issues, whatever those may be. Defendants describe "[h]ow a church funds its operations" and "how it invests its money" as "core" issues. Defs. Petn. 12.[5] But if the Religion Clauses impose an absolute bar on all suits related to such questions, then churches would be exempt from all ordinary laws about investments and fundraising—a

---

[5] Some of defendants' *amici* advance an even broader theory under which "[c]ourts have no authority to second-guess [religious] speech" or "probe what Church leadership meant." Becket Br. 21. Defendants do not go this far, acknowledging that "courts are perfectly capable of scrutinizing" whether a church leader's invocation of religion belief is sincere or not. Petn. Reply 5.

startling outcome that even defendants do not suggest. If such suits are only barred when brought by believers or "former believers," Defts. Petn. 17, that "would raise its own serious problems under the Free Exercise Clause," *Puri*, 844 F.3d at 1166–67. Fortunately, this is not the law. Under the Religion Clause, these questions can be adjudicated, so long as courts apply neutral principles of secular law.

This would also be a particularly inappropriate area to create any such carve-out. For decades, courts have adjudicated claims that religious leaders fraudulently solicited donations. *See* Huntsman Opp. 14–15 n.3; *see generally* Br. *Amicus Curiae* Interfaith Alliance. And the Supreme Court has indicated that the justification for deference to religious institutions is at its lowest ebb in cases involving fraud. *See, e.g.,* *Jones*, 443 U.S. at 609 n.8.

Finally, while defendants and their *amici* invoke a litany of purportedly catastrophic effects, ruling for Mr. Huntsman would not require changing the law one iota. The neutral-principles doctrine is already the law in this Circuit, in California, and in Utah. If applying that doctrine would cause catastrophic effects, surely we would have seen them by now.

## II. Mr. Huntsman's claims can be adjudicated under neutral principles of civil law by a properly instructed jury.

Because *Jones v. Wolf* provides the governing framework, at this stage of the litigation, the question is whether a reasonable juror could rule in Mr. Huntsman's favor without deciding any questions of religious doctrine. This question must be

answered by "viewing the evidence in the light most favorable" to Mr. Huntsman and "draw[ing] all justifiable inferences in [his] favor." *Brown v. Arizona*, 82 F.4th 863, 874 (9th Cir. 2023).

The longstanding elements of common-law fraud include "misrepresentation (false representation, concealment, or nondisclosure)" and "justifiable reliance." *Small v. Fritz Companies, Inc.*, 65 P.3d 1255, 1258 (Cal. 2003). Defendants assert that Mr. Huntsman could not prove these elements without asking a court to adjudicate questions of religious doctrine. But under California law, Mr. Huntsman can prevail if he can show that defendants: (A) knew that some recipients of the statements, like Mr. Huntsman, would care about the source of the funds for the commercial mall project; and (B) intended for some recipients to get the false impression that no tithes or interest on tithes would be used on the mall project.

These are "secular factual question[s]" that are "quintessentially susceptible to decision by neutral principles." *Puri*, 844 F.3d at 1167. And viewing record evidence in the light most favorable to Mr. Huntsman and drawing all reasonable inferences in his favor, a reasonable juror could agree with him on both of these factual questions even while deferring to defendants' interpretations of religious doctrine. *See, e.g.*, *McCarthy v. Fuller*, 714 F.3d 971, 979 (7th Cir. 2013) (fraud claims could proceed so long as courts deferred to religious organization on question of religious doctrine).

To be sure, the facts could ultimately show that no fraud occurred here. For example, the evidence might bear out defendants' assertions that no misrepresentations were intended. *Amicus* offers no judgment on this or any other factual questions that will eventually decide this case, nor on the ultimate question whether defendants did anything unlawful. Those are questions for the jury. Instead, *amicus* merely sets out the proper framework for evaluating Mr. Huntsman's claims at this early stage of the litigation, when resolution of factual disputes or credibility would be premature.

### A. A jury can determine justifiable reliance under settled principles of California fraud law, without adjudicating any questions of religious doctrine.

As to justifiable reliance, a reasonable juror must be able to find "that (1) the [misrepresented] matter was material" and "(2) it was reasonable for [Mr. Huntsman] to have relied on the misrepresentation." *Hoffman v. 162 N. Wolfe LLC*, 175 Cal. Rptr. 3d 820, 833 (2014). "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." *Pub. Emps.' Ret. Sys. v. Moody's Invs. Serv., Inc.*, 172 Cal. Rptr. 3d 238, 261 (2014). And here, a reasonable juror could rule in Mr. Huntsman's favor as a matter of fact without adjudicating any questions of religious doctrine.

**1.** As to the first prong, California follows the longstanding principle that "[a] misrepresentation is judged to be material … if 'the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.'" *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 892 (Cal. 2011) (quoting (Restatement (Second) of Torts, § 538, subd. (2)(b) (1977)); *see also Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) (recognizing this principle). And whether defendants knew (or had reason to know) that recipients would care about the source of the funding for the mall project is question of fact that a reasonable juror could resolve without resort to religious doctrine.

*First*, a reasonable juror could infer as much from whistleblower testimony that the head of the church's investment fund "stated that it was important that people not know [the investment fund's] role as the source of the funds" for the mall project. 2-ER-82. The investment fund took pains to hide this fact by funneling the money through two other entities to ensure that "people would not know [the investment fund] was the source of this funding to City Creek Mall." 2-ER-81–82. A reasonable juror could infer from these efforts to keep the source of the money secret that defendants knew that some members of the church considered the source of funding for the mall project to be "important." *Kwikset*, 246 P.3d at 892.

*Second*, church officials made repeated public statements that "[n]one of this money comes from the tithing of our faithful members. That is not how we use tithing funds." 1-ER-4; *see also id.* ("[n]o tithing funds will be used in the redevelopment" of the mall); *id.* ("Money for the project is not coming from LDS Church members' tithing donations."); *id.* ("not one penny of tithing goes to the church's for-profit endeavors" and "no tithing went toward City Creek Center"). Once again, a reasonable juror could infer from church officials' repeated assurances that defendants knew that some church members like Mr. Huntsman cared about what funds the church used to finance the mall project.

Neither of these determinations would require a juror to question defendants' definition of tithes as a matter of religious doctrine. Instead, defendants' primary response is that "Huntsman has never suggested that the Church had actual knowledge of his views during the relevant period." Petn. Reply 6. They cite no authority in California law for the proposition that the defendant must know the specific identity of the recipients who will find the misrepresented information important. To the contrary, courts routinely evaluate whether companies are aware that certain claims will matter to their customers without needing to show that the company was aware of the specific identity of each of those customers. *See, e.g.*, *Kumar v. Salov N. Am. Corp.*, 2016 WL 3844334, at *8 (N.D. Cal. July 15, 2016) (compiling cases).

Defendants also assert "that Church members have a religious obligation to tithe without respect to the destination of the funds" and that the reasonableness of Mr. Huntsman's beliefs would need to be evaluated in light of that doctrine. Defts. Petn. 16–17. Defendants' *amici* argue that because Mr. Huntsman testified that he had been a "devout" member of the church, "presumably, he accepted the Church's teachings that tithes should be offered as an act of self-denial and submission to God's will, not because the tithes would be put to any particular use." Becket Br. 22. But Mr. Huntsman testified that if he'd known his donations were going to these purposes, he "never would have made [his] donations in the first place." 2-ER-45. And second-guessing Mr. Huntsman's own understanding of his religious obligations, based on the views of church authorities, is strictly forbidden by the First Amendment. *See, e.g.*, *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 715–16 (1981).

More fundamentally, the question is not whether, as a religious matter, church members should care about how tithing funds are used. It is whether, as a factual matter, defendants knew that church members like Mr. Huntsman did, in fact, care. Drawing all inferences in Mr. Huntsman's favor based on the undisputed record before the Court, a reasonable juror could decide that question in his favor while deferring to defendants' religious definition of tithing and religious interpretation of tithing obligations.

**2.** As to the second prong, whether it "was reasonable for the plaintiff to have relied on the misrepresentation," *Hoffman*, 228 Cal. App. 4th at 1194, that factual question can be easily answered. For defendants to prevail, Mr. Huntsman had to have relied on "representations that were preposterous or shown by facts within his observation to be … patently and obviously false." *Pub. Emps.*, 172 Cal. Rptr. 3d at 262. Given the "secrecy" around the actual source of funding for the mall, Mr. Huntsman had no reason to doubt repeated statements by church officials. *Id.*

**3.** Moreover, defendants' argument would prove far too much. If any inquiry into whether a representation is "material to [a person's] tithing decisions" is "verboten," Petn. Reply 6–7, then no one could sue for any misrepresentation made in soliciting tithes—no matter how blatantly false. Even if a televangelist knew that false claims about how donations would be used would lead his congregation to donate, so long as he sincerely believed that his faithful were required to donate regardless of how the funds were used, he would be shielded by the First Amendment.

This would be a terrible rule for believers, religious institutions, and those with whom they deal. Religious institutions raise money all the time and regularly represent how that money will be used, and donors in turn rely on those representations. And it is important for religious institutions and donors alike to know that regular principles of private law will apply to things like conditions on

gifts. For example, there are capital campaigns where churches will list the projects to which donations will be devoted. Or a congregant may give a gift with express conditions attached. Yet if a church could disregard an "express condition" on a contribution, "[t]hat is a recipe for making congregants unwilling to contribute." McConnell & Goodrich at 340; *see also* Greenawalt, *Hands Off!*, 98 Colum. L. Rev. at 1865. Instead, it serves the interests of both "the faithful" and "the church" if they "can rely on the other parties playing by the rules." *Jeffs*, 970 P.2d at 1250–51. This does not require religious institutions to speak "with an accountant's precision" or face fraud liability. Defts. Petn. 10. There is no fraud without "intent to defraud," *Small*, 65 P.3d at 1258, and heightened pleading requirements for fraud claims protect against spurious suits and conclusory allegations, *see, e.g.*, *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011).

**B.    A jury could determine that defendants made misrepresentations under settled principles of California fraud law, without adjudicating any questions of religious doctrine.**

The same goes for the misrepresentation element of Mr. Huntsman's claim. Drawing all reasonable inferences in his favor, a reasonable juror could conclude that the statements at issue were misrepresentations without deciding any questions of religious doctrine.

**1.** Among the various forms of misrepresentation, a "representation that the maker knows to be capable of two interpretations, one of which he knows to be false

and the other true[,] is fraudulent if it is made[] with the intention that it be understood in the sense in which it is false." Restatement (Second) of Torts § 527(a). "As the leading text on California law puts it, 'ambiguous statements, with a possible true or false meaning, are fraudulent … if the false meaning was intended.'" *El Dorado Irrigation Dist. v. Traylor Bros., Inc.*, 2005 WL 8155281, at *15 (E.D. Cal. Oct. 7, 2005) (quoting 5 Witkin, Summary of Cal. Law (9th ed.) Torts, § 704); *see also Friedman v. Medjet Assistance, LLC*, 2010 WL 1462853, at *14 (C.D. Cal. Nov. 1, 2010).

Other states and courts of appeals recognize this longstanding common-law rule. *See deNourie & Yost Homes, LLC v. Frost*, 854 N.W.2d 298, 312 (Neb. 2014) ("[A] representation literally true is fraudulent if used to create an impression substantially false" and "an ambiguous statement is fraudulent if made with the intent that it be understood in its false sense."); *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 735 (Iowa 2009); *Metro. Life Ins. Co. v. Ditmore*, 729 F.2d 1, 5 (1st Cir. 1984); *Tenneco Oil Co. v. Joiner*, 696 F.2d 768, 773 (10th Cir. 1982); *Gen. Motors Acceptance Corp. v. Cent. Nat'l Bank of Mattoon*, 773 F.2d 771, 781–82 (7th Cir. 1985); *Ollerman v. O'Rourke Co.*, 288 N.W.2d 95, 102 (Wis. 1980).

**2.** Here, a reasonable juror could infer that defendants knew that some congregants would interpret statements like the following to mean that tithes and funds derived from tithing were walled off from the mall project: "Money for the project is not coming from LDS Church members' tithing donations. City Creek

Center is being developed by Property Reserve, Inc., the Church's real-estate development arm, and its money comes from other real-estate ventures." 1-ER-4.

And a reasonable juror could infer that this "false meaning was intended." *El Dorado*, 2005 WL 8155281, at \*15 (quoting Witkin § 704). For example, a juror could reasonably infer that efforts to conceal the source of mall project funding by funneling it through "Property Reserve, Inc. and Deseret Management Corporation," 2-ER-81, reflect an intent to ensure that congregants would believe that the money for the project came only from "the Church's real-estate development arm, and its money comes from other real-estate ventures," 1-ER-4.

Similarly, a juror could reasonably infer that if "senior leadership" in the church's investment fund "referred to and revered all funds of EPA as 'tithing' money, regardless of whether they were referring to principal or earnings on that principal," then defendants were aware that other congregants could have the same interpretation. 2-ER-80.

None of these factual determinations and inferences require the adjudication of religious doctrine. And a court could guard against that danger through jury instructions.

**3.** Furthermore, there is no blanket First Amendment rule that protects religious organizations from any misrepresentation claim so long as a donation was solicited using religious language. Defendants cite no authority for this proposition,

which cannot be squared with decades of cases where courts adjudicated fraud claims based on religious solicitations. *See* Huntsman Opp. 14–15 n.3; *see generally* Br. *Amicus Curiae* Interfaith Alliance. Once again, it is important for religious institutions and donors alike to know that regular principles of private law apply if religious officials make commitments in soliciting donations. *See supra* 13–14.

Yet under defendants' approach, even if the church admitted that it knew that its members had a different understanding of "tithing funds" and the church relied on that understanding to deceive them, there could be no fraud claim. This rule would foreclose fraud claims against all but the crudest scams, closing the courthouse door to honest believers misled by dishonest leaders.

## CONCLUSION

The Religion Clauses do not bar this suit from proceeding.

Respectfully submitted,

*/s/ Thomas Scott-Railton*
THOMAS SCOTT-RAILTON
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*thomas@guptawessler.com*

April 5, 2024

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Circuit Rule 29-2(c)(3) because this brief contains 6,999 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Thomas Scott-Railton*
Thomas Scott-Railton