**No. 21-56056**

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JAMES HUNTSMAN,

*Plaintiff–Appellant,*

v.

CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, *et al.,*

*Defendants–Appellees.*

On Appeal from a Final Judgment of the
United States District Court for the Central District of California
Case No. 2:21-cv-02504, Hon. Stephen V. Wilson

**BRIEF OF INTERFAITH ALLIANCE, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., NATIONAL WOMEN'S LAW CENTER, AND SIKH COALITION AS *AMICI CURIAE* SUPPORTING APPELLANT**

RICHARD B. KATSKEE
JOSHUA BRITT†
MARGARET K. KRUZNER†
LUKE MEARS†
   *Duke University*
    *School of Law*
   *210 Science Dr., Box 90360*
   *Durham, NC 27708-0360*
   *(919) 613-7230*

*Counsel for* Amici Curiae

† Law student appearing under Cir. R. 46-4.

**CORPORATE DISCLOSURE STATEMENT**

*Amici* are nonprofit organizations. They have no parent corporations, and no publicly held corporation owns any portion of any of them.

# TABLE OF CONTENTS

Page

Corporate Disclosure Statement ................................................................. i

Table of Authorities ................................................................................ iii

Interests of the *Amici Curiae* ................................................................. 1

Introduction and Summary of Argument ................................................... 3

Argument ................................................................................................. 6

    A.   Ecclesiastical abstention does not prevent courts from hearing ordinary disputes, and especially not fraud cases. ........... 6

    B.   The dramatic expansion of ecclesiastical abstention that the Church seeks would invite religious entities to ignore the law. ............................................................................... 11

    C.   The limits on ecclesiastical abstention benefit religious institutions and the public alike. ................................................ 15

    D.   Huntsman's claims may be adjudicated without addressing questions of theology, doctrine, or religious practice that would implicate ecclesiastical abstention. .............. 21

Conclusion ............................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ................................................................ 2

*Alliance Mortg. Co. v. Rothwell*,
900 P.2d 601 (Cal. 1995) ...................................................... 28

*Ambassador Coll. v. Geotzke*,
675 F.2d 662 (5th Cir. 1982) ............................................. 8, 9

*Belya v. Kapral*,
45 F.4th 621 (2d Cir. 2022),
*reh'g en banc denied*, 59 F.4th 570 (2d Cir. 2023)............................ 9, 10

*Belya v. Kapral*,
59 F.4th 570 (2d Cir. 2023) ................................................ 27

*Bivin v. Wright*,
656 N.E.2d 1121 (Ill. App. Ct. 5th Dist. 1995) ..................... 14

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ............................................................ 13

*Bollard v. Cal. Province of Soc'y of Jesus*,
196 F.3d 940 (9th Cir. 1999) ..................................... 15, 16, 17

*Broberg v. Guardian Life Ins. Co.*,
171 Cal. App. 4th 912 (2009)................................................ 28

*Bryce v. Episcopal Church in the Diocese of Colo.*,
289 F.3d 648 (10th Cir. 2002) .............................................. 7

*Burri Law PA v. Skurla*,
35 F.4th 1207 (9th Cir. 2022)......................................... 14, 29

*Cantwell v. Connecticut*,
310 U.S. 296 (1940) ................................................... 4, 7, 20

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
723 F. Supp. 1467 (S.D. Fla. 1989),
*aff'd*, 936 F.2d 586 (11th Cir. 1991),
*rev'd on other grounds*, 508 U.S. 520 (1993).......................... 13

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Conroy v. Regents of Univ. of Cal.*,
203 P.3d 1127 (Cal. 2009) ........................................................ 21

*Crowder v. S. Baptist Convention*,
828 F.2d 718 (11th Cir. 1987) ................................................... 8

*Elvig v. Calvin Presbyterian Church*,
375 F.3d 951 (9th Cir. 2004) ............................................. 15, 16

*Emp. Div. v. Smith*,
494 U.S. 872 (1990) ............................................................. 5, 12

*Funkhouser v. Oklahoma*,
763 P.2d 695 (Okla. Crim. App. 1988) ............................. 12, 13

*Garrick v. Moody Bible Inst.*,
No. 21-2683, __ F.4th __, 2024 WL 1154135
(7th Cir. Mar. 18, 2024) .................................................... 14

*Gen. Council on Fin. & Admin. United
Methodist Church v. Super. Ct.*,
439 U.S. 1355 (1978) ............................................................ 7, 8

*Gillette v. United States*,
401 U.S. 437 (1971) .................................................................. 12

*Gonzalez v. Roman Cath. Archbishop*,
280 U.S. 16 (1929) ................................................................. 6, 7

*Groff v. DeJoy*,
600 U.S. 447 (2023) .................................................................... 2

*Herx v. Diocese of Fort Wayne–South Bend, Inc.*,
772 F.3d 1085 (7th Cir. 2014) ................................................. 16

*Huntsman v. Corp. of President of Church of
Jesus Christ of Latter-Day Saints*,
76 F.4th 962 (9th Cir. 2023) ............................................. 4, 22

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Huntsman v. Corp. of President of Church of
    Jesus Christ of Latter-Day Saints*,
    No. 2:21-cv-02504, 2021 WL 4296208
    (C.D. Cal. Sept. 10, 2021) ........................................................... 4

*Illinois ex rel. Madigan v. Telemarketing Assocs.*,
    538 U.S. 600 (2003) ................................................................. 18

*Jenkins v. Trinity Evangelical Lutheran Church*,
    825 N.E.2d 1206 (Ill. App. Ct. 3d Dist. 2005)................................. 14, 17

*Jones v. Wolf*,
    443 U.S. 595 (1979) ............................................................7, 10, 17, 20

*Kirby v. Lexington Theological Seminary*,
    426 S.W.3d 597 (Ky. 2014) ....................................................... 17

*Listecki v. Off. Comm. Unsecured Creditors*,
    780 F.3d 731 (7th Cir. 2015) ..................................................... 9

*Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*,
    179 F.3d 1244 (9th Cir. 1999) .................................................... 5

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*,
    584 U.S. 617 (2018) ................................................................. 2

*Masterson v. Diocese of Nw. Tex.*,
    422 S.W.3d 594 (Tex. 2013)................................................... 10, 14, 17

*McCarthy v. Fuller*,
    714 F.3d 971 (7th Cir. 2013) ..................................................... 9

*McRaney v. N. Am. Mission Bd. of
    S. Baptist Convention, Inc.*,
    966 F.3d 346 (5th Cir. 2020) .................................................. 10, 12, 20

*Myhre v. Seventh-Day Adventist Church Reform
    Movement Am. Union Int'l Missionary Soc'y*,
    719 Fed. App'x 926 (11th Cir. 2018) ........................................... 9

*Nation Ford Baptist Church v. Davis*,
    876 S.E.2d 742 (N.C. 2022) ....................................................... 17

## TABLE OF AUTHORITIES—continued

**Page(s)**

*North Carolina v. Massey*,
229 N.C. 734 (1949) ................................................. 13

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S. Ct. 2049 (2020) ....................................... 10, 11

*Paul v. Watchtower Bible & Tract Soc'y*,
819 F.2d 875 (9th Cir. 1987) ................................... 29

*Presbyterian Church in U.S. v. Mary Elizabeth*
*Blue Hull Mem. Presbyterian Church*,
393 U.S. 440 (1969) ............................................... 16

*Prince v. Massachusetts*,
321 U.S. 158 (1944) ............................................... 13

*Puri v. Khalsa*,
844 F.3d 1152 (9th Cir. 2017) ................................5, 20, 21, 27

*Samarzia v. Clark Cnty.*,
859 F.2d 88 (9th Cir. 1988) ................................... 26

*Sanders v. Casa View Baptist Church*,
134 F.3d 331 (5th Cir. 1998) ................................. 12

*Scotts Afr. Union Methodist Protestant Church v. Conf. Afr.*
*Union First Colored Methodist Protestant Church*,
98 F.3d 78 (3d Cir. 1996)..................................... 8, 25

*Seeger v. Odell*,
115 P.2d 977 (Cal. 1941) ....................................... 28

*Serbian E. Orthodox Diocese for U.S.A. & Can. v. Milivojevich*,
426 U.S. 696 (1976) ........................................ 6, 7, 8

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
471 U.S. 290 (1985) ............................................... 13

*Tort Claimants Comm. v. Roman Catholic Archbishop*,
335 B.R. 842 (Or. Bankr. Ct. 2005)........................ 14

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Trustees of New Life in Christ Church v.*
  *City of Fredericksburg,*
  142 S. Ct. 678 (2022) .............................................................. 11

*United Fed'n of Churches LLC v. Johnson,*
  No. 23-35060, 2023 U.S. App. LEXIS 31643
  (9th Cir. Nov. 15, 2023) ......................................................... 16

*United States v. Annamalai,*
  939 F.3d 1216 (11th Cir. 2019) ............................................ 13

*United States v. Hartshorn,*
  751 F.3d 1194 (10th Cir. 2014) ............................................ 13

*United States v. Lee,*
  455 U.S. 252 (1982) ................................................................ 12

*United States v. Little,*
  638 F. Supp. 337 (Mont. 1986) ............................................. 13

*United States v. Lyons,*
  472 F.3d 1055 (9th Cir. 2007) .............................................. 18

*United States v. Rasheed,*
  663 F.2d 843 (9th Cir. 1981) .......................................... 25, 26

*Wells v. Creighton Preparatory Sch.,*
  82 F.4th 586 (8th Cir. 2023)................................................. 14

*Whole Woman's Health v. Smith,*
  896 F.3d 362 (5th Cir. 2018) ................................................ 16

## TABLE OF AUTHORITIES—continued

**Page(s)**

**Constitution, Statutes, and Rules of Court**

U.S. Const. amend. I. ..............................................................*passim*

Fed. R. Evid. 610 ........................................................................ 16

Cal. Civ. Code § 1572 ................................................................. 24

**Other Authorities**

Alejandra Molina, *Catholic Church in California
    grapples with over 3,000 lawsuits alleging abuse,*
    WASH. POST, May 30, 2023, https://rb.gy/ajwxrl ................................... 15

Brian Bushard, *Mormon Church Will Pay Millions In SEC
    Settlement Over Investment Portfolio Allegedly Saving For
    'Second Coming Of Christ,'* FORBES (Feb. 21, 2023),
    https://rb.gy/1fdup4 ......................................................... 22

HARVARD DIVINITY SCHOOL RELIGION AND PUBLIC LIFE,
    PROSPERITY GOSPEL, https://rb.gy/q7f0q7 .............................................. 19

James Queally & Matthew Ormseth, *Scientology's secrets spill
    into open in Danny Masterson rape case*, L.A. TIMES (May
    27, 2021), https://rb.gy/em19wj .............................................. 27

Marci A. Hamilton, *The Waterloo For The So-Called Church
    Autonomy Theory: Widespread Clergy Abuse and
    Institutional Cover-Up*, 29 CARDOZO L. REV. 225 (2010) ...................... 15

Michael G. Weisberg, *Balancing Cultural Integrity Against
    Individual Liberty: Civil Court Review of Ecclesiastical
    Judgments*, 25 U. MICH. J.L. REFORM 955 (1992)................................. 29

Ruth Marcus, *Jim Bakker, Former Aides Are Indicted In PTL
    Case*, WASH. POST, Dec. 5, 1988, https://shorturl.at/kyL14 .................. 13

Terry Gross, *How the Southern Baptist Convention covered up
    its widespread sexual abuse scandal*, NPR, June 2, 2022,
    https://rb.gy/1fdup4 ........................................................ 15

WEBSTER'S NEW INT'L DICTIONARY (3d ed. 2002) ....................................... 24

## INTERESTS OF THE *AMICI CURIAE*[1]

*Amici* are nonprofit religious and civil-rights organizations. Collectively, *amici* work to ensure that the law protects all people against discrimination and other harms, including by seeking redress for injuries in the courts. Because *amici* depend on donations to support our work, we also recognize the importance of generally applicable, enforceable legal rules, which engender trust that charitable contributions will be put to the charitable purposes that donors expect and intend. *Amici* write to explain why, if those rules did not apply generally, the seeds of doubt thus sewn would deter donations, harming the work of religious and nonreligious organizations alike in service of the public good, while also depriving those who have been injured by religious entities of a venue to seek legal remedies.

Interfaith Alliance is a network of people of diverse faiths and beliefs from across the country working together to build a resilient democracy and fulfill America's promise of religious freedom and civil rights not just for some, but for all. We mobilize powerful coalitions to challenge Christian nationalism and religious extremism, while fostering a better

---

[1]  No counsel for a party authored this brief in whole or in part and no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. The parties have consented to this filing.

understanding of the healthy boundaries between religion and government. We advocate at all levels of government for an equitable and just America where the freedoms of belief and religious practice are protected, and where all persons are treated with dignity and have the opportunity to thrive.

Lambda Legal Defense and Education Fund, Inc., is the nation's oldest and largest nonprofit legal organization working for full recognition of the civil rights of lesbian, gay, bisexual, and transgender people and everyone living with HIV, through impact litigation, education, and policy advocacy. Lambda Legal has participated in many cases navigating issues of religious liberty and rights to be free from discrimination. *See, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023); *Groff v. DeJoy*, 600 U.S. 447 (2023); *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617 (2018). Lambda Legal's work depends on parties' being able to seek redress in court for deprivations of their legal rights, including at the hands of religious entities.

The National Women's Law Center is a nonprofit legal-advocacy organization that fights for gender justice in the courts, in public policy, and in our society. NWLC works across issues that are central to the lives of women, girls, and all who face sex discrimination—especially women of color, LGBTQI+ people, and low-income women and families. Since its founding in 1972, NWLC has worked to advance educational opportunities,

workplace justice, health and reproductive rights, and income security, with particular focus on the needs of those who face multiple and intersecting forms of discrimination. NWLC has also long advocated against overbroad religious exemptions that would permit institutions like employers, schools, or healthcare providers to violate individuals' rights, because one person's rights should not depend on another's religious beliefs.

The Sikh Coalition is the largest community-based organization working to protect Sikh civil rights across the United States. The Sikh Coalition's goal is working toward a world where Sikhs and other religious minorities in America may freely practice their faith without bias or discrimination. Since its inception, the Sikh Coalition has worked to defend civil rights and liberties for all people, to empower the Sikh community, to create an environment in which Sikhs can lead a dignified life unhindered by bias or discrimination, and to educate the broader community about Sikhism.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The central legal question in this case is not what counts as a tithe, but what constitutes civil fraud. That question animates every fraud case, and it is one that civil courts are not just capable, but obligated, to answer, no matter who the parties are. Ecclesiastical abstention ensures that civil courts do not adjudge the truth or falsity of theological doctrine or dictate

religious practices. But that essential safeguard for religious freedom was never "intended even remotely to imply that, under the cloak of religion, persons [or religious institutions] may, with impunity, commit frauds upon the public." *Cantwell v. Connecticut*, 310 U.S. 296, 306 (1940).

The Church's and its *amici*'s broad assertions here about ecclesiastical abstention find no support in either law or logic. Thus, it is no surprise that every judge at every step in this case rejected the Church's proffered interpretation of the First Amendment. *See Huntsman v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, No. 2:21-cv-02504, 2021 WL 4296208, at *3–4 (C.D. Cal. Sept. 10, 2021); *Huntsman v. Corp. of President of Church of Latter-Day Saints*, 76 F.4th 962, 968–969 (9th Cir. 2023); *id.* at 982 (Korman, J., dissenting in part). In the Church's view, because it used the religious term "tithe" in some solicitations, civil courts should not consider whether the Church intentionally misled people into thinking that they were donating money for charitable purposes when the Church instead used the contributions to construct, maintain, and operate a taxable for-profit shopping mall.

If the Church's legal theory were correct, religious organizations could insist that they were free from all possible liability, as long as there was some religious component or label to their conduct.

Fortunately for religious and secular individuals and institutions alike, the Constitution neither requires nor countenances any such thing. *See Emp. Div. v. Smith*, 494 U.S. 872, 888–889 (1990). The civil courts are not so powerless to address fraud or other illegal acts. *See Puri v. Khalsa*, 844 F.3d 1152, 1164 (9th Cir. 2017). Neither was the Internal Revenue Service forbidden to determine, as it did here following a whistleblower report, that the Church's diversion of tax-exempt charitable contributions to a for-profit shopping mall violated the tax laws.

District courts routinely manage litigation to ensure that when religious entities are involved in legal disputes, the parties are pursuing, and the courts themselves are adjudicating, civil claims under civil law using civil proof. The Religion Clauses require only that "courts decide disputes involving religious organizations 'without resolving underlying controversies over religious doctrine'" (*Puri*, 844 F.3d at 1164 (quoting *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1248 (9th Cir. 1999)))—not that courts must entirely abstain from hearing cases just because a religious party describes its conduct using religious terminology. This settled rule benefits everyone: The availability of a neutral forum to litigate civil disputes provides remedies for injuries and encourages charitable contributions.

5

Religiously neutral adjudication is eminently possible here: The district court can resolve Huntsman's claims without adjudging the veracity of the Church's religious beliefs or imposing a judicial definition of the term "tithe." Hence, this case can and should go forward.

## ARGUMENT

### A. Ecclesiastical abstention does not prevent courts from hearing ordinary disputes, and especially not fraud cases.

1. Because religious authorities must have the final say "on matters of discipline, faith, internal organization, [and] ecclesiastical rule, custom, or law" if they are to remain the authors and arbiters of the faith, civil courts cannot decide "dispute[s] [that are] strictly and purely ecclesiastical in [their] character." *Serbian E. Orthodox Diocese for U.S.A. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976). Courts must therefore refrain from adjudicating matters of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them . . . ." *Id.* at 714.

But while "it is the function of the church authorities to determine" religious controversies, it remains the province of the civil courts to decide controversies arising under civil law. *Gonzalez v. Roman Cath. Archbishop*, 280 U.S. 1, 16 (1929). And claims sounding in civil fraud are inherently the province of the civil courts—even when the fraud was committed by a

religious institution or its leaders. Hence, ecclesiastical abstention "is not without limits." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657 (10th Cir. 2002). The cases "premised on a perceived danger that in resolving intrachurch disputes the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs . . . are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract, [or] statutory violations are alleged." *Gen. Council on Fin. & Admin. United Methodist Church v. Super. Ct.*, 439 U.S. 1355, 1373 (1978) (Rehnquist, J., in chambers).

That principle is in keeping with the Supreme Court's consistent, long-standing, unambiguous declarations that "[n]othing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public." *Cantwell*, 310 U.S. at 306 (quoted in *United Methodist*, 439 U.S. at 1373). For the First "Amendment embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Id.* at 303–304 (cleaned up). *See generally Jones v. Wolf*, 443 U.S. 595, 609 & n.8 (1979); *Milivojevich*, 426 U.S. at 713 & n.7; *Gonzalez*, 280 U.S. at 16.

7

In keeping with that clear demarcation of religious and secular authority, the courts of appeals have consistently recognized that fraud claims are not categorically barred by the First Amendment just because the defendant is a religious entity and the dispute is "incidentally ecclesiastical." *Scotts Afr. Union Methodist Protestant Church v. Conf. Afr. Union First Colored Methodist Protestant Church*, 98 F.3d 78, 94 (3d Cir. 1996). That is because members of a religious faith or congregation, and all persons, "retain a strong interest in obtaining a civil forum" when fraud is afoot. *Crowder v. S. Baptist Convention*, 828 F.2d 718, 726 (11th Cir. 1987).

As the Fifth Circuit explained, *Milivojevich* and the other cases on which the Church seeks to rely (*see* Reply Supp. Reh'g 7) acknowledge civil courts' lack of authority to solve disputes concerning internal church governance or religious doctrine and its application. *See Ambassador Coll. v. Geotzke*, 675 F.2d 662, 665 (5th Cir. 1982) (quoting *United Methodist*, 439 U.S. at 1373). They do not bar ordinary applications of civil or criminal law to religious actors or to misdeeds that happen to involve the use of religious terminology.

2. Fraud cases in particular normally involve "purely secular dispute[s]" that may be decided with reference to neutral legal principles. *Id.* As long as determining whether a religious institution's conduct was fraudulent does not require a court to "interpret any religious law or

8

principles" or "examine a decision of a religious organization or 'tribunal,'" "no intrachurch dispute" is at issue, and ecclesiastical abstention "is not applicable." *Listecki v. Off. Comm. Unsecured Creditors*, 780 F.3d 731, 742 (7th Cir. 2015). That principle governs the ecclesiastical-abstention doctrine's important but circumscribed role for the full panoply of potential claims and defenses, religious and civil, that may arise when a religious entity is involved in a dispute.

It follows, for example, that a church has full, exclusive authority to define who is or isn't a nun in good standing. *See McCarthy v. Fuller*, 714 F.3d 971, 979–980 (7th Cir. 2013). Likewise, a secular court, in resolving a defamation claim or a dispute about retirement benefits, must not second-guess whether a clergymember was properly defrocked. *See Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022) (defamation), *reh'g en banc denied*, 59 F.4th 570 (2d Cir. 2023); *Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 719 Fed. App'x 926, 927–930 (11th Cir. 2018) (retirement benefits). And courts must not resolve "a struggle over who will be the Russian Orthodox Archbishop[,] . . . [or] who has the power to restructure the Serbian Orthodox diocese." *Geotzke*, 675 F.2d at 665.

But civil courts may determine whether church officials defamed a former clergymember by publishing statements that he is a forger (*Belya*,

9

45 F.4th at 634) or defamed the leader of a group of churches by lying about his job performance (*McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, 966 F.3d 346, 348–349 (5th Cir. 2020)), regardless of whether religious terminology or conduct is in the mix, as long as the legal analysis focuses on secular questions. And courts may properly determine the "ownership of disputed property," even by "considering evidence such as . . . relevant provisions of governing documents of the general church" (*Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 603 (Tex. 2013)), as long as they do not adjudicate questions of religious doctrine. "[S]imply having a religious association on one side of the 'v' does not automatically mean a district court must dismiss the case or limit discovery." *Belya*, 45 F.4th at 630. Ordinary, mine-run legal disputes that don't require deciding inherently religious questions can be, and properly are, resolved by secular courts. *See Wolf*, 443 U.S. at 606 ("The neutral-principles approach cannot be said to 'inhibit' the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which the churches own property, hire employees, or purchase goods.").

Hence, while *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020), applied a close cousin of ecclesiastical abstention—the ministerial exception—to hold that the First Amendment barred suits for employment discrimination brought against religious schools by

10

teachers who taught religion, the rationale was that churches must be free to decide for themselves who teaches and preaches the faith. The Court manifestly did not hold, as the Church here would have it, that secular civil and criminal law are categorically inapplicable to religious institutions when they describe their actions using religious terminology. Quite the contrary: The Supreme Court reaffirmed the foundational legal principle that "religious institutions" do not "enjoy a general immunity to secular laws." 140 S. Ct. at 2060. And Justice Gorsuch has underscored that the principle that the "First Amendment does not permit . . . judges to subject religious beliefs to verification" applies only "[a]bsent proof of insincerity or fraud." *Trustees of New Life in Christ Church v. City of Fredericksburg*, 142 S. Ct. 678, 679 (2022) (Gorsuch, J., dissenting from denial of *cert.*) (internal quotation marks omitted). The protections for church "autonomy with respect to internal management decisions" (*Our Lady of Guadalupe*, 140 S. Ct. at 2060) simply do not apply when, as here, the question is whether church leaders and church-owned businesses intentionally misled people to obtain donations.

**B.    The dramatic expansion of ecclesiastical abstention that the Church seeks would invite religious entities to ignore the law.**

Ecclesiastical abstention cannot be the universal free pass that the Church and its *amici* seek for religious entities to avoid legal consequences

of their actions, because "the First Amendment does not categorically insulate religious relationships from judicial scrutiny" (*McRaney*, 966 F.3d at 348 (quoting *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 335–336 (5th Cir. 1998))). If the rule were otherwise, it would "impermissibly place . . . religious [institutions] in a preferred position in our society," infringing the conscience rights of members of all religious communities, both by making them live in accordance with the dictates of a religion to which they may not subscribe, and by allowing civil harms that cannot be remedied. *Id.*

If the Church's interpretation were the constitutional standard—which it isn't—that would, as Justice Scalia explained for the Supreme Court, undermine the rule of law by mandating "constitutionally required religious exemptions from civic obligations of almost every conceivable kind—ranging from compulsory military service to the payment of taxes; to health and safety regulation such as manslaughter and child neglect laws, compulsory vaccination laws, drug laws, and traffic laws; to social welfare legislation such as minimum wage laws, child labor laws, animal cruelty laws; environmental protection laws, and laws providing for equality of opportunity for the races." *Smith*, 494 U.S. at 888–889 (citing for the contrary, correct legal principle, *Gillette v. United States*, 401 U.S. 437 (1971); *United States v. Lee*, 455 U.S. 252 (1982); *Funkhouser v. Oklahoma*,

763 P.2d 695 (Okla. Crim. App. 1988); *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290 (1985); *Prince v. Massachusetts*, 321 U.S. 158 (1944); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 723 F. Supp. 1467 (S.D. Fla. 1989); *North Carolina v. Massey*, 229 N.C. 734 (1949); *United States v. Little*, 638 F. Supp. 337 (Mont. 1986); *Bob Jones Univ. v. United States*, 461 U.S. 574, 603–604 (1983)).

The Church's rewrite of the ecclesiastical-abstention doctrine would, in other words, invite the argument that religious adherents and religious dissenters alike have no recourse whenever a tortfeasor or accused criminal is a religious institution or clergymember and asserts that religious matters are in the mix:

- A temple could "advertise[] its services online," overcharge its followers, and use "the fraud proceeds to fund [its leaders'] lavish lifestyle," and yet insist that no one may be charged, must less convicted, if the offered services are religious. *Contra United States v. Annamalai*, 939 F.3d 1216, 1221, 1225–1226 (11th Cir. 2019).

- A church could argue that it cannot be held liable for labeling all its members as "ministers" and falsely telling them that they can avoid paying taxes if they transfer to the church formal title to all their real and personal property. *Contra United States v. Hartshorn*, 751 F.3d 1194, 1198–1203 (10th Cir. 2014).

- Televangelists could seek to escape liability for tax evasion after raising huge sums as charitable contributions and using the money to fund extravagant lifestyles and pay personal debts. *But see* Ruth Marcus, *Jim Bakker, Former Aides Are Indicted In PTL Case*, WASH. POST, Dec. 5, 1988, https://shorturl.at/kyL14.

- A religious organization could assert religious rights to tortiously interfere with an outside accountant's employment contract and defame him for initiating a lawsuit after discovering that the organization is violating ERISA. *Contra Burri Law PA v. Skurla*, 35 F.4th 1207, 1212 (9th Cir. 2022).

- Religious entities could assert that courts are unable to hear secular disputes about "land titles, trusts, [or] corporate formation, governance, and dissolution." *Contra Masterson*, 422 S.W.3d at 606.

- Bankrupt religious entities could seek to evade creditors by asserting that collection efforts intrude on their religious self-governance. *Contra Tort Claimants Comm. v. Roman Catholic Archbishop*, 335 B.R. 842, 851–853 (Or. Bankr. Ct. 2005).

- Religious employers could assert that all their operations are religious and then argue that non-ministerial employees have no recourse in disputes arising under their employment contracts. *Contra Jenkins v. Trinity Evangelical Lutheran Church*, 825 N.E.2d 1206, 1211–1213 (Ill. App. Ct. 3d Dist. 2005).

- Religious entities and officials could argue that they cannot be sued for medical or psychological damages even for conduct unrelated to matters of faith, such as assault and battery of a congregant. *Contra Bivin v. Wright*, 656 N.E.2d 1121, 1123–1125 (Ill. App. Ct. 5th Dist. 1995).

- A private religious school could argue that it cannot be sued for failing to follow its own procedures when expelling a student. *Contra Wells v. Creighton Preparatory Sch.*, 82 F.4th 586, 594 n.4 (8th Cir. 2023).

- Religious institutions could argue that no employees could ever raise sex-discrimination claims for a hostile work environment or unequal treatment respecting job duties, employment requirements, or performance reviews. *Contra Garrick v. Moody Bible Inst.*, No. 21-2683, __ F.4th __, 2024 WL 1154135, *6–7 (7th Cir. Mar. 18, 2024).

- Religious employers could argue that their employees are barred from raising claims of sexual harassment or retaliation. *Contra Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 953 (9th Cir. 2004); *Bollard v. Cal. Province of Soc'y of Jesus*, 196 F.3d 940, 944–950 (9th Cir. 1999).

- Religious entities and officials could argue that they cannot be held responsible for failing to stop, and instead covering up under the label of internal church governance, the sexual abuse of children. *See, e.g.*, Alejandra Molina, *Catholic Church in California grapples with over 3,000 lawsuits alleging abuse*, WASH. POST, May 30, 2023, https://rb.gy/ajwxrl; Terry Gross, *How the Southern Baptist Convention covered up its widespread sexual abuse scandal*, NPR, June 2, 2022, https://rb.gy/1fdup4; Marci A. Hamilton, *The Waterloo For The So-Called Church Autonomy Theory: Widespread Clergy Abuse and Institutional Cover-Up*, 29 CARDOZO L. REV. 225, 232–244 (2010).

The First Amendment neither requires nor allows these abrogations of the rule of law. Instead, clear, unambiguous, long-standing precedent underscores why, for ordinary civil and criminal matters, and for fraud cases especially, ecclesiastical abstention either does not apply or merely limits some aspects of how cases are litigated. It does not categorically bar the courthouse doors.

### C. The limits on ecclesiastical abstention benefit religious institutions and the public alike.

1. Fortunately for victims of fraud, discrimination, and abuse, the Church's broad view of ecclesiastical abstention is not the law. Rather, district courts, employing case-management tools, are competent to adjudicate cases involving religious organizations without impermissibly

veering into religious inquiries. *See, e.g., Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U.S. 440, 449 (1969).

District courts may, for example, limit discovery so that litigation does not excessively intrude into religious affairs. *See*, *e.g., Elvig*, 375 F.3d at 967–968; *Whole Woman's Health v. Smith*, 896 F.3d 362, 373–375 (5th Cir. 2018). And even when a plaintiff's complaint appears to invite religious inquiries, courts may allow amendments to ensure that the case focuses on secular issues. *See*, *e.g., United Fed'n of Churches LLC v. Johnson*, No. 23-35060, 2023 U.S. App. LEXIS 31643, at *3 (9th Cir. Nov. 15, 2023). Courts may limit the evidence introduced. *Cf.* Fed. R. Evid. 610 (court must not admit evidence of religious beliefs to attack witnesses' credibility). Parties may obtain jury instructions that direct the jurors to address only secular considerations under neutral law. *See Herx v. Diocese of Fort Wayne–South Bend, Inc.*, 772 F.3d 1085, 1091 (7th Cir. 2014). And remedies may be limited to money damages to avoid judicial oversight or monitoring of religious institutions. *See Bollard*, 196 F.3d at 950.

2. With those guardrails available, settled law on ecclesiastical abstention provides religious institutions and secular parties alike with necessary forums to resolve disputes. "The public at large and religious organizations also have an interest in the courthouse remaining open for

the resolution of civil disputes: the contractors, vendors, lenders, and employees upon whom religious organizations depend to assist in the more prosaic elements of operating a nonprofit corporation might think twice about providing their services if there were no neutral forum for resolving the kinds of disputes that inevitably arise in the course of everyday business." *Nation Ford Baptist Church v. Davis*, 876 S.E.2d 742, 750 (N.C. 2022); *accord Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 606 n.71 (Ky. 2014).

If employees could not pursue contract claims against religious employers (*contra Jenkins*, 825 N.E.2d at 1211–1213), religious organizations might struggle to find workers, much less highly skilled ones with other options. So too if employees could not sue or seek regulatory remedies for discriminatory harassment and hostile work environments (*contra Bollard*, 196 F.3d at 944–950). If courts could not adjudicate routine business disputes that touch on arguably religious activities (*contra Wolf*, 443 U.S. 602), restaurants might understandably decline to cater Easter brunch; DJs might hesitate to play at bat mitzvahs; and contractors might refuse remodeling projects for temples. If courts could not hear land disputes involving religious organizations (*contra Masterson*, 422 S.W.3d at 606), individuals might hesitate to buy, sell, or lease land when a religious

17

group is involved, thus hampering denominations' ability to establish new houses of worship.

3. These considerations apply with special force in the civil-fraud context: Religious organizations provide millions of Americans with social services, ranging from education and healthcare to a hot meal and a safe place to sleep at night. Donations from adherents and nonadherents alike support that critical work. If ecclesiastical abstention barred suit over the diversion of funds to noncharitable purposes, potential contributors might send their money elsewhere—or not donate at all.

The rule that false representations about donations are actionable (*see*, *e.g.*, *United States v. Lyons*, 472 F.3d 1055, 1060–1062 (9th Cir. 2007); *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 623–624 (2003)) thus serves the critical function of engendering public trust, so as not to deter charitable contributions. The Church's novel take on ecclesiastical abstention would thus harm everyone: religious adherents who wish to support the works of their house of worship, people who seek to contract with religious institutions for either financial or values-driven reasons, and the religious entities themselves.

4. The Church contends, however, that its expansive view of ecclesiastical abstention does not utterly throw church members or the public to the wolves because courts may evaluate a religious defendant's

sincerity. But fraud law addresses whether the defendant lied to or intentionally misled the plaintiff for the defendant's gain, not whether the defendant has genuine beliefs or sincere reasons for desiring to profit from its misdeeds. Thus, the proffered sincerity test, raised for the first time (and not explained) in the Church's Reply in Support of Petition for Rehearing (at 5) provides cold comfort that fraud will be deterred or remedied. A pastor who adheres to prosperity gospel might genuinely and wholeheartedly believe that the reward for piety comes as riches in this life.[2] But if the pastor solicits alms with the promise that they will go to feed the poor and then uses them to buy a private jet, the underlying sincerity of the religious beliefs and the pastor's commitment to them do not sublimate the false promise into a truthful one.

The Church's proffered sincerity test is also a poor proxy for fraud because not all non-fraudulent solicitations by religious organizations are grounded in sincere religious belief. If a rabbi has a crisis of faith but still encourages congregants to donate to the synagogue's campaign to feed the poor, that should not render the solicitation a fraud. Yet the Church's sincerity test may call for that result. In all events, it would encourage needless, highly intrusive discovery into the validity of speakers' professions

---

[2] *See* HARVARD DIVINITY SCHOOL RELIGION AND PUBLIC LIFE, PROSPERITY GOSPEL, https://rb.gy/q7f0q7 (last visited Apr. 5, 2024).

of belief, rather than straightforwardly evaluating whether a solicitation is truthful about how the money will be spent. And the invasive judicial scrutiny would be antithetical to ecclesiastical abstention's aim to "free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Puri*, 844 F.3d at 1165 (quoting *Wolf*, 443 U.S. at 603).

Here, of course, the entire case is about sincerity—but not religious sincerity. The Church may as a theological matter genuinely believe that tithing funds are solely the dollars that congregants pay in, and not those same monies once deposited into church reserves or the interest or return on investments of the funds. But that sincere belief does not answer, and therefore should not preclude a civil court from asking, whether the Church induced people to contribute by intentionally misleading them about how it would fund its for-profit activities. If the Church's authority to define for itself what a tithe is wholly exempted it from even the possibility of legal responsibility for gross mismanagement, diversion, or outright theft, that would not only permit religious groups, "under the cloak of religion[,] . . . [to] commit frauds upon the public" (*contra Cantwell*, 310 U.S. at 306), but also "impermissibly place . . . religious [institutions] in a preferred position in our society" (*McRaney*, 966 F.3d at 348), at the expense of everyone and everything else. And the mistrust of charitable institutions that this law-free zone would engender would harm the ability of religious

20

and other nonprofits to raise funds for critically important programs and services.

> **D. Huntsman's claims may be adjudicated without addressing questions of theology, doctrine, or religious practice that would implicate ecclesiastical abstention.**

On summary judgment, Huntsman presented evidence that Church officials stated that donations like his would not fund the for-profit shopping mall. Those statements are not impermissibly privileged just because church leaders assign a religious label to the donations. And it will be eminently possible to determine whether the statements constitute fraud under neutral principles of California law, without "resolving underlying controversies over religious doctrine." *Puri*, 844 F.3d at 1164 (citations omitted). Hence, even if ecclesiastical abstention might sometimes apply in fraud actions, *this* case can be fully and fairly litigated without encroaching on any First Amendment rights.

1. To succeed on a claim of common-law fraud in California, a plaintiff must prove a misrepresentation, knowledge that the misrepresentation is false, intent to induce reliance, justifiable reliance, and damages. *Conroy v. Regents of Univ. of Cal.*, 203 P.3d 1127, 1135–1136 (Cal. 2009). That the defendant here is a religious organization that terms donations "tithing funds" does not transform this factfinding into judicial second-guessing of theology.

First of all, Huntsman does not offer a competing definition of tithing funds or ask the district court to decide which definition is correct. *Contra* Reply Supp. Reh'g 3. Rather, he acknowledges that the Church may define what a tithe is for the Church's own purposes. Yet as the panel majority recognized, he offered evidence from which a jury could conclude that he was defrauded. *See* 76 F.4th at 969–976.

Specifically, Huntsman offered evidence from whistleblower David Nielsen, who reported to the IRS that the Church indiscriminately mixed charitable contributions with other monies and spent $1.4 billion in commingled funds on commercial development of the shopping mall. 2-ER-81.

Huntsman also offered substantial evidence that on multiple occasions Church officials broadly represented that no tithing funds, which it solicited as tax-exempt charitable contributions, would be used to support the mall (2-ER-81)—a business that is not a tax-exempt charitable undertaking, and hence was a basis for the federal tax-evasion charges, which the Church paid $1 million in back taxes and penalties to settle. *See* Brian Bushard, *Mormon Church Will Pay Millions In SEC Settlement Over Investment Portfolio Allegedly Saving For 'Second Coming Of Christ,'* FORBES (Feb. 21, 2023), https://rb.gy/1fdup4.

He supplied evidence that the Church began publicly addressing the funding of the mall project only after it "received much notice in the local press" (2-ER-257), and that, to assuage donors' fears that their donations might be used to develop the mall, the Church provided repeated "assurance[s] that tithing funds have not and will not be used to acquire this property." *Id.*

He presented evidence that the Church expressly disavowed any use of tithes to support the mall and instead declared that funding for the mall came solely "from those commercial entities owned by the Church. . . . together with the earnings of invested reserve funds." 2-ER-250. He also presented evidence from which a jury could conclude that instead of explaining that "invested reserve funds" meant invested tithes, the Church obfuscated to mislead, lest contributions dry up. *See, e.g.*, 2-ER-24–25.

And most pointedly, Huntsman presented evidence that the Church President specifically stated in the press that money for the mall would come from the Church's "real-estate development arm" and that the money for that for-profit business comes from "other real-estate ventures." 2-ER-57. So a jury could find that, however the Church defines tithing funds, it still misrepresented where the money for the shopping mall came from.

Indeed, even if the Church were to argue that its leaders spoke without actually knowing where the money for the mall was coming from,

Huntsman may still raise questions for trial, because under California law, a "positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true," is a fraudulent misrepresentation. Cal. Civ. Code § 1572.

A civil-fraud claim is thus legally cognizable regardless of the Church's view on whether tithes include reserve funds.[3]

And quite apart from the question whether the Church internally used "tithing funds" to mean one thing while trying to profit from donors' understanding that it meant something else, Huntsman's evidence suggests another theory of misrepresentation also: Church-president Hinckley stated that "tithing funds have not and will not be *used* to acquire [the mall]," and Presiding Bishop Barton confirmed, "[t]hat is not how we *use* tithing funds." 2-ER-257 (emphasis added). "Use" means "to put into action or service." WEBSTER'S NEW INT'L DICTIONARY 2523 (3d ed. 2002); *see also id.* at 2524 (defining "used" as "employed in accomplishing something"). The district court is eminently capable of considering whether those statements about how monies would be used encouraged potential contributors to understand

---

[3]   The Church curiously insists (at Reply Supp. Reh'g 5) that "defer[ring]" to the "highest" church authority is constitutionally required here. Yet it was the Church president who repeatedly assured the public about the mall funding. 2-ER-250. Recognizing that the head of a denomination is the final authority in spiritual matters is a far cry from requiring courts to abstain from hearing cases just because a religious leader has spoken.

the Church to be rigorously cordoning off contributions from its for-profit enterprises. And what is meant and what was intended by the term "use" are certainly subject to the application of neutral legal principles. Adjudication will therefore, at the very worst, implicate matters that are only "incidentally ecclesiastical," which the Free Exercise Clause allows (*Scotts*, 98 F.3d at 94).

Whether, on the weight of the evidence, Huntsman proves that the Church knew and intended that its statements would be misunderstood in ways that would benefit itself financially is ordinary fodder for the factfinder in fraud actions. And it does not require judicial scrutiny into or rejection of the Church's theological definition of a tithe. It requires only that the district court determine whether the Church intended to mislead for the sake of securing (or not losing) donations.

This case thus involves the same sorts of legal issues as *United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981)—though *Rasheed* involved criminal fraud rather than civil fraud and tax fraud. There, the defendant founded a religious organization and "Dare to be Rich" program, which "taught that if one donated money to the Church, one would receive an 'increase of God.'" *Id.* at 845. The defendant knowingly lied, "through Church literature and through his aides at the Church," about the source of the funds used in the program as well as the benefits to be had. *Id.* at 846. And while "increase of

God" was a vague term—intentionally so, perhaps—adherents were led to believe that it meant a financial return, which they did not receive. *Id.* Even though the defendant was careful not to "tell potential donors that the Church was making any promise or guarantee of payment" (*id.* at 847), this Court upheld his conviction, seeing no First Amendment problem with determining whether the defendant "made assertions" about the Dare to be Rich program "with knowledge of the falsity of those assertions." *Id.* at 846–849.

That is the issue presented by this case: Did the Church and its leaders knowingly make misleading statements to get Huntsman and others to part with their money? A jury might decide the case either way—without denying the Church's authority to decide what it counts as a tithe.

2. Whether Huntsman relied on the Church's assurances is likewise an appropriate question for the jury. *See Samarzia v. Clark Cnty.*, 859 F.2d 88, 90 (9th Cir. 1988). The Church's contention that Huntsman was not defrauded and seeks his money back only because he is now disillusioned with the Church is a theory that may be raised at trial. But that would not impermissibly convert the district court into a rump religious tribunal. If it did, religious institutions could escape all possible liability by asserting that the true, hidden motivation of any plaintiff is dissatisfaction with the entity itself, and no jury would ever get to consider questions of misrepresentation,

26

reliance, or injury. That is not, and should not be, the rule. *Cf. Puri*, 844 F.3d at 1166 (applying neutral principles in fraud case). The Free Exercise Clause does not license the Church to ascribe unsupported motivations to a plaintiff, contend that those motivations arise from religious dissent, and bar legal claims before any factfinding to determine whether the motivations that the Church ascribes to the plaintiff are correct. *See Belya v. Kapral*, 59 F.4th 570, 572 (2d Cir. 2023) (Lohier, J., joined by Lee, Robinson, Nathan, and Merriam, J.J., concurring in denial of rehearing en banc).

Consideration of Church officials' statements and those individuals' credibility as witnesses are also properly left to the jury. That the speakers are Church leaders should not alter the basic legal framework. For if credibility in civil or criminal matters were deemed a religious question, no church employee could ever testify in any case. Worse yet, if one church employee or congregant were to accuse another of a crime, the house of worship could, on the Church's theory here, insist that any judicial forum is foreclosed, regardless of what the crime is or whether it is religious in nature. *Cf.* James Queally & Matthew Ormseth, *Scientology's secrets spill into open in Danny Masterson rape case*, L.A. TIMES (May 27, 2021), https://rb.gy/em19wj ("The church's doctrine generally dismisses government institutions like courts as invalid and directs members to deal with

complaints internally"). No one would benefit from that rule—not the victims, and not the institutions that rely on public trust to solicit donations for the public good.

3. Huntsman also presented sufficient evidence to raise a jury question whether he justifiably relied on the Church's statements. In that regard, reliance is justified if the misrepresentations are material and not "preposterous" or "so patently and obviously false that [the plaintiff] must have closed his eyes to avoid discovery of the truth." *Broberg v. Guardian Life Ins. Co.*, 171 Cal. App. 4th 912, 921–922 (Cal. Ct. App. 2009) (quoting *Seeger v. Odell*, 115 P.2d 977, 981 (Cal. 1941)). Just like credibility determinations, justifiable reliance is a question for the finder of fact. *Alliance Mortg. Co. v. Rothwell*, 900 P.2d 601, 609 (Cal. 1995). And a jury could find justifiable reliance based on the Church's repeated assurances about how it would fund its shopping mall, without undertaking any religious inquiry.

Finally, Huntsman has offered evidence of damages. He showed that he donated millions of dollars to the Church (2-ER-51), and he seeks to recoup only the sums that he gave after receiving the Church's assurances about how his money would—and would not—be used. As with any claim of fraud through diversion of donations, the calculation of damages is a math problem that does not turn on any theological question, and one that avoids

28

even the possibility that equitable relief (which Huntsman does not seek) might dictate or distort religious doctrine. *See* Michael G. Weisberg, *Balancing Cultural Integrity Against Individual Liberty: Civil Court Review of Ecclesiastical Judgments*, 25 U. MICH. J.L. REFORM 955, 979 (1992).

4. Whether the label that a defendant employs is "tithes" or "alms" or "donations" or "gifts" or "tax-deductible charitable contributions" normally will not and should not change the central legal inquiry. Were religious labels (even if theologically accurate) dispositive in the way that the Church asserts, religious institutions could, by the simple expedient of employing religious terminology, commit torts or crimes with impunity and entirely evade earthly consequences for their actions. That is not how the law works. Murder would still be murder if committed by a group that deems it a sacrament. And fraud is still fraud if clothed in religious vestments.

As the panel majority determined, the record includes evidence on which a jury might find all the elements of fraud, without evaluating the truth or wisdom of any religious doctrine or belief. Ecclesiastical abstention generally does not and ought not apply when, as here, a plaintiff "seeks relief for the harms he has suffered as a result of conduct engaged in by" a religious entity, even if the misconduct is "consistent with the governing law of the Church." *Burri Law PA*, 35 F.4th at 1212 (quoting *Paul v. Watchtower Bible & Tract Soc'y*, 819 F.2d 875, 878 (9th Cir. 1987) (cleaned up)).

## CONCLUSION

Ecclesiastical abstention does not categorically bar actions sounding in fraud. To interpret the doctrine otherwise would give religious entities unfettered license to commit tortious and criminal acts while escaping even the possibility of liability. The decision below is not just legally incorrect but deleterious to the public good, harming donors and also potentially deterring them from supporting charitable works.

Respectfully submitted,

 /s/ *Richard B. Katskee*

RICHARD B. KATSKEE
JOSHUA BRITT†
MARGARET K. KRUZNER†
LUKE MEARS†
*Duke University*
*School of Law*
*210 Science Dr., Box 90360*
*Durham, NC 27708-0360*
*(919) 613-7230*

*Counsel for* Amici Curiae

Date:    April 5, 2024

---

† Law student appearing under Cir. R. 46-4.

30

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 21-56056

I am the attorney or self-represented party.

**This brief contains** | 6,800 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Richard B. Katskee | **Date** | April 5, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)**  | 21-56056

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Brief of Interfaith Alliance, Lambda Legal Defense and Education Fund, Inc., National Women's Law Center, and Sikh Coalition as Amici Curiae Supporting Appellant

**Signature**  | /s/ Richard B. Katskee      **Date** | April 5, 2024

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                                 *Rev. 12/01/2018*