**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAMES HUNTSMAN, | No. 21-56056 |
| *Plaintiff-Appellant*, | D.C. No. 2:21-cv-02504-SVW-SK |
| v. | |
| CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, | OPINION |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted En Banc September 25, 2024
San Francisco, California

Filed January 31, 2025

Before: Mary H. Murguia, Chief Judge, and Milan D.
Smith, Jr., Jacqueline H. Nguyen, John B. Owens, Michelle
T. Friedland, Daniel A. Bress, Patrick J. Bumatay,
Lawrence VanDyke, Jennifer Sung, Gabriel P. Sanchez and
Ana de Alba, Circuit Judges.

Opinion by Judge Friedland;
Concurrence by Judge Bress;
Concurrence by Judge Bumatay

## SUMMARY[*]

### Fraud / First Amendment

The en banc court affirmed the district court's order granting summary judgment to the Church of Jesus Christ of Latter-day Saints ("the Church") in an action brought by James Huntsman, a former member of the Church, alleging that the Church had committed fraud by using tithing funds to finance commercial endeavors despite stating that it would not do so.

Huntsman contended that the Church committed fraud under California law by misrepresenting which funds it used to finance the City Creek Center project, a redevelopment of a commercial shopping mall in downtown Salt Lake City, Utah; and which funds were used to allegedly "bail out" the Beneficial Life Insurance Company, a Church-owned entity. Huntsman tithed substantial sums to the Church from 1993 to 2015.

The en banc court held that no reasonable juror could conclude that the Church misrepresented the source of funds for the City Creek project. The Church had long explained that the sources of the reserve funds included tithing funds,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and Huntsman had not presented evidence that the Church did anything other than what it said it would do. The en banc court held that Huntsman's claim with respect to the $600 million allegedly transferred to Beneficial Life also failed. Huntsman did not identify any specific statements made by the Church about the source of funds for Beneficial Life. Accordingly, the record did not support a claim of fraudulent misrepresentation. Finally, the en banc court held that the church autonomy doctrine had no bearing in this case because nothing in the court's analysis of Huntsman's fraud claims delved into matters of Church doctrine or policy.

Judge Bress, joined by Judges M. Smith and Nguyen, and joined by Judge VanDyke except as to footnotes 1 and 2, concurred in the judgment. He agreed with the majority that there was no fraudulent misrepresentation, but he would hold that there was no way in which Huntsman here could prevail without running headlong into basic First Amendment prohibitions on courts resolving ecclesiastical disputes.

Judge Bumatay concurred in the judgment only, because it is necessary to decide this case on church autonomy grounds. Because Huntsman's claims involve court interference in matters of religious truth, the church autonomy doctrine bars reaching the merits of his claims.

## COUNSEL

David B. Jonelis (argued), Lavely & Singer PC, Los Angeles, California; Jake A. Camara, Berk Brettler LLP, West Hollywood, California; Bradley Girard, Democracy Forward Foundation, Washington, D.C.; Jenny Samuels, Americans United for Separation of Church and State, Washington, D.C.; for Plaintiff-Appellant.

Rick Richmond (argued), Troy S. Tessem, and Andrew E. Calderón, Larson LLP, Los Angeles, California; Paul D. Clement (argued), Andrew C. Lawrence, and Chadwick J. Harper, Clement & Murphy PLLC, Alexandria, Virginia; for Defendant-Appellee.

Eric S. Baxter, Laura Wolk Slavis, James J. Kim, and Benjamin A. Fleshman, The Becket Fund for Religious Liberty, Washington, D.C., for Amicus Curiae The Becket Fund for Religious Liberty.

John A. Taylor, Jr., Horvitz & Levy LLP, Burbank, California; Jeremy B. Rosen, Horvitz & Levy LLP, San Francisco, California; for Amici Curiae Ayuda Humanitarian, Charityvision, Five.12 Foundation, and Thanksgiving Point.

Blaine H. Evanson and Joseph Edmonds, Gibson Dunn & Crutcher LLP, Irvine, California; Joseph E. Barakat and Katie R. Talley, Gibson Dunn & Crutcher LLP, Dallas, Texas; Katherine L. Montoya, Gibson Dunn & Crutcher LLP, Washington, D.C.; for Amicus Curiae J. Reuben Clark Law Society.

David M. Andersen and Steven M. Sandberg, Brigham Young University, Office of the General Counsel, Provo, Utah, for Amici Curiae Association of Catholic Colleges and

Universities, Brigham Young University-Hawaii, Brigham Young University-Idaho, California Baptist University, and the Council for Christian Colleges and Universities.

Gene C. Schaerr and James C. Phillips, Schaerr Jaffe LLP, Washington, D.C., for Amici Curiae 11 Major Religious Organizations.

Richard B. Katskee, Joshua Britt, Margaret K. Kruzner, and Luke Mears, Duke University School of Law, Durham, North Carolina, for Amici Curiae Interfaith Alliance, Lambda Legal Defense and Education Fund, Inc., National Women's Law Center, and Sikh Coalition.

Thomas Scott-Railton, Gupta Wessler LLP, Washington, D.C., for Amicus Curiae Professor Robert W. Tuttle.

---

## OPINION

FRIEDLAND, Circuit Judge, with whom MURGUIA, Chief Judge, and OWENS, SUNG, SANCHEZ, and DE ALBA, Circuit Judges, join:

Plaintiff James Huntsman sued the Church of Jesus Christ of Latter-day Saints ("the Church") in federal district court. Huntsman, a former member of the Church, alleged that the Church had committed fraud by using tithing funds to finance commercial endeavors despite stating that it had not and would not do so. The district court granted summary judgment to the Church, holding that no reasonable juror could find that the Church had misrepresented how it used tithing funds. We agree and therefore affirm.

6        HUNTSMAN V. CORPORATION OF THE PRESIDENT

## I.

## A.

Huntsman first contends that the Church misrepresented which funds it used to finance the City Creek Center project. That project, first announced by the Church in 2003 and completed in 2012, was the redevelopment of a commercial shopping mall in downtown Salt Lake City, Utah, across from the Church's main temple and headquarters. Huntsman also contends that the Church misrepresented which funds were used to allegedly "bail out" the Beneficial Life Insurance Company, a Church-owned entity, in 2009.

Members of the Church engage in tithing, a practice of contributing ten percent of their annual income to the Church. Tithing is the principal way that members financially contribute to the Church. Huntsman, who comes from a prominent family of devout Church members, tithed for twenty-two years, from 1993 to 2015. Between 2003 and 2015, he tithed over $1 million in cash, over 20,000 shares of Huntsman Corporation stock, and over 1,800 shares of Sigma Designs stock. Huntsman later "became disillusioned with the Church's doctrines" and stopped tithing, eventually resigning his membership from the Church.

The Church has a practice of setting aside a portion of its annual income, which includes tithing funds that Church members contribute that year, as "reserves." The former President of the Church, Gordon B. Hinckley, spoke publicly about that practice on at least two occasions. In 1991, Hinckley (then a senior Church leader) stated, "In the financial operations of the Church, we have observed two basic and fixed principles: One, the Church will live within its means. It will not spend more than it receives. Two, a fixed percentage of the income will be set aside to build

reserves against what might be called a possible 'rainy day.'"
In 1995, Hinckley (then Church President) reiterated, "Not
only are we determined to live within the means of the
Church, but each year we put into the reserves of the Church
a portion of our annual budget. . . . Should there come a time
of economic distress, we would hope to have the means to
weather the storm."

During the time the Church was developing City Creek,
the Church primarily invested its reserve funds through a
separate entity called Ensign Peak Advisors, Inc.  Ensign
Peak held both reserve funds and earnings on invested
reserves.  The Church used Ensign Peak funds to finance the
City Creek project.

Huntsman asserts that the Church made five public
statements about the source of funds for the City Creek
project.  First, when President Hinckley announced the
project in April 2003 at the Church's General Conference,
he stated:

> We feel we have a compelling
> responsibility to protect the environment of
> the Salt Lake Temple. . . .  But I wish to give
> the entire Church the assurance that tithing
> funds have not and will not be used to acquire
> this property.  Nor will they be used in
> developing it for commercial purposes.
>
> Funds for this have come and will come
> from those commercial entities owned by the
> Church.  These resources, together with the

earnings of invested reserve funds, will accommodate this program.

Second, in October 2003, Presiding Bishop H. David Burton stated at a press conference about the City Creek project that "[n]one of this money comes from the tithing of our faithful members. That is not how we use tithing funds."

Third, the Church magazine *Ensign* reported in 2006:

The Church first announced three years ago it was planning to redevelop the downtown area to energize the economy of the city that houses its headquarters and to bolster the area near Temple Square. No tithing funds will be used in the redevelopment.

Fourth, the Church newspaper *Deseret News* reported in 2007:

Money for the project is not coming from LDS Church members' tithing donations. City Creek Center is being developed by Property Reserve, Inc., the Church's real-estate development arm, and its money comes from other real-estate ventures.

Fifth, in 2012, the *Salt Lake Tribune* wrote the following about Keith B. McMullin, the head of a Church commercial entity: "McMullin said not one penny of tithing goes to the Church's for-profit endeavors. Specifically, the Church has said no tithing went towards City Creek Center."

Separately, the Church allegedly used $600 million of Ensign Peak funds to "bail out" Beneficial Life. Huntsman

does not, however, identify any statement made by the Church regarding Beneficial Life in particular.

David Nielsen, who was a Senior Portfolio Manager at Ensign Peak from 2010 to 2019, filed a whistleblower complaint with the Internal Revenue Service in 2019 alleging that the Church misused tithing funds to engage in commercial ventures, including funding the City Creek project and bailing out Beneficial Life. After Huntsman learned about Nielsen's complaint, Huntsman asked the Church to return his lifetime tithing donations. The Church refused, and Huntsman subsequently filed this lawsuit in the United States District Court for the Central District of California.[1] Huntsman's Complaint alleged that the Church committed fraud by stating that tithing funds were not used for the Church's commercial endeavors when in fact they were. The Complaint further alleged that Huntsman relied on the Church's statements in continuing to pay tithings.

**B.**

The Church moved for summary judgment, arguing that it had made no misrepresentations. The Church contended that the City Creek project had been funded with earnings on invested reserves, not direct tithing contributions, and that this was consistent with its public statements. As to Beneficial Life, the Church argued that Huntsman had not submitted evidence of any specific statements and thus had not identified any misrepresentations that could possibly support a fraud claim. In the alternative, the Church argued

---

[1] Huntsman sued the Corporation of the President of the Church of Jesus Christ of Latter-day Saints, which has since been renamed the Church of Jesus Christ of Latter-day Saints.

that summary judgment was warranted under the First Amendment church autonomy doctrine.

To explain the funding of the City Creek project, the Church submitted two declarations. The first declaration, by a director in the Church's Finance and Records Department named Paul Rytting, stated that all the funds allocated to the City Creek project came from earnings on the Church's reserve funds invested by Ensign Peak, meaning that no principal reserve funds (*i.e.*, funds taken directly from Church members' tithing contributions) were used. Rytting testified that Ensign Peak's assets included both reserve funds and earnings on invested reserve funds. In 2003 alone, Ensign Peak accumulated approximately $3.9 billion of earnings on invested reserve funds. On January 1, 2004, several months after the Church announced the City Creek project, Ensign Peak allocated $1.2 billion into an internal account earmarked for the project. Those earmarked funds were themselves invested and reached a total value of nearly $1.7 billion before any appropriations were made for the City Creek project. Then, from 2007 to 2012, Ensign Peak periodically appropriated funds to a separate entity that managed and owned the Church's investment in City Creek. In total, approximately $1.4 billion was appropriated for the City Creek project. Rytting supported the foregoing testimony with Ensign Peak financial documents.

The second declaration was by Roger Clarke, who stated that he was "the President and Managing Director of Ensign Peak from its inception in 1997 until [he] retired in May 2020" and that he had "knowledge of the Church policies and practices relating to the management of funds" and "the financing of the City Creek project." Clarke's declaration affirmed the veracity of Rytting's declaration and

authenticated the Ensign Peak financial documents that
Rytting had submitted.

In opposition to the Church's motion for summary
judgment, Huntsman submitted a declaration by
whistleblower David Nielsen. Nielsen stated:

> During my employment at EPA [Ensign
> Peak Advisors], EPA's senior leadership and
> other EPA employees referred to . . . all funds
> of EPA as "tithing" money, regardless of
> whether they were referring to principal or
> earnings on that principal. In addition, during
> my time at EPA, tithing donations from the
> Church's members were commingled with
> earnings that EPA had made.

Nielsen stated that Ensign Peak withdrew "approximately
$1.4 billion in tithing funds" for the City Creek project and
"$600 million in tithing funds" for Beneficial Life. He
described a presentation given by Ensign Peak President
Clarke at an employee meeting in March 2013. Clarke had
displayed a slide that listed "[e]xamples of withdrawals"
from Ensign Peak's "investment reserve," including "City
Creek: $1,400mm over 5 years," and "Beneficial Life:
$600mm in 2009."[2] Nielsen stated that he had asked how
those withdrawals were consistent with the Church's public
statements about "no tithing funds being used for City Creek
Mall or Beneficial Life." According to Nielsen, Clarke
responded that the funds were transferred from Ensign Peak
to other Church-affiliated entities so that people would not
know that Ensign Peak was the source of the funds.

---

[2] Nielsen attached a copy of the slide as an exhibit to his declaration.

The district court granted summary judgment in favor of the Church.  It first held that the First Amendment did not prevent it from reaching the merits of Huntsman's fraud claims, and it then held that "no reasonable juror could find [that the Church] made a misrepresentation."

Huntsman timely appealed.  A divided three-judge panel of our court reversed as to the City Creek project.  The panel unanimously affirmed as to Beneficial Life.[3]  *See Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 76 F.4th 962 (9th Cir. 2023), *reh'g en banc granted*, 94 F.4th 781 (9th Cir. 2024).  Upon the vote of a majority of non-recused active judges, we granted rehearing en banc and vacated the three-judge panel decision.

## II.

We review the district court's grant of summary judgment de novo.  *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021).  Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party (here, Huntsman), there is "no genuine issue of material fact."  *Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 816 (9th Cir. 2021).

---

[3] Before the court's decision issued, the Church requested sealing of any portions of the opinion that included "confidential and competitively sensitive business and financial information relating to the operations of the Church and its affiliated commercial entities."  The panel denied that request, though the rest of the confidential financial information that the parties submitted in this litigation has been maintained under seal.  Here, we discuss only the financial information already published in the now-vacated opinion.

## III.

Huntsman claims that the Church committed fraud under California law.**[4]** The elements of fraud under California law are "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Small v. Fritz Cos.*, 30 Cal. 4th 167, 173 (2003) (quotation marks omitted). To constitute fraud, the misrepresentation generally must be "a material and knowingly false representation of fact." *Orient Handel v. U.S. Fid. & Guar. Co.*, 237 Cal. Rptr. 667, 672 (Cal. Ct. App. 1987).

Huntsman argues that the Church committed fraud by misrepresenting the source of funds for the City Creek project and Beneficial Life. We address Huntsman's claims with respect to City Creek and Beneficial Life in turn.

## A.

No reasonable juror could conclude that the Church misrepresented the source of funds for the City Creek project. Although the Church stated that no tithing funds would be used to fund City Creek, it also clarified that earnings on invested reserve funds would be used. The

---

[4] We apply California law here because Huntsman brought his claims under California law, the Church has not challenged the applicability of California law, and the district court did not discuss choice of law. *See Mont. Power Co. v. Pub. Util. Dist. No. 2 of Grant Cnty.*, 587 F.2d 1019, 1022 n.1 (9th Cir. 1978) ("There apparently was no consideration in the district court of whether Washington or Montana law would apply to this case. . . . Due to the absence of a decision by the district court, the failure of the parties to even raise the choice of law issue, and the equivalent of a waiver of the issue by appellant's counsel, we will assume appellees are correct and apply Washington law.").

Church had long explained that the sources of the reserve funds include tithing funds. Huntsman has not presented evidence that the Church did anything other than what it said it would do.

President Hinckley qualified the assertion that tithing funds would not be used by noting that earnings on invested reserve funds would be used. In his 2003 announcement of the City Creek project, Hinckley stated:

> [T]ithing funds have not and will not be used to acquire this property. Nor will they be used in developing it for commercial purposes.
>
> Funds for this have come and will come from those commercial entities owned by the Church. These resources, *together with the earnings of invested reserve funds*, will accommodate this program.

(Emphasis added). That statement thus drew a distinction between principal tithing funds, coming directly from Church members, and earnings on the funds that the Church sets aside from its annual income (which includes tithing funds). The four subsequent statements that Huntsman points to, which state without qualification that tithing funds were not used for City Creek, can only be understood within the context of Hinckley's earlier statement distinguishing between tithing funds and earnings on reserves, and they therefore do not support Huntsman's fraud claim.

The Church had also long publicly indicated that "reserve funds" come at least in part from tithing funds. In a 1991 statement, Hinckley suggested that tithing comprises

the bulk of the Church's annual income and budget.  In that same statement, Hinckley said that "a fixed percentage of the [Church's] income will be set aside to build reserves against what might be called a possible 'rainy day.'"  In 1995, he repeated that message, stating that "each year we put into the reserves of the Church a portion of our annual budget." Because Hinckley stated that tithing funds are critical to the Church's annual income and budget, those statements necessarily implied that the reserves contained tithing funds.

Ensign Peak's financial records are consistent with the Church's statements that it funded City Creek with earnings on invested reserve funds.  The undisputed evidence in the record indicates that Ensign Peak's investments earned approximately $3.9 billion in 2003 alone, which was more than enough to cover Ensign Peak's allocation on January 1, 2004, of $1.2 billion to the earmarked account for City Creek.  The undisputed evidence further indicates that the earmarked funds were invested and increased in value to a total of nearly $1.7 billion before any funds were appropriated for City Creek.  The approximately $1.4 billion in total funds appropriated for City Creek thus in no way belies the Church's statements that City Creek would be funded by earnings on invested reserve funds.  Because each relevant Ensign Peak account held enough earnings on invested funds to cover the funds appropriated for City Creek, any commingling of principal tithing funds and earnings on invested tithing funds cannot support Huntsman's fraud claim.

Nielsen's declaration does not contradict the conclusion that Ensign Peak held sufficient earnings on invested reserve funds to fund the project without using principal tithing funds.  Nielsen testified that Ensign Peak's senior leadership and other employees "referred to . . . all [Ensign Peak funds]

as 'tithing' money, regardless of whether they were referring to principal or earnings on that principal," and that the approximately $1.4 billion that Ensign Peak appropriated for City Creek came from tithing funds. The presentation slide that Nielsen submitted with his declaration indicated that "1,400mm over 5 years" was withdrawn from Ensign Peak's "investment reserves" for City Creek. Even accepting the facts asserted in Nielsen's declaration as true, they do not show that *principal* tithing funds were used for the City Creek project. Neither Nielsen's statement nor the Ensign Peak presentation slide distinguished between principal and earnings, so neither contradicts President Hinckley's public statement that only earnings would be used. They also do not conflict with Ensign Peak's financial records, which show that Ensign Peak held sufficient earnings on reserve funds to finance City Creek.

Moreover, even accepting Nielsen's account that Ensign Peak employees used "tithing" to refer interchangeably to both principal and earnings, that does not support Huntsman's claim because President Hinckley drew a distinction between those types of funds in his public statements.[5] And Nielsen's additional assertion that Ensign Peak President Clarke told him that the organization took steps to obscure the source of funds for City Creek is similarly inapposite. Even if true, that assertion does not show that the Church's public statements about the funding for City Creek were misrepresentations.

---

[5] We need not determine whether Nielsen, a former employee at Ensign Peak, has any authority to speak for the Church about the meaning of "tithing," because Nielsen's statements do not conflict with President Hinckley's statements.

Finally, the term "earnings of invested reserve funds" was not so ambiguous that the Church could have expected or intended its relevant audience—here, Huntsman—to misunderstand what it meant. *Cf.* Restatement (Third) of Torts: Liab. for Econ. Harm § 9, cmt. c (Am. L. Inst. 2020) (explaining that ambiguous statements are actionable if the speaker intends that they be understood in their false sense or is indifferent to which way the statement is taken). As explained above, the Church had publicly discussed on multiple earlier occasions its practice of maintaining reserve funds. And the Church would have expected Huntsman to be aware of its explanation that reserve funds included tithing funds. Huntsman came from a prominent family in the Church and was himself a leader in the community who kept up with the Church's affairs and official statements. He also had extensive experience running and owning businesses so was presumably familiar with investment concepts. Those factors would have given the Church good reason to think that Huntsman would understand the meaning of "earnings of invested reserve funds."

In sum, on this record, no reasonable juror could conclude that the Church made a "knowingly false representation of fact" to Huntsman about the source of funds for the City Creek project. *Orient Handel*, 237 Cal. Rptr. at 672.

**B.**

Huntsman's claim with respect to the $600 million allegedly transferred to Beneficial Life also fails. Huntsman does not identify any specific statements made by the Church about the source of funds for Beneficial Life. Instead, he points only to "Sunday School manuals" and "conference addresses" that generally spoke about how

tithing funds were used, as well as the 2012 statement in the *Salt Lake Tribune* that "McMullin said not one penny of tithing goes to the Church's for-profit endeavors." Because the record contains no representations by the Church about Beneficial Life in particular, it does not support a claim of fraudulent misrepresentation.

## IV.

Finally, the church autonomy doctrine has no bearing here.[6] That doctrine protects First Amendment values by prohibiting courts from resolving "controversies over religious doctrine and practice." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). Because nothing in our analysis of Huntsman's fraud claims delves into matters of Church doctrine or policy, our decision in this case does not run afoul of the church autonomy doctrine.

## V.

For the foregoing reasons, we **AFFIRM** the district court's order granting summary judgment to the Church.

---

[6] Throughout this appeal, the Church has maintained the position that this Court can, and should, hold only that the fraud claim fails to state a claim on the merits.

BRESS, Circuit Judge, with whom M. SMITH and NGUYEN, Circuit Judges, join, and with whom VANDYKE, Circuit Judge, joins except as to footnotes 1 and 2, concurring in the judgment:

A prominent disaffected member of the Church of Jesus Christ of Latter-day Saints is suing the Church seeking a refund of religiously commanded tithes because the Church's leader made purported fraudulent misrepresentations during a religious address to the Church. This lawsuit is extraordinary and patently inappropriate, a not-so thinly concealed effort to challenge the Church's belief system under the guise of litigation. The majority is correct that there was no fraudulent misrepresentation even on the terms of plaintiff's own allegations. But it would have done well for the en banc court to recognize the obvious: there is no way in which the plaintiff here could prevail without running headlong into basic First Amendment prohibitions on courts resolving ecclesiastical disputes.

Constitutional protections for religious freedom provide the core principles that drive the inescapable outcome in this case. "The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 736 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). Courts therefore cannot resolve disagreements over church teachings and governance, which would pose grave threats to the autonomy of religious organizations. Yet governmental intrusion on religion is precisely what plaintiff's suit would require, if it were to go any further.

Although plaintiff's claims can be rejected even as he styles them, which is the approach the majority takes, we should not indulge in the illusion that this is merely a secular lawsuit about civil fraud. Under the First Amendment, the plaintiff's challenge to the Church's understanding of tithing is not susceptible to resolution in a court of law, lest the judiciary wrest control from religious authorities over matters of theological concern. It would have been straightforward and preferable for the court to recognize that plaintiff's unprecedented theory encounters overwhelming First Amendment impediments. While every judge on this panel agrees that the plaintiff's claims fail, I write separately to explain why a suit like this could never succeed under the First Amendment's church autonomy doctrine.

I

A more complete portrait of this lawsuit than the majority opinion offers helps to show how this case is on a collision course with the First Amendment. Plaintiff James Huntsman was, for many years, a devout and prominent member of the Church of Jesus Christ of Latter-day Saints. After decades of Church membership and service, Huntsman decided to leave the Church. He did so because, in his words, he had become "disillusioned with the Church's doctrines (including its support of polygamy and its open disdain for members of the LGBTQ community)."

While a member of the Church, Huntsman participated in the practice of tithing. For members of the Church, tithing is a religious commandment and a central obligation of the faith. As they understand it, tithing is an act mandated by God, consistent with an interpretation of the Old Testament (Malachi 3:10). The requirement of tithing was revealed through the prophet Joseph Smith in Missouri in 1838 and

recorded in the Church's *Doctrine and Covenants*, a part of the Church's canon of scripture. That year, the Lord marked "the beginning of the tithing of my people," directing adherents to give the Church one-tenth of their income annually and decreeing that "this shall be a standing law unto them forever." Doctrine & Covenants 119:3–4. According to Smith's revelation, the Saints "shall observe this law, or they shall not be found worthy to abide among you." Doctrine & Covenants 119:5.

The Church's scripture commits the disposition of tithes to a "council" composed of the Church's President and senior leaders who act according to the Lord's "own voice." Doctrine & Covenants 120:1. The President of the Church, who at relevant times of this case was Gordon B. Hinckley, is regarded within the Church as "God's prophet on the earth today[,] . . . the only person on the earth who receives revelation to guide the entire Church." Church of Jesus Christ of Latter-day Saints, *The Organization of the Church of Jesus Christ*, Oct. 2023, http://tinyurl.com/mr52srd3. As a prophet, the President "make[s] known God's will and true character," and the President's "teachings reflect the will of the Lord." Church of Jesus Christ of Latter-day Saints, *Prophets*, http://tinyurl.com/494af6td.

The Church places tithed funds into its reserves. The claimed controversy in this case centers on the use of earnings on these reserve funds in connection with one of the Church's commercial real estate projects in Salt Lake City, known as the "City Creek project." In 2003, the Church announced that it would purchase a shopping mall and commercial buildings near its downtown Salt Lake City Temple, the Church's physical and spiritual headquarters. The nearby commercial establishments were situated on historic Church land that had been used for Church-run

enterprises since the Church relocated to Utah in the mid-1800s.

Church leaders viewed the project as central to the Church's future and objectives. It was necessary to reinvest in these properties, President Hinckley told Church members at a religious gathering, because "[w]e feel we have a compelling responsibility to protect the environment of the Salt Lake Temple." Geared toward "revitaliz[ing] this area" around the Church's sacred Temple, the Church explains that the expenditure of Church funds for the City Creek project was consistent with the Church's religious mission. There is no suggestion that the project involved self-dealing on the part of Church leaders.

The purported dispute in this case concerns Huntsman's allegation that senior Church leaders lied to congregants about whether tithed funds would be used for the City Creek project. The key statement in question is from an address that President Hinckley gave at the Church's April 2003 General Conference. These conferences are a "semi-annual event consisting of worship services and messages from Church leaders broadcast to the worldwide Church." In his address, and in what was effectively both a sermon and a general update on the state of the Church, President Hinckley offered "heaven's richest blessings" on Church members, exhorting them to follow in the Gospel of Christ and to "incorporate it in our lives." "The gospel of Jesus Christ is the way of peace," President Hinckley told fellow members of his faith, as he urged them to continue their missionary work, to live within their means, and to guide Church youth as they grow into adults.

During his address, and touching upon the City Creek project that is the subject of this lawsuit, President Hinckley also said the following:

> I wish to give the entire Church the assurance that *tithing funds have not and will not be used to acquire this property*. Nor will they be used in developing it for commercial purposes. Funds for this have come and will come from those commercial entities owned by the Church. These resources, together with *the earnings of invested reserve funds*, will accommodate this program.

In this lawsuit, Huntsman alleges that this statement by the prophet of the Church, along with other similar statements by Church leaders and in official Church publications, misled him about whether "tithing funds" would be used for the City Creek project. According to Huntsman, he would not have paid tithing if he had known that tithed funds were being put toward that purpose. In Huntsman's view, "tithing funds" includes both the principal *and* earnings on tithes, and he believed neither would be used to finance City Creek. There is no dispute that only earnings on invested tithed funds were used to finance the project; the principal on the tithed funds was not used. Nevertheless, Huntsman filed this lawsuit in 2021, seeking to recover $5,000,000 in past tithings, as well as punitive damages.

Huntsman's complaint lays bare his broad disagreement with the direction of the Church. It opens with a quote from Church prophet Brigham Young, claiming that had the Church "heeded these profound words," Huntsman would

not have filed his lawsuit.  The complaint then goes on to express Huntsman's "[h]ope[]" that "this lawsuit will put an end to the LDS Corporation's lies and deceit once and for all so that the Church can refocus its attention and efforts on following the path of righteousness and honesty paved by its former leaders."  The complaint further promises that if Huntsman prevails, "[h]e will then use the recovered funds to benefit organizations and communities whose members have been marginalized by the Church's teachings and doctrines, including by donating to charities supporting LGBTQ, African-American, and women's rights."

As the Church has noted in its briefing, Huntsman has also used his lawsuit to criticize the Church in the media. *See, e.g.*, Washington Post, *He was Mormon royalty. Now his lawsuit against the church is a rallying cry*, Sept. 9, 2023. For example, in one interview, and in response to the question of what was "at stake in your lawsuit, beyond the tithing you're seeking to recoup," Huntsman offered that he "hope[d] the LDS Church will finally get serious about deploying its massive billions of dollars to help society instead of, when asked about its wealth management strategy, using meaningless answers such as saving for a rainy day or preparing for the return of Jesus."  Salt Lake City Tribune, *James Huntsman on the LDS Church: Why he left it, sued it, and what he hopes to change in it*, Oct. 29, 2023.

## II

## A

It is possible to resolve this case as the majority does, by taking Huntsman's allegations at face value and finding that on their surface, President Hinckley did not say that earnings on tithed funds would not be used for the City Creek project.

President Hinckley, in other words, did not say what Huntsman says he said. As the majority therefore correctly concludes, "Huntsman has not presented evidence that the Church did anything other than what it said it would do." Every judge on this en banc court to reach the question concludes the same, as did the district court.

But the majority's lawyerly comparison of President Hinckley's statements with other Church comments and financial documents should not obscure a more fundamental point of constitutional principle: that the First Amendment's protections for religious organizations would have never permitted Huntsman to prevail. Had the case gone further, it would have required the courts to resolve a religious disagreement, a transparent fight about the current course of the Church masquerading as a civil lawsuit. The First Amendment would clearly prohibit this. Indeed, it is the First Amendment's protections that most properly frame the central and unavoidable problem with this case.

As I set forth above, "[t]he First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady of Guadalupe Sch.*, 591 U.S. at 736 (quoting *Kedroff*, 344 U.S. at 116). The corollary to this is that courts must respect religious organizations' "independence in matters of faith and doctrine and in closely linked matters of internal government." *Id.* at 747. This is known as the church autonomy doctrine, or, alternatively, the doctrine of ecclesiastical abstention. These doctrines reflect a basic American truth: "[T]he Religion Clauses protect the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." *Id.* at 746 (quoting *Hosanna-Tabor Evangelical Lutheran Church and*

*Sch. v. E.E.O.C.*, 565 U.S. 171, 186 (2012)). That includes intrusion by the courts.

This doctrine is longstanding, a logically necessary feature of the Constitution's protections for religious freedom. As the Supreme Court explained over 150 years ago, courts may not decide a matter that is "ecclesiastical in its character." *Watson v. Jones*, 80 U.S. 679, 733 (1871); *see also, e.g.*, *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713–14 (1976) (courts may not resolve "a matter which concerns theological controversy" (internal quotations omitted)). The reasons are self-evident, grounded in the proper role of the courts and the vital religious liberty protections that the First Amendment affords. There is a "substantial danger" of infringing on religious freedom if courts "become entangled in essentially religious controversies." *Milivojevich*, 426 U.S. at 709. And "First Amendment values are plainly jeopardized when . . . litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969); *see also, e.g.*, *Kedroff*, 344 U.S. at 114 (explaining that court involvement in church religious determinations "would lead to the total subversion of such religious bodies" (internal quotations omitted)). Evaluating questions of religious doctrine and practice far exceeds our charge, and intruding on those matters would impose severe harm on the very First Amendment freedoms we are otherwise entrusted with protecting.[1]

---

[1] I disagree with Judge Bumatay's conclusion that the church autonomy doctrine is in some sense "jurisdictional," so that we would always have

B

In this case, resolving Huntsman's fraud claim in his favor would violate core First Amendment principles. It would do so in two main ways.

1

*First*, for Huntsman to prevail, a court or jury would need to agree with his view of what "tithing funds" in the Church includes. But that would intrude on the Church's authority to define that divine concept for itself.

In the Church, the duty to tithe is a religious commandment from God. Doctrine & Covenants 119:3–4. What that duty embodies, and what the concept of "tithing" means—including whether "tithing funds" includes earnings on tithed funds—are questions of a religious dimension. These matters are for the Church to decide on its own, within the decision-making hierarchy it establishes. "It is not within 'the judicial function and judicial competence' . . . to determine" whether Huntsman or the Church "has the proper

---

to resolve that issue first before proceeding further. The quotes from historical sources that Judge Bumatay provides do not support his thesis; they do not speak to the issue of judicial order of operations. The Supreme Court has fairly clearly said these types of issues are not jurisdictional, *see Hosanna-Tabor*, 565 U.S. at 195 n.4, as Judge Bumatay concedes. And the Church itself disagrees with Judge Bumatay's position, arguing that one could narrowly reject Huntsman's claims simply by concluding that he has misstated what President Hinckley said. I do not think it does any violence to church autonomy for a court to recognize, for example, that a claim against a religious organization is frivolous on its face. But even if we are not required to reach the church autonomy doctrine, the First Amendment lies at the heart of this case, as the Church has consistently argued. We should not ignore the church autonomy doctrine in explaining why a suit like this not only does, but must, fail.

interpretation of" Church practice and belief. *United States v. Lee*, 455 U.S. 252, 257 (1982) (quoting *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981)).

According to the Church, "tithing funds" does *not* include the earnings on such funds. This is not mere lawyer-speak. This interpretation, the Church says, came directly from the authority of President Hinckley—at the time, "God's prophet on the earth" whose religious pronouncements are authoritative. Doctrine & Covenants 21:5. As President Hinckley described it at an earlier General Conference, "[t]ithing is the Lord's law of finance." Vindicating Huntsman's position would effectively take away from the Church the authority to articulate, through its divinely inspired spiritual leader, the contours of holy funds, a matter of core religious significance. The district court below thus had it right: "determining whether the term 'tithing funds' encompasses earnings on invested tithing funds would require an analysis of Church doctrines and teachings." That is "a religious dispute the resolution of which . . . is for ecclesiastical and not civil tribunals." *Milivojevich*, 426 U.S. at 709.

Huntsman cannot override the First Amendment's protections by abstracting the Church's statements about tithing from their religious context. President Hinckley was not addressing investors in a company. He was not required to speak through generally accepted accounting principles. President Hinckley was speaking as a prophet of God at a spiritual convocation about, among other things, funds the payment of which is required by divine revelation. Even religious tenets that "might seem incredible, if not preposterous," may not be "subject to trial" on "their truth or falsity." *United States v. Ballard*, 322 U.S. 78, 87 (1944). The issues of religious teaching and practice at issue here are

not simply secular matters that a court could resolve against the Church.

It is therefore irrelevant that, in stylized form, the elements of a fraud claim can have a secular orientation. It is likewise irrelevant that terms like "income" and "reserved funds" can have secular meanings. The question here is not whether it is possible to recast Huntsman's argument in secular terms, without the religious trappings. The Supreme Court has confronted analogous situations in which disputes involving religious organizations could have been characterized in secular terms, but the Court held that the Religion Clauses and church autonomy principles prevented judicial resolution. *See, e.g.*, *Milivojevich*, 426 U.S. at 709–10 (property disputes); *Kedroff*, 344 U.S. at 119 (corporate structure dispute); *Presbyterian Church*, 393 U.S. at 442–47 (trespass dispute).

The most notable example in recent years concerns employment discrimination suits involving employees performing certain religious duties, an area known as the "ministerial exception." *See Our Lady of Guadalupe Sch.*, 591 U.S. at 737; *Hosanna-Tabor*, 565 U.S. at 188. In *Hosanna-Tabor*, the Supreme Court explained that although "[t]he interest of society in the enforcement of employment discrimination statutes is undoubtedly important," "so too is the interest of religious groups" in deciding how to "carry out their mission." 565 U.S. at 196.

So too here. That a litigant invokes a state-law prohibition on fraud, even though "a valid and neutral law of general applicability," *id.* at 190, does not sideline the church autonomy doctrine. Religious disputes restated in the elements of a fraud claim do not lose their inevitably religious character, just as employment disputes involving

persons with religious duties cannot be regarded as purely secular, either.

In this case in particular, it is startling to think that courts and juries would be examining a religious sermon for "accuracy," much less concluding that the leader of a worldwide religion intended to defraud his congregants on religious matters that the Church's canonical texts commit to his rightful authority. Nothing says "entanglement with religion" more than Huntsman's apparent position that the head of a religious faith should have spoken with greater precision about inherently religious topics, lest the Church be found liable for fraud.

How could this lawsuit proceed further without putting the Church of Jesus Christ of Latter-day Saints on trial for its own beliefs? To prove a fraud claim, a plaintiff must show not only that the defendant made a misrepresentation, but that the defendant did so with knowledge of its falsity and an intent to defraud. *See, e.g.*, *Small v. Fritz Cos.*, 65 P.3d 1255, 1258 (Cal. 2003). The Church's ultimate defense to Huntsman's claim is that his subjective understanding of tithing is simply wrong as a matter of Church doctrine and practice, and that President Hinckley did not intend to defraud when he spoke as God's prophet on Earth. But the prospect of Church leaders being cross-examined on matters of religious understanding is deeply unsettling. And any effort to limit the Church to "secular" defenses would implicitly deem illegitimate the very system of beliefs and governance that define the Church as a religious institution and that lie at the heart of the First Amendment's protections for religion.

It is understandable that even members of the same religion may have different views on religious practices and

requirements. But it is up to members of the Church to work through these issues among themselves and through their own processes. Religious disagreements are to be worked out within the faith. *See Watson*, 80 U.S. at 729 ("It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for."). Indeed, we have reasoned that "[c]ourts generally do not scrutinize closely the relationship among members (or former members) of a church." *Paul v. Watchtower Bible & Tract Soc. of N.Y., Inc.*, 819 F.2d 875, 883 (9th Cir. 1987).

In treating "tithing" in the Church of Jesus Christ of Latter-day Saints as an ambiguous concept that could be given meaning through law, facts, and evidence, Huntsman's lawsuit presupposes that religious authorities could be subject to judicial review on core questions of religious belief. That would be a serious affront to the church autonomy doctrine and the First Amendment values it represents.[2]

---

[2] The Church acknowledges, and I agree, that the church autonomy doctrine would not immunize religious leaders from fraudulently enriching themselves under the guise of religion. Although courts may not evaluate the validity of religious beliefs—a problem that is more immediate in cases like this involving suits by disaffected church members against a church—courts do not violate the First Amendment in assessing whether asserted beliefs are sincerely held. *See United States v. Rasheed*, 663 F.2d 843, 847–49 (9th Cir. 1981) (explaining, in the context of a fraud prosecution of religious leaders for what "was essentially a Ponzi scheme," that "the sincerity of the [defendants] claiming to hold such beliefs can be examined"); *see also United States*

2

*Second*, for Huntsman to prevail, a court or jury would further need to agree that he reasonably relied on the Church's alleged misrepresentations. But that too would embroil the courts in a sectarian dispute.

To prevail on his fraud claim, Huntsman would have to prove justifiable reliance. *See Small*, 65 P.3d at 1258. To make this showing, "plaintiffs must show (1) that they actually relied on the defendant's misrepresentations, and (2) that they were reasonable in doing so." *OMC Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*, 68 Cal. Rptr. 3d 828, 855 (Cal. Ct. App. 2007). Reasonable reliance, in turn, requires demonstrating that "the matter was material in the sense that a reasonable person would find it important in determining how he or she would act." *Hoffman v. 162 N. Wolfe LLC*, 175 Cal. Rptr. 3d 820, 833 (Cal. Ct. App. 2014).

Huntsman claims that he believed, based on President Hinkley's April 2003 General Conference remarks and other Church statements, that no tithing principal or earnings would be used to finance City Creek, and that Huntsman would not have made tithes if he had known otherwise. But to conclude that Huntsman's asserted reliance was justifiable, we would need to decide that a reasonable member of the Church of Jesus Christ of Latter-day Saints would pay tithing based on the Church's representations

_____

*v. Seeger*, 380 U.S. 163, 184–85 (1965) (explaining, in the context of draft exemptions, that a court's "task is to decide whether the beliefs professed by a registrant are sincerely held"); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022); *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005). Of course, in this case there is no suggestion that the City Creek project involves self-dealing on the part of Church leaders.

about its spending decisions. That inquiry would quickly devolve into questions about religious doctrine. The Church explains that the religious obligation to tithe exists irrespective of how the funds are used. *See* Amicus Br. of J. Reuben Clark Soc'y, at 17–21; The Church of Jesus Christ of Latter-day Saints, *Tithing and Charitable Donations*, http://tinyurl.com/bddan639 ("For Latter-day Saints, tithing is a natural and integrated aspect of their religious belief and practice . . . Latter-day Saints make charitable donations because they believe in fulfilling God's commandment to tithe and give to the poor. All funds given to the Church by its members are considered sacred."). Huntsman himself agreed in this litigation that "[w]hen [he] made tithing contributions, he believed he was obeying one of God's commandments and would receive blessings from God for doing so."

But because Huntsman now argues that he made tithing contributions conditioned on certain understandings about how tithed funds would be used, to rule in his favor a factfinder would need to credit his position notwithstanding its evident contradiction with Church teachings. This would leave courts and juries making determinations about *why* a reasonable member of the Church of Jesus Christ of Latter-day Saints would or should tithe. These are inherently religious questions. They would require courts "to determine matters at the very core of religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role." *Presbyterian Church*, 393 U.S. at 450.

\*     \*     \*

The plaintiff in this case is free to criticize his former Church and advocate for Church reforms. But he cannot ask the judiciary to intrude on the Church's own authority over core matters of faith and doctrine. That is the lesson of this lawsuit. We as courts are not here to emcee religious disputes, much less decide them. The First Amendment restricts our role as it protects religious organizations from lawsuits such as this.

---

BUMATAY, Circuit Judge, concurring:

My colleagues believe we have a choice on how to resolve this case. According to the majority and main concurrence, we can either decide the case on the merits— we can take the Church of Jesus Christ of Latter-day Saints President's word on the meaning of "tithing" and conclude that the Church did not misrepresent its actions. Or we can decide this case based on the church autonomy doctrine, which precludes courts from reaching religious questions, and deny the fraud claims.

The Constitution gives us no such choice. In deciding religious matters, the Constitution strictly limits our authority. Simply put, the church autonomy doctrine bars federal courts from resolving matters of faith, doctrine, and church governance. So we can't just sidestep the doctrine and jump straight to the merits. Nor can the doctrine be assumed away, considered an afterthought, or serve as a convenient alternative ruling. Rather, it's a *threshold* structural bar that must be reckoned with. Otherwise, we violate the restraints the Constitution places on our power.

In this case, James Huntsman alleges that the Church committed fraud in inducing its members to tithe. He claims he only gave millions of dollars in tithes to the Church because it assured the faithful that the money donated would not be spent on a specific development project. In truth, he says, the Church used tithes to fund the development project. But resolving his claims requires swimming in a current of religious affairs. What is a "tithe"? Who can speak for the Church on the meaning of "tithes"? What are Church members' obligations to offer "tithes"? These are questions that only ecclesiastical authorities—not federal courts—can decide.

Because Huntsman's claims involve court interference in matters of religious truth, the church autonomy doctrine bars reaching their merits. The doctrine is born of the First Amendment's Religion Clauses. "[T]he Religion Clauses protect the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (simplified). Through the Free Exercise Clause, religious groups have the right "to shape [their] own faith and mission[.]" *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012). The Establishment Clause, on the other hand, "prohibits government involvement in . . . ecclesiastical decisions." *Id.* at 189. So government interference in religious matters both "violate[s] the free exercise of religion" and "constitute[s] one of the central attributes of an establishment of religion." *Our Lady of Guadalupe*, 591 U.S. at 746. In other words, the Constitution leaves matters of faith exclusively to the people and their Creator.

Together then, the Religion Clauses create a structural restraint on the government's power to decide religious questions. The doctrine's structural nature is most clear through its Establishment Clause foundation. The Establishment Clause provides that "no law" may establish religion. As an original matter, the Clause denied the federal government authority to operate in the religious sphere. That means no court can decide internal religious questions. And we are not free to ignore the doctrine. Although not strictly jurisdictional in the technical sense, the church autonomy doctrine operates as a limit on judicial authority itself. Given this limitation, the church autonomy doctrine cannot be disposed of at the court's choosing and must be addressed as a threshold matter. So the majority errs in skirting the doctrine and reaching the merits, and the main concurrence errs in endorsing the majority's merits ruling as a simple alternative to its church autonomy analysis.

I thus concur in the judgment only.

## I.

To understand the church autonomy doctrine's structural nature, we look to the Establishment Clause's text and historical understanding. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19–22 (2022) (looking at text, history and tradition to determine bounds of Second Amendment); *see also* Randy E. Barnett, Lawrence B. Solum, *Originalism After Dobbs, Bruen, and Kennedy: The Role of History and Tradition*, 118 Nw. U. L. Rev. 433, 439–42 (2023). And in interpreting the Clause today, we must read it "in light of and in the direction of the constitutional text and constitutional history." *United States v. Hansen*, 40 F.4th 1049, 1072 (9th Cir. 2022) (Bumatay, J., dissenting from denial of rehearing en banc) (simplified).

## A.

### Constitutional Text

As always, we start with the text.  The Establishment Clause declares that "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  The first part of the phrase—"Congress shall make no law"—"'precisely tracked and inverted the exact wording' of the Necessary and Proper Clause" that "Congress shall have power . . . to make all laws which shall be necessary and proper[.]"  *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 604–05 (2014) (Thomas, J., concurring in part) (quoting A. Amar, The Bill of Rights 39 (1998)).  The design was intentional.  The amendment was required, according to James Madison, to assuage Anti-Federalist concerns that the Necessary and Proper Clause "enabled [Congress] to make laws of such a nature as might . . . establish a national religion."  Debates on the Amendments to the Constitution (Aug. 15, 1789), 1 Annals of Congress 758 (1834).

The "shall make no law" language denies the federal government power over a specific subject matter—anything "respecting an establishment of religion."  *See* Vincent Phillip Munoz, Religious Liberty and the American Founding 168 (2022).  By doing so, the Establishment Clause differed from any other amendment.  "It reenforced the strategy of limiting governmental power by explicitly declaring that Congress . . . lacked power over particular subjects" and thus "achiev[ed] that purpose [by] adopt[ing] an express limitation on national jurisdiction."  Steven D. Smith, *The Jurisdictional Establishment Clause: A Reappraisal*, 81 Notre Dame L. Rev. 1843, 1850–51 (2006).

The term "respecting" also suggests the structural nature of the Establishment Clause.  "Respecting" meant the same

thing then as it does now: "to look at, regard, or consider"; "to regard with deference, esteem, or honor"; or "with reference to, [or] with regard to." Munoz, Religious Liberty and the American Founding 168 (collecting contemporaneous dictionary sources). Neither the House nor the Senate included the word in their proposed drafts. No state constitution included it either. "Respecting" appeared for the first time in the adopted text at the House-Senate Conference Committee. *Id.* at 167–68. So the inclusion of the term is "particularly revealing" of "the original meaning of the adopted text." *Id.* at 168.

Before the House-Senate Conference Committee, the House text read "Congress shall make no law establishing Religion" and the Senate text included "Congress shall make no law establishing articles of faith or a mode of worship." *Id.* at 167. While we lack records confirming why the Committee inserted "respecting an establishment," we do know a primary concern in the House was whether Congress could regulate *state* establishments under its implied powers. *Id.* at 170–73. The plain import of the change—from "no law establishing religion" to "no law respecting an establishment of religion"—broadens the restriction's scope to cover protections for state establishments. Thus, through "respecting," the original Establishment Clause operated in two ways: (1) it denied the federal government power to establish a national religion, and (2) it prohibited the federal government from interfering with state establishments. *See* Smith, 81 Notre Dame L. Rev. at 1870–71.

The Constitution also uses "respecting" elsewhere to connote structural limitations. Look at Article 4, Section 3: "The Congress shall have Power to dispose of and make all needful Rules and Regulations *respecting* the Territory or other Property belonging to the United States." Munoz,

Religious Liberty and the American Founding 169 (quoting U.S. Const. art. IV, § 3, cl. 2) (emphasis added). While Article 4, Section 3 grants Congress power over certain territories, the Establishment Clause "would seem to do the opposite: to deny Congress" authority to legislate. *Id.* These are the only two uses of "respecting" in the Constitution.

The contrast with the Free Exercise Clause also reveals a structural purpose. Unlike the individual-rights language of "prohibiting" in the Free Exercise Clause, the "respecting" language suggests a zone of government-free activity. While both Religion Clauses share the opening "Congress shall make no law," the two provisions diverge from there. The Establishment Clause restricts Congress from operating in a certain area—anything related to an "establishment of religion." On the other hand, the Free Exercise Clause protects an individual right—one's "free exercise" of religion. Put differently, one clause "polic[es] the boundary between civil authorities and organized religion," and the other protects a moral right held by all. Carl H. Esbeck, *Dissent and Disestablishment: The Church-State Settlement in the Early American Republic*, 2004 BYU L. Rev. 1385, 1388–89 (2004). So properly understood, the Establishment Clause negates federal power over a subject matter, it does not recognize an individual right. Smith, 81 Notre Dame L. Rev. at 1850–51.

So what is the subject matter covered by the "establishment of religion"? The words were not defined during the drafting process. *See* Munoz, Religious Liberty and the American Founding 176 ("[T]he records pertaining to the drafting of the Establishment Clause in the First Congress do not furnish a clear answer" to the substantive question.). But we are not left in the dark. Looking at history, there are "telling traits" of what constituted an

establishment of religion.    *Shurtleff v. City of Bos.,
Massachusetts*, 596 U.S. 243, 285–86 (2022) (Gorsuch, J.,
concurring).  We turn there next.

## B.

### Early Origins of Dual Authorities

In both England and the colonies, an "establishment"
was understood to be "the promotion and inculcation of a
common set of beliefs through governmental authority."
Michael    W.    McConnell,    *Establishment    and
Disestablishment at the Founding, Part I: Establishment of
Religion*, 44 Wm. & Mary L. Rev. 2105, 2131 (2003).
Establishments took on different forms at the two ends of the
Atlantic, but each included certain traits.

> First, the government exerted control over the
> doctrine and personnel of the established
> church. Second, the government mandated
> attendance in the established church and
> punished people for failing to participate.
> Third, the government punished dissenting
> churches and individuals for their religious
> exercise. Fourth, the government restricted
> political participation by dissenters. Fifth, the
> government provided financial support for
> the established church, often in a way that
> preferred the established denomination over
> other churches. And sixth, the government
> used the established church to carry out
> certain civil functions, often by giving the

> established church a monopoly over a
> specific function.

*Shurtleff*, 596 U.S. at 285–86 (2022) (Gorsuch, J.,
concurring) (citing McConnell, 44 Wm. & Mary L. Rev. at
2131–81). At bottom, each of those six historical traits
required "[t]he government [to] decid[e] religious truth."
Christopher C. Lund, *Favoritism, Coercion, and the
Establishment Clause*, 122 Mich. L. Rev. 1303, 1307 (2024).

Government deciding religious truth is nothing new.
Civil authorities have sought to control religion by deciding
such matters since antiquity. In the West, the church
responded at each turn with a *structural* argument—
religious matters are exclusively committed to the Almighty.
Put differently, the church and state are separate sovereigns
(or dual authorities) that each hold exclusive jurisdiction
over certain subject matters. Esbeck, 2004 BYU L. Rev. at
1589. Henry VIII and Parliament rejected that ancient
tradition when they established the Church of England. But
American patriots reclaimed it through religious dissent, a
Revolution, and the Second Great Awakening. Thus, it is
that tradition undergirding the Establishment Clause's
prohibition.

The English establishment upended an ancient practice
recognizing the dual authorities of church and state. In
Christianity, that practice flows directly from Scripture:
"Jesus said to them, 'Render to Caesar the things that are
Caesar's, and to God the things that are God's.' And they
marveled at him." Mark 12:17 (ESV). At least since the 4th
century, the church-state relationship in the West
"presume[d] a dual-authority pattern" where "there [we]re
subject matters over which the state ha[d] sovereign power

and subject matters over which the church ha[d] exclusive authority." Esbeck, 2004 BYU L. Rev. at 1589.

The first conflict drawing the line between church and state began with the Edict of Milan in 313 A.D., when the Roman Empire legalized Christianity. *Id.* at 1391. Later, Emperor Theodosius I established Christianity as the official religion throughout the Empire. *Id.*

But the church did not consent to the Empire's claim over ecclesiastical matters. Evidencing this dissent, the Bishop of Cordova wrote to Emperor Constantine: "Do not interfere in matters ecclesiastical, nor give us orders on such questions, but learn about them from us. For into your hands God has put the kingdom; the affairs of his Church he has committed to us." *Id.* (quoting 350 A.D. letter from Hosius, Bishop of Cordova, to Emperor Constantine). So the response to the Empire's growing desire to establish religion was structural—"We are not permitted to exercise an earthly rule; and you, Sire, are not authorized to burn incense." *Id.*; *see also id.* at 1391–92 ("Two there are, august Emperor, by which this world is ruled on title of original and sovereign right—the consecrated authority of the priesthood and the royal power.") (quoting 494 A.D. letter from Pope Gelasius I to Byzantine Emperor Anastasius I).

That structural rationale persisted throughout the Middle Ages. *See* Roscoe Pound, *A Comparison of Ideals of Law*, 47 Harv. L. Rev. 1, 6 (1933) ("In the politics and law of the Middle Ages the distinction between the spiritual and the temporal, between the jurisdiction of religiously organized Christendom and the jurisdiction of the temporal sovereign . . . was fundamental."); *see also* Carl H. Esbeck,

*The Establishment Clause as Structural Restraint on Government Power*, 84 Iowa L. Rev. 1, 50 n.206 (1998).

Take the Investiture Conflict of the 11th century. It typified the battle for church independence. There, the Papacy fought against the Holy Roman Empire for the ability to appoint its own bishops—a power then vested in the emperor. The conflict was "jurisdictional" as the church sought "liberation of the clergy from imperial, royal, and feudal domination and their unification under papal authority." Gregory A. Kalscheur, S.J., *Civil Procedure and the Establishment Clause: Exploring the Ministerial Exception, Subject-Matter Jurisdiction, and the Freedom of the Church*, 17 Wm. & Mary Bill Rts. J. 43, 61 (2008) (simplified). The church first championed "freedom of the church" because it believed the Pope sovereign over such appointments. *See* Charles J. Reid, Jr., *The Spirit of the Learned Laws*, 1 Wash. U. Global Stud. L. Rev. 507, 529 (2002) (quoting the Dictatus Papae to show how the church advocated for "papal sovereignty"); *see also* Richard W. Garnett, *"The Freedom of the Church": (Towards) an Exposition, Translation, and Defense*, 21 J. Contemp. Legal Issues 33 (2013) (drawing on the Investiture Conflict to delineate the substantive content of *libertas ecclesia*— "freedom of the church").

Thus, in both ancient and medieval times, the church's basis for autonomy rested on structural grounds. Because God committed authority over spiritual matters (like the burning of incense or appointment of clergy) exclusively to the church, the state lacked authority over such matters.

## C.

### English Establishment

In England, the government initially recognized church independence. Church autonomy "was addressed in the very first clause of Magna Carta[,]" in which King John "agreed that 'the English church shall be free, and shall have its rights undiminished and its liberties unimpaired.'" *Hosanna-Tabor*, 565 U.S. at 182 (quoting Magna Carta App. IV, p. 317, cl. 1 (J. Holt ed. 1965)). That's because the Magna Carta resulted from one sovereign—the church—checking the absolutist powers of the other—the state. Esbeck, 2004 BYU L. Rev. at 1408 (chronicling events between Pope Innocent III and King John leading to Magna Carta). Although the promise of independence proved "more theoretical than real," the Roman Catholic Church of England continued to enjoy some autonomy from the state. *Hosanna-Tabor*, 565 U.S. at 182; *see also* Esbeck, 2004 BYU L. Rev. at 1405.

That all changed with the English Reformation. In 1534, Henry VIII consolidated power as the head of the Church of England and eliminated the sovereign distinction between the Pope and the Crown. *See* McConnell, 44 Wm. & Mary L. Rev. at 2112–13. While Henry's desire for a male heir prompted the religious split, the establishment persisted because English leaders sought to quash any "divided loyalty" to a "foreign prince" like the Pope. Esbeck, 2004 BYU L. Rev. at 1405.

The Church of England gained control through a complex "web of legislation," which installed it as the only place for lawful public worship. McConnell, 44 Wm. & Mary L. Rev. at 2111, 2113. First, Parliament enacted the Act of Supremacy in 1534, which declared the English

monarch the head of the Church of England and granted the state control over religious doctrine. *Id.* at 2112–13. Then, Parliament created the Book of Common Prayer prescribing the Church's liturgy and worship. *Id.* at 2113. Other acts prohibited non-members from holding certain offices and, even worse, some targeted dissenting religions or sects with punishments—penal or otherwise. *Id.* at 2113–14.

Through each of these acts, the state controlled religious doctrine and personnel, mandated church attendance and membership, punished dissenters, restricted political participation, provided money to the established church, and used the church to execute certain social functions. *See id.* at 2131–81. In creating this establishment, the government wasn't concerned with religious truth. Instead, "[t]he dominant purpose of the establishment was *not* to advance religious truth, but to control and harness religion in service of the state." *Id.* at 2208 (emphasis added). That's because the English establishment molded religion for its own purposes: to promote loyalty within its subjects and perpetuate its reign. *Id.* at 2207–08.

That religious monopolization created waves of dissent. *See* Esbeck, 2004 BYU L. Rev. at 1409–10 (detailing the "contest between church and state" during this time as the struggle between Henry VIII and Thomas More, the former Chancellor executed for refusing to disavow papal authority). Throughout the 16th and 17th centuries, it led dissenting religious factions—like the Puritans—to flee persecution and leave for the colonies. *Id.* at 1412. In time, these dissenters would create their own conceptions of establishment and church autonomy.

## D.

### American Establishment

From this history, the American colonies inherited two conflicting views. For one, England exported its sentiment for religious control to the colonies. But the Crown's religious persecution also pushed dissenters, like the Puritans, to our shores. This mix resulted in established religion "assum[ing] two principal forms" in America: (1) "an exclusive Anglican establishment in the southern states" and (2) "a localized Puritan establishment in the New England states other than Rhode Island." McConnell, 44 Wm. & Mary L. Rev. at 2115.

Take Virginia and Massachusetts as examples of each. Establishments persisted in both forms. On the Anglican side, Thomas Jefferson compiled 17 Virginian statutes dating from 1661 that established the Church of England in Virginia. *Id.* at 2111. Effectively, those Acts mirrored the web of English statutes constructing establishment there. *Id.* And not surprisingly, the Anglican establishment in Virginia resembled that of Mother England, with Anglicans typically professing allegiance to the Crown.

New England religious institutions didn't install the Church of England as the established church. Although many "had the same essential elements" as Virginia, New England institutions were more localized and "based on . . . religious convictions." *Id.* at 2121. Chief among those religious convictions was the separation of church and state stemming from the Calvinist doctrine of "two kingdoms." *Id.* at 2123. In time, Massachusetts became a "multiple establishment"—"a system in which all residents [we]re required to support, and perhaps to attend, religious worship, but within certain limits [could] choose which

one." *Id.* at 2124. Thus, the New England approach was characterized as "the dissidence of dissent" against the Crown. *Id.* (quoting Edmund Burke, *Speech on Moving His Resolutions for Conciliation with the Colonies* (Mar. 22, 1774)).

The American Revolution shifted church-state relations closer to the New England approach. The relationship moved "toward a new and decidedly non-European approach," in which "material government support for religion" was in "decline." Esbeck, 2004 BYU L. Rev. at 1395. Instead, "[r]eligion became more personal and emotional, less authoritarian, more decentralized," and opposed "[a] top-down rule by a professional class of ecclesiastics" as "at odds with the growing American ethos of liberty and individualism and a leveling of social classes." *Id.* at 1591. Calvinism and its belief in "two kingdoms" provided the "seedbeds of support for the patriot cause, supplying much of the emotional fervor as well as intellectual justification for the fight." McConnell, 44 Wm. & Mary L. Rev. at 2123–24. In short, the American conception of religious liberty "interwove[] strands of Enlightenment and Protestant thought" to remove religious authority from the power of the state. *See* Christopher C. Lund, *Church Autonomy in the United States*, in Freedom of Religion and Religious Pluralism 192, 194 (Md Jahid Hossain Bhuiyan & Carla M. Zoethout, eds., 2023).

In that way, "our religious system ha[d] undergone a revolution, if possible, more extraordinary than our political one." 2 John G. Shea, Life and Times of the Most Rev. John Carroll, Bishop and First Archbishop of Baltimore, 1763-1815 at 211 (1888) (quoting 1783 letter from Rev. Carroll to Pope Pius VI). That revolution would later be described as the Second Great Awakening.

Several events confirm that the new American government didn't possess authority over religious matters. In 1784, seven years before the Establishment Clause was ratified, Congress disclaimed any "jurisdiction" over the "spiritual" matter of appointing a Catholic Bishop to the United States. *Id.* at 217 ("[T]he subject of his application to doctor Franklin, being purely spiritual, it is without the jurisdiction and powers of Congress, who have no authority to permit or refuse it, these powers being reserved to the several states individually."). Because the matter was "purely spiritual," it fell beyond the "jurisdiction and powers of Congress."

James Madison, architect of the Bill of Rights, also believed the federal government lacked authority over religious matters. In his seminal Memorial and Remonstrance Against Religious Assessments, Madison based his criticism of a bill supporting Christian teachers on structural concerns.

First, Madison recognized freedom of conscience as an "unalienable right . . . because what is here a right towards men, is a duty towards the Creator." James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785), *reprinted in* 5 The Founders' Constitution 82 (Philip B. Kurland & Ralph Lerner eds., 1987). So "[i]t is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him." *Id.* (alluding to Mark 12:17). And that duty "both in order of time and in degree of obligation" comes "precedent" to "claims of Civil Society." *Id.* Since each man owes his first allegiance to the Creator, "Religion is wholly exempt from [Civil Society's] cognizance." *Id.*

Second, "[b]ecause Religion [is] exempt from the authority of the Society at large," Madison also believed that it could not "be subject to [the authority] of the Legislative Body." *Id.* That's because the "jurisdiction" of the legislature "is both derivative and limited . . . with regard to the constituents." *Id.* So it must not "overleap the great Barrier which defends the rights of the people" to practice their religion. *Id.*

Third, Madison opposed the bill because it "implie[d] either that the Civil Magistrate is a competent Judge of Religious Truth; or that he may employ Religion as an engine of Civil policy." *Id.* at 83. Neither of which is true. "The first is an arrogant pretension falsified by the contradictory opinions of Rulers in all ages, and throughout the world: the second an unhallowed perversion of the means of salvation." *Id.*

Lastly, Madison documented the harm historical establishments have inflicted. "Religion both existed and flourished, not only without the support of human laws, but in spite of every opposition from them." *Id.* That's because "a Religion not invented by human policy, must have pre-existed and been supported, before it was established by human policy." *Id.* History has thus shown that "ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation." *Id.*

Madison's view was symbolic of the period, but it wasn't new. Although he never mentions it, Madison took a stance almost identical to that of theologian-politician Elisha Williams decades earlier. In 1744, Williams published "The Essential Rights and Liberties of Protestants" in response to the Connecticut Act for Regulating Abuses and Correcting

Disorders in Ecclesiastical Affairs. Esbeck, 2004 BYU L. Rev. at 1421. Williams contended—like Madison—that people have an inalienable right to decide religious questions for themselves. Elisha Williams, The Essential Rights and Liberties of Protestants: A Seasonable Plea for the Liberty of Conscience and the Right of Private Judgment in Matters of Religion Without Any Controul from Human Authority 8 (1744). As a corollary, Williams recognized "[t]hat the Civil Authority hath no Power to make or ordain Articles of Faith, Creeds, Forms of Worship, or Church Government," because that right "belongs to Christ the supream [sic] King and Head of his Church." *Id.* at 13. For civil society to address such matters negates what "is already sufficiently done by Christ in the sacred Scriptures." *Id.* at 14. And civil authority has no power to establish a religion because each person has a "Duty, Privilege and Right to search the sacred Writings as Christ has bid him, and know and judge for himself what the Mind and Will of his only Lord and Master is in these Matters." *Id.* at 19.

So from Williams to Madison, we see that—by 1785—a person's duty to the Creator prohibited the federal government from intruding into matters of religious truth.

### E.

### The First Amendment's Ratification

Within this context, the First Congress confronted the question of the federal government's power over religion. The original Constitution did not mention establishment. But Anti-Federalists seized on Congress's power under the Necessary and Proper Clause to claim that the federal government would not be limited by its enumerated powers and could enact a national religion. Munoz, Religious Liberty and the American Founding at 128–34 (reviewing

letters from Anti-Federalist essayist "The Federal Farmer"); *see also* Debates on the Amendments to the Constitution (Aug. 15, 1789), 1 Annals of Congress 758 (1834).

Federalists thought an "amendment was unnecessary" because it was clear that "the national government lacked jurisdiction over religion." Munoz, Religious Liberty and the American Founding at 166. So both Federalists and Anti-Federalists agreed that the federal government didn't have authority over religion. Smith, 81 Notre Dame L. Rev. at 1849 ("[S]upporters and opponents of the Constitution alike—agreed from the outset that religion had been and should continue to be a matter within the domain of the states: it should not be transferred to the jurisdiction of the national government."). With the burgeoning religious revolution—the Second Great Awakening—occurring at state and local levels, the fear of a centralized government reasserting power over religion proved too much. Federalists, James Madison among them, conceded that the First Amendment "was as well expressed as the language would admit" in curbing the potential for the new government to establish a national religion. Debates on the Amendments to the Constitution (Aug. 15, 1789), 1 Annals of Congress 758 (1834). So both parties agreed the Amendment codified the existing paradigm at the time— religion was a matter for the state, not federal, government. Smith, 81 Notre Dame L. Rev. at 1849. And it was at those local levels of government that the public trusted officials to represent their religious preferences.

Thus, the Framers adopted a structural prohibition in the Establishment Clause that recognized the federal government's limits. So although church and state historically competed on where to draw the line between the sovereigns, "[t]he First Amendment, with its doctrine of

church autonomy, is a recognition" that government has no "jurisdiction over the internal affairs of religious organizations." Esbeck, 2004 BYU L. Rev. at 1589. In America, "religion"—not the state—has "jurisdiction over ultimate truths, a comprehensive claim to undivided loyalty, and a command to worship." Kalscheur, 17 Wm. & Mary Bill Rts. J. at 93 (simplified). "Caesar recognizes that he is only Caesar and forswears any attempt to demand what is God's." *Id.* at 64 (simplified).

## F.

## Post-Ratification Practice

After ratification, Executive practice further cemented structural barriers over matters implicating religious truth.

Take the newly acquired Louisiana Purchase. In one instance, Madison, serving as Secretary of State, received word from the governor of the Orleans Territory that he had "Shut the Doors of the church" in the territory as rival priests feuded. Kevin Pybas, *Disestablishment in the Louisiana and Missouri Territories*, in Disestablishment and Religious Dissent: Church-State Relations in the New American States (1776–1833), 273, 281–82 (Carl H. Esbeck & Jonathan J. Den Hartog eds. 2019) (quoting W.C.C. Claiborne to James Madison, May 29, 1804). Secretary Madison told President Jefferson and the President responded that "it was an error in our officer to shut the doors of the church" because "[o]n our principles all church-discipline is voluntary; and never to be enforced by the public authority." *Id.* at 282 (quoting Thomas Jefferson to James Madison, July 5, 1804). Thus, President Jefferson acknowledged that, so long as religious officials did not "breach the peace," the government lacked any authority to interfere in "church-discipline." *Id.*

A second incident happened a week later.  After the United States acquired the Louisiana Purchase from France, it voided nearly all Spanish land grants made after October 1, 1800.  *Id.* at 280.  A convent of Ursuline nuns worried their title might be nullified.  *Id.*  The mother superior of the convent wrote to President Jefferson requesting that Congress confirm the security of their title.  *Id.* (quoting Sr. Therese de St. Xavier Farjon to Thomas Jefferson, June 13, 1804).  President Jefferson responded promptly that "the principles of the constitution and government of the United States are a sure guarantee to you that [your property] will be preserved to you."  *Id.* at 281 (quoting Thomas Jefferson to Sr. Therese de St. Xavier Farjon, July 13, 1804) (cleaned up).  Jefferson added, "your institution will be permitted to govern itself according to it[]s own voluntary rules, without interference from the civil authority."  *Id.*  The mother superior wrote about property rights, yet the President clarified that in addition to respecting the church's property rights, the state recognized its *autonomy*.  *Id.*

And during his presidency, Madison continued to believe the federal government lacked authority over religious matters.  *See Hosanna-Tabor*, 565 U.S. at 184–85 (describing (1) Madison refusing to give an opinion on the appointment of a Catholic bishop in Louisiana because it was "entirely ecclesiastical," and (2) vetoing a bill to establish the Episcopal Church in the District of Columbia because it "exceed[ed] the rightful authority to which Governments are limited, by the essential distinction between civil and religious functions").

With each of these acts, American officials refused to tread into the forbidden sphere of church faith and doctrine. They understood such questions—settling feuds between priests, enforcing church-discipline, or appointing religious

leaders—were exclusively committed to the church. And under the Establishment Clause, the government possesses no authority to answer such questions. Another does.

## II.

### A.

With this understanding of original meaning, we return to whether the church autonomy doctrine is a structural limit on our authority. Consider Supreme Court precedent.

The first time the Supreme Court addressed the doctrine it viewed it as a "question[] of jurisdiction." *Watson v. Jones*, 80 U.S. 679, 733 (1871). In that case, while sitting in diversity, the Court considered how the general law bound civil courts to respect the final decisions of "ecclesiastical courts." *Id.* at 732 (simplified). *Watson* recognized that "where [the] subject-matter of [a] dispute" is "strictly and purely ecclesiastical in character," "the civil courts [can] exercise no jurisdiction" over it. *Id.* at 733. These matters included "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Id.* *Watson* then described the heart of the church autonomy doctrine as the principle that,

> The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the

> individual members, congregations, and
> officers within the general association, is
> unquestioned. All who unite themselves to
> such a body do so with an implied consent to
> this government, and are bound to submit to
> it. But it would be a vain consent and would
> lead to the total subversion of such religious
> bodies, if any one aggrieved by one of their
> decisions could appeal to the secular courts
> and have them reversed. It is of the essence
> of these religious unions, and of their right to
> establish tribunals for the decision of
> questions arising among themselves, that
> those decisions should be binding in all cases
> of ecclesiastical cognizance, subject only to
> such appeals as the organism itself provides
> for.

*Id.* at 728–29. *Watson* thus confirmed that the government
may not answer religious questions because "no jurisdiction
has been conferred on the tribunal to try the particular case
before it, or that, in its judgment, it exceeds the powers
conferred upon it." *Id.* at 733.

Over 80 years later, the Supreme Court revisited church
autonomy in *Kedroff v. St. Nicholas Cathedral of the
Russian Orthodox Church*, 344 U.S. 94 (1952). This time,
the Court grounded church autonomy in the Free Exercise
Clause. *Id.* at 116. *Kedroff* sought to constitutionalize the
*Watson* holding, recognizing that it "radiate[d] . . . a spirit of
freedom for religious organizations, an independence from
secular control or manipulation," and provided churches the
"power to decide for themselves, free from state
interference, matters of church government as well as those

of faith and doctrine." *Id.* Given this "federal constitutional protection . . . against state interference," *id.*, when "civil courts" must decide issues involving the church, such as property disputes, the "church rule [must] control[]" on "ecclesiastical issues." *Id.* at 120–21.

Lastly, the Court confirmed the doctrine's structural roots in *Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich*, 426 U.S. 696 (1976). The Court said, "it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria." *Id.* at 714–15. Thus, other "[c]onstitutional concepts," like due process, are "hardly relevant to such matters of ecclesiastical cognizance." *Id.* at 715. Repeating *Watson*, the Court accepted that the church autonomy doctrine involves "in [the] sense often used in the courts, . . . questions of jurisdiction." *Id.* at 714 (quoting *Watson*, 80 U.S. at 733).

True, in these cases, "jurisdiction" may not mean what the term means today. Even in *Watson*'s time, the Court recognized that "no word in legal terminology" is "so capable of use in a general and vague sense, and which is used so often by men learned in the law without a due regard to precision in its application." 80 U.S. at 732; *cf. MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 298 (2023) (observing the Court's "past sometimes-loose use of the word 'jurisdiction'" and "endeavor[ing] 'to bring some discipline' to this area" (simplified)).

Several scholars, however, have viewed the church autonomy doctrine as strictly "jurisdictional," depriving courts of the power to hear the case, like subject-matter jurisdiction or Article III jurisdiction. *See, e.g.*, Kalscheur,

17 Wm. & Mary Bill Rts. J. at 84–85 (The First Amendment's "constitutionally compelled limitation on civil authority with respect to . . . a particular subject matter" means the doctrine "is best described as a limitation on the court's subject-matter jurisdiction." (simplified)); Ira C. Lupu, Robert W. Tuttle, *Courts, Clergy, and Congregations: Disputes Between Religious Institutions and Their Leaders*, 7 Geo. J.L. & Pub. Pol'y 119, 145–46 (2009) (labeling the doctrine as "jurisdiction[al]" because "the Establishment Clause disables courts from deciding religious questions, and the parties may not vest the court with adjudicative authority by consent"). In this light, the doctrine would carry "severe" jurisdictional "consequences," like precluding waiver or forfeiture and requiring courts to raise and enforce it sua sponte. *See MOAC Mall Holdings LLC*, 598 U.S. at 297.

Others view the doctrine as a structural barrier to court involvement in religious affairs—closer to sovereign immunity—but not strictly jurisdictional. *See, e.g.*, Esbeck, 84 Iowa L. Rev. at 42–44 (When dismissing under the church autonomy doctrine, "there is nothing in Article III that limits a federal court's power in this regard[,]" but "the limitation is imposed by the Establishment Clause."); Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U. Chi. L. J., 471, 510 (2022) ("Sovereign immunity provides a point of reference" because "[i]t is, like church autonomy, a structural limit on government power" but "[l]ike church autonomy, [it] is not fully jurisdictional in the strictest, technical sense.").

In *Hosanna-Tabor*, the Court suggested in a footnote that it may favor the non-jurisdictional view. In addressing whether the ministerial exception—a component of the church autonomy doctrine—"operates as an affirmative

defense" or a "jurisdictional bar," the Court said the former.
565 U.S. at 195 n.4. The Court reasoned that, under the
ministerial exception, "the issue presented . . . is 'whether
the allegations the plaintiff makes entitle him to relief,' not
whether the court has the 'power to hear [the] case.'" *Id.*
(simplified). According to the Court, "[d]istrict courts have
power to review [the] claims [brought], and to decide
whether the claim can proceed or is instead barred by the
ministerial exception." *Id.* As some have noted, however,
"[t]he footnote was not necessary to the resolution of the
case and so [it's] not technically binding precedent."
Weinberger, 54 Loy. U. Chi. L. J. at 481 (observing that
some state courts still treat the doctrine as jurisdictional).

**B.**

Given this history and precedent, the church autonomy
doctrine speaks directly to court authority and cannot be
assumed away. Constitutional text, history and tradition,
and precedent *all* confirm that the doctrine has structural
roots. It operates as a strict bar to federal courts deciding
matters of faith, doctrine, and church governance. While it
may not be "jurisdictional" in the technical sense, it "still has
a uniquely structural character." *Id.* at 485. Thus, it's no
mere affirmative defense—to be decided in the order of the
court's choosing. Instead, when raised, it must be *treated* as
jurisdictional, like other constitutional doctrines limiting
federal power.

Take sovereign immunity—another structural limit on
our court's power. We've said that "sovereign immunity is
not jurisdictional in the sense that it must be raised and
decided by this Court on its own motion, but rather in the
sense that it may be asserted at any time." *Pistor v. Garcia*,
791 F.3d 1104, 1111 (9th Cir. 2015) (simplified); *see also*

*Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 515 n.19 (1982).  As a matter of civil procedure, we allow claims of sovereign immunity to be raised in either a motion under Rule 12(b)(1) (lack of subject-matter jurisdiction) or 12(b)(6) (failure to state a claim).  *Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 927 n.2 (9th Cir. 2017).  Either way, once raised, we view sovereign immunity as jurisdictional.  Indeed, we treat "sovereign immunity [as a] *threshold* jurisdictional issue" no different than Article III standing.  *Deschutes River Alliance v. Portland Gen. Elec. Co.*, 1 F.4th 1153, 1158 (9th Cir. 2021) (emphasis added).  So we don't wait until the end of our merits analysis just to check to see if we've exceeded our authority.  *Cf. Bolivarian Republic of Venezuela v. Helmerich & Payne Intern. Drilling Co.*, 581 U.S. 170, 187 (2017) ("[A] court should decide the foreign sovereign's immunity defense '[a]t the threshold' of the action.") (simplified). We respect state sovereignty by granting claims of sovereign immunity this privileged posture in our cases; so too must we respect the sovereignty of religious institutions.

By treating the church autonomy doctrine as a threshold issue, we adhere to the constitutional limits on federal power and give due reverence to the dual authorities governing the people—faith and government.  Thus, when a party raises the issue, like the Church did here, we must resolve the issue before turning to the merits.  We can't simply decide it as an afterthought, as the majority does, or view it as an alternative ruling to decide at our convenience, as the main concurrence does.    And *Hosanna-Tabor* doesn't say otherwise. *Hosanna-Tabor* holds that the church autonomy doctrine should be brought as an affirmative defense to the merits. 565 U.S. at 195 n.4.  But like sovereign immunity, once brought as an affirmative defense, we *must* "decide whether

the claim can proceed or is instead barred by the [church autonomy doctrine]." *Hosanna-Tabor*, 565 U.S. at 195 n.4. In other words, we must treat it as a threshold issue.

## C.

The dangers of skipping church autonomy and heading straight to the merits are clear here.

Tithes are a historically sensitive area of a church's independence from the state. *See* Stephanie H. Barclay et al., *Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis*, 61 Ariz. L. Rev. 505, 548–49 (2019) (explaining how government action on "church tithes [would] involve[] government interference in church affairs"). Alexander Hamilton recognized that a government's interference with a church's tithes, even if in a positive way, "converts it into an establishment." Alexander Hamilton, *Remarks on the Quebec Bill: Part Two*, Rivington's N.Y. Gazetteer (June 22, 1775). Hamilton was responding to the Quebec Bill, which permitted the Catholic clergy to "hold, receive and enjoy their accustomed dues and rights." *Id.* Proponents of the bill asserted that it only "permit[ed] a tolerated church to enjoy its own property," so it was "far short of the idea of an establishment." *Id.* But Hamilton realized that if tithes are the legal "property" of a church, the legislation amounts to government control over religion. That's because "[n]othing can be deemed my *property*, to which, I have not a perfect and uncontrolable [sic] right by the laws." *Id.* So if a church's claim to its tithes comes from the law—or an act of government—it "has a *legal* claim to them, and the conditional consent of the [church members] is set aside." *Id.* (emphasis added). Because the state "might withhold or diminish at pleasure"

this legal claim, "this, in the most proper sense, converts it into an establishment." *Id.*

The majority brushes past the church autonomy doctrine and resolves this case on the merits of Huntsman's fraud claims. It relegates the church autonomy analysis to a single paragraph—a mere afterthought to its merits analysis. It believes that "nothing in [its] analysis of Huntsman's fraud claims delves into matters of Church doctrine or policy." Maj. Op. 18. But Huntsman's fraud claims ask whether the Church's statements about its tithing policy were fraudulent. So to decide this case, the majority must necessarily settle a dispute between the Church and a disaffiliated member concerning the meaning of "tithes."

Take how the majority gets to its merits decision.

First, it parses the Church President's statements to Church members about tithes. Based on its close reading of his statements, the majority concludes that the President properly "drew a distinction between principal tithing funds, coming directly from Church members, and earnings on the funds that the Church sets aside from its annual income (which includes tithing funds)." Maj. Op. 14. But should we be so comfortable with a court flyspecking statements of faith like this? What if the President hadn't been so precise in distinguishing religious terminology? Can courts really serve as copy editors for religious doctrine? The First Amendment commands that we cannot.

Second, the majority weighs in on disputed religious doctrine. Huntsman contends that the Church didn't distinguish between "principal" funds and "earnings on that principal" and that the Church treated all funds as "tithes." *Id.* at 11. The majority sides with the Church over Huntsman. Siding with one side of a doctrinal dispute

necessarily decides the issue. Perhaps, under *Kedroff*, that decision is right. *See* 344 U.S. at 94 (observing that, in property disputes, "the church rule controls"). But that's *only because of* the church autonomy doctrine—reinforcing its applicability. Imagine instead that this dispute was not between a church and a former member but between two factions within a church. Could the majority so easily side with one faction over the other on the meaning of "tithes"?

Third, the majority scrutinizes the Church's financial records and deems them "consistent" with Church doctrine. *See* Maj. Op. 15 ("Ensign Peak's financial records are consistent with the Church's statements that it funded City Creek with earnings on invested reserve funds."). As Hamilton recognized, any interference in church financial affairs, even approvingly, is establishment "in the most proper sense." Hamilton, *Remarks on the Quebec Bill: Part Two*.

Fourth, the majority decides who may speak for the Church. It considers the statement of a purported whistleblower, David Nielson, who disagreed with how the Church publicly defined "tithes." The majority resolves this by asserting that his view on the meaning of "tithing" money "d[id] not conflict" with the Church's statements on the doctrine. Maj. Op. 16 n.5. But who are we to decide whether Nielsen or others can speak about church doctrine for the Church? As Madison said, we are not the "competent Judge of Religious Truth." *Memorial and Remonstrance*, 5 The Founders' Constitution 83. Whether his statements adhered to church teachings is not for us to resolve.

Fifth, the majority decides how Church adherents should construe the pronouncements of religious doctrine from Church leaders. Because Huntsman was a sophisticated

businessman and from a religious family, the majority holds that he "would understand the meaning" of the Church's statements on tithing doctrine. Maj. Op. 17. But, in doing so, the Court assumes the role of a faith leader and dictates what a religious adherent *should* understand about church doctrine.

Sixth, the majority announces the level of precision that Church teachings must follow to avoid fraud charges. Because the Church tithing doctrine was not "so ambiguous," the majority says the Church "could [not] have expected or intended" its followers "to misunderstand what it meant." Maj. Op. 17. But if the doctrine *was* obscure or ambiguous, could the majority then demand more precision in the Church's explanation of its faith? Courts have no competence to answer how a religious institution should preach to its congregants.

All this shows the trouble we invite by deciding cases implicating religious doctrine on the merits. Our authority is limited. Temporal. With no say over what is eternal. Given that the Constitution demands that we not enter the sphere of religious faith, the majority vastly oversteps our authority by reaching the merits.

## III.

Because it was necessary to decide this case on church autonomy grounds, I concur in the judgment only.